# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| TRACEY E. GEORGE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-02182 |
| | ) | Judge Haynes |
| WILLIAM EDWARD "BILL" HASLAM, | ) | |
| as Governor of the State of Tennessee, | ) | |
| in his official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

Pursuant to Local Rule 7.01(b), Plaintiffs Tracey E. George, Ellen Wright Clayton, Deborah Webster-Clair, Kenneth T. Whalum, Jr., Meryl Rice, Jan Liff, Teresa M. Halloran, and Mary Howard Hayes (collectively "Plaintiffs") submit this response in opposition to the motion to dismiss filed by Defendants William Edward "Bill" Haslam, Tre Hargett, Mark Goins, Herbert H. Slatery III, the State Election Commission of Tennessee, Judy Blackburn, Donna Barrett, Gregg Duckett, Tommy Head, Jimmy Wallace, Tom Wheeler, and Kent Younce (collectively "Defendants") under Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction and Fed. R. Civ. P. 12(b)(6) for failure to state a claim.

The Court should deny Defendants' motion to dismiss for the following reasons:

<u>First</u>, the plain language of Tennessee's Constitution unambiguously requires that amendments by referendum be ratified "by a majority of all the citizens of the state voting for governor, voting in their favor," text which Defendants ignored not only during the election, but also in their motion to dismiss.

Second, because they are voters who have been specifically harmed and who seek to maintain the effectiveness of their individual votes, Plaintiffs assert sufficiently particularized injuries to have standing to challenge Defendants' unconstitutional vote tabulation method.

Third, based on the plain text of the Tennessee Constitution and the Defendants' undisputed actions, Plaintiffs have stated claims pursuant to 42 U.S.C. § 1983 for violations of their constitutional rights under both the Due Process and Equal Protection clauses of the Fourteenth Amendment.

Fourth, *Pullman* abstention is inappropriate because Plaintiffs' due process and equal protection injuries derive not from any predominating *unsettled* issue of state law but instead from Defendants' plain and unambiguous obligations under the Fourteenth Amendment and the Tennessee Constitution.

Fifth, Defendants' unilateral action to certify the vote after Plaintiffs initiated this action does not moot or otherwise limit Plaintiffs' ultimate ability to obtain relief under § 1983 for Defendants' violation of Plaintiffs' rights secured by the U.S. Constitution.

For these reasons, Plaintiffs respectfully request that the Court deny the motion to dismiss.

## **FACTS**

This case revolves around Defendants' actions to disenfranchise Plaintiffs and certain other Tennessee voters by violating their federally protected voting rights. In actions that were consistent with their own political agendas, Defendants' used an improper method of tabulating votes on Constitutional Amendment 1 to the Tennessee Constitution on the November 4, 2014 state and federal general election ballot ("Amendment 1"). Defendants' actions caused the dilution of Plaintiffs' votes and contravened the vote tabulation method mandated by the Tennessee Constitution. The election process was tainted.

Tennessee's Constitution provides two amendment methods—either a constitutional convention or a public referendum (also called the legislative method). Tenn. Const. Art. XI, § 3.

Under the referendum method, either house of the General Assembly may propose an amendment. The proposed amendment must first pass with a majority vote in each house, next be published six months before the next General Assembly convenes, and then pass both houses of that next General Assembly by a two-thirds vote. *Id.* At that point, the General Assembly submits the proposed amendment:

> to the people at the next general election in which a governor is to be chosen. And if the people shall approve and ratify such amendment or amendments **by a majority of all the citizens of the state voting for governor, voting in their favor**, such amendment or amendments shall become a part of this Constitution.

*Id.* (emphasis added). Based on this plain language, an amendment such as Amendment 1 can only be ratified if "a majority of all the citizens of the state voting for governor" voted in its favor—*i.e.*, only if a majority of the citizens who voted for governor also voted to approve the amendment.

Proposed Amendment 1 stated:

Shall Article I, of the Constitution of Tennessee be amended by adding the following language as a new, appropriately designated section:

> Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion. The people retain the right through their elected state representatives and state senators to enact, amend, or repeal statutes regarding abortion, including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother.

Plaintiffs opposed Amendment 1. Defendants publicly favored Amendment 1.

After Amendment 1 was placed on the November 4, 2014 ballot, Defendants announced that they would not follow the strictures of the Tennessee Constitution. Instead, they would employ their own ratification procedure and deem Amendment 1 passed if the total votes in favor of Amendment 1 constituted a majority of the total number of votes cast in the gubernatorial race, even if only a *minority* of all voters had voted in favor of the amendment and *regardless* of whether

those who voted in favor of Amendment 1 had also voted in the governor's race.[1] Complaint at ¶¶ 2-7, 31-37. Despite the plain language of Article XI, Section 3, Defendants unequivocally stated that they did not intend to correlate votes from citizens who voted for governor with the votes for Amendment 1 and instead would only compare the totals in each race. Defendants' method can be envisioned as a fraction with the number of total votes for Amendment 1 (regardless of whether voters had also voted for governor) as the numerator and the number of votes cast in the governor's race as the denominator. Under this method, if the fraction was greater than ½, then Amendment 1 would be approved and ratified.[2]

Defendants' announcement of its intentions to dilute "no" votes and increase the voting power of "yes" votes was then reinforced by supporters of Amendment 1—including some of the Defendants—who promoted a scheme to encourage "yes" voters not to vote in the governor's race in order to make their votes on Amendment 1 count "double," *e.g.*, "Tenn Williamson," *Double Your Vote on Amendment 1*, www.youtube.com/watch?v=7mnIgn-WXls, or as a "vote and a half," *e.g.*, Cathedral of the Incarnation, *Twenty Eighth Sunday in Ordinary Time—October 12, 2014*, at 4. *See* Complaint at ¶ 8. These groups exploited Defendants' announced vote-tabulating intentions to raise the numerator of the state's election fraction without commensurately adding to the denominator by voting for governor.

