# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| TRACEY E. GEORGE, ELLEN WRIGHT CLAYTON, DEBORAH WEBSTER-CLAIR, KENNETH T. WHALUM Jr., MERYL RICE, JAN LIFF, TERESA M. HALLORAN, and MARY HOWARD HAYES, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No.  3:14-2182 |
| WILLIAM EDWARD "BILL" HASLAM, as Governor the State of Tennessee, in his official capacity; et al. | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants hereby submit this memorandum of law in support of their motion to dismiss Plaintiffs' First Amended Complaint for lack of subject matter jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

## INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiffs are registered voters in Tennessee who voted in the November 4, 2014, general election.  On the ballot in that general election were, among other things, the gubernatorial election and four proposed amendments to the Tennessee Constitution.

Plaintiffs purport to state a claim under 42 U.S.C. § 1983, alleging that their civil rights have been violated by the way in which the Defendants tabulated the votes cast on Amendment 1. Plaintiffs base that federal claim on their interpretation of language in Article XI, § 3, of the

Tennessee Constitution, which specifies the vote that is required for ratification of constitutional amendments by referendum.

Article XI, § 3, of the Tennessee Constitution currently provides two different methods for amending the Tennessee Constitution—the legislative process and the convention process. At issue in this case is the legislative process, which permits the legislature to propose an amendment and then submit the amendment for ratification by popular referendum. Once the proposed amendment makes its way through the prescribed legislative process,

> then it shall be the duty of the general assembly to submit such proposed amendment or amendments to the people at the next general election in which a Governor is to be chosen. *And if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the State voting for Governor, voting in their favor, such amendment or amendments shall become a part of this Constitution.*

Tenn. Const., art. XI, § 3 (emphasis added).[1] Plaintiffs' focus is on the italicized sentence.

Pursuant to this legislative process, four proposed Amendments to the Tennessee Constitution were placed on the ballot in the November 4, 2014, general election. The official results of the November 4, 2014, general election reflect that a total of 1,353,728 votes were cast for Governor. The official results further reflect that 729,163 votes were cast in favor of adoption of Amendment 1, while 657,192 votes were cast in favor of rejection of Amendment 1.[2] Since the number of votes cast in favor of adoption of Amendment 1 exceeded the number of votes cast by a majority (*i.e.*, 676,865) of the citizens of the State voting for Governor, Governor Haslam, Secretary of State Hargett, and Attorney General Slatery certified that Amendment 1 had been

---

[1] The complete text of Article XI, § 3, is reproduced in <u>Appendix A</u>.

[2] *See* http://state.tn.us/sos/election/results.htm.

ratified on December 8, 2014.[3]   Because the votes cast in favor of adoption of the other three proposed constitutional amendments likewise exceeded the number of votes cast by a majority of the citizens of the State voting for Governor, these three constitutional amendments were also certified as having been ratified.[4]

Plaintiffs allege that Defendants' method of tabulating the votes on Amendment 1 "flouts Article XI, Section 3's mandate" and "severely burdens Plaintiffs' right to vote" in violation of their substantive due process rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the federal constitution.   Plaintiffs further assert that Defendants have misconstrued Article XI, § 3, by reading it to mean that Amendment 1 may be ratified "if the total number of votes cast in favor of Amendment 1 equaled or exceeded the number of votes required to achieve a majority in the governor's race."  (D.E. 51, Page ID# 585).  The proper interpretation of Section 3, say the Plaintiffs, is that a voter must first meet the threshold requirement of having voted for governor in order to vote on Amendment 1 and have his or her vote counted.  *Id*.  In other words, the Plaintiffs' view is that casting a vote in the gubernatorial election is an absolute precondition to having one's vote counted in favor of a proposed constitutional amendment in a referendum on the same ballot.

On December 11, 2014, Defendants filed a motion to dismiss the original complaint, together with a memorandum in support of the motion to dismiss.  (D.E. 24, 25.)  Plaintiffs' original complaint, as Defendants demonstrated in that memorandum, was subject to dismissal for lack of subject matter jurisdiction because Plaintiffs had failed to allege any particularized injury.

---

[3] Plaintiffs assert that for the first time ever, the total votes cast on a constitutional amendment, Amendment 1, exceeded the total votes cast for governor.  However, they fail to point out that the total votes cast on Amendment 2 on the November 2014 general election ballot (1,366,161), also exceeded the total votes cast for governor (1,353,728). *See* n.2, *supra*.

[4] *See* n.2, *supra*.

3

The original complaint was also subject to dismissal for failure to state a federal claim. As Defendants' memorandum further showed, Plaintiffs' interpretation of Art. XI, § 3, of the Tennessee Constitution was contrary to the plain language and the legislative history of that constitutional provisions, and was also contrary to long-standing practice and application by the State of Tennessee. Therefore, because Plaintiffs' federal § 1983 claims were solely predicated on their erroneous interpretation of Art. XI, § 3, Plaintiffs' complaint presented no cognizable federal claim.. (*Id.*).

On March 6, 2015, Plaintiffs were allowed to file their First Amended Complaint. (D.E. 51). The Amended Complaint does not add any parties or new causes of action; it does not add any substantially new factual allegations. Rather, it simply makes new <u>arguments</u> in response to Defendants' pending motion to dismiss and in support of Plaintiffs' interpretation of Art. XI, § 3, of the Tennessee Constitution. (*Id*).

In other words, the First Amended Complaint is essentially nothing more than a sur-reply to the pending motion to dismiss. Accordingly, Defendants adopt and incorporate, as if fully restated herein, their previously filed Memorandum of Law in support of their Motion to Dismiss (D.E. 25) and Reply in Support of their Motion to Dismiss (D.E. 33). And, as set forth herein, Defendants address the new arguments raised in the Amended Complaint to demonstrate that none of these arguments establishes that Plaintiffs have their requisite standing or that their Amended Complaint has stated a claim for relief.

### HISTORY OF ART. XI, § 3, OF THE TENNESSEE CONSTITUTION

Tennessee's original Constitution of 1796 provided that

> whenever two thirds of the general assembly shall think it necessary
> to amend or change this constitution, they shall recommend to the
> electors, at the next election for members of the general assembly,
> to vote for or against a convention; and if it shall appear that a

4

> majority of all the citizens of the state voting for representatives, have voted for a convention, the general assembly shall, at their next session, call a convention . . . for the purpose of revising and amending or changing the constitution.

Tenn. Const. art. X, § 3, (1796). This provision was changed in 1834 to the forerunner of today's "legislative process" for amending the constitution. The 1834 change set out a procedure for the legislature to propose and agree to a constitutional amendment. Once a proposed amendment made its way through that process,

> then it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the people, in such manner, and at such time, as the General Assembly shall prescribe. *And if the people shall approve and ratify such amendment or amendments, by a majority of all the citizens of the State, voting for Representatives, voting in their favor, such amendment or amendments shall become part of this Constitution.*

Tenn. Const., art. XI, § 3 (1834) (emphasis added).[5] This provision was amended again in 1870 to add back the process for calling a constitutional convention; however, the language establishing the legislative process for constitutional amendments remained unchanged.

