# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| TRACEY E. GEORGE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-02182 |
| | ) | Chief Judge Sharp |
| WILLIAM EDWARD "BILL" HASLAM, | ) | Magistrate Judge Bryant |
| as Governor of the State of Tennessee, | ) | |
| in his official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFFS' RESPONSE IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

---

Pursuant to Local Rule 7.01(b), Plaintiffs Tracey E. George, Ellen Wright Clayton, Deborah Webster-Clair, Kenneth T. Whalum, Jr., Meryl Rice, Jan Liff, Teresa M. Halloran, and Mary Howard Hayes (collectively "Plaintiffs") submit this response in opposition to the Motion to Dismiss the First Amended Complaint[1] filed by Defendants William Edward "Bill" Haslam, Tre Hargett, Mark Goins, Herbert H. Slatery III, the State Election Commission of Tennessee, Judy Blackburn, Donna Barrett, Gregg Duckett, Tommy Head, Jimmy Wallace, Tom Wheeler, and Kent Younce (collectively "Defendants").

Defendants' motion seeks to dismiss a complaint that is not before the Court. The complaint attacked by Defendants is one brought to simply declare the meaning of Article XI, Section 3 of the Tennessee Constitution and require the state to follow its strictures—that complaint is not the one brought by Plaintiffs.

---

[1] *See* Docket Entry ("DE") 52: Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, PageID 603; DE 53: Memorandum of Law In Support of Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint, PageID 676.

Instead, the complaint before this Court alleges that Defendants' actions, whether contrary to or consistent with Article XI, Section 3, specifically violated Plaintiffs' federally-secured, fundamental right to vote by implementing a fundamentally unfair voting scheme (Count 1) and by disenfranchising Plaintiffs through vote dilution (Count 2). Although Plaintiffs certainly recognize that Defendants' actions also contravene the plain language of Article XI, Section 3 of Tennessee's Constitution, such a transgression is decidedly not the lynchpin of Plaintiffs' complaint. Plaintiffs do not know how they could have made this anymore plain in their First Amended Complaint, which explicitly states: "[r]egardless of whether Defendants' tabulation method was contrary to or consistent with Article XI, Section 3, it subjected Plaintiffs—who voted both for governor and against Amendment 1—to a coordinated scheme that violated their federally-secured due process and equal protection rights." DE 51: First Amended Complaint at ¶ 8, PageID 585.

Defendants' preoccupation with the history, convention debate, purported intent, and news articles concerning Article XI, Section 3 makes for an interesting law review article, but it does not address the claims before this Court. After all, history and tradition are no defense to a state's infringement of federally-protected constitutional rights. Thus even if this Court were to reject the plain meaning of the words of Article XI, Section 3 and ultimately find Defendants' position on the Tennessee Constitution to be correct (a finding that would require the Court to look beyond the pleadings and consider the voluminous materials proffered by Defendants), that finding still would not condone Defendants' violations of Plaintiffs' Fourteenth Amendment voting rights. It is axiomatic that a state can act consistently with its own constitution or statutes and still violate a plaintiff's federal constitutional rights. *See, e.g., Romer v. Evans*, 517 U.S. 620 (1996); *Williams v. Rhodes*, 393 U.S. 23 (1968); *Loving v. Virginia*, 388 U.S. 1 (1967); *Reitman v. Mulkey*, 387 U.S. 369 (1967); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966); *Carrington v. Rash*,

380 U.S. 89 (1965); *McLaughlin v. State of Florida*, 379 U.S. 184 (1964); *Reynolds v. Sims*, 377 U.S. 533 (1964).

As in their filings seeking to dismiss the original complaint, Defendants' current motion papers never question, let alone address, the critical factual allegations that Plaintiffs' votes were diluted and Defendants' tabulation method led to a fundamentally unfair voting process that resulted in certain votes in favor of Amendment 1 receiving disproportionate weight as compared to Plaintiffs' votes. Defendants' misapprehension of this lawsuit is also reflected in Defendants' standing and abstention/certification arguments. While Defendants' arguments may be subject to reasonable debate if this lawsuit simply sought to ask this Court to construe the plain meaning of Article XI, Section 3, that is, again, not what this lawsuit is about. Instead, Plaintiffs have been personally injured by having *their* votes devalued and diluted in defiance of *their* rights under the Fourteenth Amendment. The bedrock of federal civil rights jurisprudence is premised on the fact that when plaintiffs are injured in such a manner, they have standing to seek redress for their particularized harm.

Likewise, *Pullman* abstention is inappropriate because Plaintiffs' due process and equal protection injuries derive from Defendants' failure to comply with the Fourteenth Amendment. Even if the interpretation of Article XI, Section 3 were unsettled, no such resolution can lead to a favorable disposition for Defendants: either Plaintiffs' plain language reading of Article XI, Section 3 is correct and Defendants have thereby violated both the Tennessee and United States constitutions or, assuming for the sake of argument that Defendants' interpretation of Article XI, Section 3 is correct, Defendants have nonetheless implemented a voting system that does not comply with the Fourteenth Amendment. This not only renders *Pullman* abstention inapplicable, but it also illustrates the futility of certification to the Tennessee Supreme Court because—even if the Court should find that Defendants' secondary materials somehow call into question the plain language of Article XI, Section 3—Defendants' actions in tabulating the vote on Amendment 1

still violates Plaintiffs' Fourteenth Amendment rights by differentially weighing votes in defiance of the Equal Protection Clause and implementing a fundamentally unfair voting system in violation of the Due Process Clause.

Accordingly, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

## FACTS

This case arises from Defendants' implementation of a vote tabulation scheme that violated Plaintiffs' federally protected voting rights.[2] In tabulating the vote on Amendment 1, Defendants gave certain votes in favor of the amendment twice the effective weight Defendants afforded Plaintiffs' votes against the amendment. In so doing, Defendants employed a fundamentally unfair voting scheme, diluted Plaintiffs' votes, contravened the plain language of the Tennessee Constitution, and ultimately yielded a result that effectively disenfranchised Plaintiffs.[3]

---

[2] Plaintiffs' Response in Opposition to Defendants' first Motion to Dismiss (DE 27, PageID 155) and Plaintiffs' Request to Reconsider Order Granting Defendants' Motion for Leave (DE 38, PageID 267) along with other pleadings such as the First Amended Complaint (DE 51, PageID 583), provides this factual background in greater detail. To avoid being duplicative, Plaintiffs incorporate their original Response as if fully stated herein and will only summarize and supplement here.

[3] Although the fact section in this response relies solely on the allegations in the First Amended Complaint, Defendants have made the following admissions by virtue of their failure to timely respond to requests for admissions propounded on them in this case:

- Defendants admit that Article XI, Section 3 of the Tennessee Constitution requires that an amendment to the Tennessee Constitution be ratified only when a majority of the qualified voters who voted for governor also vote in favor of the amendment. DE 48-3: Pl.'s First Set Requests for Admissions to Defs., PageID 488, at 499.

- Defendants admit that Tennessee voters were not provided any "legislative history" or other "drafters' intent" documentation when they voted on approving Article XI, Section 3's current language. *Id.* at 15, PageID 502.

- Defendants admit that they employed and publicized a methodology of counting ballots contrary to the requirements of the Tennessee Constitution and which undermined the integrity of the election on Amendment 1 and disenfranchised voters. *Id.* at PageID 493-494.

