**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **TRACEY E. GEORGE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:14-02182** |
| | ) | **Judge Sharp** |
| **WILLIAM EDWARD "BILL" HASLAM,** | ) | |
| **as Governor of the State of Tennessee,** | ) | |
| **in his official capacity, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

This case presents a constitutional challenge to the method by which votes cast at the November 4, 2014 state and federal general election in Tennessee were counted. Specifically, Plaintiffs are eight registered voters who claim that their rights to due process and equal protection under the Fourteenth Amendment to the United States Constitution were violated because their votes against Constitutional Amendment 1 to the Tennessee Constitution ("Amendment 1"), which was on the ballot, were improperly diluted.

Defendants now move to dismiss the First Amended Complaint, and that Motion (Docket No. 52) has been fully briefed by the parties (Docket Nos. 53, 57 & 60). For the reasons that follow, Defendants' Motion will be denied.

### I. Factual Background

On November 4, 2014, Tennessee held a general election. Among other things, voters could cast their votes for governor, and vote on four proposed Amendments to the Tennessee Constitution. Proposed Amendment 1, which is at issue in this case, asked:

1

Shall Article I, of the Constitution of Tennessee be amended by adding the following language as a new, appropriately designated section:

> Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion. The people retain the right through their elected state representatives and state senators to enact, amend, or repeal statutes regarding abortion, including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother.

(Docket No. 57 at 5).

According to the Tennessee Secretary of State, the official results of the November 4, 2014 general election reflect that a total of 1,353,728 votes were cast in the Governor's race. Those results also reflect that 729,163 votes were cast in favor of adoption of Amendment 1, while 657,192 votes were cast in favor of rejection of Amendment 1.

Defendants assert that, because the number of votes cast in favor of adoption of Amendment 1 exceeded the number of votes cast by a majority (i.e., 676,865) of the citizens of the State voting in the Governor's race, Governor William Haslam, Secretary of State Tre Hargett, and Attorney General Herbert Slatery III certified on December 8, 2014, that Amendment 1 had been ratified. Further, because the votes cast in favor of adoption of the other three proposed constitutional amendments likewise exceeded the number of votes cast by a majority of the citizens of the State voting for Governor, those three constitutional amendments were also certified as having been ratified.

Plaintiffs voted in the gubernatorial race on November 4, 2014, and voted not to approve Amendment 1. They claim that the method used to count the votes in favor of Amendment 1 violated Article XI, Section 3 of the Tennessee Constitution, which states:

> Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives, and if the same shall be agreed to by a majority of all

2

the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals with the yeas and nays thereon, and referred to the General Assembly then next to be chosen; and shall be published six months previous to the time of making such choice; and if in the General Assembly then next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by two-thirds of all the members elected to each house, then it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the people at the next general election in which a governor is to be chosen. **And if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for governor, voting in their favor, such amendment or amendments shall become a part of this Constitution.**

Tenn. Const. Art. XI, Section 3 (emphasis added).

Plaintiffs allege that, notwithstanding, Article XI, Section 3's mandate that proposed amendments must be approved by "a majority of all citizens of the state voting for governor, voting in their favor," Defendants tabulated the vote on Amendment 1 by examining the number of total votes in favor of Amendment 1, regardless of whether the voter also voted for governor. In this regard, Plaintiffs allege:

Whereas the state constitution's text demands that Amendment 1 will only pass if it is approved "by a majority of all the citizens of the state voting for governor, voting in [its] favor," Tenn. Const. Art. XI, § 3, Defendants have essentially re-written Section 3 to say that Amendment 1 would pass if "the number of citizens of the state voting in its favor equals or exceeds the number of votes required for a majority in the governor's race." Put differently, if [total votes in favor of Amendment 1] / [total votes for governor] > ½, then, according to Defendants, Amendment 1 would be ratified. Defendants counted the votes on Amendment 1 without first establishing whether each "yes" voter met Section 3's threshold of having also voted for governor.

(Docket No. 51, Amended Complaint ¶ 7).

Plaintiffs further allege that "[r]egardless of whether Defendants' tabulation method was contrary to or consistent with Article XI, Section 3," the "pre-announced tabulation method" was part of a "coordinated scheme" that "incentivized proponents of Amendment 1 to forego their own right to vote in the governor's race so as to add 'yes' votes without increasing the number of votes

3

needed to surpass a majority of votes cast in the governor's race." (Id. ¶ 8). This chosen method, according to Plaintiffs, "encourage[d] the efforts of some voters to manipulate the system by voting for Amendment 1 and expressly not voting in the governor's election," at the expense of those, like Plaintiffs, "who complied with the Tennessee Constitution, engaged fully in their civic duty to vote, and exercised their right to vote for governor," and whose votes were "diluted." (Id. ¶¶ 9 & 11).