The scheme to dilute Plaintiffs' votes worked. For the first time in Tennessee's history, the number of votes on a proposed constitutional amendment exceeded—and indeed, substantially exceeded—the number of votes in the gubernatorial race. Defendants made no effort whatsoever to follow the voting tabulation methods proscribed by the Tennessee Constitution and instead

---

[1] The state has not yet released the total number of voters who cast ballots in the November 4, 2014 election, despite Plaintiffs' requests for this information.

[2] Seen another way, if [total votes in favor of Amendment 1] / [total votes for governor] > ½, then, according to Defendants, Amendment 1 would be ratified.

simply declared Amendment 1 as having been ratified because the number of "yes" votes on Amendment 1 exceeded half of the total votes cast in the gubernatorial race.

Plaintiffs now challenge Defendants' actions. Plaintiffs all are citizens of Tennessee, who (i) were registered to vote in the November 4, 2014 election, (ii) voted in that election, (iii) voted in the gubernatorial race, and (iv) voted against ratifying Amendment 1. Based on the plain language of Article XI, Section 3, the Tennessee Constitution mandated that they vote for governor to have their vote on Amendment 1 tabulated. Based on Defendants' scheme, however, Plaintiffs' votes were diluted by unlawfully counted ballots. Whereas Plaintiffs' votes were counted equally into both the numerator and the denominator of the Defendants' voting fraction, those voters who cast ballots only in favor of Amendment 1 and without voting in the gubernatorial race as they had been encouraged by Defendants' announced intentions of tabulating the votes were counted only as part of the numerator. Accordingly, Plaintiffs' votes against Amendment 1 were undervalued while those votes cast in accordance with Defendants' scheme were overvalued.

Both before and after bringing suit, Plaintiffs have sought information from Defendants in an attempt to tabulate the votes correctly and have urged Defendants to follow the strictures of the Tennessee Constitution. These requests have fallen on deaf ears, and Defendants now state that they have certified the election results without providing the most basic information such as total voter turnout. *See* Def.'s Mem. in Support of Mot. to Dismiss at 3, PageID 77. The "official" results underlying this certification tracked with the preliminary numbers released immediately after the election. Defendants still have not released any data regarding the correlation between votes for governor and votes on the Amendment or data regarding the total number of ballots cast in the November 4, 2014 general election. The reality is that Defendants' actions irreparably tainted the election process and their post-hoc justification set forth in their motion papers that the Tennessee Constitution is unconstitutional itself does not condone Defendants' actions but instead condemns the entire election result.

## ARGUMENT

Defendants' motion to dismiss begins by attacking the very language of the Tennessee Constitution that Defendants have the duty to uphold. Defendants all but concede that they failed to follow the plain language of Article XI, Section 3 and instead offer various excuses for their actions. None of these excuses afford justification, just as none of their attempts to shield their actions from judicial redress under the auspices of Fed. R. Civ. 12(b)(1), Fed. R. Civ. P. 12(b)(6), *Pullman* abstention, and mootness have merit. Plaintiffs will address Defendants' arguments in turn beginning with the plain text of Article XI, Section 3 that Defendants have ignored throughout their motion to dismiss just as they did throughout the November 4, 2014 election.

I. **Every argument advanced by Defendants ignores the plain language of Article XI, Section 3 of Tennessee's Constitution.**

The language of Article XI, Section 3 of the Tennessee Constitution is plain: in order to ratify amendments to the constitution, they must pass "by a majority of all the citizens of the state voting for governor, voting in their favor." Tenn. Const. Art. XI, § 3. Defendants point to no ambiguity in this language. Nor do they point to any other possible meaning of the words. This is dispositive. *See, e.g., State ex rel. Cohen v. Darnell,* 885 S.W.2d 61, 63 (Tenn. 1994) (enforcing the plain language of Article XI, Section 3 and explaining that "[w]hen construing a constitutional provision we must give 'to its terms their ordinary and inherent meaning'"); *Sebelius v. Cloer*, 133 S. Ct. 1886, 1896 (2013) ("[W]e reiterate that 'when . . . language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'") (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000) (internal quotation marks omitted)); *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010) (explaining that courts only move beyond the "plain and ordinary meaning" of language when that language is ambiguous).

Accordingly, Defendants' extended history discussion in their motion to dismiss is irrelevant.[3] It is also wrong. The persons who adopted the Article XI, Section 3 were not the delegates to the 1953 Constitutional Convention but instead the people of Tennessee through their votes. Thus, unlike the passage of a statute where the same group—the legislature—hears discussion, establishes legislative history, and votes, the proposed language that became the modern version of Article XI, Section 3 was submitted to and ratified by Tennesseans, who voted *only* on the plain language of the text. Thus, Defendants' reliance on side comments or anecdotes from a couple of delegates to the 1953 Constitutional Convention[4] is misplaced and has no bearing on interpreting the text of Article XI, Section 3. *See* Def.'s Mem. in Support of Mot. to Dismiss at 5, 9, PageID 79, 83; Complaint at ¶ 32. Courts must construe Tennessee's constitutional provisions with respect to the intentions of the persons, *i.e.*, the voters, who adopted the provision at issue, *see Cleveland Surgery Ctr., L.P. v. Bradley Cnty. Mem'l Hosp.,* 30 S.W.3d 278, 281-82 (Tenn. 2000); *Shelby Cnty. v. Hale,* 292 S.W.2d 745, 748 (Tenn. 1956), which is reflected in the text of the Constitution itself, *Hatcher v. Bell,* 521 S.W.2d 799, 803 (Tenn. 1974).