On April 21, 1953, a limited constitutional convention was convened to address six provisions of the Constitution, including Article XI, § 3, relative to amendments and conventions. *See* 1951 Tenn. Pub. Acts, ch. 130. There was significant debate among the convention delegates as to what majority should be required for an amendment to be ratified. That debate is reflected in a Majority Report, a Minority Report, and a Substitute Minority Report of the Committee on Amending Process. The Majority Report proposed leaving the language "majority of all the citizens of the State voting for representatives" in Article XI, § 3, unchanged. The Minority Report would have changed the language to make ratification of a proposed amendment dependent on the majority vote of those voting on the proposed amendment. The Substitute Minority Report would

---

[5] The complete text of the 1834 version of Article XI, § 3, is reproduced in <u>Appendix A</u>.

5

have provided for approval and ratification of a proposed amendment by two-thirds of the total vote cast for or against a proposed amendment. *See* Journal and Proceedings 1953 Constitutional Convention at 197-199 (copy attached as Exhibit 1 to Motion to Dismiss Amended Complaint).[6]

In introducing the Majority Report, the Chair of the Committee on Amending Process, Delegate Gilreath, noted that

> [a]n overwhelming majority of that committee felt that something more than a mere majority of those voting should be required. We discussed this question, that is by what percentage of the votes cast should the proposal be carried, we discussed hinging it on the voting in the presidential election; we discussed hinging it on the vote in the Governor's race; we discussed hinging it and making it depend on the vote for congressional representatives, and one by one, for reasons which seem sufficient to the committee, each of these was rejected by a majority.

Exhibit 1 at 736.

Delegate Gilreath further discussed how this amending process had been applied in the past, and none of his comments reflects the notion that a voter must first vote in a representative election in order to have his or her vote for an amendment counted. To the contrary, his comments reflect that a calculation of the number of votes cast for representatives was all that was required:

> I have the information here that in 1940 an amendment to increase legislative pay was submitted and the popular vote on that was, Aye, 158,215; No, 77,614; that makes a total of 235,830. The vote on representatives in the same year was 377,111. In 1940 on the Governor's term, to increase it to four years, the vote was 171,209; that is Aye, 171,209; No, 68,506; that is a total of 239,715, and the total vote on representatives was 377,111. In 1950, on non-

---

[6]The Sixth Circuit has specifically recognized that it is well within the discretion of a district court to take judicial notice of the legislative and constitutional history of challenged legislation. *See Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010); *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir.2007) ("A court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." (citation omitted)). *See also Intri-Plex Techs., Inc. v. Crest Group, Inc.*, 499 F.3d 1048, 1052 (9th Cir. 2007) (proper subjects for judicial notice include "matters of public record (*e.g.*, pleadings, orders and other papers on file in another action pending the court; records or reports of administrative bodies; or the legislative history of laws, rules or ordinances) as long as the facts noticed are not subject to reasonable dispute").

diversion of the gas tax, which I submit was a revenue measure and had no place in the Constitution whatsoever, the popular vote was Aye, 115, 232; No, 38,777, a total of 153,030; the total vote on representatives was 253,184.

*Id*. at 741-742.

Comments from other delegates reflect a similar understanding that the legislative amending process in Article XI, §3, does not impose any precondition or prior participation requirement, *i.e.*, participation in a representative election is not required in order to participate in a constitutional-amendment referendum. Indeed, one delegate, C.C. Sims, explained that "when we were voting on an amendment to raise the pay of legislators, *I, favoring the amendment, advised my friends not to vote in uncontested legislative races because it would give the amendment a better chance*." *Id*. at 854 (emphasis added).

Perhaps most instructive are the comments of Delegate McGinniss, who in speaking against the Majority Report, specifically addressed the meaning of this part of Section 3 of Article XI:

The question is whether the present provision of Section 3 of Article XI shall be retained or whether it shall be changed; and if changed, what shall be substituted for it. Now, let us take a look at the provision with a view to determining whether it should be changed or retained. Here is the exact language; that is, after it has been approved by two legislatures, then "it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the people in such manner and at such time as the General Assembly shall prescribe, *and if the people shall approve and ratify such amendment or amendments by a majority vote of all the citizens of the State voting for representatives, voting in their favor*, such amendment or amendments shall become part of the Constitution."

*That means, I take it all will agree, that this legislative proposed amendment must be submitted to the people at an election in which representatives in the General Assembly are elected, and **then in order to have it ratified it shall receive a vote equal to a majority***

7

> *of all the votes cast in that particular election for representatives* .
> . . .
>
> The majority on this Committee seem adamant in their position *that ratification must be by a majority of all the votes cast for representatives, that is to say, must be by a vote equal to a majority of all the votes cast for representatives*.

*Id*. at 765-766 (emphases added).

As a result of multiple complaints about the difficulty and uncertainty in ascertaining the total number of votes cast in representative elections,[7] Delegate Tipton proposed "*that an amendment to carry, instead of receiving a majority of the votes cast for representatives, shall receive a majority of the votes cast for Governor.* It would only be able to be voted upon when a Governor is elected or every four years, but it takes at least three years to get an amendment through the legislature now." *Id*. at 893 (emphasis added).

Tipton's proposal was adopted as part of the Majority Report by a vote of 61-36. *Id*. at 231, 893. The Amended Majority Report was approved by the Committee on Amendment Process by a vote of 65-32, and on May 27, 1953, the Amended Majority Report, Resolution No. 120, was adopted by the entire Convention by a vote of 73-22. *Id*. at 234, 237. This Resolution was subsequently approved as an amendment to Article XI, § 3, of the Tennessee Constitution by a majority of the voters in a referendum election held in November 1953. The version of Article XI, § 3, that was made part of the Constitution in 1953 is the current version of the "legislative process."

---

[7]Delegate McGinnis, for example, ventured to "say it is impossible to ascertain, how many votes are cast for representatives in an election in those counties where more than one representative is elected. Gallup and all his staff couldn't figure it out to save their lives, how many votes are cast for representatives in the county of Davidson in any election." Exhibit 1 at 766.

8

Plaintiffs are incorrect that this language amending Art. XI, § 3, "was approved as written by Tennessee voters without regard to any statements, qualifications or explanations from the delegates to the constitutional convention of 1953." (D.E. 51, Page ID# 593). The intent of the delegates was made known to the voters and was the subject of public discourse. In a May 27, 1953, article, Delegate Walter Chandler explained that the Constitutional Convention had agreed "to make the vote for governor the yardstick for amendment ratification rather than that for state representative" and that in doing so, the convention had taken "'its most progressive step to date.'" *See* May 27, 1953 article published in *Kingsport Times News* attached as Exhibit 2 in support of Defendants' Motion to Dismiss Amended Complaint.

Similarly, in June 1953, Delegates John R. Todd (Sullivan County) and Ernest F. (Jack) Smith (Hawkins and Sullivan Counties), spoke at a luncheon meeting of the League of Women Voters where they discussed the six proposed amendments to the Constitution adopted at the 1953 Constitutional Convention. With respect to the proposed amendment to Art. XI, § 3, these delegates explained that "[a]n amendment must pass two successive legislatures and then be ratified in a general referendum by a vote equal to a majority of votes cast for governor in the general election. *See* June 23, 1953 article published in *Kingsport Times News* attached as Exhibit 3 in support of Defendants' Motion to Dismiss Amended Complaint.[8]

---

[8] Other newspaper articles published either while the Constitutional Convention was in session or shortly thereafter contain similar explanations of the proposed amendment to Art. XI, § 3. *See, e.g.,* May 27, 1953 article published in *Kingsport Times News* (Convention ratified plan to "[s]ubstitute a majority of the total vote cast for governor instead of state representative as the requirement for popular approval of amendments") and June 7, 1953 article published in *Kingsport Times News* (Convention "changed the requirement of popular vote ratification from majority equal to a majority of those voting for state representative to a majority equal to a majority of those voting for governor") (copies attached as Exhibit 4 in support of Defendants' Motion to Dismiss Amended Complaint). Additionally, the *Kingsport Times News* published a series of articles dealing with the proposed constitutional amendments leading up to the November 8, 1953, election. The article discussing the amending process first notes that, under the current process, constitutional amendments had been defeated "because of a requirement that a proposal receive a vote equal to the majority of the total vote cast for state representative." The article then explains that under the proposed change to Art. XI, § 3, once a proposed amendment has been approved by the two different legislatures, "a majority of the people equal to a majority of the total vote cast for governor in a general election must ratify the amendment to make it

9

## STANDARD OF REVIEW FOR 12(B) MOTION TO DISMISS

### I.     Dismissal for Lack of Subject Matter Jurisdiction

A challenge to the court's subject-matter jurisdiction under Rule 12(b)(1) may be either a facial attack or a factual attack. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007). A facial attack "questions merely the sufficiency of the pleadings." *Id*. When reviewing a facial attack, this Court must take the allegations in the complaint to be true. *Id*.