- Defendants admit that they do not know how many voters who cast a ballot in favor of Amendment 1 did not vote in the Governor's race. *Id.* at 9, PageID 496.

To amend Tennessee's Constitution using the public referendum (or legislative) method, a proposed amendment must pass two different General Assemblies. Tenn. Const. Art. XI, § 3. The latter General Assembly then submits the proposed amendment:

> to the people at the next general election in which a governor is to be chosen. And if the people shall approve and ratify such amendment or amendments **by a majority of all the citizens of the state voting for governor, voting in their favor**, such amendment or amendments shall become a part of this Constitution.

*Id.* (emphasis added). This plain language mandates that an amendment such as Amendment 1 is ratified only if "a majority of all the citizens of the state voting for governor" vote in its favor— *i.e.*, only if a majority of the citizens who voted for governor also vote to approve the amendment.

Proposed Amendment 1 stated:

Shall Article I, of the Constitution of Tennessee be amended by adding the following language as a new, appropriately designated section:

> Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion. The people retain the right through their elected state representatives and state senators to enact, amend, or repeal statutes regarding abortion, including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother.

Plaintiffs opposed Amendment 1. Defendants publicly favored Amendment 1.

---

- Defendants admit that no vote from an eligible citizen should count double, count as a vote-and-a-half, or count any more than any other eligible citizen's vote. *Id*. at 10, PageID 497.

- Defendants admit that voter confidence is jeopardized when a person's vote is "effectively cancelled by someone who wasn't eligible to cast a ballot." *Id*. at 11, PageID 498.

- Defendants admit that supporters of Amendment 1 encouraged voters to vote for Amendment 1 and refrain from voting in the Governor's race. *Id*. at 14, PageID 501.

- Defendants admit that they individually all favored passage of Amendment 1. *Id.*

To the extent the Court is going to consider the beyond-the-pleadings materials offered by Defendants, then the Court should also consider these admissions, which all but concede the factual predicate for Plaintiffs' claims and which are more fully discussed in Plaintiffs' Motion to Compel and supporting Memorandum. DE 47: Motion to Compel and for Sanctions, PageID 335; DE 48: Memorandum in Support of Motion to Compel and for Sanctions, PageID 338.

After Amendment 1 was placed on the November 4, 2014 ballot, Defendants announced that they would consider Amendment 1 to have passed if the total votes in favor of Amendment 1 constituted a majority of the total number of votes cast in the gubernatorial race, regardless of whether those who voted in favor of Amendment 1 had also voted in the governor's race. DE 51: First Amended Complaint at ¶¶ 5-7, 39-43, PageID 584-85, 593-94. Defendants unequivocally stated that they would only compare the totals in each race and would not correlate votes from citizens who voted for governor with the votes for Amendment 1.[4] In other words, if 2,000,000 persons participated in the November 4, 2014 election but only 1,000,000 people voted in the gubernatorial race, Defendants would deem Amendment 1 as having been approved so long as it received 500,001 "yes" votes, even if 1,499,999 votes were cast against the amendment.

Taking cues from this pre-announced tabulation method, supporters of Amendment 1—including some Defendants—encouraged "yes" voters to abstain from the governor's race in order to make their votes on Amendment 1 count "double" or as a "vote and a half" to capitalize on and reinforce Defendants' method diluting "no" votes and increasing the voting power of "yes" votes. *See id*. at ¶ 8, PageID 585. Defendants' publicized vote-tabulating intentions were utilized to raise the numerator of the state's election fraction without commensurately adding to the denominator by voting for governor. This scheme diluted Plaintiffs' votes.

The scheme worked. For the first time in Tennessee's history, the number of votes on a proposed constitutional amendment (1,386,355 for Amendment 1) exceeded the number of votes in the gubernatorial race (1,353,728).[5] Defendants then simply declared Amendment 1 ratified

---

[4] Envisioning Defendants' method as a fraction, if [total votes in favor of Amendment 1, regardless of whether those voters voted for governor] / [total votes for governor] > ½, then, according to Defendants, Amendment 1 was ratified.

[5] Defendants point out that the total vote on Amendment 2 (1,357,161) also exceeded the total number of votes cast for governor. This outcome is not unexpected given than some voters who skipped the governor's race to increase the weight of their vote in favor of Amendment 1 also may have voted on Amendment 2. But while there were 32,627 more votes on Amendment 1 than in the gubernatorial race, there were only

because the number of "yes" votes on Amendment 1 exceeded half of the total votes cast in the gubernatorial race.

After a series of requests from Plaintiffs and delays from Defendants,[6] Defendants eventually publicly revealed that a total of 1,430,117 ballots were cast in the November 4, 2014 election. Collectively, these election data can only confirm that, at maximum, 652,774 votes in favor of Amendment 1 were cast by those who voted in the governor's race—a number that falls 24,091 votes short of the 676,865 votes required to ratify Amendment 1.[7] *Id.* at ¶¶ 44-46, PageID 594-95. Thus, whether Amendment 1 has properly passed remains incurably uncertain given the current data released by the Defendants, who have refused to provide any additional details or data in discovery or otherwise, giving rise to the inference that Defendants themselves realize that Amendment 1 indeed failed to pass.

Plaintiffs all are citizens of Tennessee, who (i) were eligible to vote and registered to vote in the November 4, 2014 election, (ii) voted in that election, (iii) voted in the gubernatorial race, and (iv) voted against ratifying Amendment 1. Based on the plain language of Article XI, Section

---

3,433 more votes on Amendment 2 than for governor—a difference of nearly 10 times. This almost ten-times difference between the number of votes in excess of the number of votes for governor on Amendment 1 and Amendment 2 suggests there was a coordinated scheme to manipulate the vote on Amendment 1 in a way that did not occur for Amendment 2 (and certainly not for Amendments 3 or 4).

[6] Contrary to Defendants' assertion in their motion papers that the First Amendment Complaint adds no new factual allegations and is a quasi-surreply, Plaintiffs—as explained in their motion to amend—filed their First Amendment Complaint to incorporate the election data, including total voter turnout once the data were finally released. *See* DE 45: Memorandum in Support of Motion for Leave to File First Amended Complaint at 1-2, PageID 322-23. Defendants acknowledged as much during the March 24, 2015 telephonic case management conference with Judge Bryant.

[7] To determine "certain" votes, subtract the difference in the number of total votes cast in the election and total votes for governor from the total number of votes for Amendment 1. Put another way, assume in the case of Amendment 1 that A = total votes cast for governor (1,353,728); B = total votes cast in the entire election (1,430,117); and C = total votes for Amendment 1 (729,163). If $C - (B - A) \leq (A / 2) + 1$, then Amendment 1 may not have passed if the votes were correctly tabulated. Here $729,163 - (1,430,117 - 1,353,728) \leq (1,353,728/2) + 1$ holds true as $652,774 \leq 676,865$, indicating that Amendment 1 might not have passed. By comparison, when this equation is applied to Amendment 2, it indicates that Amendment 2 had enough "certain votes" to have definitely passed.

3, the Tennessee Constitution mandated that they vote for governor to have their vote on Amendment 1 tabulated. Based on Defendants' conduct, however, Plaintiffs' votes were diluted by counting ballots from voters who did not vote in the governor's race, which results were then used to determine the threshold number of votes to pass Amendment 1. Whereas Plaintiffs' votes were counted equally into both the numerator and the denominator of the Defendants' voting fraction, those voters who cast ballots only in favor of Amendment 1 and without voting in the gubernatorial race, as they had been encouraged by Defendants' announced intentions of tabulating the votes, were counted only as part of the numerator. Accordingly, Plaintiffs' votes against Amendment 1 were undervalued while certain votes cast in favor were overvalued. Defendants' actions violated Plaintiffs' federally-protected constitutional rights and irreparably tainted the election process on Amendment 1.