Plaintiffs further allege that, with regard to Amendment 1, "for the first time, a concerted campaign was launched with the support of Defendants' tabulation method to double count 'yes' votes at the expense of 'no voters,'" and that "[f]or the first time in the history of the State, votes on a constitutional amendment outnumbered the votes in the governor's race." (Id. ¶ 14). They claim that Amendment 1 may very well not have passed "if votes were correctly tabulated" because "[t]he voter turnout data released by Defendants confirmed that as many as 76,000 votes in favor of Amendment 1 may have been improperly tabulated, which would result in Amendment 1 falling short of passage by 24,000 votes." (Id. ¶ 15).

The Amended Complaint is in two counts, both asserting a violation of the Fourteenth Amendment. In Count I, Plaintiffs contend that they were denied due process as result of a "fundamentally unfair voting scheme," and in Count II, they allege the denial of equal protection due to "disenfranchisement through vote dilution."

Plaintiffs request a declaration that (1) Article XI, Section 3 of the Tennessee Constitution requires that only voters who voted for governor may have their votes on Amendment 1 counted to determine whether the amendment is ratified; (2) Defendants' vote tabulation method, regardless of its compliance with Article XI, Section 3, violates both the due process and equal protection clauses; and (3) the results for the November 4, 2014 election, as currently certified by Defendants,

4

are void.  They also seek an injunction requiring Defendants to comply with the counting mechanism prescribed in Article XI, Section 3, or, if Defendants are unable to count the votes in compliance with the constitution, a declaration permanently voiding the vote on Amendment 1 in the November 4, 2014 election.

## II.  Legal Discussion

Defendants move to dismiss the Amended Complaint pursuant to Rule 12 of the Federal Rules of Civil Procedure on two grounds.  First, they argue dismissal is warranted under Rule 12(b)(1) for lack of subject matter jurisdiction because Plaintiffs have no standing to pursue their claims.  Second, they argue that under Rule 12(b)(6), the Amended Complaint fails to state a claim upon which relief may be granted.  As an alternative to outright dismissal, Defendants request that this Court either abstain from hearing this case, or certify the question of the proper interpretation of the Tennessee constitutional provision to the Tennessee Supreme Court.

### A.  Rule 12(b)(1) and Jurisdiction

The Court necessarily begins with Defendants' jurisdictional arguments because a court must address "questions pertaining to its jurisdiction before proceeding to the merits," Tenet v. Doe, 544 U.S. 1, 6 n.4 (2005), and  "the issue of standing . . . is properly considered an attack on the court's subject matter jurisdiction under Rule 12(b)(1)," Allstate Ins. C. v. Global Med. Billing, Inc., 520 Fed. App'x 409, 410-11 (6th Cir. 2013).  The Sixth Circuit has summarized the applicable standard of review as follows:

> A Rule 12(b)(1) motion for lack of subject matter jurisdiction can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack).  United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994).  A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis.  Id.

5

> A factual attack challenges the factual existence of subject matter jurisdiction. In the case of a factual attack, a court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case. <u>Id</u>. Plaintiff bears the burden of establishing that subject matter jurisdiction exists. <u>DLX, Inc. v. Commonwealth of Kentucky</u>, 381 F.3d 511, 516 (6th Cir. 2004).

<u>Cartwright v. Garner</u>, 751 F.3d 752, 759-60 (6th Cir. 2014).

Defendants argue that Plaintiffs lack standing because they "fail to allege any injury that affects them in a particularized way peculiar to them, as distinct from an injury to their fellow citizens." (Docket No. 53 at 15). Rather, "Plaintiffs are seeking to vindicate the alleged rights of all voters who voted against Amendment 1[.]" (<u>Id</u>.)."

"Trained on 'whether the plaintiff is [a] proper party to bring [a particular lawsuit,]' standing is '[o]ne element' of the Constitution's case-or-controversy limitation on federal judicial authority, expressed in Article III of the Constitution.'" <u>Ariz. State Legislature v. Ariz. Ind. Redistricting Comm'n</u>, ___ U.S. ___, Slip op. at 10 (June 29, 2015) (brackets in original) (quoting, <u>Raines v. Byrd</u>, 521 U. S. 811, 818 (1997)). Standing must exist at the time of filing of the complaint, and "does not have to be maintained throughout all stages of the litigation." <u>Cleveland Branch, N.A.A.C.P. v. City of Parma</u>, 263 F.3d 513, 524 & 526 (6th Cir. 2001).