Indeed, the Tennessee Supreme Court has already held that the plain language of Article XI, Section 3 means what it says. In *Snow v. City of Memphis*, 527 S.W.2d 55 (Tenn. 1975), the Tennessee Supreme Court squarely addressed the direct predecessor to the current version of

---

[3] Relying on *Northville Downs v. Granholm*, 662 F.3d 579, 586 (6th Cir. 2007) and *Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007), Defendants assert that the Court may take judicial notice of the legislative and constitutional history of Article XI, Section III. Those cases, however, emphasize that judicial notice is appropriate when the material noticed is "not subject to reasonable dispute." *Intri-Plex Techs., Inc.*, 499 F.3d at 1052 (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). Although the existence of a record from the 1953 Constitutional Convention is beyond dispute, Defendants' inferences of intent from those materials are hotly disputed and thus not appropriate for judicial notice.

[4] Additionally, Defendants' argument based on the delegates' statements are not as clear as Defendants assert. For example, relying on Delegate McGinniss's comments—which Defendants characterize as "[p]erhaps most instructive," Def.'s Mem. in Support of Mot. to Dismiss at 7, PageID 81—dives into the fraught waters of attempting to infer the intent of one position based on an opponent of that position's characterization. As Defendants note, Delegate McGinniss opposed the proposed Majority Report about which he was speaking.

Article XI, Section 3, which had identical language except for requiring that a voter cast a ballot for "representative" instead of "governor." *Compare* Tenn. Const. Art. XI, § 3 (current) (". . . by a majority of all the citizens of the state voting for governor, voting in their favor.") *with* Tenn. Const. Art. XI, § 3 (1870) (". . . by a majority of all the citizens of the State voting for Representatives, voting in their favor"). Discussing the history of the referendum/legislative method for amending the state's constitution, the Tennessee Supreme Court stated:

> Eleven efforts to amend the 1870 Constitution by the legislative method had failed because of the obstacle of obtaining <u>voter ratification by a majority of all those voting for representatives</u>. We judicially note, that in said efforts to amend by that process, <u>only a small percentage of the voters who voted for representatives cast their ballots either for or against constitutional amendments, leaving the required majority of those voting for representatives, unattainable.</u>

*Snow*, 527 S.W.2d at 61 (footnote omitted) (emphasis added).

As the Tennessee Supreme Court has articulated, under the prior language of Article XI, Section 3, the only votes that counted for an amendment were those cast by voters *who had voted for Representative*. Because that version of Article XI, Section 3 tracks word-for-word with the current version but for the substitution of "governor" for "Representatives," the current version demands a congruent interpretation—*i.e.*, that an amendment only passes if a majority of the citizens who voted for governor also vote in its favor. As such, the language of the Tennessee Constitution is not only plain, but it is also dispositive of each of Plaintiffs' grounds for dismissal, which are addressed next.

## II. Plaintiffs have standing: Defendants failure to follow the plain language of Article XI, Section 3 has caused particularized injury to Plaintiffs by diluting the relative weight of *their* votes on Amendment 1.

Plaintiffs have established Article III standing because they have "suffered a concrete and particularized injury that is either actual or imminent [*i.e.*, dilution of their votes], that the injury is fairly traceable to the defendant [*i.e.*, Defendants's deviation from the voting tabulation requirements of Article XI, Section 3], and that it is likely that a favorable decision will redress

that injury [*i.e.*, voiding of the election and proper tabulation of Plaintiffs' votes]." *Mass. v. E.P.A.*, 549 U.S. 497, 517 (2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Nonetheless, Defendants attack Plaintiffs' standing when addressing both Plaintiffs' due process and their equal protection claims by asserting that Plaintiffs' only claim generalized public harm.

Defendants' argument is unfounded because "any person whose right to vote is impaired has standing to sue." *Gray v. Sanders*, 372 U.S. 368, 375 (1963) (citations omitted). An injury sufficient for standing need not be so intensely particularized or personalized that only a single plaintiff could assert it. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) (holding that plaintiffs who merely averred that they were persons "for whom the aesthetic and recreational values of [an] area will be lessened" by a challenged activity had sufficiently alleged an injury for the purposes of standing). Plaintiffs need only "have more than 'a general interest common to all members of the public.'" *Lance v. Coffman*, 549 U.S. 437, 440 (2007) (quoting *Ex Parte Levitt*, 302 U.S. 633, 634 (1937)).

Plaintiffs' injury in this case arises from *their* specific votes not being counted the same as other votes. This harm is not generalized to all Tennessee voters. Indeed, voters who cast ballots only in favor of Amendment 1 were not injured at all; instead, they were rewarded by Defendants' refusal to follow the strictures of the Tennessee Constitution. Only those voters such as Plaintiffs had their votes devalued, and only they had their fundamental voting rights impeded.

Accordingly, Plaintiffs' claims move well beyond a generalized the-law-is-not-being-followed assertion to explain that Defendants' refusal to follow the law has undermined the value of *their* votes and thereby violated *their* due process rights to a fair election and *their* free exercise of franchise in violation of the Equal Protection Clause. *See, e.g.*, Complaint at ¶¶ 9, 11-12. These allegations must be taken as true at this stage of these proceeding and they conclusively establish that Plaintiffs' injuries are not shared by the general public, all registered voters, or even all persons

who voted in the November 4, 2014 election. Instead, they are particular to Plaintiffs, who voted in the election, voted in the governor's race, and voted against Amendment 1.