But when there is a factual attack, the Court must weigh conflicting evidence provided by the plaintiff and the defendant to determine whether subject-matter jurisdiction exists. *Id*. Thus in reviewing a factual attack, the Court may consider evidence outside the pleadings and both parties are free to supplement the record by affidavits. *Id*. *See Rogers v. Stratton Industries*, 798 F.2d 913, 916 (6th Cir. 1986).

### II.    Dismissal for Failure to State a Claim

To state a claim upon which relief can be granted, a complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005); *Wittstock v. Mark A Van Sile, Inc.*, 330 F.3d 889, 902 (6th Cir. 2003). While the factual allegations in a complaint need not be detailed, they "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-95 (2007)).

The United States Supreme Court has recently encapsulated the appropriate standard to be applied in considering a motion to dismiss for failure to state a claim:

---

effective." *See* October 8, 1953 article, a copy of which is attached as Exhibit 5 to Defendants' Motion to Dismiss Amended Complaint.

Two working principles underlie our decision in [*Bell Atlantic v.*] *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice. . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. . . . Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not "show[n]" – "that the pleader is entitled to relief."

*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949-1950 (2009) (citations omitted).

## ARGUMENT

## I.     PLAINTIFFS' AMENDED COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT-MATTER JURISDICTION.

Plaintiffs lack the standing necessary to vest jurisdiction in this Court. Nothing in the Amended Complaint alters that inescapable conclusion.

"The first and fundamental question presented by every case brought to the federal courts is whether it has jurisdiction to hear a case." *Evans v. Allen*, No. 3:13-CV-480-TAV-CCS, 2014 WL 585392, at *1 (E.D. Tenn. Feb. 14, 2014) (quoting *Douglas v. E.G. Baldwin & Assocs.*, 150 F.3d 604, 607 (6th Cir.1998), *abrogation on other grounds recognized by Heartwood, Inc. v. Agpaoa*, 628 F.3d 261, 266 (6th Cir.2010)). "Standing goes to a court's subject matter jurisdiction." *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir.2013) (internal quotation and brackets omitted). Thus, a complaint must be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) if the plaintiff lacks standing to bring suit. *See, e.g., Taylor v. KeyCorp*, 680 F.3d 609 (6th Cir.2012) (affirming district court's grant of Rule 12(b)(1) motion to dismiss for lack of standing);

11

*Allstate Ins. Co. Global Med. Billing, Inc.,* 520 F. App'x 409, 410–11 (6th Cir.2013) (stating that lack of standing is treated as an attack on the court's subject matter jurisdiction and is therefore considered under Rule 12(b)(1)).

The plaintiff bears the burden of proving jurisdiction on a motion to dismiss under Rule 12(b)(1). *United States v. Smith & Nephew, Inc.*, 749 F.Supp.2d 773, 778 (W.D. Tenn. 2010) citing *Rogers v. Stratton Indus., Inc.,* 798 F.2d 913, 915 (6th Cir.1986); *see also United Gov't Sec. Officers of Am. v. Akal Sec., Inc.,* 475 F.Supp.2d 732, 736 (S.D.Ohio 2006). Thus, when a defendant challenges the plaintiff's standing to sue under Rule 12(b)(1), the burden is on the plaintiff to show that jurisdiction exists. *Taylor,* 680 F.3d at 612; *Lewis v. Whirlpool Corp.,* 630 F.3d 484, 487 (6th Cir.2011); *Golden v. Gorno Bros., Inc.,* 410 F.3d 879, 881 (6th Cir.2005).

Article III of the United States Constitution gives federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Hooker v. Sasser*, 893 F. Supp.764, 766 (M.D. Tenn. 1995) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Thus, a party seeking to invoke a federal court's jurisdiction must establish the necessary standing to sue before that court may consider the merits of the party's cause of action. *Id*. (citing *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990)); *see also Wilson v. United States*, No. 2:11-CV-02302-JTF, 2013 WL 3717738, at *2 (W.D. Tenn. July 11, 2013), *aff'd* (July 2, 2014) (federal court "must be satisfied that the jurisdictional and standing requirements are met before addressing the substance of Plaintiff's claims on the merits").

The Supreme Court has set forth the three elements that constitute "the irreducible constitutional minimum of standing:" (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal connection between the injury and the challenged conduct; and (3) it must be likely that a favorable decision will remedy the injury. *Id*. (citing *Whitmore v. Arkansas*, 495

U.S. 149, 154 (1990)).  And the plaintiff bears the burden of establishing all three elements of

standing:

> The party invoking federal jurisdiction bears the burden of establishing these elements [of standing].  Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof. . .

*Lujan*, 504 U.S. at 561.

To establish an "injury in fact," a plaintiff must show that he or she "has sustained or is in

danger of sustaining some direct injury" as the result of the challenged official conduct and such

"injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"

*City of Los Angeles v. Lyons*, 461 U.S. 95, 101-102 (1983) (citations omitted).  In other words, the

injury must be one that "affect[s] the plaintiff in a *personal and individual* way."  *Lujan*, 504 U.S.

at 560 (emphasis added).  Moreover, the Sixth Circuit has concluded that "the constitutional

standing requirement of a 'distinct and palpable injury that is likely to be redressed if the requested

relief is granted ... states a limitation on judicial power, not merely a factor to be balanced in the

weighing of so-called 'prudential' considerations.' "  *Prime Media, Inc. v. City of Brentwood,* 485

F.3d 343, 349 (6th Cir. 2007).

Thus, the primary focus of a standing inquiry is on the party, not on the merits of the claim.

*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S.