## ARGUMENT

As in their motion to dismiss the original complaint, Defendants ignore the actual constitutional claims brought by Plaintiffs and instead begin their current motion by trying to introduce stacks of outside-the-pleadings materials in an attempt to call into question the plain language of Article XI, Section 3 of the Tennessee Constitution. Defendants again all but concede that they failed to follow the plain language of Article XI, Section 3 and attempt to justify this failure by offering a panoply of purported history and competing interpretations of Article XI, Section 3. While Plaintiffs continue to assert that the language of Article XI, Section 3 must be given its plain meaning as previously dictated by the Tennessee Supreme Court, no amount of outside-the-pleading documents can change the fact that Plaintiffs' rights under the Fourteenth Amendment have been violated. In the same way, Defendants' other attempts to shield their actions from redress in this Court—whether under the auspices of Fed. R. Civ. 12(b)(1), Fed. R. Civ. P. 12(b)(6), *Pullman* abstention, or certification to the Tennessee Supreme Court—are unavailing. The Court should deny this motion to dismiss.

## I. Plaintiffs have standing because Defendants' tabulation method has caused particularized injury to Plaintiffs by diluting—and thereby effectively denying—their individual votes on Amendment 1.

Plaintiffs have established Article III standing in their First Amended Complaint by demonstrating that they have "suffered a[n actual] concrete and particularized injury" through the dilution of their votes, "that the injury is fairly traceable to the defendant" based on Defendants' tabulation method (which also deviates from Article XI, Section 3's voting tabulation requirements[8]), and "that it is likely that a favorable decision will redress that injury" by this Court's voiding of the results on Amendment 1 and requiring tabulation consistent with the Fourteenth Amendment. *Mass. v. E.P.A.*, 549 U.S. 497, 517 (2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Defendants do not dispute the causality or redressability of Plaintiffs' injury and, at root, do not seriously dispute that Plaintiffs' votes have been diluted. Rather, Defendants assert that Plaintiffs lack standing—thus depriving this Court of subject matter jurisdiction—because the injury of their diluted votes is one shared by everyone and thus is unfit to convey standing pursuant to the prudential generalized-grievance doctrine.

Defendants' argument is unfounded because "any person whose right to vote is impaired has standing to sue." *Gray v. Sanders*, 372 U.S. 368, 375 (1963) (citations omitted). Plaintiffs need only "have more than 'a general interest common to all members of the public'" to establish standing, *Lance v. Coffman*, 549 U.S. 437, 440 (2007) (quoting *Ex Parte Levitt*, 302 U.S. 633, 634 (1937)), and an injury sufficient for standing need not be so intensely particularized or personalized that only a single plaintiff could assert it. *See, e.g.*, *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972) (holding that plaintiffs who merely averred that they were persons "for whom the aesthetic

---

[8] Or, should the Court disagree with Plaintiffs' plain language reading, based on Defendants' application of a state law that violates the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

and recreational values of [an] area will be lessened" by a challenged activity had sufficiently alleged an injury for the purposes of standing).

Plaintiffs' injury derives from their individual votes on Amendment 1 not being counted and valued the same way as other votes. This injury is distinct not only from the general public, but also from all voters in the November 4 election and even from all voters on Amendment 1. Plaintiffs' due process and equal protection injuries are specific only to them and those like them who (i) are registered to vote, (ii) voted in the November 4, 2014 election, (iii) voted in the gubernatorial race, (iv) voted against Amendment 1, and therefore (v) had the relative values of their particular votes devalued. In contrast, voters who cast ballots only in favor of Amendment 1 were not injured at all; rather, they were rewarded by Defendants' unconstitutional counting method. Accordingly, Plaintiffs' claims move well beyond a generalized assertion that "some law is not being followed" to explain how Defendants' refusal to follow the law has undermined the value of *their* votes and thereby violated *their* due process rights to a fair election and *their* free exercise of franchise in violation of the Equal Protection Clause. *See, e.g.*, DE 51: First Amended Complaint at ¶¶ 48-50, PageID 596.

The watershed voting rights case *Baker v. Carr*, 369 U.S. 186, 207-208 (1962), affirms Plaintiffs' standing. In *Baker*, residents of several Tennessee counties sued under § 1983 "on their own behalf and on behalf of all qualified voters of their respective counties, and further, on behalf of all voters of the State of Tennessee who are similarly situated" to challenge the apportionment of members in the Tennessee General Assembly. 369 U.S. at 187-88. The Court held that the *Baker* plaintiffs had standing, noting that "*Colegrove v. Green*, [328 U.S. 549 (1946),] squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue. A number of cases decided after *Colegrove* recognized the standing of the voters there involved to bring those actions." *Id.* at 206-07.

Defendants attempt to circumvent this holding from *Baker*, by asserting that Plaintiffs allege only a general harm because other voters—those who casts ballots similar to Plaintiffs'—also suffered this harm. But the fact that others have suffered this harm does not make Plaintiffs' claims generalized. Taking a step back, this result would be absurd and lead to conclusions such that a state could decline to count ballots from people based on their eye color, gender, or national origin because all persons having those same characteristics would share a similar injury. *Baker* explains that this is not and indeed cannot be the law.

In *Baker*, the Court explained that the plaintiffs there sought "seek relief in order to protect or vindicate *an interest of their own, and of those similarly situated*," *Baker*, 369 U.S. at 207 (emphasis added), and that those plaintiffs, as citizens of their counties, were:

> asserting "a plain, direct and adequate interest in maintaining the effectiveness of *their* votes," *Coleman v. Miller*, 307 U.S. [433, 438 (1939)] not merely a claim of "the right possessed by every citizen 'to require that the government be administered according to law." *Fairchild v. Hughes*, 258 U.S. 126, 129 [(1922)].

*Baker*, 369 U.S. at 208 (emphasis added). *Baker* refutes Defendants' assertion that Plaintiffs lack standing because they have failed to "allege any injury that affects them in a particularized way peculiar to them, as distinct from injury to their fellow citizens." DE 53: Def.'s Mem. in Support of Mot. to Dismiss First Amended Complaint at 15, PageID 690. Like the Plaintiffs in *Baker* and numerous other voting rights cases—including other classic voting rights cases such as *Reynolds v. Sims*, 377 U.S. 533 (1964)—Plaintiffs have asserted a particularized injury as voters who have been disadvantaged as individuals by government action in an election and who have a direct interest in the effectiveness of their vote on Amendment 1.

Defendants' reliance on two inapposite cases—*Hein v. Freedom From Religion Foundation*, 551 U.S. 587 (2007) and *Lance*, 549 U.S. 437—underscores that Plaintiffs have standing. In *Hein*, plaintiffs whose only basis for standing was that that they paid federal taxes asserted that the President's Faith-Based and Community Initiatives program violated the First

Amendment's Establishment Clause. 551 U.S. at 592. The Supreme Court dismissed this claim for lack of jurisdiction, holding that status as a federal taxpayer alone does not establish standing to challenge the federal government's appropriations or expenditures. *Id*. at 605. Whereas the *Hein* plaintiffs asserted an attenuated non-particularized injury based on merely being a taxpayer (an attribute common to the nearly all citizens), Plaintiffs' injuries are specific to them as a specific-type of voter, who voted in the November 4, 2014 election, who voted both for governor and against Amendment 1, whom Defendants treated differently from other voters in the same election, and whose individual fundamental rights to vote were impeded.