The constitutional requirements for standing were explained by the Supreme Court in <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992):

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

6

(internal quotation marks, citations, and footnote omitted). "In requiring a particular injury, the Court [in Lujan] meant that 'the injury must affect the plaintiff in a personal and individual way.'" Ariz. Christian Sch. Tuition Org. v. Winn, 131 S.Ct. 1436, 1442 (2011) (quoting Lujan, at 560 n.11).

Here, Defendants argue that Plaintiffs have not alleged the personal injury required to establish standing. To the contrary, Plaintiffs "plainly acknowledge that their 'harm' is shared by the over 650,000 voters who voted against Amendment 1." (Docket No. 53 at 15). Thus, Defendants argue, "[t]he instant case parallels and is controlled by Lance [v. Coffman, 549 U.S. 437 (2007)] and Hein [v. Freedom from Religion Foundation, Inc., 551 U.S. 587 (2007)]." (Id. at 17).

Even though both Hein and Lance contain language favorable to Defendants, the Court finds neither controlling. As Defendants point out, the Supreme Court in Hein observed that claimants have no standing "'to challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens.'" 551 U.S. at 598 (quoting, ASARCO Inc. v. Kadish, 490 U.S. 605, 623 (1989)). However, the Supreme Court made that statement immediately after noting that "[t]he constitutionally mandated standing inquiry is especially important in a case like this one, in which taxpayers" make such a challenge, id., with the question being whether the case fits within the "narrow exception to the general prohibition against taxpayer standing," id. at 593, announced in Flast v. Cohen, 392 U.S. 83 (1968). While Hein reaffirms the general principal that "[t]he federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution," but "[r]ather sit 'solely, to decide on the right of individuals,'" Hein, 551 U.S. at 491 (quoting Marbury v. Madison, 1 Cranch 137, 170 (1803), the case should not be read too broadly given the nuances of taxpayer standing. See, Murray v. U.S. Dept. of Treasury, 681 F.3d 744, 748 (6th Cir. 2012) ("taxpayer standing has

7

been 'long-disfavored' as a basis for federal jurisdiction over a challenge to a federal appropriation" because "a taxpayer's interest in the disbursement of federal appropriations is 'too generalized and attenuated' to establish a 'particularized injury' to the taxpayer-plaintiff"); Pedreira v. Ky. Baptist Homes for Children, Inc., 579 F.3d 722, 729 ("Generally, individuals lack standing when their only interest in the matter is as a taxpayer," and only "[a]fter forty-five years of 'an impenetrable barrier' to taxpayer standing, [did] the Supreme Court announce[] a narrow exception" to this rule in Flast); American Atheists, Inc. v. City of Detroit, 567 F.3d 278, 285 (6th Cir. 2009) (Hein simply "marked the boundaries of an existing exception to the rule against federal and state taxpayer standing").

Lance, on the other hand, was a case brought by voters. Specifically, four voters brought suit challenging a Colorado Supreme Court decision (in which they did not participate) that upheld the use of court drawn congressional districts, instead of districts drawn by the state legislature, allegedly in violation of the Election Clause of Art. 1 Section 4 of the United States Constitution. Noting that its "refusal to serve as a forum for generalized grievances has a lengthy pedigree," Lance, 549 U.S. at 439, the Supreme Court held that plaintiffs lacked standing inasmuch as their claim was that the Colorado Constitution and the Colorado Supreme Court's interpretation of that document "violated [the Elections Clause] of the U.S. Constitution by depriving the state legislature of its responsibility to draw congressional districts." Id. at 441. The Supreme Court then observed:

> the problem with this allegation should be obvious: The only injury plaintiffs allege is that the law – specifically the Elections Clause – has not been followed. This injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past. It is quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing. See, e.g., Baker v. Carr, 369 U.S. 186, 207-208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Because plaintiffs assert no particularized stake in the litigation, we hold that they lack standing to bring their Elections Clause claim.

Id. at 442.

8

Baker, which the Supreme Court distinguished in Lance, involved a constitutional challenge to Tennessee's 1901 Apportionment Act brought by qualified voters on their own behalf and on behalf of all voters. Plaintiffs asserted that the Act – the last reapportionment act passed by the Tennessee General Assembly even though the eligible voter population had "shifted and enlarged" from 487,380 to 2,092,891 – "arbitrarily and capriciously apportioned representatives in the Senate and House without reference . . . to any logical or reasonable formula whatever" and deprived plaintiffs of equal protection of the law "'by virtue of the debasement of their votes.'" Baker, 369 U.S. at 193-94.