The Supreme Court's seminal voting rights case of *Baker v. Carr*, 369 U.S. 186, 207-208 (1962), confirms Plaintiffs' standing. In *Baker*, residents of several Tennessee counties sued under § 1983 "on their own behalf and on behalf of all qualified voters of their respective counties, and further, on behalf of all voters of the State of Tennessee who are similarly situated" to challenge the apportionment of members in the Tennessee General Assembly. 369 U.S. at 187-88. The Court held that the *Baker* plaintiffs had standing, noting that "*Colegrove v. Green*, [328 U.S. 549 (1946),] squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue. A number of cases decided after *Colegrove* recognized the standing of the voters there involved to bring those actions." *Id.* at 206-07. As the Supreme Court further explained, the *Baker* plaintiffs, as citizens of their counties, were:

> asserting "a plain, direct and adequate interest in maintaining the effectiveness of their votes," *Coleman v. Miller*, 307 U.S. [433, 438 (1939)] not merely a claim of "the right possessed by every citizen 'to require that the government be administered according to law." *Fairchild v. Hughes*, 258 U.S. 126, 129 [(1922)].

*Baker*, 369 U.S. at 208.

Accordingly, *Baker v. Carr* directly refutes Defendants' assertion that Plaintiffs lack standing because they have failed to allege "an injury not shared by all voters who voted as they did in the November 2014 general election." Def.'s Mem. in Support of Mot. to Dismiss at 18, PageID 92. Like the Plaintiffs in *Baker* and numerous other voting rights cases—including cases cited by the Defendants, *e.g.*, *Reynolds v. Sims*, 377 U.S. 533 (1964)—Plaintiffs have asserted a particularized injury as voters who have been disadvantaged as individuals by government action in an election and who have a direct interest in the effectiveness of their vote on Amendment 1.

Plaintiffs' standing is further highlighted by Defendants' misplaced reliance on *Hein v. Freedom From Religion Foundation*, 551 U.S. 587 (2007) and *Lance*, 549 U.S. 437. The plaintiffs

in *Hein* filed suit asserting that President George W. Bush's Faith-Based and Community Initiatives program violated the First Amendment's Establishment Clause. 551 U.S. at 592. The *Hein* plaintiffs' only basis for standing was that they paid federal taxes. The Supreme Court held that merely being a federal taxpayer does not establish standing to challenge the federal government's appropriations or expenditures. *Id.* at 605. But whereas the *Hein* plaintiffs asserted an attenuated non-particularized injury based on merely being a taxpayer, Plaintiffs' injuries are specific to them as voters, who voted in the November 4, 2014 election, who voted both for governor and against Amendment 1, whom Defendants treated differently from other voters, and whose individual fundamental rights to vote were impeded.

Similarly, in *Lance,* four private citizens filed suit in federal court asserting that the Colorado Supreme Court's decision in *People ex rel. Salazar v. Davidson*, 79 P.3d 1221, 1231 (Colo. 2003), *cert. denied*, 541 U.S. 1093—a wholly separate case invalidating a redistricting plan devised by the Colorado legislature and also a case in which none of the plaintiffs had participated—violated the Elections Clause of the United States Constitution. *Lance*, 549 U.S. at 437-39. But as the Supreme Court explained in *Lance,* the injury alleged by the plaintiffs was "quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing." *Id.* (citing, by way of example, *Baker v. Carr*). The *Lance* plaintiffs' votes or ability to vote were not at issue at all. In this case, however, the key issue is Defendants' scheme to devalue Plaintiffs' specific votes and intentionally violate Plaintiffs' Fourteenth Amendment rights to the due process rights of a fair election and the free exercise of franchise guaranteed by Equal Protection Clause. Unlike the *Lance* plaintiffs, Plaintiffs have alleged a particularized injury.

Accordingly, under *Baker v. Carr* and unlike the cases on which Defendants rely, Plaintiffs have pled a particularized injury. Plaintiffs have standing. And Defendants' motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) should be denied.[5]

### III. Plaintiffs have sufficiently pled violations of the Due Process and Equal Protection clauses of the Fourteenth Amendment.

Plaintiffs have stated claims for violations under both the Due Process and Equal Protection clauses of the Fourteenth Amendment.

#### A. Plaintiffs sufficiently allege that Defendants have created a fundamentally unfair voting system by deviating from the voting tabulation requirements of the Tennessee Constitution in order to devalue Plaintiffs' votes.

"The Due Process clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair." *League of Women Voters v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (citing *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1978)). Defendants' acknowledge this holding but contend that their deviation from the requirements of the Tennessee Constitution does not rise to the level of fundamental unfairness.

Respectfully, if the words "fundamental fairness" mean anything with respect to a state's voting system, they should mean that votes are counted in accordance with the law and not pursuant to an unlawful method which has the effect of devaluing votes with which state officials may disagree. The string citation of cases offered by Defendants establish just this proposition. For example, in *Briscoe v. Kusper*, 435 F.2d 1046, 1055 (7th Cir. 1970), the Seventh Circuit held that a city election officials' action of changing voting rules and then refusing to count votes from voters they did not inform of the change created a fundamentally unfair system. Similarly, in *United States v. Saylor*, 322 U.S. 385, 388-39 (1944), the Supreme Court explained that a state

---

[5] Defendants assert in a footnote that "logic and jurisprudential principles" would require that Plaintiffs' challenge to Amendment 1 be applied to all the amendments on the November 4, 2014 ballot. Def.'s Mem. in Support of Mot. to Dismiss at 18, PageID 92. Not so. As Defendants themselves argue, the jurisprudential principle of standing requires that courts only address live cases and controversies. Plaintiffs have not challenged any of the other Amendments, and only Amendment 1 involved a concerted plan to dilute "no" votes and overvalue "yes" votes.

election violated federal due process when election officials' willful and illegal conduct resulted in fraudulent or fundamentally unfair voting results.