464, 484 (1982); *Flast v. Cohen*, 392 U.S. 83, 99 (1968).  While standing does not depend on the

merits, it often runs on the nature and source of the claim asserted; a standing inquiry therefore

requires a "careful judicial examination of the complaint's allegations to ascertain whether the

particular plaintiff is entitled to an adjudication of the particular claims asserted."  *Valley Forge*,

454 U.S. at 484; *Flast*, 392 U.S. at 99.

13

In addition to these constitutional standing requirements, the Supreme Court has established certain co-extensive prudential standing principles. One such principle is that an alleged injury that is "a generalized grievance shared in substantially equal measure by all or *a large class of citizens*" does not constitute a specific injury-in-fact that warrants the exercise of a federal court's subject matter jurisdiction. *Warth,* 422 U.S. at 499 (emphasis added). Thus, "a plaintiff raising only a generally available grievance about government ... and seeking relief that no more directly and tangibly benefits him than it does the public at large ... does not state [an injury-in-fact sufficient to establish] an Article III case or controversy." *Lujan,* 504 U.S. at 573–74*; see also Johnston v. Geise*, No. 3:14-CV-01425, 2015 WL 687291, at *6 (M.D. Tenn. Feb. 18, 2015) citing *Lujan*, 504 at 573-74 (collecting numerous cases dismissed by the Supreme Court based on the insufficiency of citizen or taxpayer standing to confer jurisdiction over lawsuits generally alleging improper or unconstitutional governance and noting that "the right, possessed by every citizen, to require that the government be administered according to law and that public moneys not be wasted" does not alone entitle a private citizen to institute an action in the federal courts); *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (noting the general prohibition on a litigant's raising another person's legal rights and the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches of government); *Mass v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (noting that "standing cannot be predicated upon an injury the plaintiff suffers in some indefinite way in common with people generally"); *Tyler v. Judges of Court of Registration,* 179 U.S. 405, 406, 21 S.Ct. 206, 45 L.Ed. 252 (1900) ("Even in a proceeding which he prosecutes for the benefit of the public, the plaintiff must generally aver an injury peculiar to himself, as distinguished from the great body of his fellow citizens."); *Fialka–Feldman v. Oakland Univ. Bd. Of Trustees,* 639

14

F.3d 711, 715 (6th Cir.2011) (observing that matters of public interest are the arena in which the federal court must be most vigilant about the "case or controversy" requirement) (citing Felix Frankfurter, A Note on Advisory Opinions, 37 HARV. L. REV. 1002, 1007 (1924) (describing advisory opinions as "ghosts that slay")); *Hooker v. Fed. Election Comm'n,* 21 F. App'x 402, 406 (6th Cir.2001) (finding general claims regarding the election process to be an apt example of the type of general, non-concrete allegations that the Supreme Court adverted to in *Warth* ); *Hooker v. Sasser,* 893 F.Supp. 764, 767–68 (M.D.Tenn.1995) (where alleged injuries were common to all state voters, finding that there was insufficient factual specificity to allow the court to make a decision and redress those injuries and that doing so would constitute interference with the legislative branch of government).

Here, Plaintiffs' claim is that the Defendants have interfered with their right to vote. Plaintiffs allege that they have been harmed by having their "vote not to approve Amendment 1 diluted by Defendants' improper tabulation of votes" and that their injury in this case arises from their "votes not being counted the same as other votes." (First Amended Complaint, D.E. 51 Page ID# 589-90, 596).

However, Plaintiffs fail to allege any injury that affects them in a particularized way peculiar to them, as distinct from injury to their fellow citizens. While Plaintiffs try to characterize the alleged improper tabulation of their votes as a harm that is specific only to the Plaintiffs, it is clear from the allegations in their Amended Complaint that Plaintiffs are seeking to vindicate the alleged rights of all voters who voted against Amendment 1 and not just the rights of the Plaintiffs. Indeed, Plaintiffs plainly acknowledge that their "harm" is shared by the over 650,000 voters who voted against Amendment 1. *See* D.E. 51, Page ID# 596 ("Only those voters such as Plaintiffs had their votes devalued, and only they had their fundamental voting rights impeded.")

15

The Supreme Court has consistently held that a plaintiff raising only such a generally available grievance about government—claiming only harm to his and other citizens' interest in the proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy. *See Lujan*, 504 U.S. at 555; *Allen v. Wright*, 468 U.S. 757, 104 S. Ct. 3315, 3326 (1984); *Valley Forge*, 454 U.S. at 483.

The Supreme Court reaffirmed this holding in *Lance v. Coffman*, 549 U.S. 437 (2007), a case that is on point here. In *Lance*, four private citizens brought suit in federal district court arguing that Article V, § 44, of the Colorado Constitution, as interpreted by the Colorado Supreme Court, violated their rights under the Elections Clause of Article I, § 4, cl. 1, of the United States Constitution. 549 U.S. at 439. The Supreme Court first noted that its "refusal to serve as a forum for generalized grievances has a lengthy pedigree," citing *Fairchild v. Hughes*, 258 U.S. 126 (1922), and its progeny. *Id*. at 440. The Court then found that the only injury the plaintiffs had alleged was that the law—specifically the Elections Clause—had not been followed and that this "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." *Id*. at 442. Accordingly, the Court held that the plaintiffs lacked standing to bring their Elections Clause claim because they had no particularized stake in the litigation. *Id*.

Similarly, in *Hein v. Freedom From Religion Foundation*, 551 U.S. 587 (2007), the Supreme Court reinforced the need for plaintiffs to show a particular, individualized injury in order to have standing. Standing does not exist, for example, in cases where citizens and taxpayers seek "to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens." 551 U.S. at 598. In *Hein*, an organization opposed to

government endorsement of religion and three of its members brought suit against the White House Office of Faith-Based and Community Initiatives, alleging that its use of federal money to fund conferences to promote the President's "faith-based-initiatives" violated the Establishment Clause of the United States Constitution. The Supreme Court found that the interest of the plaintiffs as taxpayers in seeing that federal funds were spent in accordance with the Constitution was, in essence, the interest of the public at large and consequently did "not give rise to the kind of redressable 'personal injury' required for Article III standing." *Id.* at 599.

The instant case parallels and is therefore controlled by *Lance* and *Hein*. The injury Plaintiffs have alleged is that Article XI, § 3, of the Tennessee Constitution (as <u>they</u> would construe it) has not been followed with respect to the tabulation of votes cast on Amendment 1 in the November 2014 general election. This injury is "plainly undifferentiated" and "shared in substantially equal measure by all or a large class of citizens" (over 650,000 voters who voted against Amendment 1) and does not give rise to the kind of redressable personal injury required for either constitutional or prudential standing.

Moreover, Plaintiffs' reliance on their status as voters in the November 2014 general election), to establish standing under *Baker v. Carr,* 369 U.S. 186 (1962), is not justified. In *Baker*, the Supreme Court held that only "voters who allege facts showing disadvantage to themselves *as individuals* have standing to sue." 369 U.S. at 206. Thus, the plaintiffs in *Baker* had standing, not because of their status as voters, but because they could demonstrate facts showing disadvantage to them as individuals, *i.e.*, that under the existing apportionment act they were being under-represented in the state legislature while residents of other counties were being over-represented. *See Moncier v. Haslam* 1 F.Supp.3d 854, 862 (E.D. Tenn. 2014) (rejecting plaintiff's argument that *Baker v. Carr* clearly establishes standing of a qualified voter to challenge a state law without

17

first demonstrating a concrete and particularized injury); *Looper v. Boman*, 958 F.Supp. 341, 344 (M.D. Tenn. 1997) ("*Baker v. Carr* does not make every alleged dilution of voting rights a sufficient injury to confer standing") (citation omitted); *see also Parks v. Alexander*, 608 S.W.2d 881, 885-891 (Tenn. Ct. App. 1980) (holding that voters obtained no greater "interest" by virtue of having voted in referendum election, for purpose of their standing to maintain suit challenging referendum, than they had as citizens of state in general).