In *Lance,* four private citizens filed suit in federal court asserting that the Colorado Supreme Court's decision in redistricting case in which none of the plaintiffs participated violated the Elections Clause of the United States Constitution. *Lance*, 549 U.S. at 437-39. As the Supreme Court explained in *Lance,* the plaintiffs' purported the-law-is-not-being-followed injury was "quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing." *Id*. (citing, by way of example, *Baker v. Carr*). Neither the *Lance* plaintiffs' individual votes nor their overall ability to vote were at issue. In contrast, the crux of the case before this Court is Defendants' methodology to devalue Plaintiffs' specific votes and intentionally violate Plaintiffs' Fourteenth Amendment rights to the due process rights of a fair election and the free exercise of franchise guaranteed by Equal Protection Clause. Unlike the *Lance* plaintiffs, Plaintiffs have alleged a particularized injury derived from the disparate treatment of their individual votes.

The remainder of Defendants' examples likewise feature plaintiffs asserting standing on the basis of government officials' "failure to follow the law" or on their status as a voter generally—not as plaintiffs who, like those in the case at bar, have been specifically and individually harmed by treatment that is not common to all Tennessee voters. *See Moncier v. Haslam*, 1 F. Supp. 3d 854, 862 (E.D. Tenn. 2014) (holding that the plaintiff who had "not alleged

that he [was] being treated differently from **any** other voters in Tennessee" lacked standing (emphasis added)); *Looper v. Boman*, 958 F. Supp. 341, 345 (M.D. Tenn. 1997) (holding that the plaintiff—who had been elected to be the Assessor of Property for Putnam County, Tennessee — lacked standing to seek prospective injunctive relief in future elections and both compensatory and punitive damages based on alleged injuries "common to **all** voters or candidates in Putnam County" (emphasis added)); *Parks v. Alexander*, 608 S.W.2d 881 (Tenn. Ct. App. 1980) (holding that plaintiffs who voted on a constitutional referendum—but who did not allege any differential treatment of their votes—lacked standing to challenge that constitutional referendum).

In contrast to those inapposite cases, on-point cases find standing in situations comparable to Plaintiffs, whose votes on Amendment 1 were undervalued while other votes were overvalued. *See, e.g.*, *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1333 (11th Cir. 2007) (contrasting plaintiffs who have alleged "alleged concrete and personalized injuries in the form of denials of equal treatment or of vote dilution" with plaintiffs who "merely seek to protect an asserted interest in being free of an allegedly illegal electoral system" and noting that "vote dilution, whether motivated by race or other factors" may provide grounds for standing); *see also Radford v. Gary*, 145 F. Supp. 541, 542 (W.D. Okla.), *aff'd* 352 U.S. 991 (1957) (finding standing in a vote dilution challenge but dismissing on substantive grounds).

Plaintiffs meet the three fundamental criteria for standing: (1) they have been injured by having their individual votes devalued, (2) Defendants' tabulation method (which Plaintiffs additionally allege constitutes a failure to follow Article XI, Section 3[9]) and diluting their individual votes caused this injury, and (3) this Court can redress the injury by voiding the current results for the Amendment 1 vote. By pleading harms that are individualized to them, Plaintiffs do

---

[9] Alternatively, should the Court ultimately disagree with Plaintiffs' reading of Article XI, Section 3, Plaintiffs nonetheless still have standing because their injury remains the same, Defendants' application of a state law that undermines federal rights is the cause, and the Court can provide redress by voiding the vote on Amendment 1.

not assert non-justiciable generalized grievances. Accordingly, Plaintiffs have established standing and this Court has subject-matter jurisdiction dictating that Defendants' motion under Rule 12(b)(1) should be denied.

**II.** **Plaintiffs plead sufficient facts to support their assertions that Defendants subjected them to a fundamentally unfair voting system and diminished the value of their votes, and Plaintiffs therefore have stated claims under the Fourteenth Amendment's Due Process and Equal Protection Clauses.**

Defendants take a multifaceted approach to the 12(b)(6) failure-to-state-a-claim-portion of their argument: first blithely (and incorrectly) asserting that Plaintiffs' claims derive exclusively from a failure to follow Article XI, Section 3 of the Tennessee Constitution, then claiming that Plaintiffs' reading of Article XI, Section 3 is not based on plain language, before devoting pages upon pages (including some in the background section) to justifying and then drawing inferences from their ten beyond-the-pleadings exhibits, and finally asserting that Plaintiffs' reading of Article XI, Section 3 is unconstitutional because it compels votes for governor in order to vote for a constitutional amendment. Although Plaintiffs address each in turn, none of these arguments— either individually or collectively—even if correct, warrant dismissing Plaintiffs' First Amended Complaint because none of them question the fact that Defendants' conduct in tabulating the vote violated Plaintiffs' equal protection and due process rights secured by the Fourteenth Amendment.

> A. Plaintiffs' claims are rooted in the Fourteenth Amendment to the U.S. Constitution; these claims persist regardless of how the Court opts to read Article XI, Section 3 of the Tennessee Constitution.

Contrary to assertions throughout Defendants' motion papers, *see, e.g.*, DE 53: Def.'s Mem. in Support of Mot. to Dismiss First Am. Complaint at 19, 31, PageID 694, 706, the two counts in Plaintiffs' First Amended Complaint do not strictly derive from allegations regarding Defendants' misapplication of Article XI, Section 3 of Tennessee's Constitution. *See* DE 51: First Amended Complaint at ¶¶ 51-70, PageID 596-600. Rather, Plaintiffs' claims wholly derive from Defendants' violating Plaintiffs' federally-secured, fundamental right to vote by creating a

fundamentally unfair voting scheme (Count 1) and by disenfranchising them through vote dilution (Count 2).[10] Although one way Plaintiffs demonstrate these violations is by showing Defendants actions contravened Article XI, Section 3 of Tennessee's Constitution, this allegation is decidedly not the lynchpin of Plaintiffs' argument. As the First Amended Complaint itself explains, "[r]egardless of whether Defendants' tabulation method was contrary to or consistent with Article XI, Section 3, it subjected Plaintiffs—who voted both for governor and against Amendment 1— to a coordinated scheme that violated their federally-secured due process and equal protection rights." *Id.* at ¶ 8, PageID 585.

While Defendants' violations of Plaintiffs' equal protection and substantive due process rights are certainly exacerbated, if not definitively established, by Defendants' refusal to follow the plain language of Article XI, Section 3, Plaintiffs' claims are not tied <u>solely</u> to this state constitutional language. Even if this Court were to reject the plain meaning of the words and ultimately find Defendants' interpretation of Article XI, Section 3 to be correct (a finding that would require the Court to look beyond the pleadings and consider the news articles and other documents proffered by Defendants), that finding still would not condone Defendants' violations of Plaintiffs' Fourteenth Amendment voting rights. It is axiomatic that a state can act consistently with its own constitution or statutes and still violate a plaintiff's federal constitutional rights. *See, e.g.*, *Romer v. Evans*, 517 U.S. 620 (1996); *Williams v. Rhodes*, 393 U.S. 23 (1968); *Loving v. Virginia*, 388 U.S. 1 (1967); *Reitman v. Mulkey*, 387 U.S. 369 (1967); *Harper v. Virginia State Bd. Of Elections*, 383 U.S. 663 (1966); *Carrington v. Rash*, 380 U.S. 89 (1965); *McLaughlin v. State of Florida*, 379 U.S. 184 (1964); *Reynolds v. Sims*, 377 U.S. 533 (1964).