Given the allegations pleaded, the Supreme Court in Baker held that its "decisions plainly support th[e] conclusion" that plaintiffs had standing, and, in fact, Colgrove v. Green, 328 U.S. 549 (1946) "squarely held that voters who allege facts showing disadvantage to themselves as individuals have standing to sue." Baker, 369 U.S. at 206. The Court went on to write:

> These [plaintiffs] seek relief in order to protect or vindicate an interest of their own, and of those similarly situated. Their constitutional claim is, in substance, that the 1901 statute constitutes arbitrary and capricious state action, offensive to the Fourteenth Amendment in its irrational disregard of the standard of apportionment prescribed by the State's Constitution or of any standard, effecting a gross disproportion of representation to voting population. The injury which [plaintiffs] assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-a -vis voters in irrationally favored counties. A citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution, when such impairment resulted from dilution by a false tally, . . or by a refusal to count votes from arbitrarily selected precincts, . . . or by a stuffing of the ballot box[.]

Id. at 207-08 (internal citations omitted).

"The distinction referenced in Lance refers to the difference between plaintiffs such as those in Baker . . . who alleged concrete and personalized injuries in the form of denials of equal treatment

or of vote dilution, and plaintiffs like those in . . . <u>Lance</u> itself, who merely seek to protect an asserted interest in being free of an allegedly illegal electoral system." <u>Dillard v. Chilton Cnty. Comm'r</u>, 495 F.3d 1324, 1333 (11th Cir. 2007). "This properly denominates as cognizable, for instance, the injuries of plaintiffs who are subject to racial classification in voting systems, . . . and to vote dilution, whether motivated by race or other factors[.]" <u>Id</u>. (internal citations and footnote omitted); <u>see</u> <u>League of United Latin Am. Citizens v. City of Boerne</u>, 659 F.3d 421, 430 (5th Cir. 2011) ("What distinguishes <u>Lance</u> from the present case is that in <u>Lance</u>, the plaintiffs were not deprived of the right to vote for any office.  They each undoubtedly had a right to vote for one member of the U.S. House of Representatives in a single-member district; the only thing at stake in <u>Lance</u> was whether they would vote in districts drawn by the state legislature or by a state court.").

Here, Plaintiffs' claim is not simply that Defendants misread or misapplied Article XI, Section 3 of the Tennessee Constitution.  Rather, their claim is that the misapplication of that constitutional provision diluted their nay votes in relation to Amendment 1, and that this was part of a coordinated scheme to ensure passage of that Amendment.

"A voting rights claim strikes at the heart of the political process." <u>Judge v. Quinn</u>, 612 F.3d 537, 545 (7th Cir. 2010).  As the Sixth Circuit has observed, "[t]he right to vote is a 'precious' and 'fundamental' right," and "'[o]ther rights, even the most basic, are illusory if the right to vote is undermined.'" <u>Obama for Am. v. Husted</u>, 697 F.3d 423, 428 (6th Cir. 2012) (quoting, <u>Westbury v. Sanders</u>, 376 U.S. 1, 17 (1964)).  This right "'is protected in more than the initial allocation of the franchise'" and "'applies as well to the manner of its exercise.'" <u>Id</u>. (quoting <u>League of Women Voters v. Brunner</u>, 548 F.3d 463, 477 (6th Cir. 2008)).  Thus, citizens have "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction,"

and "the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.'" Id. (quoting, Bush v. Gore, 531 U.S. 98, 104-05 (2000)).

Read fairly, and stripped to its essence, Plaintiffs' claimed injury is that their individual votes on Amendment 1 were not counted and valued the same way as other votes, making their injury distinct. Their alleged injuries are specific to them, and those like them, who (1) were registered to vote; (2) voted in the November 4, 2014 election; (3) voted in the gubernatorial race in that election; (4) voted against Amendment 1, and (5) (allegedly) had the relative values of their particular votes devalued. As such, theirs is not a generalized grievance about a law not being followed that is applicable to all, a point best exemplified by the fact that those voters who cast ballots only in favor of Amendment 1 were allegedly not injured. In short, Plaintiffs claim "'a plain, direct and adequate interest in maintaining the effectiveness of their votes.'" Baker, 369 U.S. at 208 (quoting Coleman v. Miller, 307 U.S. 433, 438 (1939).