Defendants have willfully miscounted votes and now certified election results in violation of the plain language of Tennessee's Constitution and thereby have obtained results that are fundamentally unfair. Examining other cases in which courts have seen fit to grant § 1983 due process relief demonstrates that Plaintiffs' Complaint has appropriately stated a claim for the same relief in comparable circumstances. In *Saylor*, the Supreme Court found that election officials engaging in ballot stuffing violated due process. 322 U.S. at 388-39. Although Defendants themselves did not cast more than one vote for Amendment 1, their refusal to comply with Article XI, Section 3 has yielded a comparable result in two ways. First, Defendants have allowed, if not encouraged, unlawful votes for Amendment 1 from voters who did not vote for governor. Second, Defendants have accorded these votes greater weight. Like the officials in *Saylor*, Defendants' willful conduct created fraudulent election results. Similarly, in *Roe v. State of Alabama*, the Eleventh Circuit explained that Alabama's counting of contested absentee ballots (which, until the election in question, had not been counted) implicated fundamental fairness because, among other reasons, counting those contested ballots "effectively 'stuff[ed] the ballot box.'" 43 F.3d 574, 581 (11th Cir.) *certified question answered sub nom. Roe v. Mobile Cnty. Appointment Bd.*, 676 So. 2d 1206 (Ala. 1995). In the same way, the ballot boxes on Amendment 1 have been effectively stuffed by Defendants' counting votes from voters who did not comply with Article XI, Section 3.

As even Defendants acknowledge, conduct violates fundamental fairness "when the complained-of conduct discriminates against a discrete group of voters, *see, e.g.*, *United States v. Hays*, 515 U.S. 737, 744-45 (1995)." Def.'s Mem. in Support of Mot. to Dismiss at 19, PageID 93. Here Defendants' conduct—disregarding Article XI, Section 3 to count votes from voters who did not vote for governor—discriminates against a discrete group of voters: people who voted for governor. Based on Defendants' calculation method, a vote on Amendment 1 from anyone who

voted for governor, regardless of whether the vote was for or against Amendment 1, has less value than a vote for Amendment 1 from someone who did not vote for governor. By devaluing Amendment 1 votes from voters who voted for governor, Defendants have violated fundamental fairness. Thus, Defendants' argument that Plaintiffs fail to state a due process claim is incorrect, especially at this motion to dismiss stage where inferences are to be drawn in Plaintiffs' favor.

Defendants cannot escape § 1983 scrutiny by asserting that the voting tabulation requirements of Article XI, Section 3 run afoul of the U.S. Constitution. It would be surprising if Defendants are indeed making such a contention as they have a duty as state officials to defend the state constitution.[6] But assuming for the sake of argument that it is Defendants' position that Article XI, Section 3, as written, violates the U.S. Constitution, then the appropriate judicial response is not dismissal, but instead voiding the election until such time as the Tennessee Constitution may be brought in line with the federal constitution. Defendants cannot justify their disregard of the law by taking matters into their own hands and rewriting the Tennessee Constitution to "amend or alter the Constitution under the guise of construction." *Mayhew*, 46 S.W.3d at 784 (citing *Ashe v. Leech,* 653 S.W.2d 398, 401 (Tenn. 1983)). Moreover, if Defendants are convinced that Article XI, Section 3 is unconstitutional, they should have raised this issue long before the November 4, 2014 election, not after the election and only in response to a lawsuit filed by injured voters. After all, the Tennessee Constitution provides for two mechanisms for amending the constitution, and if Defendants truly believed that the public referendum method runs afoul of the U.S. Constitution, they could have easily advised the state legislature to proceed via the constitutional convention method.

---

[6] For example, Defendant Slattery, as Tennessee's Attorney General and Reporter, has a duty to defend the state's constitution and the validity of all State legislation, except in those instances where the he is of the opinion that such legislation is not constitutional. *See, e.g.*, Tenn. Code Ann. § 8-6-109(b)(9). Similarly Article III, Section 10 of Tennessee's Constitution mandates that Defendant Haslam, as governor, is responsible for ensuring that the state's laws be faithfully executed.

Turning to the substance of Defendants' contention, the plain language of Article XI, Section 3 does not violate the U.S. Constitution by impermissibly compelling speech any more than Defendants' own tabulation scheme. Under the scheme adopted by Defendants, the outcome of one election is pegged to votes in another election. Even using Defendants' method, anyone who wanted to vote against Amendment 1 still needed to vote for governor to have their vote count. Under Defendants' method, someone favoring an amendment may vote for governor and for the amendment (and thereby decrease the relative weight of their vote for the amendment) or just vote for the amendment (and thereby increase the relative weight of the vote for the amendment). But, using Defendants' tabulation, someone who opposes an amendment can only meaningfully register this opposition by voting for governor and not voting for the amendment. Under Defendants' scheme, a vote from someone who does not vote in the gubernatorial race and who votes against an amendment may be permissible, but it is meaningless: such a vote would not factor into either the numerator (votes in favor of Amendment 1) or the denominator (votes cast in the gubernatorial race) of Defendants' tabulation fraction and thus has no influence. If a compelled vote issue exists, it exists under either Plaintiffs' or Defendants' tabulation methods. It just so happens that the tabulation method advanced by Plaintiffs is set forth by the Tennessee Constitution and the one utilized by Defendants is of their own making (and has the further insidious result of encouraging those who feel strongly about a constitutional amendment to refrain from exercising their fundamental right to vote for governor).