Here, Plaintiffs have not alleged or otherwise demonstrated any "disadvantage to themselves as individuals" but instead allege that

> Defendants' proposed counting method also violates the Equal Protection Clause of the Fourteenth Amendment both *by diluting the votes on Amendment 1 of those voters who complied with the Tennessee Constitution*, engaged fully in their civic duty to vote, and exercise their right to vote for governor and by overvaluing the votes of Amendment 1 supporters who chose not to cast a vote for governor . . . Defendants' counting method violates the Fourteenth Amendment's Equal Protection Clause *by differentially valuing votes from the voters of two classes—those like Plaintiffs who voted in the gubernatorial race as well as on Amendment 1* and those who did not and merely voted on Amendment 1—*to the detriment of Plaintiffs and others who voted against Amendment 1*.

(D.E. 51 Page ID# 587) (emphasis added).  This claim, which expressly seeks to vindicate the rights of all voters who voted against Amendment 1, is nothing more than a generalized grievance regarding what Plaintiffs perceive to be an illegal method of tabulating the votes.

At best, Plaintiffs have pled "a type of institutional injury"—an allegedly improper method of counting the votes on a proposed constitutional amendment—"which necessarily damages" all voters "equally." *Raines v. Byrd*, 521 U.S. 811, 821 (1997).  This is insufficient to confer standing on the Plaintiffs.  Accordingly, Plaintiffs' Amended Complaint should be dismissed for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).

## II.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM PURSUANT TO FED. R. CIV. P. 12(b)(6).

Plaintiffs' federal claims are all premised upon their interpretation of Art. XI, § 3, of the Tennessee Constitution.  In other words, their claims that Defendants have "implemented a fundamentally unfair system of vote tabulation" in violation of the Due Process Clause and have diluted the value of Plaintiffs' votes in violation of the Equal Protection Clause can proceed, if and only if, Plaintiffs can demonstrate that their interpretation of Art. XI, § 3, of the Tennessee Constitution is the correct interpretation.  The Amended Complaint does not fulfill that requirement and should be dismissed.

As this Court has recognized, the interpretation of a statute or state constitutional provision is a "question of law."  *City of Goodlettsville, Tenn. V. Priceline.com, Inc.*, 844 F.Supp.2d 897, 904 (M.D. Tenn. 2012) (citing *Home Builders Ass'n of Middle Tenn. v. Williamson Cnty.,* 304 S.W.3d 812, 816–17 (Tenn.2010); *see also State ex rel. Pope v. U.S. Fire Ins. Co.,* 145 S.W.3d 529, 533 (Tenn.2004); *Mullin v. Hartford Accident and Indem. Co.,* No. 3:04–CV–525, 2005 WL 1429305, at *2 (E.D.Tenn. June 17, 2005) (applying Tennessee law)); *see also U.S. v. Shafer*, 573 F.3d 267, 272 (6th Cir. 2009).  Thus, the underpinning of Plaintiffs' alleged federal causes of action—the meaning of the language of Art. XI, § 3, of the Tennessee Constitution—is purely a question of law and appropriate for determination pursuant to a motion under Fed. R. Civ. P. 12(b)(6).

Although the Tennessee Supreme Court has not ruled on the proper construction of the language at issue, there is controlling state law on the construction of that language—state law established and settled by a long and consistent practice.  The United States Supreme Court has held that for federal equal protection purposes, when "all the organs of the state are conforming to a practice, systematic unbroken for more than forty years," then that "[s]ettled state practice"—

19

although it "cannot supplant constitutional guarantees"—"can establish what is state law." *Nashville, Chattanooga & St. Louis Railway v. Browning*, 310 U.S. 362, 369 (1940). Thus, "[d]eeply embedded traditional ways of carrying out state policy . . . are often tougher and truer law than the dead words of the written text" and "[i]t is not the Fourteenth Amendment's function to uproot systems of [constitutional amendment] inseparable from the state's tradition of [constitutional law] and ingrained in the habits of its people." *Id*.

Since its inception Art. XI, § 3, has consistently been interpreted as requiring for ratification that the total number of votes cast in favor of a proposed constitutional amendment equal or exceed the majority of votes cast for Governor (or Representatives). The State has consistently <u>applied</u> this interpretation to determine whether a proposed amendment is ratified.[9] Indeed, the State applied this tabulation method not just for Amendment 1 on the November 2014 general election ballot, but for the other three proposed Amendments as well.[10]

This settled practice establishes state law. *Nashville, Chattanooga & St. Louis Railway v. Browning*, 310 U.S. 362, 369 (1940). And the Plaintiffs' interpretation—the basis for all their claims—is contrary to that settled state law. Therefore, the Plaintiffs fail to state a claim.

Further analysis is not necessary. But if it were, it would also lead to dismissal for failure to state a claim.

_____

[9] *See, e.g.,* http://www.tennessee.gov/sos/election/results/2002-11/index.htm. This makes it clear that Defendants did not "willfully" miscount the votes as part of a scheme to get Amendment 1 passed. Defendants simply counted the votes the same way they have counted votes since 1834, only substituting the vote for governor with the vote for representatives as the yardstick for determining ratification.

[10] The fact that the State has consistently applied this interpretation to all of the proposed constitutional amendments on the November 2014 ballot highlights a significant fallacy in Plaintiffs' arguments. Specifically, Plaintiffs say that because they have only asserted a challenge with respect to Amendment 1, a "case or controversy" exists only with respect to Amendment 1 and, therefore, any decision in this case will have no bearing on the other three amendments. However, Plaintiffs' challenge with respect to Amendment 1 is purely a legal one, *i.e.*, what is the proper method of tabulating votes to determine whether a constitutional amendment is ratified. Consequently, if the election as to Amendment 1 is invalid, as Plaintiff assert, because the State utilized the wrong method of tabulating votes, then the election as to all four amendments is invalid as the State used the same method with respect to these amendments.

Constitutional provisions must be construed as written without reading any ambiguities into them. *State ex rel. Sonnenburg v. Gaia*, 717 S.W.2d 883, 885 (Tenn. 1986). If there is *any doubt* about the meaning of the Constitution "it is the first obligation of the Court to go to the proceedings of the Constitutional Convention which adopted this provision and see from these proceedings what the framers of this resolution intended it to mean.*"* *Shelby County v. Hale*, 292 S.W.2d 745, 748 (Tenn. 1956); *see also Hooker v. Haslam*, 437 S.W.3d 409, 429 (Tenn. 2014); *Highwoods Properties, Inc. v. City of Memphis*, 297 S.W.3d 695, 703-04 (Tenn. 2009); *Frost v. City of Chattanooga*, 488 S.W.2d 370, 373 (Tenn. 1972); *Washington County Election Commission v. City of Johnson City*, 350 S.W.2d 601, 604 (Tenn. 1961); *State ex rel. Doyle v. Torrence*, 310 S.W.2d 425, 427 (Tenn. 1958).

For example, in *Shelby County v. Hale*, the construction of the second paragraph of Art. XI, § 9, of the Tennessee Constitution was at issue. 292 S.W.2d at 747. Although it considered the meaning of this language to be plain and without doubt, the Tennessee Supreme Court still found it appropriate to examine the proceedings of the Constitutional Convention and determined from the Journal of the Constitutional Convention that "it is very clear from the debate of the various members on this very question that the interpretation that we have given the constitutional provision above is the correct one." *Id.* at 748.