As in their filings seeking to dismiss the original complaint, Defendants' current motion papers never question, let alone address, the critical factual allegations that Plaintiffs' votes were

---

[10] For more in-depth treatment of these claims, see DE 27: Response in Opposition to first Motion to Dismiss at 12-21, PageID 166-75, which Plaintiffs fully incorporate by reference.

diluted and Defendants' tabulation method created a fundamentally unfair voting process that resulted in certain votes in favor of Amendment 1 receiving disproportionate weight as compared to Plaintiffs' votes. Regardless of whether Defendants' actions were contrary to or consistent with the language of Article XI, Section 3, those actions diluted Plaintiffs' votes and violated Plaintiffs' federal equal protection and substantive due process rights. Defendants never address this dispositive point; the Court should therefore deny their Fed. R. Civ. P. 12(b)(6) motion.

> B.    The language of Article XI, Section 3 of the Tennessee Constitution is unambiguous, and Defendants have neglected to comply with it.

Logic demonstrates the basic error in Defendants' argument. Principles of logic explain that just because all dogs are animals, not all animals are dogs. The same principle is at work here. While Defendants' violation of Article XI, Section 3 of the Tennessee Constitution transgresses Plaintiffs' rights under the Fourteenth Amendment, a violation of the Fourteenth Amendment does not require transgression of Article XI, Section 3 of the Tennessee Constitution. Thus while subsection II.A above demonstrates that Plaintiffs need not succeed on their reading of Article XI, Section 3 of the Tennessee Constitution to allege a violation of the Fourteenth Amendment, Plaintiffs do succeed if their reading of Article XI, Section 3 is correct. And correct it is.

Article XI, Section 3's words are plain: to be ratified by the referendum method, amendments to Tennessee's constitution must pass "by a majority of all the citizens of the state voting for governor, voting in their favor." Tenn. Const. Art. XI, § 3. Parsing that phrase, an amendment must pass not merely by a majority of all citizens of the state voting in its favor or by a majority of citizens voting for governor; rather, to pass, an amendment must be ratified by a majority comprised of "all the citizens of the state voting for governor," *i.e.*, voting for governor is critical to voting for an amendment. To adopt the Defendants' approach and excise the requirement to have voted for governor in order to vote for amendments is to not give effect to all of the words and punctuation in the relevant language of Article XI, Section 3. Defendants, who

have conceded this in failing to timely respond to Plaintiffs' requests for admission, admit that Article XI, Section 3 of the Tennessee Constitution requires that an amendment to the Tennessee Constitution be ratified only when a majority of the qualified voters who voted for governor also vote in favor of the amendment. DE 48-3: Pl.'s First Set Requests for Admissions to Defs., PageID 488, at 499.

Both the United States and Tennessee Supreme Courts have emphasized that when language is plain, a court should end its analysis and apply or enforce that language. *E.g.*, *Sebelius v. Cloer*, 133 S. Ct. 1886, 1896 (2013) ("[W]e reiterate that 'when . . . language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'"); *State ex rel. Cohen v. Darnell,* 885 S.W.2d 61, 63 (Tenn. 1994) (enforcing plain language in Article XI, Section 3 and explaining that "[w]hen construing a constitutional provision we must give 'to its terms their ordinary and inherent meaning'") (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000) (internal quotation marks omitted)). And courts move beyond plain language only when the language in question is ambiguous. *E.g.*, *State v. Marshall*, 319 S.W.3d 558, 561 (Tenn. 2010). Here the language at issue is plain and unambiguous, so the Court need not, and should not, move beyond it.

Indeed, the Tennessee Supreme Court has already endorsed Plaintiffs' plain reading. In *Snow v. City of Memphis*, 527 S.W.2d 55 (Tenn. 1975), the Court reviewed the methods to amend Tennessee's Constitution. In so doing, it specifically discusses the language relevant to this case— "by a majority of all citizens of the state voting for Representatives [subsequently changed to "governor"], voting in their favor"—noting the "obstacle of obtaining voter ratification of a majority *of those voting for representatives*." *Id*. (emphasis added). Underscoring this point, *Snow* acknowledges that "only a small percentage of the voters *who voted for representatives* cast their ballots either for or against constitutional amendments, leaving the required majority *of those*

*voting for representatives*, unattainable." *Id.* (emphasis added). Defendants' fail to acknowledge that this language is substantively identical to the current language—only substituting "governor" for "Representatives"—and thus demands an identical interpretation: that passing an amendment under the current language of Article XI, Section 3 requires a majority of those voting for governor to vote in favor of that amendment.

On this plain language, Defendants' motion to dismiss should be denied.

C.     A tradition of violating the plain language of Tennessee's Constitution, no matter how longstanding, cannot legitimize a federal constitutional violation or transform it into a settled interpretation of law.

Notwithstanding the plain language, Defendants assert that their actions were consistent with Article XI, Section 3 because the language has been applied this way since 1953 and essentially the same way since 1834. Defendants use this point as a springboard to jump to the conclusion that, in essence, the purported age of their actions somehow legitimizes them, despite their failure to comply with the text of Article XI, Section 3. Temporarily setting aside both the flaws in Defendants' evidence to support this assertion and the impropriety of asserting outside-the-pleading materials at the motion to dismiss stage, Defendants' tradition argument still falters because it misconstrues the case on which it relies, *Nashville, Chattanooga & St. Louis Railway v. Browning*, 310 U.S. 362 (1940).

*Browning* presented a commerce clause and equal protection challenge to the method by which Tennessee assessed an ad valorem railway tax. *Id.* 363-65. The railroad petitioner in *Browning* challenged this assessment scheme under the Equal Protection clause not on the basis of the state's interpretation of the law itself but rather on the grounds that two state entities were applying the law disparately to the railway's disadvantage. *Id.* at 367. In that context, the Supreme Court explained that settled state practice—such as the disparate application of a tax assessment in *Browning*—can establish state law, which the Supreme Court will decline to disturb via an equal protection challenge. *Id.* at 369.

714620-1   10680-001

The *Browning* court, however, takes pains to emphasize that state tradition or state law "cannot supplant constitutional guarantees." *Id.* Defendants in this case attempt to stretch *Browning*'s holding to cover this case's dissimilar facts (where a state has been violating federal rights and its own constitution—not choosing to apply a law in one of several permissible ways) to attempt to supplant federal constitutional guarantees. Because Defendants have not been complying with Article XI, Section 3, no amount of state tradition can excuse this noncompliance or rewrite the provision.[11] *See Mayhew v. Wilder*, 46 S.W.3d 760, 784 (Tenn. Ct. App. 2001) (citing *Ashe v. Leech,* 653 S.W.2d 398, 401 (Tenn. 1983)) (proscribing "amend[ing] or alter[ing] the Constitution under the guise of construction"). Defendants' assertion that "we've always done it this way" offers no grounds to dismiss Plaintiffs' claims and certainly offers no grounds to condone Defendants' violations of Plaintiffs' federal constitutional rights.