"Where a plaintiff's voting rights are curtailed, the injury is sufficiently concrete to count as an 'injury in fact'" because, in such cases, "the plaintiffs 'are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes,' . . . not merely a claim of 'the right possessed by every citizen to require that the government be administered according to law.'" Judge, 612 F.3d at 545-46. In fact, more than 50 years ago, the Supreme Court stated that "any person whose right to vote is impaired . . . has standing to sue." Gray v. Saunders, 372 U.S. 368, 375 (1963). That is effectively what Plaintiffs are claiming here. The Court therefore concludes that Plaintiffs have standing and this Court has subject matter jurisdiction over the First Amended Complaint.

**B. Rule 12(b)(6) and Failure to State a Claim**

The standards governing motions to dismiss for failure to state a claim are well-known but sometimes honored more in the breach than in the observance. "For a complaint to survive such motions, it must – when the record is construed in the light most favorable to the nonmoving party and when all well-pled factual allegations are accepted as true – contain 'either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory.'" D'Ambrosio v. Marino, 747 F.3d 378, 383 (6th Cir. 2014) (quoting Philadelphia Indem. Ins. Co. v. Youth Alive, Inc., 732 F.3d 645, 649 (6th Cir. 2013)). In considering the complaint, a court "'need not accept as true legal conclusions or unwarranted factual inferences, and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice.'" Id. (quoting Terry v. Tyson Farms, Inc., 604 F.3d 272, 275-76 (6th Cir. 2010)). "Rather, '[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Republic Bank & Trust Co. v. Bear Stearns & Co., Inc., 683 F.3d 239, 247 (6th Cir. 2012) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Defendants advance a wide-ranging attack on the sufficiency of the First Amended Complaint, and go well beyond the pleadings. They argue that Plaintiffs' interpretation of Article XI, Section 3 of the Tennessee Constitution is contrary to the plain language and legislative history of that constitutional provision. They also argue that Plaintiffs' reading runs counter to the long-standing practice and application of that provision by the State of Tennessee. Defendants further argue that interpreting Article XI, Section 3 in the manner suggested by Plaintiffs would be unconstitutional under the First Amendment of the United States Constitution because it would compel voting for governor in order to vote for a constitutional amendment.

As noted, the specific language at the center of this case states that "if the people shall

12

approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for governor, voting in their favor, such amendment or amendments shall become a part of this Constitution." Tenn. Const. Art. XI, Section 3. Determination of the meaning of that language is a matter of law. See, Waters v. Farr, 291 S.W.3d 873, 882 (Tenn. 2009) (citation omitted) ("[i]ssues of constitutional interpretation are questions of law").

"The courts are to construe constitutional provisions as written without reading any ambiguities into them." State ex rel. Sonnenberg v. Gaia, 717 S.W.2d 883, 885 (1986) (citing Chattanooga-Hamilton Co. Hosp. Auth. v. Chattanooga, 580 S.W.2d 322, 327 (Tenn.1979). As the Tennessee Supreme Court recently stated:

> When a provision clearly means one thing, courts should not give it another meaning. The intent of the people adopting the Constitution should be given effect as that meaning is found in the instrument itself, and courts must presume that the language in the Constitution has been used with sufficient precision to convey that intent. . . Constitutional provisions will be taken literally unless the language is ambiguous.
>
> When the words are free from ambiguity and doubt and express plainly and clearly the sense of the framers of the Constitution there is no need to resort to other means of interpretation. Shelby County v. Hale, 200 Tenn. 503, 292 S.W.2d 745, 748 (1956). . . .

Hooker v. Haslam, 437 S.W.3d 409, 426 (Tenn. 2014).

Plaintiffs read "by a majority of all the citizens of the state voting for governor" to mean that, in order for a proposed constitutional amendment to be ratified, it must receive a majority of the votes cast in its favor from those voters who voted for Governor. In other words, an "amendment must pass not merely by a majority of all citizens of the state voting in its favor or by a majority of citizens voting for governor; rather, to pass, an amendment must be ratified by a majority comprised of 'all the citizens of the state voting for governor,' i.e., voting for governor is critical to voting for an amendment." (Docket No. 57 at 16). Plaintiffs' reading of the constitutional requirement for the

13

passage of an amendment in Tennessee seems perfectly natural. It may even be a reading shared by the Tennessee Supreme Court.