Moreover, none of the cases cited by Defendants involves the voting tabulation methodology for constitutional amendments and instead all involve ordinary political elections. *Ayer-Shaffner* presented the question "can state election officials restrict the right to vote in a new, curative election to those who participated in the original, defective election." 37 F.3d at 727. The First Circuit concluded it could not. *Id*. As a case dealing with restrictions on the ability to vote in one election based on having voted in a previously held election (and without the foreknowledge

that the first election would be nullified), *Ayer-Shaffner* is so factually distant from the application of Tennessee's Article XI, Section 3 here that it is inapposite.

Defendants' other cases, *Partnoy v. Shelley*, 277 F. Supp. 2d 1064 (S.D. Cal.), *as modified on reconsideration* (Aug. 21, 2003), and *In re Hickenlooper*, 312 P.3d 153 (Colo. 2013), address state recall election procedures, which predicated voting on a successor on having voted in the recall race itself. In both cases, voters in a recall election could vote "yes" or "no" on whether to recall targeted officials, and on the same ballot, voters could also vote for a candidate to succeed the targeted officials, should they be recalled. If a targeted official lost the recall vote, then the candidate who received the most votes would replace the official. Both *Partnoy* and *Hickenlooper* presented the same fundamental issue: whether the state's conditioning the ability to vote for a successor candidate in a recall election on having also voted in the recall itself violated the U.S. Constitution. *Hickenlooper*, 312 P.3d at 156; *Partnoy*, 277 F. Supp. 2d at 1069.

The courts found that the procedures compelled voting. *Hickenlooper*, 312 P.3d at 156; *Partnoy*, 277 F. Supp. 2d at 1069. However, that was not determinative as such compelled voting is permissible provided that it advances a compelling state interest. *Hickenlooper*, 312 P.3d at 158; *Partnoy*, 277 F. Supp. 2d at 1075, 1077. *See also Burdick*, 504 U.S. at 434 (explaining that a court must "weigh the character and magnitude of the asserted injury" against the state's interests "as justifications for the burden imposed by its rule"); *Kramer v. Union Free School District No. 15*, 395 U.S. 621 (1969) (holding that restrictions on franchise other than residence, age, and citizenship must promote a compelling state interest in order to survive constitutional attack). While Defendants may suggest that Article XI, Section 3 compels voting (*i.e.*, a voter must vote for governor in order to vote to ratify a proposed constitutional amendment), Defendants nowhere argue that Article XI, Section 3 fails to advance a compelling state interest. Nor would such an argument be appropriate at this stage of the proceedings when no record has been created (nor even permitted to be considered).

16

In any event, *Hickenlooper* and *Partnoy* are distinguishable because they deal with provisions governing recall elections, rather than provisions governing amending a state's constitution. A state's interest in a recall election pales in comparison to the significance of amending a constitution. A recall necessarily leads to a temporary result; a successor will merely complete the recalled official's term. Conversely, a constitutional amendment is permanent in theory and in practice will exceed a single elected official's term. The differences in timeframes and processes for a recall and for a constitutional amendment underscore the differences in scope and scale: whereas an amendment to the Tennessee Constitution is a multi-year process requiring several legislative votes and then a vote by the people, the entire recall procedures (from obtaining signatures on the recall petition to the election of a successor) at issue in *Partnoy* and *Hickenlooper* were required to occur in less than six months. Moreover, elected officials may shape or direct laws and policy within a state, but they remain subject to the state's constitution; amending a constitution is fundamentally changing the rules of the game.

Beyond the essential differences between a recall election and a constitutional amendment, the practical differences between the recall provisions at issue in those cases and the ratification procedures set forth in Article XI, Section 3 here easily distinguish them. Although the questions of whether to recall an official and who should succeed the official share subject matter, the counting mechanisms for each question were not actually tied together (as *Partnoy*, 277 F. Supp. 2d at 1074, robustly documents): a majority of voters on the recall question must choose to unseat the official, but the successor candidate need only win a plurality of the votes on the successor question to be elected. Although there is a subject-matter connection between the recall votes and the successor votes, neither Colorado's nor California's recall provisions contained language requiring a successor to be chosen based on the number of votes on the recall. The Tennessee amendment process, however, explicitly connects votes for governor to votes required to pass an

amendment. As such, Article XI, Section 3's process is strongly distinguishable from those in *Partnoy* and *Hickenlooper*.

Accordingly, Plaintiffs have stated a claim for violation of their due process rights, which Defendants cannot avoid by arguing that their own state constitution violates the U.S. Constitution.

B.    Plaintiffs have sufficiently stated an equal protection claim by pleading that Defendants have ignored Article XI, Section 3 and instead instituted a vote tabulation scheme, which permits votes to be counted unequally, reduces the value of Plaintiffs' votes, and thereby impedes their free exercise of franchise.

"The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). "In decision after decision, [the Supreme] Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (string citations omitted). The Complaint pleads that Defendants' tabulation method for Amendment 1—a method that defies Article XI, Section III— treated Plaintiffs and their votes disparately and thus effectively denied Plaintiffs' free exercise of franchise. *See, e.g.*, *Reynolds*, 377 U.S. at 555 ("The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

Defendants argue that Plaintiffs' equal protection claims fail because Plaintiffs, as a group, were not treated differently from any other group. To bolster this conclusion, Defendants point to the Supreme Court case *Gordon v. Lance*, 403 U.S. 1 (1971). *Gordon* addressed West Virginia's requirement that political subdivisions of the state could only increase taxes above those established in West Virginia's Constitution or incur bonded indebtedness if 60% of the voters in a referendum election approved these actions. *Id*. at 2-3. The *Gordon* plaintiffs voted in favor of additional taxes and a bond issuance in a 1968 referendum election, and although more than a majority of voters favored both of these actions, neither earned the requisite 60% vote to pass. *Id*.

at 3. Plaintiffs filed suit asserting that 60% vote threshold violated the equal protection clause by disproportionately empowering a minority. *Id.* The Supreme Court disagreed, explaining that departing from a strict majority rule may empower the minority but that this threshold applied equally to all voters. *Id.* at 5-6. Although the *Gordon* plaintiffs had to assemble more than a simple majority, the value of their votes remained the same relative to all other voters in the state.