Other than simply asserting that the language of Art. XI, § 3, is unambiguous and must be interpreted as requiring a voter to have first voted in the gubernatorial election before the voter can vote on a proposed constitutional amendment, Plaintiffs provide no support for their interpretation. However, neither the plain language of the constitutional provision nor the legislative history, nor long-standing practice and application of this provision by the State supports Plaintiffs' desired interpretation of the provision. Moreover, Plaintiffs' interpretation clearly violates the First

21

Amendment rights of voters who, for whatever reason, choose not to vote in the gubernatorial election, by depriving them of their right to abstain and of their right to vote on a proposed constitutional amendment.[11]

First, the language in Art. XI, § 3, central to Plaintiffs' claims is clear and unambiguous. The relevant language states:

> And if the people shall approve and ratify such amendment or amendments by a *majority of all the citizens of the state voting for Governor*, voting in their favor, such amendment or amendments shall become a part of this Constitution. (emphasis added).

Instead of giving this language in its plain and ordinary meaning, Plaintiffs "interpret" it to mean that in order for a proposed constitutional amendment to be ratified, it must receive a majority of the votes cast in its favor and only the votes of those voters who have voted for Governor may be counted. Clearly, Plaintiffs' interpretation is not based on a reading of the language in the Constitution, but instead is based on reading additional language into the Constitution. Thus, contrary to Plaintiffs' assertions, this language does not establish a condition precedent to voting on a proposed constitutional amendment; rather it simply refers to the quantity or number of votes required to carry an amendment, *i.e.*, if the number of citizens voting in favor of an amendment exceeds the majority of citizens voting for Governor then an amendment is ratified. This is the correct interpretation according to the plain meaning of the provision, and Defendants applied that

---

[11] Contrary to assertions in Plaintiffs' Amended Complaint, Defendants do not argue that "Article XI, Section 3, as written, is itself unconstitutional." (D.E. 51, Page ID# 593). Rather, as clearly set forth in Defendants' Memorandum of Law in support of Motion to Dismiss, Defendants argue that Plaintiffs' interpretation of Art. XI, § 3, is unconstitutional in that it deprives an otherwise qualified voter from the right to vote on a proposed constitutional amendment simply because that voter chooses to exercise the First Amendment right not to vote in the gubernatorial election. *See* D.E. 25 Page ID# 94-97.

22

plain-meaning reading with respect to all four proposed constitutional amendments on the November 2014 general election ballot.[12]

Second, even assuming that the constitutional provision at issue here were ambiguous, the proceedings of the Constitutional Convention that adopted the language makes the intent of the framers crystal clear:  for a proposed amendment to pass it must get votes equal to the majority of total votes cast for governor.  *See* Exhibits 1-5.  The debate of the various members of the 1953 Constitutional Convention on the meaning of Art. XI, § 3, demonstrates that the Defendants' interpretation is consistent with the framers' intent.  *See* Exh. 1.  Of particular importance is the statement of Delegate Tipton in introducing the language that was ultimately adopted by the Constitutional Convention.  He clarified that the proposed amendment contemplated "that an amendment to carry, *instead of receiving a majority of the votes cast for representatives, shall receive a majority of the votes cast for Governor*." *Id.* (emphasis added). [13]

Third, Plaintiffs' interpretation is contrary to long-standing interpretation and application of Art. XI, § 3, by State officials in determining whether a proposed constitutional amendment is ratified.  The law is clear that federal courts should accord "great deference" to "consistent and long-standing agency interpretations."  *See, e.g., BLE Intern. Reform Committee v. Sytsma*, 802

---

[12] Plaintiffs also argue that, under their interpretation of Art. XI, § 3, in order to determine whether Amendment 1 passed, the difference in the number of total votes cast in the election (1,430,117) and total votes for governor (1,353,728) should have been subtracted from the total number of votes for Amendment 1, and when such calculation is made, the " 652,744 'certain' votes fall 24,091 votes short of the 676,865 votes required to ratify Amendment 1." *See* D.E. 51 Page ID# 595.  This argument is meritless.  The language of Art. XI, § 3, makes no reference to the total votes cast in an election; it speaks only to the votes cast for Governor as the appropriate measure for determining whether an amendment has passed.  Moreover, the fact that the total votes cast in the November 2014 exceeded the number of votes cast for Governor is not unusual, as the total number of votes cast in every gubernatorial and presidential election since 1998 have routinely exceeded the number of votes cast for Governor of President.  *See* http://state.tn.us/sos/election/results.htm.

[13] Had the members of the 1953 Convention intended to make voting in the gubernatorial election a condition precedent to voting for a constitutional amendment there would certainly have been at least some mention of that intent reflected in the record of the proceedings.  But there is no such mention in the record of the proceedings.

F.2d 180, 191 (6th Cir. 1986) quoting *Udall v. Tallman*, 380 U.S. 1, 16 (1965) ("When faced with a problem of statutory construction [federal courts] show [ ] great deference to the interpretation given the statute by the officers or agency charged with its administration."). The Tennessee Supreme Court has similarly held that administrative interpretations by the agency charged with enforcement or administration are entitled to great weight in determining intent, particularly when, as here, the administrative interpretation is unchallenged over a long period of time. *Covington Pike Toyota, Inc. v. Cardwell*, 829 S.W.2d 132, 134 (Tenn. 1992).

Since its inception Art. XI, § 3, has consistently been interpreted as requiring for ratification that the total number of votes cast in favor of a proposed constitutional amendment equal or exceed the majority of votes cast for Governor (or Representatives). The State has consistently <u>applied</u> this interpretation to determine whether a proposed amendment is ratified.

As previously discussed, the "legislative process" for amending the Constitution was added to the Constitution in 1834. Under that Constitution, once a proposed amendment made its way through the process and was submitted to the voters, it would become part of the Constitution

> *if the people shall approve and ratify such amendment or amendments, by a majority of all the citizens of the State, voting for Representatives, voting in their favor, such amendment or amendments shall become part of this Constitution.*

Tenn. Const., art. XI, § 3 (1834) (emphasis added). Just six years later in 1842, the Tennessee General Assembly adopted three separate resolutions to amend Art. X, § 4, of the Tennessee Constitution with respect to certain county boundaries. *See* Resolution Nos. V, VI, and XV, copies of which are attached as Exhibit 6 in support of Defendants' Motion to Dismiss Amended Complaint. The next General Assembly also adopted these Resolutions. *See* Resolution Nos. VIII, XVII, and LI, copies of which are attached as Exhibit 7 in support of Defendants' Motion to Dismiss Amended Complaint. That same General Assembly enacted Public Chapter CLXXV

24

(175) establishing both when and how the vote of the people on these proposed constitutional amendments was to be conducted.  Section 1 of that Act provided

> That the Sheriffs holding the election for Representatives to the General Assembly, at the next general election in August 1845, shall open and hold an election in each and every county in this State, *when and where all persons entitled to vote for Representatives, may vote for the amendments proposed to the constitution* by the resolutions agreed to by the last General Assembly, and now by this General Assembly in the manner required by the Constitution, which resolutions are hereby submitted to the people for approval and ratification, and all persons entitled to vote as aforesaid, approving said amendment, shall put on their ticket the word "approved," and if the people shall approve and ratify said amendment by a majority of all the citizens of the State voting for representatives, voting in its favor, said amendments shall become a part of the Constitution of the State.

Acts of 1844, Public Chapter CLXXV, emphasis added (copy attached to Motion to Dismiss Amended Complaint as Exhibit 8).  Section 2 of the Act further directed the Sheriff of each county to make out and certify statements of "the number of votes given in their respective counties for Representatives to the State Legislature . . . and also the number of votes given in their respective counties for the approval of the amendments to the constitution."  *Id*.  However, nothing in this Act directed the Sheriffs to first determine whether a voter had voted in a Representative's race before counting that person's vote on the proposed constitutional amendments.  Thus, this Act clearly reflects that the Legislature understood Art. XI, § 3, as simply establishing the quantity or number of votes required to carry an amendment, *i.e.*, if the number of citizens voting in favor of an amendment exceeds the majority of qualified citizens voting for representatives, then an amendment is ratified.