Defendants' deference argument is likewise flawed. Importing a concept from administrative law, Defendants assert that the Court should defer to their interpretation of Article XI, Section 3 because their interpretation is longstanding and has gone unchallenged for a long period of time. *See* DE 53: Def.'s Mem. in Support of Mot. to Dismiss First Amended Complaint at 23-24, PageID 698-699. No such deference is warranted here. Although Defendants correctly note that federal courts facing an ambiguous statute give deference to the agency that regularly interprets and works with the statute in question, this deference applies only when the agency's interpretation is one of several the statute could permit. But where, as here, an interpretation defies the statute's plain language, courts do not defer. *Cf. Public Employees Ret. Sys. v. Betts*, 492 U.S. 158, 171 (1989) ("But, of course, no deference is due to agency interpretations at odds with the

---

[11] Conversely, should the Court disagree with Plaintiffs' plain language reading, this reliance on tradition such that it amounts to law is nonetheless misplaced because, as *Browning* states, tradition cannot override the rights guaranteed by the U.S. Constitution, including the Fourteenth Amendment Rights to due process and equal protection at issue in this case.

Case 3:14-cv-02182   Document 57   Filed 04/03/15   Page 19 of 31 PageID #: 734

plain language of the statute itself. Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language.").

That Defendants' interpretation has been purportedly unchallenged for a long period of time likewise does not in-and-of-itself merit deference. Even assuming Defendants have always applied Article XI, Section 3 the same way, the fact remains that this interpretation was not primed for a challenge until the vote on Amendment 1. In prior elections—as well as in the votes on Amendments 2, 3, and 4 on the November 4, 2014 ballot—the application of Article XI, Section 3 has not had any bearing on the ultimate outcome. But the vote on Amendment 1 was different: for the first time, Defendants loudly broadcast the method by which they would tabulate the vote; for the first time, a large-scale campaign was organized and effectuated to enhance the value of yes votes unfairly by capitalizing on this tabulation method; for the first time, significantly more people voted on an amendment than voted for governor; and for the first time, the correct application of Article XI, Section 3 would have likely changed the outcome of an amendment vote. Accordingly, no amount of reliance on or deference to unchallenged tradition permits the dismissal of Plaintiffs' claims.

Moreover, Defendants' arguments relying on tradition and deference go beyond the pleadings and seek to introduce purported facts not in the record. Notably, Plaintiffs served Defendants with discovery on Defendants' past practices and the factual basis for any tradition-based argument. For example, Plaintiffs have asked Defendants to "identify all instances since 1953 in which any person or entity has questioned or otherwise raised the issue of the proper methodology for counting ballots for constitutional amendments pursuant to the state constitution." DE 48-1: Pl.'s First Set of Interrogatories to Defs. at No. 13, PageID 474. Defendants have refused to respond. Likewise, Plaintiffs have asked Defendants to "produce the documents on which [Defendants] relied to articulate publicly that the state has always interpreted the constitution the same way since it was written in 1953" along with "all documents that support

[Defendants'] position that the state has interpreted the constitution the same way since it was written in 1953." DE 48-2: Pl.'s First Set of Requests for Production to Defs. at Nos. 9-11; 5-8, PageID 482-85. Again, Defendants have refused to respond.

Defendants have thus far refused to participate in any discovery, which places both Plaintiffs and this Court at a disadvantage when evaluating the various fact-based, beyond-the-pleadings arguments asserted by Defendants. For example, in the prior round of briefing, Defendants asserted that the plain meaning of Article XI, Section 3 violates voters' right to a secret ballot. Plaintiffs responded by disputing Defendants' factual assumptions as highly unlikely to be true. Plaintiffs reasoned that there is no need to violate any voter's right to a secret ballot to effectuate the plain meaning of Article XI, Section 3, especially with the advent of electronic voting machines, which are used in every district in Tennessee. Plaintiffs had already requested, through discovery, information and documents on this very issue, and Plaintiffs explained that they expected to learn that computer correlation is easily accomplished without any infringement of rights, much like voting machines are set up to correlate a voter's residency address with the races in which they are permitted to vote. Plaintiffs reasoned that if schools and universities are able to grade papers and exams on a blind basis (using randomly generated student numbers or otherwise), there is no reason in this day of technology and modern voting machines that Defendants could not have effectuated the plain meaning of Article XI, Section 3 without violating any voter's right to a secret ballot. Notably, Defendants have refused to provide discovery but have now abandoned their prior argument.

Plaintiffs believe that discovery will likewise demonstrate the infirmity of any factual basis for Defendants' newly-proffered tradition and deference arguments. Unfortunately, Defendants have refused to respond to these discovery requests, which are now subject to a pending motion to compel and for sanctions given Defendants' complete refusal to participate in this case for the past four months. Whatever the merits of Defendants' refusal to provide discovery, one overriding

principle applies: Defendants cannot on one hand try to justify their refusal to participate in discovery to Magistrate Judge Bryant by asserting this case rests solely on the plain language of Article XI, Section 3, while on the other hand, filing the current motion to dismiss injecting factual arguments about tradition and deference in which Defendants assert to this Court that the language of Article XI, Section 3 "is not so clear and unambiguous." DE 33: Def.'s Reply to Response to Motion to Dismiss at 3, PageID 198.

Accordingly, not only is there is no legal basis to consider tradition and deference when construing the plain meaning of Article XI, Section 3, but even if there were, Plaintiffs should first be entitled to discovery on the factual premises asserted by Defendants so that this Court may have the benefit of a full record before ruling on a motion asking this Court to look beyond the four corners of Article XI, Section 3.

> D. In addition to being inappropriate at this juncture, Defendants' reams of beyond-the-pleadings materials fail to offer any definitive insight into the interpretation of Article XI, Section 3 and thus should be disregarded.

The plain language of Article XI, Section 3 supports Plaintiffs' position that Defendants must tabulate the votes on Amendment 1 based on citizens who also voted for governor. And regardless of how Article XI, Section 3 is interpreted, Plaintiffs have stated claims under the due process and equal protection clauses of the Fourteenth Amendment. Rather than face these issues head-on, Defendants devote a substantial portion of their motion papers to justifying their reliance on outside-of-the-pleadings exhibits, drawing on those materials to craft a history narrative that is, at best, tangential to the case at bar, and extracting tenuous inferences from those extraneous documents.

Article XI, Section 3 is clear and unambiguous. As such, the analysis of that text should begin and end with the words themselves and not delve into extraneous information.[12] *See, e.g.,*

---

[12] Defendants rely on *Shelby County v. Hale*, 292 S.W.2d 745, 747 (Tenn. 1956), to assert that even when statutes are unambiguous, courts still look beyond the text. This investigation of extratextual material in

*Sebelius v. Cloer*, 133 S. Ct. at 1896; *Cohen,* 885 S.W.2d at 63. Nonetheless, Defendants delve improperly into a variety of information not just outside of the statute's text, but also outside the pleadings themselves. *E.g.*, *Kostrzewa v. City of Troy*, 247 F.3d 633, 643 (6th Cir. 2001) ("The district court, in reviewing a motion to dismiss, may not consider matters beyond the complaint.").