In Snow v. City of Memphis, 527 S.W.2d 55 (Tenn. 1975), the Tennessee Supreme Court considered a challenge to the Constitutional Convention of 1971 relating to the classification of property. In discussing the issue, the court provided "[a] brief review of the background and events leading directly to the amendment of Article XI, Section 3 of our Constitution, dealing with the Convention method of amendment," and, in doing so, reviewed 1945 legislation that authorized the appointment of a Constitution Revision Committee that "was to make a study of the needs for revision of the Constitution of Tennessee and present its recommendations to the 1947 Session of the General Assembly." Id. at 61. Commenting on the results of that study, the Tennessee Supreme Court observed:

> Said commission recommended that nine sections of the Constitution be changed and devoted much of its report to the procedure best calculated to bring about the suggested changes. Eleven efforts to amend the 1870 Constitution by the legislative method had failed because of the obstacle of obtaining voter ratification of a majority of those voting for representatives. We judicially note that in said efforts to amend by that process, only a small percentage of the voters who voted for representatives cast ballots either for or against constitutional amendments, leaving the required majority of those voting for representative unattainable.

Id.[1]

As Defendants point out, Snow's observation about "obtaining voter ratification of a majority of those voting for representatives" may well be *dicta* in that it was not central to the holding of the case. Even so, it lends plausibility to Plaintiffs' reading of the provision at issue. That reading is certainly no more an "idiosyncratic interpretation of Article XI, § 3 of the Tennessee Constitution,"

---

[1] In an accompanying footnote, the court set forth the relevant language of Article XI, Section 3 which is identical to the present language, except that "voting for Governor" read "voting for representative" in the 1870 version of that constitutional provision.

(Docket No. 60 at 5) than Defendants' assertion that the provision "simply refers to the quantity or number of votes required to carry an amendment, *i.e.*, if the number of citizens voting in favor of an amendment exceeds the majority of citizens voting for Governor then an amendment is ratified." (Docket No. 53 at 22). Defendants insist their reading is confirmed by statements made by Delegates during the Constitutional Convention of 1953. They present excerpts from the Journal of the Constitutional Convention and contemporaneous newspaper articles to support that position.

Not to say that it necessarily exists in this case, but where there is doubt about the meaning of the language in a constitutional provision "it is the first obligation of the Court to go to the proceedings of the Constitutional Convention which adopted th[e] provision and see from these proceedings what the framers of this resolution intended it to mean." Hale, 292 S.W.3d at 510; see also Snow, 527 S.W.2d at 59 (a court "may, *sua sponte*, make use of a journal of proceedings of constitutional conventions when an issue presented makes such use relevant"). In this regard, Defendants argue that "[o]f particular importance is the statement of Delegate Tipton in introducing the language that was ultimately adopted by the Constitutional Convention" who "clarified that the proposed amendment 'contemplated that an amendment to carry, *instead of receiving a majority of the votes cast for representatives, shall receive a majority of the votes cast for Governor.*'" (Docket No. 53 at 23, emphasis by Defendant, citation omitted).

From all outward appearances, Delegate Tipton apparently was simply referencing the substitution of the phrase "cast for Governor" for "cast for Representatives" because, immediately after the quoted language, he stated that, with the change, an Amendment "would only be able to be voted upon when a Governor is elected or very four years; but it takes at least three years to get an amendment through the legislature now." JOURNAL AND PROCEEDINGS OF THE 1953 LIMITED

CONSTITUTIONAL CONVENTION 893. Thus, his concern may have been more with the timing of the votes, rather than their calculations. The other cherry-picked snippets from the Journal that Defendants quote hardly compel the conclusion that their reading of Article XI, Section 3 is correct.

It is true that "[a]rticulating constitutional principles, like any other interpretative exercise, may be aided by referring to external sources," and, "[a]ccordingly, Tennessee's courts have relied upon historical documents, constitutional convention proceedings, the proposed constitution of the State of Franklin, other similar state and federal constitutional provisions, and decisions from other jurisdictions construing similar provisions." Martin v. Beer Bd. of City of Dickson, 908 S.W.2d 941, 947 (Tenn. App. 1995) (collecting cases). However, Defendants go far beyond that which is allowed to be considered on a Motion to Dismiss when they rely on articles from the KINGSPORT TIMES NEWS and its reporting of such things as what Delegates Todd and Smith told a luncheon meeting of the League of Women Voters. This is particularly so since Defendants rely on those articles for the truth of the matter asserted. See, U.S. ex rel. Osheroff v. Humana Inc., 776 F.3d 805, 811 n.4 (11th Cir. 2015) ("courts may take judicial notice of documents such as . . . newspaper articles . . . for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)"); Garber v. Legg Mason, Inc., 347 F. App'x 665, 669 (2nd Cir. 2009) ("on a Rule 12(b)(6) motion to dismiss a court may consider matters of which judicial notice may be taken . . . including 'the fact that press coverage . . . contained certain information, without regard to the truth of their contents'").