By contrast, as the Complaint explains, Plaintiffs' individual votes are not being equally weighed under Defendants' vote tabulation fraction. Whereas any vote on Amendment 1 that complies with Article XI, Section 3 necessarily raises the denominator (by increasing the number of votes in the gubernatorial race) and may raise the numerator (depending on whether that voter favors Amendment 1), Defendants' vote tabulation method permits ballots from voters who did not comply with Tennessee's Constitution and thereby are able to increase only the numerator of the state's voting fraction by voting in favor of Amendment 1 without voting in the governor's race. These numerator-only votes in favor of Amendment 1 both were improperly cast under Article XI, Section III and afforded a greater relative weight than either Plaintiff's votes against Amendment 1 or votes for Amendment 1 from voters who voted in the gubernatorial race. Thus, the votes from Plaintiffs—and anyone who voted in the gubernatorial race—received less weight than votes from those who did not. Whereas there was no equal protection violation in *Gordon* because every voter's vote received equal weight, Plaintiffs have pled an equal protection violation here because their votes have not been afforded the same weight as votes from other voters who did not vote for governor.

Defendants also rely on the Ninth Circuit decision in *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012). *Angle* presented an equal protection challenge to Nevada's "All Districts Rule," which required that proponents of direct legislation initiatives secure a certain percentage of signatures in each of Nevada's three equally apportioned congressional districts. *Id.* at 1126-27. The *Angle* plaintiffs claimed that this requirement violated the Equal Protection Clause's prohibition on vote

dilution because it permitted a minority of the state's population to veto the wishes of the majority with regard to ballot initiatives. *Id.* at 1127. These claims, which the Ninth Circuit rejected, were premised on different grounds than the instant lawsuit. The plaintiffs in *Angle* argued that their votes were diluted and their equal protection rights were violated because votes were counted on a district-by-district basis and because the "All Districts Rule" undercut simply majority rule. Plaintiffs here do not rely on such arguments. Rather, Plaintiffs plead that their votes—counted statewide and in a simple-majority election—have been devalued by Defendants' counting other non-Constitutionally-compliant votes and that this unequal weighing of votes violates the Equal Protection Clause.

Defendants attempt to connect Plaintiffs to the *Angle* and *Gordon* plaintiffs by asserting that Plaintiffs' only common element is having voting against Amendment 1. To the contrary Plaintiffs are also united by each having voted for governor. In this way, Plaintiffs' Equal Protection claims parallel the logic of cases involving unequal apportionment or imbalanced county-unit systems such that some votes are valued more than others. *See, e.g.*, *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969); *Reynolds*, 377 U.S. at 555; *Gray v. Sanders*, 372 U.S. 368, 380 (1963); *see also Baker v. Carr,* 369 U.S. 186 (1962). Like those cases—and unlike *Angle* or *Gordon*, where each vote was equally weighed but the threshold to effect change was above a simple majority— Plaintiffs plead that because of Defendants' failure to comply with Article XI, Section 3 and implementation of an unlawful tabulation scheme, their votes have not been afforded the same relative weigh working toward a simple majority threshold as other votes cast on the same issue (and votes improperly cast, at that). As the Supreme Court explained in *Gray v. Sanders*:

> Every voter's vote is entitled to be counted once. It must be correctly counted and reported. As stated in *United States v. Mosley*, 238 U.S. 383, 386 [(1913)] , "the right to have one's vote counted" has the same dignity as "the right to put a ballot in a box." It can be protected from the diluting effect of illegal ballots. *Ex parte Siebold*, 100 U.S. 371 [(1879)]; *United States v. Saylor*, 322 U.S. 385 [(1944)].

372 U.S. at 380.

When Defendants are not defending their unlawful tabulation scheme, they readily agree and recognize these principles. *See, e.g.*, Tre Hargett, *The Blue Pages Newsletter*, Vol. 3, No. 2 (explaining exercising one's right to vote is one of the most important expressions of a free society); Hargett, *Guest column: Photo ID bill will help stop voter fraud*, THE COMMERCIAL APPEAL, February 23, 2011, http://www.commercialappeal.com/ opinion/guest-column-photo-id-bill-will-help-stop-voter (stating that "[o]ur process is guided by the principle that each participant in an election gets one vote, which counts for no less (and no more) than any other participant's vote. As a voter, I want to be confident that the ballot I cast will have as much influence as the ballot cast by my neighbor down the street" and asserting that ballot integrity is important to prevent counting even a single vote that should not have been counted); Hargett, *Hargett: Updated voter rolls ensure fair elections*, KNOXVILLE NEWS-SENTINEL, January 9, 2010, http://www.knoxnews.com/opinion/columnists/updated-voter-rolls-ensure-fair-elections-by-tre (stating that voter confidence is jeopardized when a person's vote is "effectively cancelled by someone who wasn't eligible to cast a ballot.").

Accordingly, Defendants' position is puzzling and a departure from the very legal principles they have previously espoused and pledged to uphold. Plaintiffs have sufficiently pled a claim under the Equal Protection Clause by alleging that Defendants diluted their votes, instituted an unlawful tabulation scheme, and counted illegal votes for the express purpose of disenfranchising Plaintiffs, who were opposed to the passage of Amendment 1. Accordingly, the Court should deny Defendants' 12(b)(6) motion to dismiss.