That understanding was again demonstrated in 1887, when the General Assembly set an election on a proposed constitutional amendment at a time when there were no Representative elections.  In 1885, the 44th General Assembly had passed Senate Joint Resolution No. 2 to amend

25

the Tennessee Constitution to add as section 18 to Art. XI, a prohibition on the manufacture and sale of "any intoxicating liquors." (Copy of this resolution attached to the Motion to Dismiss Amended Complaint as Exhibit 9.) This same resolution was passed by the 45th General Assembly in 1887. The 45th General Assembly also enacted Public Chapter 86, which established "the mode of submitting the proposed amendment to the Constitution to the vote of the people." (Copy of this Act is attached to Motion to Dismiss Amended Complaint as Exhibit 10.)

Section 1 of the Act provided "[t]hat on the *last Thursday of September, 1887*, there shall be opened and held at each and every precinct or place of election in this State an election for the purpose of submitting to the people for their approval and ratification or rejection, the said proposed amendment to the Constitution of this State." *Id*. (emphasis added). However, Art. II, § 7, of the Tennessee Constitution of 1870 provided that the "first election for Senators and Representatives shall be held on the second Tuesday in November, on thousand eight hundred and seventy; and forever thereafter, *elections for members of the General Assembly shall be held once in two years, on the first Tuesday after the first Monday in November*." (Emphasis added.) Clearly, had the Tennessee General Assembly read Art. XI, § 3, as requiring a voter to have first voted in a Representative election before being allowed to vote on a proposed constitutional amendment, it would not have scheduled an election on a proposed constitutional amendment at a time when no Representative elections could be held.

Fourth and finally, Plaintiffs' interpretation of Art. XI, § 3, would unconstitutionally condition a voter's eligibility to vote on a constitutional amendment upon that voter's participation in the gubernatorial election without any compelling or rational state justification. *See Ayer-Schaffner v. DiStefano*, 37 F.3d 726, 727 (1st Cir. 1994); *Partnoy v. Shelley*, 277 F.Supp.2d 1064 (S.D. Ca. 2003) and *In re Hickenlooper*, 312 P.3d 153, 155 (Co. 2103). *See also* Defendants'

Memorandum in support of motion to dismiss (D.E. 25, Page ID# 94-97), which is adopted and incorporated as if fully restated herein.

On the other hand, Defendants' application of the State's long-standing interpretation of Art. XI, § 3, unlike that propounded by the Plaintiffs, does not impermissibly burden the First and Fourteenth Amendment rights of voters by forcing them to vote in a gubernatorial election as a condition to exercising their franchise on a proposed constitutional amendment.

Plaintiffs' federal claims are all premised on the assumption that their idiosyncratic interpretation of Art. XI, § 3, of the Tennessee Constitution is the correct interpretation. That assumption is wrong. Neither the language, the legislative history, nor the long-standing interpretation and application of Art. XI, § 3, supports Plaintiffs' theory. On the contrary, the plain language of the Constitution, the legislative history, and settled law as embodied in the long-standing and consistent interpretation and application of Art. XI, § 3, all show that Plaintiffs' interpretation is wrong as a matter of law. Since the underlying assumption is wrong, it follows that the claims based on that assumption do not make out a cause of action.

In sum, the linchpin of Plaintiffs' federal claims is an assumption that has no legal basis. That inherently deficient linchpin cannot hold the wheel to the axle: Plaintiffs have failed to state—and as a matter of law cannot state—a claim for violation of their due-process and equal-protection rights under the Fourteenth Amendment. Those claims should be dismissed.[14]

In fact, because Plaintiffs' claims are solely predicated on the assertion that Defendants' method of tabulation violates the Tennessee Constitution, they present no federal claim at all, and the claims should be dismissed for that reason alone.

---

[14]Defendants adopt and incorporate as if fully restated herein the arguments set forth in their previously filed memorandum of law addressing Plaintiffs' due process and equal protection claims. *See* D.E. 25, Page ID# 92-98, 100-102.

III.    **ALTERNATIVELY, ABSENTION UNDER THE PULLMAN DOCTRINE OR CERTIFICATION PURSUANT TO TENN. SUP. CT. R. 23 IS WARRANTED BECAUSE UNSETTLED STATE-LAW ISSUES PREDOMINATE.**

Should this Court nevertheless find that Plaintiffs do have the requisite standing and have stated a cognizable federal claim, then abstention and dismissal under the *Pullman* doctrine is called for, since state-law issues clearly predominate Plaintiffs' claims.  That doctrine, articulated in *Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496 (1941), directs that when a federal court is presented with both a federal constitutional issue and an unsettled issue of state law whose resolution might narrow or eliminate the federal constitutional question, abstention is justified under principles of comity in order to avoid needless friction with state policies.  Three objectives underlie this doctrine:  (1) to "avoid the waste of a tentative decision" on an unsettled question of state law, where a federal court's decision could be supplanted by a later state court ruling; (2) to prevent "premature constitutional adjudication" of federal constitutional questions; and (3) to avoid needless friction between state and federal courts.  *Id*. at 500-501.

The Sixth Circuit has held that "where uncertain questions of state law must be resolved before a federal constitutional question can be decided, federal courts should abstain until a state court has addressed the state questions."  *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) quoting *Brocket v. Spokane Arcades, Inc*., 472 U.S. 491, 508, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985) (O'Connor, J. concurring) (citing *Railroad Comm'n v. Pullman Co*., 312 U.S. 496, 501, 61 S.Ct. 643, 85 L.Ed. 971 (1941), and *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 236-37, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984)).  The Sixth Circuit has further recognized that *Pullman* abstention has regularly been applied in Section 1983 actions.  *Id*. (citations omitted).

As previously discussed, Plaintiffs' substantive-due-process and equal-protection claims rest entirely on their interpretation of Article XI, § 3, of the Tennessee Constitution.  Although

28

Plaintiffs assert otherwise, their interpretation is far from being the settled or certain interpretation of Article XI, § 3; it has never even been addressed by Tennessee courts.[15] This makes *Pullman* abstention especially appropriate and necessary in this case where the "state constitution" is "the nub of the whole controversy" and is a "matter of great state concern." *Reetz v. Bozanich*, 397 U.S. 82, 87 (1970). Indeed, Plaintiffs' interpretation of the language at issue should not be adopted without an authoritative ruling by the Tennessee Supreme Court, because the vote-tabulation method in Article XI, § 3, applies to all proposed constitutional amendments, including the other three proposed amendments that were on the ballot in the November 4, 2014, general election.

Usually when a district court abstains under *Pullman*, it retains jurisdiction pending an authoritative interpretation of the state law in question. In this case, however, it would serve no purpose to retain jurisdiction. No authoritative determination by the Tennessee courts could possibly leave grounds for further action by this Court; therefore, dismissal of this case is appropriate. *See Brown v. Tidwell*, 169 F.3d at 333. A decision rejecting Plaintiffs' interpretation of Article XI, § 3, would moot their federal constitutional claims, as those claims depend entirely

---

[15]Contrary to Plaintiffs' assertions, the Tennessee Supreme Court did not adopt or even recognize as possibly valid Plaintiffs' interpretation of Art. XI, § 3, in *Snow v. Memphis*, 527 S.W.2d 55, 61 (Tenn. 1975). The plaintiffs in that case had brought a declaratory judgment action asserting that the constitutional convention of 1971 exceeded the limitation of the call and, therefore, the amendment to Art. II, § 28, ratified in a referendum was unconstitutional. *Id.* at 58. The Tennessee Supreme Court was called upon to determine the "proper interpretation and application of the phrase in Article XI, Section 3 of our Constitution proscribing that no amendment shall become effective, 'unless within the limitations of the call of the convention.'" *Id.* at 59. Thus, to begin with, the *Snow* Court was <u>not</u> construing the language in Art. XI, § 3, on which the Plaintiffs in this case are relying.