Should the Court opt to move beyond the plain language and pleadings, only some of Defendants' proffered materials are even arguably suitable for judicial notice. For example, while the older iterations of Article XI, Section 3 may be well-suited for judicial notice as they are "not subject to reasonable disputes," *Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 936 n.4 (6th Cir. 2013) (quoting Fed. R. Evid. 201(b)), these historical versions do not suggest any particular reading other than the plain-language one advanced by Plaintiffs. As Plaintiffs note in their First Amended Complaint, *see* DE 51: First Amended Complaint at ¶ 36, PageID 593, the Tennessee Supreme Court in *Snow v. City of Memphis*, 527 S.W.2d 55, 61 (Tenn. 1975) interpreted the prior version of Article XI, Section 3—which is substantially the same but for the substitution of ". . . by a majority of all the citizens of the state voting for governor, voting in their favor" in the new version for " . . . by a majority of all the citizens of the State, voting for Representatives, voting in their favor" in the old—in a way that matches Plaintiffs' interpretation.

Out of the rest of Defendants' beyond-the-pleadings materials, the existence of legislative history such as of the Journal of the Constitutional Convention of 1953 may not be denied, but the substance of these materials and the inferences Defendants' seek to draw from them are hotly disputed and thus not suited for judicial notice. *See Bridgeport Music Inc.*, 714, F.3d at 936; *see also Oneida Indian Nation of N.Y. v. State of N.Y.*, 691 F.2d 1070, 1086 (2d Cir. 1982) (explaining that "when facts or opinions found in historical materials or secondary sources are disputed, it is error to accept the data (however authentic) as evidence"). And to the extent the Court chooses to

---

*Hale*, however, came after an en banc sitting of two chancellors—not during the analysis of a motion to dismiss. *Id. Hale* offers no support for the introduction of additional material at this phase.

engage in drawing inferences from this additional material, these inferences should all be in Plaintiffs' favor. *See, e.g.*, *Rocky Mountain Farmers Union v. Goldstene*, 719 F. Supp. 2d 1170, 1186 (E.D. Cal. 2010) (taking judicial notice of certain parts of a public record but emphasizing that "[t]o the extent that the legislative histories conflict, or represent the statements of individual legislators, this Court will consider the weight to give to the statements and resolve all doubts in favor of plaintiffs pursuant to motion to dismiss standards"); *accord Oneida Indian Nation*, 691 F.2d at 1086 ("Judicial notice of a disputed fact should not ordinarily be taken as the basis for dismissal of a complaint on its face.").

Additionally, the delegates' statements on which Defendants focus do not stand for the propositions that Defendants assert. The quotations cited from Delegates Gilreath and Sims reflect their retrospective understanding of the old pre-1953 version of Article XI, Section 3. And attempting to rely on Delegate McGinniss's comments—which Defendants characterize as "[p]erhaps most instructive," DE 53: Def.'s Mem. in Support of Mot. to Dismiss First Amended Complaint at 7, PageID 682—plunges into the fraught waters of attempting to infer the intent of one position from a characterization made by that position's opponent, because Delegate McGinniss opposed the proposed Majority Report about which he was speaking.

Accordingly, Defendants' extended history discussion in their motion to dismiss fails to provide any support for their position. Nor should it. After all, the persons who adopted the Article XI, Section 3 were not the delegates to the 1953 Constitutional Convention but instead the people of Tennessee through their votes. Thus, unlike the passage of a statute where the same group—the legislature—hears discussion, establishes legislative history, and votes, the proposed language that became the modern version of Article XI, Section 3 was submitted to and ratified by Tennesseans, who voted *only* on the plain language of the text. Courts must construe Tennessee's constitutional provisions with respect to the intentions of the persons, *i.e.*, the voters, who adopted the provision at issue, *see Cleveland Surgery Ctr., L.P. v. Bradley Cnty. Mem'l Hosp.,* 30 S.W.3d 278, 281-82

714620-1_10680-001

(Tenn. 2000); *Shelby Cnty. v. Hale,* 292 S.W.2d 745, 748 (Tenn. 1956), which is reflected in the text of the Constitution itself, *Hatcher v. Bell,* 521 S.W.2d 799, 803 (Tenn. 1974).

Finally, Defendants' reliance on newspaper editorials and articles is wholly unsuitable at the 12(b)(6) stage. Not only have Defendants already admitted that Tennessee voters were not provided any "legislative history" or other "drafters' intent" documentation when they voted on approving Article XI, Section 3's current language, DE 48-3: Pl.'s First Set Requests for Admissions to Defs., at 15, PageID 502, but also such material is certainly subject to reasonable dispute and does not fit into any of the categories of "matters of public record (*e.g.*, pleadings, orders and other papers on file in another action pending the court; records or reports of administrative bodies; or the legislative history of laws, rules or ordinances," *Intri-Plex Techs., Inc. v. Crest Group, Inc*., 499 F.3d 1048, 1052 (9th Cir. 2007), that, if noticed, do not convert a motion to dismiss to a motion for summary judgment.

For all of the ink spent by both parties as to what extraneous information should or should not be permitted at this stage, the issue is ultimately immaterial. The Court can interpret Article XI, Section 3 based on the plain language of " . . . a majority of the citizens of the state voting for governor, voting in their favor . . ." and need not move beyond this language. Moreover, although Plaintiffs strongly assert that their plain language reading of Article XI, Section 3 is correct and all but establishes their due process and equal protection claims, a finding by this Court that Plaintiffs are not correct on their reading of Article XI, Section 3 does nothing to dispose of Plaintiffs' federal due process and equal protection claims.

E.    Defendants' compelled voting argument only bolsters Plaintiffs' claims.

Finally, Defendants assert that a plain language reading of Article XI, Section 3 requires a compelled vote in violation of the First and Fourteenth Amendment. In so doing, Defendants

perfunctorily incorporate this argument from their previous motion.[13] Unfortunately for Defendants, their compelled voting argument, if true, all but makes Plaintiffs' case for them because the tabulation method used by Defendants succumbs to the very same shortcoming.

As alleged in the First Amended Complaint, Defendants' tabulation method not only compels anyone who wants to vote against an amendment to also vote for governor, but it also does so in an unequal manner by not imposing the same burden on those voters favoring an amendment. Under Defendants' method, a voter against Amendment 1 was compelled to vote for governor to have his or her vote count on Amendment 1; a vote from someone who does not vote in the gubernatorial race and who votes against an amendment is permissible but meaningless: it would not factor into either the numerator (votes in favor of Amendment 1) or the denominator (votes cast in the gubernatorial race) of Defendants' tabulation fraction and thus has no meaning. Someone favoring an amendment under Defendants' scheme faced no such compulsion and could have voted for governor and for the amendment (and thereby decrease the relative weight of their vote for the amendment) or just vote for the amendment (and thereby increase the relative weight of the vote for the amendment).

Applying the plain language of Article XI, Section 3 as advanced by Plaintiffs does not create any new compelled voting issues; rather, it levels the playing field in a viewpoint-neutral way. Plaintiffs' plain language reading gives supporters and opponents of amendments the same set of options—either vote for governor and have your vote on the amendment factor into the tabulation or abstain from the gubernatorial race and cast what amounts to a ceremonial vote on amendments. This parity reinforces Plaintiffs' plain language reading of Article XI, Section 3 and militates against Defendants' motion to dismiss. Indeed, Defendants' compelled voting argument provides an independent basis to affirmatively rule in favor of Plaintiffs given Defendants'

---

[13] In the same vein, Plaintiffs adopt and incorporate the relevant portion of their response to those original motion papers. DE 27: Response in Opposition to Def.'s first Motion to Dismiss at 15-18, PageID 169-72.

concession that a state violates the First and Fourteenth Amendments rights of its citizen by compelling them to vote in a particular race, which is exactly what Defendants' tabulation methodology forced upon Plaintiffs.