Defendants go even farther afield by simply citing "http://www.tennessee.gov/sos/election/results/2002-11/index.htm" as definitive proof of the "settled state

16

law" on how votes on amendments have been counted historically.[2]  How votes have been counted traditionally, what was the true intent and understanding of the Delegates, and matters such as the tenor of the times require further amplification from sources beyond those properly considered at the pleading stage.

Finally, regarding the sufficiency of the First Amended Complaint, Defendants incorporate by reference an argument made in their prior Motion to Dismiss to the effect that Plaintiffs' interpretation of Article XI, Section 3 "clearly violates the First Amendment rights of voters who, for whatever reason, choose not to vote in the gubernatorial election, by depriving them of their right to abstain and of their right to vote on a proposed constitutional amendment." (Docket No. 53 at 21-22).  However, Defendants do not make clear how their tabulation method compels voting any more than Plaintiffs' reading of the Amendment does.

Under Defendants' implementation of Article XI, Section 3, negative votes are effectively meaningless – indeed, they are irrelevant and do not count.  What is important is whether the total number of "yes" votes on an Amendment is one voter more than 50% of the number of voters who voted for governor.  Thus, for example, if 2,000,000 persons participated in an election, but only 1,000,000 people voted in the gubernatorial race, an Amendment will be deemed approved so long as it received 500,001 "yes" votes, even if 1,499,999 votes were cast against the amendment.  As a consequence, those who favor a proposed Amendment may feel compelled to forego voting for

_____

[2] Defendants' reliance cases like <u>Bassett v. Nat'l Collegiate Athletic Ass'n</u>, 528 F.3d 426, 430 (6th Cir. 2008) and <u>Erie Cnty. v. Morton Salt, Inc.</u>, 702 F.3d 860, 863 (6th Cir. 2012) for its citation to extraneous materials is misplaced.  The latter quotes the former for the proposition that, in considering a Rule 12(b)(6) motion, "a court 'may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.'"  Neither the Kingsport Times News, nor the Secretary of State website are referred to in the First Amended Complaint or central to Plaintiffs' claim that language of the Amendment should be read in a particular way.

17

governor so as to decrease the votes required to pass the amendment, while those who have a particular interest in seeing a proposed Amendment fail may feel compelled to vote for governor so as to increase the number which serves as the benchmark for tabulating whether an amendment passes. This appears no more a compulsion to vote than Plaintiffs' reading which they claim "gives supporters and opponents of amendments the same set of options – either vote for governor and have your vote on the amendment factor into the tabulation or abstain from the gubernatorial race and cast what amounts to a ceremonial vote on amendment." (Docket No. 57 at 26).

At this point, the Court does not decide whose reading of Article XI, Section 3 is correct. What it does decide is that Plaintiffs have set forth sufficient factual allegations so as to make their claims plausible and, consequently, Defendants' Motion to Dismiss for failure to state a claim must be denied.

## C. **Abstention or Certification**

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." Col. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). However, the Supreme Court has "held that federal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest, . . . for example, where abstention is warranted by considerations of 'proper constitutional adjudication,' 'regard for federal-state relations,' or 'wise judicial administration[.]'" Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) (citing id. at 813).

"Abstention under Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), is appropriate only where state law is unclear and a clarification of that law would preclude the need to adjudicate the federal question." Hunter v. Hamilton Cnty. Bd. of

18

Elections, 635 F.3d 219, 233 (6th Cir. 2011). That is, "[t]he Pullman abstention doctrine requires that 'when a federal constitutional claim is premised on an unsettled question of state law, the federal court should stay its hand in order to provide the state courts an opportunity to settle the underlying state law question and thus avoid the possibility of unnecessarily deciding a constitutional question.'" Assoc. Gen. Contractors of Oh., Inc. v. Drabik, 214 F.3d 730, 739 (6th Cir. 2000) (quoting Harris Cnty. Comm'rs Court v. Moore, 420 U.S. 77, 83 (1975)). "[T]he purpose of abstention is not to afford state courts an opportunity to adjudicate an issue that is functionally identical to the federal question," but rather, "the purpose of Pullman abstention in such cases is to avoid resolving the federal question by encouraging a state-law determination that may moot the federal controversy." San Remo Hotel, L.P. v. City and Cnty. of San Francisco, 545 U.S. 323, 339 (2005).[3]