**IV. Because Plaintiffs' claims arise from and hinge on federal constitutional law, not an unclear state law, this case is not a candidate for abstention under the *Pullman* doctrine.**

Alternatively, Defendants contend that this Court should abstain from ruling on Plaintiffs' claims under the doctrine first developed in *Railroad Commission of Texas v. Pullman Co.*, 312

U.S. 496 (1941).[7] The basic premise of *Pullman* abstention is that "where uncertain questions of state law must be resolved before a federal constitutional question can be decided, federal courts should abstain until a state court has addressed the state questions." *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999).

The Sixth Circuit has "established two requirements for Pullman abstention: [1] an unclear state law and [2] the likelihood that a clarification of the state law would obviate the necessity of deciding the federal claim question." *Slyman v. City of Willoughby, Ohio*, 134 F.3d 372 (6th Cir. 1998) (citing *Tyler*, 709 F.2d at 1108); *accord Accident Fund v. Baerwaldt*, 767 F.2d 919 (6th Cir. 1985). Applied to this case, neither factor favors abstention.

Looking to the first factor, *Pullman* abstention is inappropriate because there are no unclear issues of state law. Admittedly, Article XI, Section 3 of Tennessee's Constitution is a critical component of Plaintiffs' claims, but Article XI, Section 3 is not unclear—its language is plain and unambiguous as previously articled by the Tennessee Supreme Court in *Snow v. Memphis*, 527 S.W.2d at 61. The words mean what they say. Defendants do not argue otherwise. Indeed, Defendants do not seriously dispute that they failed to follow the strictures of Article XI, Section 3. Accordingly, because the state law is plain, there is no likelihood that a clarification of the state law would obviate the necessity of deciding the federal claim question. Thus, *Pullman* abstention has no place in this case.

Moreover, when federal courts do abstain under the *Pullman* doctrine, there is usually a parallel case pending in state court. *Cf. Tyler v. Collins*, 709 F.2d 1106, 1108-09 (6th Cir. 1983). No such parallel state court case exists here. As the Sixth Circuit recently cautioned:

> "[F]ederal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush* [*v. Allstate Ins. Co.*, 517 U.S. 706,] 716 [(1996)]. Abstention is an "extraordinary and narrow exception" to that duty. *Colorado River* [*Water Conservation Dist. v. United States*, 424 U.S. 800,] 813 [(1976)] (internal

---

[7] Although Defendants are arguing in the alternative, it bears mentioning that Defendants' abstention argument necessarily concedes that Plaintiffs have standing.

quotation marks omitted). Only the "clearest of justifications" will support abstention. *Rouse v. DaimlerChrysler Corp.,* 300 F.3d 711, 715 (6th Cir. 2002).

*RSM Richter, Inc. v. Behr Am., Inc.*, 729 F.3d 553, 557 (6th Cir. 2013) (reversing a district court's decision to abstain).

This case does not present such clear justifications—indeed, it presents no justification—to warrant the extraordinary action of abstention.

**IV.    Defendants' unilaterally certifying the results of the Amendment 1 vote does not interfere with Plaintiffs' ultimate ability to obtain the relief sought in their Complaint.**

Defendants' final argument is that Plaintiffs' requests for injunctive relief to prevent certification have been mooted by Defendants certifying of the vote on Amendment 1 after the Complaint was filed. Aside from asserting a fact not in the record for purposes of a motion to dismiss, even assuming that Defendants have "certified" the results of the vote on Amendment 1, such an action is merely a ministerial task. *See, e.g.*, *City of Memphis v. Shelby Cnty. Elec. Comm'n*, 146 S.W.3d 531, 534 (Tenn. 2004); *State ex rel. Robinson v. Hutcheson*, 171 S.W.2d 282, 285 (Tenn. 1943). Defendants' certifying the result of the Amendment 1 vote has no bearing on this Court's power to compel Defendants to comply with the strictures of Article XI, Section III of the Tennessee Constitution and/or to set aside the election results as void. This "fact" is not properly before this Court, but even if it were, it provides no basis for this Court to dismiss the Complaint.

## <u>CONCLUSION</u>

For the foregoing reasons, the court should deny Defendants' motion to dismiss.

Respectfully submitted,

SHERRARD & ROE, PLC

By:      ___/s/ *William L. Harbison*_____
             William L. Harbison (B.P.R. No. 7012)
             C. Dewey Branstetter Jr. (B.P.R. No. 9367)
             Phillip F. Cramer (B.P.R. No. 20697)
             Hunter C. Branstetter (B.P.R. No. 32004)
             150 3rd Avenue South, Suite 1100
             Nashville, Tennessee 37201
             Tel.: (615) 742-4200
             Fax: (615) 742-4539
             bharbison@sherrardroe.com
             dbranstetter@sherrardroe.com
             pcramer@sherrardroe.com
             hbranstetter@sherrardroe.com

             Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing was served upon the following:

| Counsel | Counsel for: | Via: |
|---|---|---|
| Janet M. Kleinfelter<br>Deputy Attorney General<br>Office of the Attorney General and Reporter<br>Public Interest Division<br>P.O. Box 20207<br>Nashville, TN 37202<br>(615) 741-7403<br>janet.kleinfelter@ag.tn.gov | Defendants | ☐ United States Mail, postage prepaid<br>☐ Hand-delivery<br>☐ Facsimile transmission<br>☐ E-Mail<br>☐ Fed Ex<br>☒ CM/ECF |

this 29th day of December, 2014.

_____/s/ *William L. Harbison*_____
William L. Harbison