In the scope-of-the-call context, the *Snow* Court engaged in a brief review of the background and events leading to the amendment of Art. XI, § 3. *Id.* at 59-63. As part of this review, the Supreme Court noted that eleven efforts to amend the 1870 Constitution by legislative method had failed "because of the obstacle of obtaining voter ratification by a majority of all those voting for representatives." As an aside the Court observed that "in said efforts to amend by that process, only a small percentage of the voters who voted for representatives cast their ballots either for or against constitutional amendments, leaving the required majority of those voting for representatives unattainable." *Id.* at 61. But nothing in these observations supports Plaintiffs' interpretation of Art. XI, § 3, that only voters who voted for governor may have their votes on a proposed constitutional amendment counted to determine whether the amendment is ratified. All that these observations reflect is the difficulty in ascertaining the total number of votes cast in representative elections, which difficulty ultimately led to the substitution of "Governor" for "representatives" in Art. IX, § 3.

29

on the acceptance of Plaintiffs' interpretation.  If, on the other hand, the Tennessee Supreme Court were to hold that Defendants' tabulation method violates the Tennessee Constitution, appropriate relief would be available in that forum.

Alternatively, the question of the correct interpretation of Art. XI, § 3, of the Tennessee Constitution should be certified to the Tennessee Supreme Court pursuant to Tenn. Sup. Ct. R. 23, § 1, which provides as follows:

> The Supreme Court may, at its discretion, answer questions of law certified to it by . . . a District Court of the United States in Tennessee . . . .  This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee.

The decision of whether to certify a question to a state supreme court "rests in the sound discretion of the federal court," *Lehman Bros. v. Shein*, 416 U.S. 386, 391 (1974), and it is a decision which may be made *sua sponte* by the court.  *Elkins v. Moreno*, 435 U.S. 647, 662 (1978). This Court has noted, certification has various benefits.  It

> eliminates guesswork and speculation about questions of state law, and "[t]aking advantage of certification made available by a State may 'greatly simplif[y]' an ultimate adjudication in federal court." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 79 (1997); *Shein*, 416 U.S. at 386 (by certifying a question of state law, the federal court may save "time, energy and resources and hel[p] build a cooperative judicial federalism").  It also serves the salutary function of "protect[ing] states' sovereignty," something which "'is no small matter, especially since a federal court's error may perpetuate itself in state courts until the state's highest court corrects it.'"  *Haley v. Univ. of Tennessee-Knoxville*, 188 S.W.3d 518, 521 (Tenn. 2006) (citation omitted).

*Renteria-Villegas v. Metropolitan Government of Nashville and Davidson County*, No. 3:11-00218, 2011 WL 4048523, at *12 (M.D. Tenn. Sept. 12, 2011).

30

Pursuant to Tenn. Sup. Ct. R. 23, § 1, certification of the state law question of the proper interpretation of Art. XI, § 3, of the Tennessee Constitution is entirely appropriate and lies well within the discretion of this Court. First, the answer to this state law question will determine the outcome of this case since each cause of action brought by Plaintiffs has as its genesis the alleged illegality of the Defendants' interpretation and application of Art. XI, § 3. Count 1 directly alleges that by applying an incorrect interpretation of Art. XI, § 3, Defendants have implemented a fundamentally unfair system of voting in violation of Plaintiffs' substantive due process rights under the Fourteenth Amendment. (D.E. 51 Page ID# 596-97). Count II alleges that by applying an incorrect interpretation of Art. XI, § 3, Defendants have diluted Plaintiffs' votes on Amendment 1 and have created two classes of voters in violation of Plaintiffs' equal protection rights under the Fourteenth Amendment. (*Id*. Page ID# 598-600).

Second, assuming that the question is not a matter of settled law (see discussion in Section II at pp. 26-27), then it would be appropriate to ask the Tennessee Supreme Court to settle the question. Plaintiffs are wrong when they say that the Tennessee Supreme Court has already done so in *Snow v. Memphis*, 527 S.W.2d 55 (Tenn. 1975). *Snow* did not at all address the proper interpretation of the language of Art. XI, § 3, at issue in this case.[16] It merely discussed the history of Art. XI, § 3, in the context of construing the scope of the call for a constitutional convention. 527 S.W.2d at 59-63.

In any event, even if *Snow* could somehow be read as dealing in some way with the interpretation of the language at issue here, that would still be only *dicta* and far from binding precedent, since the interpretation of that language was not an issue before the Court in *Snow*. The Tennessee Supreme Court has specifically cautioned that

---

[16] *See* n.9, *supra*.

31

> [a]ny language employed by us over and above that necessary and proper to dispose of the issues presented as aforesaid is not binding on future decisions of this Court.
>
> It is a familiar law that a decision is authority for the point or points decided, and nothing more, and that general expressions in an opinion are to be taken in connection with the case in which they were used, and when they go beyond that, they are not authority for another case.

*Poe v. Metro Gov't of Nashville and Davidson County*, 383 S.W.2d 265, 277 (Tenn. 1964).

In sum, if the Court should not grant Defendants' motion to dismiss for lack of jurisdiction or for failure to state a claim, then it should exercise *Pullman* abstention and dismiss Plaintiffs' claims. In the further alternative, the question of the correct interpretation of Art. XI, § 3, of the Tennessee Constitution should be certified to the Tennessee Supreme Court pursuant to Tenn. Sup. Ct. R. 23, § 1.

## CONCLUSION

For these reasons and for the reasons set forth in Defendants' Memorandum of Law in support of their Motion to Dismiss (D.E. 25) and Reply in Support of Defendants' Motion to Dismiss (D.E. 33), Defendants respectfully request that this Court dismiss Plaintiff's First Amended Complaint in its entirety and with prejudice for lack of subject matter jurisdiction and failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(1) and (6).

In the alternative, abstention and dismissal under the *Pullman* doctrine is warranted. In the further alternative, this Court should certify the state law question of the correct interpretation of Art. XI, § 3, of the Tennessee Constitution to the Tennessee Supreme Court pursuant to Tenn. Sup. Ct. R. 23, § 1.

Respectfully submitted

HERBERT H. SLATERY III
Attorney General and Reporter

32

ANDRÉE SOPHIA BLUMSTEIN
Solicitor General

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER
Deputy Attorney General
Public Interest Division
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Janet.kleinfelter@ag.tn.gov


## CERTIFICATE OF SERVICE


The undersigned hereby certifies that on the 20th day of March, 2015 a copy of the above document has been served upon the following persons by:


  X                                                   Electronic Case Filing (ECF) System to:

William L. Harbison
C. Dewey Branstetter, Jr.
Phillip F. Cramer
Hunter C. Branstetter
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
bharbison@sherrardroe.com
dbranstetter@sherrardroe.com
pcramer@sherrardroe.com
hbranstetter@sherrardroe.com


/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER

33