**IV.    Because Plaintiffs' claims arise under federal constitutional law, as opposed to an unclear or unsettled state law, this case is not an appropriate candidate for *Pullman* abstention or certification to the Tennessee Supreme Court under Tennessee Supreme Court Rule 23.**

In layers of alternative argument, Defendants contend that this Court should abstain from ruling under the doctrine developed in *Railroad Commission of Texas v. Pullman Co.*, 312 U.S. 496 (1941), or should certify the interpretation of Article XI, Section 3 of Tennessee's Constitution to the Tennessee Supreme Court. Again, these arguments address a complaint different from the one before the Court and thus do not apply.

A.    *Pullman* abstention is inappropriate because there are no predominating unclear issues of state law and, even if there were, clarification would not resolve the case in favor of Defendants.

The basic premise of *Pullman* abstention is that "where uncertain questions of state law <u>must</u> be resolved before a federal constitutional question can be decided, federal courts should abstain until a state court has addressed the state questions." *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (emphasis added). The Sixth Circuit has "established two requirements for Pullman abstention: [1] an unclear state law and [2] the likelihood that a clarification of the state law would obviate the necessity of deciding the federal claim question." *Slyman v. City of Willoughby, Ohio*, 134 F.3d 372 (6th Cir. 1998) (citing *Tyler v. Collins*, 709 F.2d 1106, 1108 (6th Cir. 1983)); *accord Accident Fund v. Baerwaldt*, 767 F.2d 919 (6th Cir. 1985).

This case, however, does not feature any necessary questions of unsettled state law: regardless of whether Defendants acted consistent with or contrary to Article XI, Section 3, they violated Plaintiffs' due process and equal protection rights under the Fourteenth Amendment. Abstaining under the *Pullman* doctrine would do nothing to advance this case.

Looking to the first factor, *Pullman* abstention is inappropriate because there are no unclear issues of state law. Admittedly, Article XI, Section 3 of Tennessee's Constitution factors into of Plaintiffs' claims, but Article XI, Section 3 is not unclear—its language is plain and unambiguous as Defendants' themselves assert (at times) and as the Tennessee Supreme Court has already discussed in *Snow*. Conversely, if the Court determine that Plaintiffs are incorrect on this point, then the issue becomes whether the counting method followed by Defendants under the auspices of Article XI, Section 3 violates federal rights to due process and equal protection secured by the Fourteenth Amendment to the United States Constitution. Thus, under the second factor, clarification would not obviate any federal claims. Because this case does not satisfy both factors, *Pullman* abstention is not warranted.[14]

> B.  The Tennessee Supreme Court has already spoken on the plain reading of Article XI, Section 3, so certification is not only is unneeded, but it is also unnecessary because it cannot render any ruling that would be dispositive for Defendants.

Like *Pullman* abstention, certification to the Tennessee Supreme Court under Tenn. Sup. Ct. R. 23 would be an exercise in futility.  As an initial matter, the Tennessee Supreme Court has already spoken in *Snow v. City of Memphis*, in which the Court specifically discusses the language relevant to this case and all but endorses the plain meaning of Article XI, Section 3 advocated by Plaintiffs.  527 S.W.2d at 55 (acknowledging that "only a small percentage of the voters *who voted*

---

[14] More pragmatically, when federal courts do abstain under the *Pullman* doctrine, there is usually a parallel case pending in state court. *Cf. Tyler*, 709 F.2d at 1108-09. No such parallel state court case exists here. As the Sixth Circuit recently cautioned:

> "[F]ederal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush* [*v. Allstate Ins. Co.*, 517 U.S. 706,] 716 [(1996)]. Abstention is an "extraordinary and narrow exception" to that duty. *Colorado River* [*Water Conservation Dist. v. United States*, 424 U.S. 800,] 813 [(1976)] (internal quotation marks omitted). Only the "clearest of justifications" will support abstention. *Rouse v. DaimlerChrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002).

*RSM Richter, Inc. v. Behr Am., Inc.*, 729 F.3d 553, 557 (6th Cir. 2013) (reversing a district court's decision to abstain). This case does not present such clear justifications—indeed, it presents no justification—to warrant the extraordinary action of abstention.

714620-4   10680-001

*for representatives* cast their ballots either for or against constitutional amendments, leaving the required majority o*f those voting for representatives*, unattainable").

Moreover, as described *supra*, Defendants have either disregarded the plain language of Article XI, Section 3's requirements thereby violating the Plaintiffs' rights under the Fourteenth Amendment or, if the Court determines that Defendants have acted in conformity with Article XI, Section 3, then this application of Article XI, Section 3—and thus the provision itself—violates the Due Process and Equal Protection Clauses. Either way, any additional ruling from Tennessee's Supreme Court on the meaning of Article XI, Section 3 cannot resolve the case in Defendants' favor. As the Tennessee Supreme Court Rules explain, certification is appropriate when "the certifying court determines that, in a proceeding before it, there are questions of law of this state which <u>will be determinative</u> of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Tenn. Sup. Ct. R. 23, § 1 (emphasis added). It is literally impossible for the Tennessee Supreme Court to answer any certified question in this case in a manner that would be determinably favorable to Defendants. Again, all dogs may be animals, but not all animals are dogs. While Defendants may desire an advisory ruling from the Tennessee Supreme Court for purposes of their future conduct and to clarify for them the proper reading of Article XI, Section 3, as Defendants themselves emphasize, cases in the federal courts are about seeking redress for a plaintiff's injury, which is exactly what Plaintiffs seek in this case.

Accordingly, not only has the Tennessee Supreme Court already spoken, but also any additional ruling from that Court cannot help Defendants. As such, the Court should avoid certifying any questions to the Tennessee Supreme Court and instead resolve this case on the merits itself, which, at this juncture, necessitates denying Defendants' motion to dismiss and compelling Defendants to participate in discovery so that this matter may be expeditiously resolved.

## CONCLUSION

For the foregoing reasons, the court should deny Defendants' motion to dismiss.

Respectfully submitted,

SHERRARD & ROE, PLC

By:      /s/ *William L. Harbison*
William L. Harbison (B.P.R. No. 7012)
C. Dewey Branstetter Jr. (B.P.R. No. 9367)
Phillip F. Cramer (B.P.R. No. 20697)
Hunter C. Branstetter (B.P.R. No. 32004)
150 3rd Avenue South, Suite 1100
Nashville, Tennessee 37201
Tel.: (615) 742-4200
Fax: (615) 742-4539
bharbison@sherrardroe.com
dbranstetter@sherrardroe.com
pcramer@sherrardroe.com
hbranstetter@sherrardroe.com

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing was served upon the following:

| Counsel | Counsel for: | Via: |
|---|---|---|
| Janet M. Kleinfelter<br>Deputy Attorney General<br>Office of the Attorney General and Reporter<br>Public Interest Division<br>P.O. Box 20207<br>Nashville, TN 37202<br>(615) 741-7403<br>janet.kleinfelter@ag.tn.gov | Defendants | ☐ United States Mail, postage prepaid<br>☐ Hand-delivery<br>☐ Facsimile transmission<br>☐ E-Mail<br>☐ Fed Ex<br>☒ CM/ECF |

this 3rd day of April, 2015.

_____/s/ *William L. Harbison*_____
William L. Harbison

714620-1   10680-001