Here, the Court finds that exceptional circumstances do not exist to justify abstention. Leaving aside the seemingly straight-forward words "by a majority of all the citizens of the state voting for governor," a state court's definitive interpretation that Article XI, Section 3 says what Defendants claim would not moot this litigation because (1) Plaintiffs allege that "[r]egardless of whether Defendants' tabulation method was contrary to or consistent with Article XI, Section 3, it subjected Plaintiffs – who voted both for governor and against Amendment 1 – to a coordinated scheme that violated their federally-secured due process and equal protection rights"; and (2) they specifically seek a declaration that "Defendants' vote tabulation method violates the rights of due

_____

[3] "A district court stay pursuant to Pullman abstention is entered with the expectation that the federal litigation will resume in the event that the plaintiff does not obtain relief in state court on state-law grounds." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 10 (1983). Thus, "parties forced by a federal judge to litigate their state-law claims in state court can return to federal court and have their federal-law claims heard, free of any preclusive effect of the state-court judgment." Atwater v. Chester, 730 F.3d 58, 63 (1st Cir. 2013) (citing England v. Lo. State Bd. of Med. Examiners, 375 U.S. 411, 415-21 (1964)).

19

process and equal protection guaranteed by the Fourteenth Amendment[.]" (Docket No. 51, Amended Complaint at 3 ¶ 8 & 18 ¶ 2).

For much the same reason, the Court will deny Defendants' request to certify the interpretation of Article XI, Section 3 to the Tennessee Supreme Court.

Under Tennessee law,

> The Supreme Court may, at its discretion, answer questions of law certified to it by the Supreme Court of the United States, a Court of Appeals of the United States, a District Court of the United States in Tennessee, or a United States Bankruptcy Court in Tennessee. This rule may be invoked when the certifying court determines that, in a proceeding before it, there are questions of law of this state which will be determinative of the cause and as to which it appears to the certifying court there is no controlling precedent in the decisions of the Supreme Court of Tennessee.

Tenn. Sup. Ct. R. 23 Section 1.

The decision of whether to certify a question to a state supreme court "rests in the sound discretion of the federal court," Lehman Bros. v. Shein, 416 U.S. 386, 391 (1974), and it is a decision which may be made *sua sponte* by the court, Elkins v. Moreno, 435 U.S. 647, 662 (1978).

While the question of whether a matter should be certified is a matter of discretion, as this Court has previously observed, it is not a decision undertaken lightly:

> On the one hand, federal courts often answer state law questions, just as state courts answer federal questions. Thus, the practice of certifying questions can be overused and add unnecessary burden on the answering court, particularly when the certification involves routine, run-of-the mill legal questions. See, Seals v. H & F, Inc., 301 S.W.3d 237, 241 n. 3 (Tenn. 2010) (noting that the Tennessee Supreme Court does "not share[ ] ... the harsh assessment of the general merits of the certification process" espoused by some commentators, but also observing "certifying a question is not always the best option").

> On the other hand, certification eliminates guesswork and speculation about questions of state law, and "[t]aking advantage of certification made available by a State may 'greatly simplif[y]' an ultimate adjudication in federal court." Arizonians for Official English v. Arizona, 520 U.S. 43, 79, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997); Shein, 416 U.S. at 386 (by certifying a question of state law, the federal court

20

> may save "time, energy and resources and hel[p] build a cooperative judicial federalism"). It also serves the salutary function of "protect[ing] states' sovereignty," something which "'is no small matter, especially since a federal court's error may perpetuate itself in state courts until the state's highest court corrects it.'" Haley v. Univ. of Tennessee–Knoxville, 188 S.W.3d 518, 521 (Tenn.2006) (citation omitted).

Renteria-Villegas v. Metro. Gov't of Nashville & Davidson Cnty., 2011 WL 4048523, at 812 (M.D. Tenn. Sept. 12, 2011).

Recognizing that the process should be used sparingly, the Court finds that certification of the state law question is inappropriate in this case. Even if the Tennessee Supreme Court were to adopt Defendants' interpretation of Article XI, Section 3, this would not "be determinative of the cause," given Plaintiffs' allegation that the tabulation method utilized to pass Amendment 1 (consistent with Defendants' reading) violated Plaintiff due process and equal protection rights under the Fourteenth Amendment.

### III.  Conclusion

On the basis of the foregoing, Defendants' Motion to Dismiss (Docket No. 52) will be denied.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

Case 3:14-cv-02182   Document 62   Filed 07/01/15   Page 22 of 22 PageID #: 785