**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| TRACEY E. GEORGE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-02182 |
| | ) | Chief Judge Sharp |
| WILLIAM EDWARD "BILL" HASLAM, as | ) | Magistrate Judge Bryant |
| Governor of the State of Tennessee, in his | ) | |
| official capacity, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

---

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

Defendants, Governor Bill Haslam, Secretary of State Tre Hargett, Coordinator of Elections Mark Goins, Attorney General and Reporter Herbert H. Slatery III, and State Election Commission members Judy Blackburn, Donna Barrett, Greg Duckett, Tommy Head, Jimmy Wallace, Tom Wheeler and Kent Younce, all in their official capacities, submit the following Proposed Findings of Fact and Conclusions of Law and accompanying exhibits[1] pursuant to this Court's order dated February 17, 2016, Dkt. 104.

---

[1] The following evidentiary materials are attached as exhibits to Defendants' Proposed Findings of Fact and Conclusions of Law:  Exhibit A – Excerpts from Deposition of Deborah Webster-Clair on December 21, 2015; Exhibit B – Excerpts from Deposition of Ellen Wright Clayton on December 18, 2015; Exhibit C – Excerpts from Deposition of Tracy George on January 8, 2016; Exhibit D – Excerpts from Deposition of Teresa Halloran on January 7, 2016; Exhibit E – Excerpts from Deposition of Jan Liff on January 25, 2016; Exhibit F – Excerpts from Deposition of Meryl Rice on December 14, 2015;  Exhibit G – Excerpts from Deposition of Kenneth Whalum on December 15, 2015; Exhibit H - Declaration of Andrew Dodd dated March 18, 2016 and accompanying exhibits 1-35; Exhibit I – Declaration of Mark Goins dated March 18, 2016 and accompanying exhibits 1-7; Exhibit J – Declaration of Brook Thompson dated March 18, 2016 and accompanying exhibits 1-5.

## PROPOSED FINDINGS OF FACT

<u>PARTIES</u>

1.      Plaintiff Tracy E. George is a Professor of Law and Professor of Political Science at Vanderbilt University. She is a resident of Nashville, Tennessee.

2.      Plaintiff Ellen Wright Clayton is a Professor of Pediatrics and Professor of Law at Vanderbilt University. She is a resident of Nashville, Tennessee.

3.      Plaintiff Deborah Webster-Clair is an Obstetrician and Gynecologist who resides in Brentwood, Tennessee.

4.      Plaintiff Kenneth T. Whalum Jr. is the pastor of New Olivet Baptist Church in Memphis, Tennessee. He is a resident of Memphis, Tennessee.

5.      Plaintiff Meryl Rice is a social worker and small business owner. She is a resident of Whiteville, Tennessee.

6.      Plaintiff Jan Liff is a registered nurse. She is a resident of Nashville, Tennessee.

7.      Plaintiff Teresa M. Halloran is the volunteer coordinator for Meals on Wheels in Franklin, Tennessee. She is a resident of Franklin, Tennessee.

8.      Plaintiff Mary Howard Hayes is the former Director of the Public Health Department of Sumner County, Tennessee. She is a resident of Gallatin, Tennessee.

9.      Defendant William Edwards "Bill" Haslam is the Governor of the State of Tennessee. He is sued in his official capacity.

10.      Defendant Tre Hargett is the Tennessee Secretary of State. He is sued in his official capacity.

11.      Defendant Mark Goins is the Coordinator of Elections of the State of Tennessee. He is sued in his official capacity.

12.     Defendant Herbert H. Slatery III is the Attorney General and Reporter of the State of Tennessee.  He is sued in his official capacity.

13.     Defendants Judy Blackburn, Donna Barrett, Gregg Duckett, Jimmy Wallace, Tom Wheeler, and Kent Younce are members of Defendant the State Election Commission of Tennessee.  Defendant Tommy Head was a member of the State Election Commission of Tennessee when the November 4, 2014 election was held but is not a current member.  The members of the State Election Commission of Tennessee are sued in their official capacities.

## JURISDICTION AND VENUE

14.     A substantial part of the acts and events giving rise to this action occurred in this District.

## PROCEDURAL HISTORY

15.     Plaintiffs' First Amended Complaint asserts two causes of action:  Count 1 for vote dilution under the Equal Protection Clause, and Count 2 for a fundamentally unfair voting scheme under the Due Process Clause.  Dkt. 51 at ¶¶ 51-70 (PageID # 596-600).

16.     Plaintiffs' First Amended Complaint seeks the following forms of relief:  (i) a declaration that article XI, section 3, of the Tennessee Constitution requires that Defendants tabulate the votes on Amendment 1 based only on the number of only voters who both voted for governor and voted on Amendment 1; (ii) a declaration that Defendants' vote tabulation method violates the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment; (iii) a declaration that the election results for Amendment 1, as currently certified, are void; (iv) an injunction requiring Defendants to recount the vote on Amendment 1 to correlate votes in the governor's race with votes on Amendment 1; (v) if Defendants are unable to correlate the votes or if Plaintiffs' interpretation of article XI, section 3, is unconstitutional, a declaration that the

3

November 4, 2014 vote on Amendment 1 is void; and (vi) costs, expenses, and reasonable attorney's fees.  Dkt. 51 at 18, Prayer for Relief (PageID # 600).

17.    After filing their First Amended Complaint, Plaintiffs never sought leave to further amend their complaint.

18.    On February 10, 2016, Plaintiffs and Defendants filed a Joint Proposed Pretrial Order.  That proposed order included a "Short Summary of Plaintiffs' Theory" in which Plaintiffs alleged for the first time that "Defendants' determination of the threshold for the ratification of proposed Constitutional Amendment No. 1 on the November 4, 2014 general election ballot" violated the First and Fourteenth Amendments by "forcing proponents of Amendment 1 to choose between increasing the likelihood of passage of Amendment 1 and exercising their constitutional right to vote in the governor's race" and by "compelling Plaintiffs and other votes against Amendment 1 to vote in the governor's race in order for their vote to count at all for purposes of ratification."  However, the "Short Summary of Plaintiffs' Theory" did not argue that Defendants had subjected Plaintiffs to a fundamentally unfair voting scheme in violation of the Due Process Clause.  Dkt. 95 at 2-3 (PageID # 1792-93).

19.    The Joint Proposed Pretrial Order also included a statement from Plaintiffs regarding the relief sought.  In that statement, Plaintiffs purport to seek the following forms of relief:  (i) a judgment voiding the November 4, 2014 election results on Amendment 1 as certified by Defendants; (ii) a declaration that the first paragraph of article XI, section 3, of the Tennessee Constitution is unconstitutional or that the method by which votes were tabulated and certified on Amendment 1 is unconstitutional; (iii) an injunction precluding Defendants from certifying the ratification of any proposed constitutional amendment under the legislative method set forth in the

4

first paragraph of article XI, section 3; and (iv) attorney's fees, costs, and expenses.  Dkt. 95 at 5 (PageID # 1795).

20.     In the Joint Proposed Pretrial Order, Defendants objected to Plaintiffs' attempt to amend their pleadings by raising new constitutional claims or seeking new relief in the Joint Proposed Pretrial Order.  Dkt. 95 at 1 (PageID # 1791).

## HISTORY OF ARTICLE XI, SECTION 3, OF THE TENNESSEE CONSTITUTION[2]

21.     Article XI, section 3, of the Tennessee Constitution governs the process of amending the Tennessee Constitution.  The first paragraph of article XI, section 3, governs the legislative method of amendment, while the second paragraph governs the convention method. Tenn. Const. art. XI, § 3.

22.     The first paragraph of the current version of article XI, section 3, of the Tennessee Constitution provides that

> Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals with the yeas and nays thereon, and referred to the general assembly then next to be chosen; and shall be published six months previous to the time of making such choice; and if in the general assembly then next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by two-thirds of all the members elected to each house, then it shall be the duty of the general assembly to submit such proposed amendment or amendments to the people at the next general election in which a Governor is to be chosen.  And if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the State voting for Governor, voting in their favor, such amendment or amendments shall become part of this Constitution. When any amendment or amendments to the Constitution shall be proposed in pursuance of the foregoing provisions the same shall at each of said sessions be read three times on three several days in each house.

---

[2] The facts contained within this section are not traditional adjudicative facts, but rather "legislative" facts that are to be determined by the Court as opposed to the trier of fact.  *See* Fed. R. Evid. 201 advisory committee's note (explaining that "legislative" facts are "those which have relevance to legal reasoning and the lawmaking process" and are resolved by the judge, whereas "adjudicative" facts are "simply the facts of the particular case" to which law is applied and are resolved by the trier of fact).

5

23.     The legislative method for amending the Tennessee Constitution was first adopted during the Constitutional Convention of 1834.  Before 1834, the only way to amend the Tennessee Constitution was to call a constitutional convention.  *See* Tenn. Const. art. X, § 3 (1796).  Because calling a constitutional convention was expensive and was thought by some to open the entire Constitution to revision, delegates to the Constitutional Convention of 1834 established a new legislative method of amendment that would be less costly and allow the revision of specific provisions of the Constitution.  "The Convention," *Nashville Republican & State Gazette*, Jul. 29, 1834) (Dodd. Decl., Ex. 2).

24.     Delegates to the Constitutional Convention of 1834 intended the legislative method to provide a more convenient way to amend the Constitution than the convention method, but they did not want to make amendments to the Constitution too easy or accessible.  "The Convention," *Nashville Republican & State Gazette*, Jul. 29, 1834 (Dodd Decl., Ex. 2).

25.     A delegate named John J. White proposed the language that was ultimately adopted as the legislative method.  *Journal of the Convention of the State of Tennessee Convened for the Purpose of Revising and Amending the Constitution* 10-13 (1834) (Dodd Decl., Ex. 1).  In relevant part, article XI, section 3, of the Tennessee Constitution of 1834 provided that, after an amendment was passed by two successive legislatures, then

> it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the people, in such manner, and at such time as the General Assembly shall prescribe.  And if the people shall approve and ratify such amendment or amendments, by a majority of all the citizens of the State, voting for representatives, voting in their favor, such amendment or amendments shall become part of this constitution.

26.     Neither Delegate White nor any other delegate indicated that voting for representatives was a precondition to voting on a proposed amendment.  "The Convention," *Nashville Republican & State Gazette*, Jul. 29, 1834 (Dodd Decl., Ex. 2).

6

27.     An amendment proposed through the legislative method first appeared on the general election ballot in 1845.  In 1844, the General Assembly passed an act to submit the proposed amendment to the people as required by article XI, section 3.  The act instructed sheriffs to "open and hold an election in each and every county in this State, when and where all persons entitled to vote for Representatives, may vote for the amendments" and further instructed them to prepare a certified statement of the "number of votes given in their respective counties for Representatives . . . and also the number of votes given . . . for the approval of the amendments." 1844 Tenn. Pub. Acts ch. 175 (Dodd Decl., Ex. 3).

28.     In 1887, the General Assembly passed an act to submit to the people a proposed amendment that would have prohibited the manufacture and sale of "any intoxicating liquors." 1885 Tenn. Pub. Acts, Senate Joint Resolution No. 2 (Dodd Decl., Ex. 6); 1887 Tenn. Pub. Acts, Senate Joint Resolution No. 7 (Dodd Decl., Ex. 7); 1887 Tenn. Pub. Acts ch. 86 (Dodd Decl., Ex. 8).  That act scheduled the election for the last Thursday of September, 1887, even though the next election for representatives would not be held until the first Tuesday in November of 1888.  1887 Tenn. Pub. Acts ch. 86 (Dodd Decl., Ex. 8); Tenn. Const. art. II, § 7 (1870).  Thus, a special election on that amendment was held when there was no vote for representatives.

29.     There was a debate regarding what vote would be necessary for ratification in the election held in September 1887.  During that debate, no one argued that the election would be improper because only voters who first vote for representatives are allowed to vote on a proposed amendment.  The debate was never resolved because the proposed amendment failed to meet the minimum threshold for approval (that is, there were more votes against the amendment than for it) and it therefore necessarily failed to pass.  "The Amendment:  What Vote Will It Require to

Become a Law," *Daily American*, Jul. 14, 1887 (Dodd Decl., Ex. 10); Official Statewide Tally Sheet from the Secretary of State for the Sept. 29, 1887 Election (Dodd Decl., Ex. 9).

30.     During the period from 1834 to 1953, when county election commissioners certified the election results for elections that included proposed constitutional amendments, they reported only the total number of votes cast for representatives, the total number of votes cast in favor of the amendment, and the total number of votes cast against the amendment. Roane County Certified Election Results for 1853 (Dodd Decl., Ex. 4); Sample Certification Documents and Statewide Totals for 1904 (Dodd Decl., Ex. 11); Bedford County Certified Election Results for 1940 (Dodd Decl., Ex. 14).

31.     During the period from 1834 to 1953, if a proposed constitutional amendment was approved by receiving more "yes" votes than "no" votes, Tennessee officials further determined whether the amendment had been ratified by simply comparing the total number of votes in favor of the amendment to the total number of votes cast for representatives. They did not correlate the votes to ensure that only votes on the amendment that were cast by voters who voted for representatives were counted. "The Election of Judges and Attorneys General by the People," *Daily Union & American*, Oct. 12, 1853 (Dodd Decl., Ex. 5); "Election Returns," *Nashville American*, Oct. 11, 1904 (Dodd Decl., Ex. 13); "Constitutional Amendments," *Nashville American*, Aug. 18, 1904 (Dodd Decl., Ex. 12); Certification of 1940 Results (Dodd Decl., Ex. 15); "Amendment Failed in November Vote, Board Certifies," *Nashville Banner*, Nov. 21, 1950 (Dodd Decl., Ex. 19); "Amendment Defeated, Official Count Shows," *Tennessean*, Nov. 21, 1950 (Dodd Decl., Ex. 20); "Machines Legal in Referendum," *Tennessean*, Oct. 13, 1950 (Dodd Decl., Ex. 17); "Beeler Expects Satisfactory Constitution Vote," *Nashville Banner*, Oct. 13, 1950 (Dodd Decl., Ex. 16).

32.     During the period from 1834 to 1953, voters who did not cast votes for representatives were not prevented from voting on proposed constitutional amendments.  "Voters Approve Constitutional Change, But Too Few Voted," *Tennessean*, Nov. 8, 1950 (Dodd Decl., Ex. 18).

33.     The legislative method of article XI, section 3, was amended during the Constitutional Convention of 1953.  The convention delegates debated what majority should be required for a proposed amendment to the Tennessee Constitution to be ratified.  The majority proposal from the Committee on the Amendment Process was to leave the ratification requirement unchanged; the minority proposal was to require ratification by only a majority of those voting on the amendment; and the substitute minority proposal was to require ratification by a two-thirds majority of those voting on the amendment.  *Journal and Proceedings of the Limited Constitutional Convention, State of Tennessee* 197-200 (1953) (hereinafter *1953 Journal*) (Dodd Decl., Ex. 22).

34.     The delegates who favored the majority proposal wanted it to be difficult to amend the Tennessee Constitution and did not think an amendment should pass if it was supported only by a majority of a small group of voters.  *1953 Journal* at 738, 867, 880 (Dodd Decl., Ex. 22); Goins Decl. ¶ 6.

35.     Ultimately, the majority proposal regarding the ratification threshold was adopted with one revision:  the language "voting for representatives" was replaced with "voting for Governor."  That change was made because it was difficult to ascertain the total number of votes cast for representatives, especially in districts that were entitled to elect more than one representative.  *1953 Journal* at 766, 893 (Dodd Decl., Ex. 22).

9

36.     The legislative method was amended in one other respect during the Constitutional Convention of 1953.  The original requirement that the General Assembly submit a proposed amendment to the people "at such time as the General Assembly shall prescribe," Tenn. Const. art. XI, § 3 (1834), was amended to require submission "at the next general election in which a Governor is to be chosen," Tenn. Const. art. XI, § 3.

37.     Delegates to the Constitutional Convention of 1953 understood the ratification requirement of article XI, section 3, to require a comparison of the number of votes cast in favor of the amendment to the total number of votes cast for representatives or governor.  *1953 Journal* at 741-42, 757, 854 (Dodd Decl., Ex. 22).

38.     The delegates' understanding was communicated to the public through newspaper reports.  "Amending Process Stalls Delegates to Convention," *Kingsport News*, May 23, 1953 (Dodd Decl., Ex. 23); "Vote for Governor May Be Key to Amending Charter," *Kingsport News*, May 27, 1953 (Dodd Decl., Ex. 24); "Constitutional Convention Nears Completion of Duty," *Kingsport News*, June 7, 1953 (Dodd Decl., Ex. 25); "League Hears Todd, Smith on Constitutional Changes," *Kingsport News*, June 23, 1953 (Dodd Decl., Ex. 26); "Amending Clause in State Constitution Has Defeated All Attempts at Change," *Kingsport News*, Oct. 8, 1953 (Dodd Decl., Ex. 27); "Oldest Constitution Hardest to Amend," *Tennessean*, Oct. 15, 1953 (Dodd Decl., Ex. 28).

39.     There is no evidence that either the delegates to the Constitutional Convention of 1953 or the public understood article XI, section 3, to make voting for representatives a precondition for having one's vote on a proposed constitutional amendment counted.

40.     During the period from 1953 to the present, if a proposed constitutional amendment was approved by receiving more "yes" votes than "no" votes, Tennessee officials further

10

determined whether the amendment had been ratified by simply comparing the total number of votes cast in favor of the amendment to the total number of votes cast for governor. They did not correlate the votes to ensure that only votes on the amendment that were cast by voters who voted for governor were counted. Certified Election Results for 1966 (Dodd Decl., Ex. 31); Certified Election Results for 1970 (Dodd Decl., Ex. 33); Certified Election Results for 1982 (Dodd Decl., Ex. 34); Certified Election Results for 1998 (Thompson Decl., Ex. 1); Certified Election Results for 2002 (Thompson Decl., Ex. 3); Certified Election Results for 2006 (Thompson Decl., Ex. 5); Certified Election Results for 2010 (Goins Decl., Ex. 2); Certified Election Results for 2014 (Goins Decl., Ex. 6); Thompson Decl. ¶¶ 6, 10, 13; Goins Decl. ¶¶ 9, 22-26.

41.     Brook Thompson, the Coordinator of Elections for the State of Tennessee from 1995 to 2009, interpreted article XI, section 3, to require an amendment to be (i) approved, by receiving "yes" votes equal to more than half of the votes cast on the amendment, and (ii) ratified, by receiving "yes" votes equal to more than half of the total votes cast for governor. He did not interpret article XI, section 3, to mean that a voter must first vote for governor in order to have his or her vote on a proposed amendment counted. Thompson Decl. ¶ 5.

42.     During his tenure as Coordinator of Elections, Brook Thompson followed this interpretation in determining whether proposed amendments that appeared on the ballot in the general elections of 1998, 2002 and 2006 had been passed as required by article XI, section 3. Thompson Decl. ¶¶ 6, 10, 13.

43.     In 2002, a proposed amendment to establish a state lottery appeared on the ballot. Brook Thompson prepared an information sheet explaining that, to pass, an amendment must get more "yes" votes than "no" votes, and the number of "yes" votes must also be a majority of the total votes cast in the gubernatorial election. That sheet also stated that "it is not necessary to vote

in the governor's race in order to vote on the Constitutional amendment." The information sheet was posted on the Secretary of State's website and otherwise made available to the public. Thompson Decl. ¶ 9; "Constitutional Amendment Issues" (Thompson Decl., Ex. 2).

44. A similar information sheet appeared on the Secretary of State's website before the 2006 general election, when two proposed constitutional amendments were on the ballot. Thompson Decl. ¶ 12; Thompson Decl., Ex. 4.

45. No one ever complained to Brook Thompson that he had interpreted article XI, section 3, incorrectly in determining whether the proposed amendments that were on the ballot in 1998, 2002 and 2006 had passed. Thompson Decl. ¶¶ 7, 11, 14.

46. During the 2010 general election, when one proposed constitutional amendment appeared on the ballot, Coordinator Goins interpreted article XI, section 3, to mean that, in order to pass, an amendment must be (i) approved, by receiving "yes" votes equal to more than half of the total votes cast on the amendment; and (ii) ratified, by receiving "yes" votes equal to more than half of the total votes cast for governor. He did not interpret article XI, section 3, to mean that a voter must first vote for governor in order to have his or her vote on a proposed amendment counted. He reached this interpretation based on the text of article XI, section 3, and conversations with his staff about how the provision had been interpreted and applied in previous elections. Goins Decl. ¶¶ 5-8.

47. In preparation for the 2010 election, Coordinator Goins's staff in the Division of Elections prepared an information sheet similar to the one that had been prepared by Brook Thompson before the 2002 and 2006 elections. Goins Decl. ¶ 8; Goins Decl., Ex. 1.

48. Coordinator Goins relied on this interpretation in determining whether the proposed amendment that appeared on the ballot in the 2010 general election had passed. No one

complained to Coordinator Goins that he had interpreted article XI, section 3, incorrectly. Goins Decl. ¶¶ 9-10.

49.　　Newspaper articles published during the period from 1953 to the present explained that, to be ratified, an amendment must receive "yes" votes equal to more than one half of the total votes cast for governor. "Group Favoring Passage of Roads Amendment Waging Strong Battle," *Kingsport Times*, Oct. 30, 1958 (Dodd. Decl., Ex. 29); "Constitution Amendment Vote," *Kingsport Times*, Apr. 15, 1966 (Dodd Decl., Ex. 30); "Sheriff Term on Ballot," *Kingsport Times*, Oct. 13, 1970) (Dodd Decl., Ex. 32); "Victim's Rights May Make State Constitution," *Tennessean*, Apr. 29, 1998 (Dodd Decl., Ex. 35).

50.　　As far as Brook Thompson and Coordinator Goins are aware, neither the Secretary of State, the Coordinator of Elections, nor the Division of Elections has ever interpreted or applied article XI, section 3, to require that a voter first vote for governor in order to have his or her vote on a constitutional amendment counted. Thompson Decl. ¶ 15; Goins Decl. ¶ 30.

51.　　On January 28, 2016, the Tennessee General Assembly enacted Public Chapter 528 to "provide[] an orderly procedure for the appointment, confirmation, and retention of appellate court judges." The General Assembly enacted Public Chapter 528 pursuant to authority granted in language that was added to article VI, section 3, of the Tennessee Constitution by Amendment 2 in the November 2014 election. The General Assembly stated in Public Chapter 528 that this language had been "ratified by the people at the November 4, 2014 general election." Goins Decl. ¶ 28; Goins Decl., Ex. 7.

<u>NOVEMBER 2014 GENERAL ELECTION</u>

52.　　The State of Tennessee held a general election on November 4, 2014. Goins Decl. ¶¶ 11-12.

13

53.     The ballot for that election included the governor's race, in which incumbent Republican Governor Bill Haslam was running for reelection against Democrat Charlie Brown and several third-party and independent candidates, including John Jay Hooker.  Goins Decl. ¶ 12.

54.     The ballot for that election also included referendums on four proposed amendments to the Tennessee Constitution, all of which were proposed pursuant to the legislative method governed by the first paragraph of article XI, section 3.  Goins Decl. ¶ 11.

55.     The first proposed amendment was referred to as Amendment 1 and appeared on the ballot as follows:

> Shall Article I of the Constitution of Tennessee be amended by adding the following language as a new, appropriately designated section:
>
> Nothing in this Constitution secures or protects a right or requires the funding of an abortion.  The people retain the right through their elected state representatives and senators to enact, amend, or repeal statutes regarding abortion, including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother.

Goins Decl. ¶ 11.

56.     The second proposed amendment, Amendment 2, related to the selection of appellate judges.  The third proposed amendment, Amendment 3, related to the prohibition of a state income tax.  The fourth proposed amendment, Amendment 4, related to charitable gaming events held by veterans' groups.  Goins Decl. ¶ 11.

57.     Before the November 2014 election, the Division of Elections received inquiries regarding how the votes on the proposed constitutional amendments would be counted.   One of those inquiries came from an individual with the Davidson County Election Commission who inquired whether article XI, section 3, requires a voter to first vote for governor in order to have his or her vote on a proposed constitutional amendment counted.  Although confident, based on previous research and the State's prior interpretation and application of article XI, section 3, that

14

the answer to that question was no, Secretary Hargett and Coordinator Goins did further research to confirm their interpretation of article XI, section 3. Based on that research, which included conversations with election officials who had administered previous elections on proposed amendments, Secretary Hargett and Coordinator Goins concluded that their interpretation of article XI, section 3, was correct. Goins Decl. ¶¶ 13-17.

58. The spokesperson for the Secretary of State, Blake Fontenay, explained to members of the media that there was no requirement that voters first vote for governor in order to have their votes on the proposed amendments counted. This position was made known to the public through newspaper articles. Goins Decl. ¶ 18; Goins Decl., Ex. 3.

59. When voters went to the polls on November 4, 2014, all registered and qualified voters were eligible to vote on any or all of the four proposed constitutional amendments regardless of whether they voted for governor. When voters cast their votes on proposed amendments, they would have expected that their votes would count regardless of whether they voted for governor. Goins Decl. ¶ 18.

NOVEMBER 4, 2014 ELECTION RESULTS

60. A total of 1,430,117 voters voted in the November 4, 2014 election. Goins Decl. ¶ 29.

61. A total of 1,353,728 votes were cast for governor. Goins Decl. ¶ 23; Goins Decl., Ex. 6.

62. Approximately 95% of the voters who voted in the November 4, 2014 election voted for governor. That percentage is comparable to the percentage of voter turnout for governor in recent elections, particularly in elections involving incumbent governors. In 2010, approximately 99% of voters who voted in the election voted for governor. In 2006, approximately

15

97% of voters who voted in the election voted for governor.  In 2002, approximately 98% of voters who voted in the election voted for governor.  In 1998, approximately 95% of voters who voted in the election voted for governor.  In 1994, approximately 98% of voters who voted in the election voted for governor.  Incumbent governors were on the ballot in 1998 and 2002.  Goins Decl. ¶ 29.

63.     A total of 1,386,355 votes were cast on Amendment 1.  Of those, 729,163 votes were cast in favor of Amendment 1, and 657,192 votes were cast against Amendment 1.  Goins Decl. ¶ 23; Goins Decl., Ex. 6.

64.     A total of 1,366,161 votes were cast on Amendment 2.  Of those, 832,188 votes were cast in favor of Amendment 2, and 533,973 votes were cast against Amendment 2.  Goins Decl. ¶ 23; Goins Decl., Ex. 6.

65.     A total of 1,333,448 votes were cast on Amendment 3.  Of those, 882,926 votes were cast in favor of Amendment 3, and 450,522 votes were cast against Amendment 3.  Goins Decl. ¶ 23; Goins Decl., Ex. 6.

66.     A total of 1,298,080 votes were cast on Amendment 4.  Of those, 903,353 votes were cast in favor of Amendment 4, and 394,727 votes were cast against Amendment 4.  Goins Decl. ¶ 23; Goins Decl., Ex. 6.

### DETERMINATION OF PASSAGE OF AMENDMENT 1

67.     In determining whether the proposed amendments that were on the ballot in 2014 had passed, Coordinator Goins followed the same method that was followed in 1998, 2002, 2006 and 2010.  Goins Decl. ¶ 22.

68.     Based on their interpretation of article XI, section 3, of the Tennessee Constitution, Coordinator Goins and his staff determined that Amendment 1 had been approved and ratified as required by that provision.  First, they determined that Amendment 1 had been approved because

16

the number of "yes" votes (729,163) exceeded a majority (693,178) of the total votes cast on the amendment (1,365,355). Second, they determined that Amendment 1 had been ratified because the number of "yes" votes on the amendment (729,163) exceeded a majority (676,865) of the total votes cast for governor (1,353,728). Goins Decl. ¶¶ 23-26.

69. Because the total number of votes cast on Amendment 1 exceeded the total number of votes cast for governor, the threshold for approval of Amendment 1 was higher than for ratification. The decisive question for purposes of determining whether Amendment 1 had passed was whether it received more "yes" votes than "no" votes. Each "yes" vote and "no" vote on the amendment therefore had exactly the same ability to affect the outcome of the election. Goins Decl. ¶ 26.

70. Based on the same interpretation of article XI, section 3, Secretary Hargett and Coordinator Goins determined that the other three proposed amendments on the ballot had also passed. Because the total number of votes on Amendment 2 exceeded the total number of votes cast for governor, the threshold for approval of that amendment was higher than for ratification. Because the total number of votes on Amendment 3 and Amendment 4 was less than the total number of votes cast for governor, the threshold for ratification of those two amendments was higher than for approval. Goins Decl. ¶¶ 23-26.

71. On December 8, 2014, Governor Haslam, Attorney General Slatery and Secretary Hargett certified the results of the November 4, 2014 election, including the results for the election on Amendment 1. Goins Decl. ¶ 27; Goins Decl., Ex. 6.

72. Plaintiffs have presented no evidence that Defendants' method of determining whether Amendment 1 had passed was a departure from previous election practice. Clayton Dep.

17

72:9-18; Halloran Dep. 45:2-6; Liff Dep. 39:19-40:1; Rice Dep. 49:24-51:9; Webster-Clair Dep. 54:21-55:15; Whalum Dep. 84:21-85:12.

73.     Plaintiffs have presented no evidence that Defendants' method of determining whether Amendment 1 had passed was intended to discriminate against Plaintiffs or other proponents of Amendment 1 or to affect the outcome of the election on Amendment 1.  Clayton Dep. 68:9-70:4, 87:20-88:11; George Dep. 97:6-99:25, 106:13-23,  112:3-113:2, 142:7-143:1; Halloran Dep. 44:6-15; Webster-Clair Dep. 38:17-21, 72:20-23.

<u>CAMPAIGN BY PROPONENTS OF AMENDMENT 1</u>

74.     Coordinator Goins was aware that some supporters of Amendment 1 were encouraging people not to vote for governor to lower the threshold for ratification, and that opponents of Amendment 1 were encouraging people to vote for governor in order to raise the threshold.  Goins Decl. ¶ 19.

75.     Plaintiffs encouraged opponents of Amendment 1 to vote for governor.  Clayton Dep. 37:16-38:1; George Dep. 42:23-43:16; Liff Dep. 59:6-13, 90:4-92:6.

76.     Defendants did not participate in any effort to encourage voters to abstain from voting for governor.  Clayton Dep. 63:1-23, 64:13-65:17, 81:11-82:11, 85:8-86:4, 112:15-113:12; George Dep. 63:14-64:14, 93:1-94:1, 100:6-104:10; Halloran Dep. 25:10-26:11, 41:10-43:18; Liff Dep. 28:18-25, 40:23-43:1, 45:17-46:11; Rice Dep. 37:16-38:2, 43:25-45:3, 46:11-48:5, 70:8-14; Webster-Clair Dep. 35:13-36:25, 39:21-40:11, 56:25-57:5; Whalum Dep. 40:9-24, 65:22-67:2, 81:23-83:4; Goins Decl. ¶ 19.

77.     Coordinator Goins took steps to ensure that his office and the local election commissions remained completely neutral and impartial with respect to the election on the proposed constitutional amendments.  Goins Decl. ¶¶ 20-21; Goins Decl., Exs. 4-5.

18

78.     Plaintiffs have presented no evidence that any voter actually abstained from voting for governor simply to lower the threshold for ratification of Amendment 1.  Clayton Dep. 57:17-20, 67:8-12, 83:10-84:2; George Dep. 88:25-89:3, 94:2-95:6.

79.     Plaintiffs have presented no evidence that they or any other voter actually voted for governor simply to increase the threshold for ratification of Amendment 1.  Clayton Dep. 56:12-25.

80.     Plaintiffs acknowledge that there are many reasons why voters may have abstained from voting for governor.  George Dep. 71:8-72:6; Webster-Clair 46:15-17.

<u>PLAINTIFFS' DECISION TO BRING LAWSUIT</u>

81.     Plaintiffs were aware of Defendants' interpretation of article XI, section 3, before the election on Amendment 1.  George Dep. 33:24-35:10.

82.     Plaintiffs were aware, before the election on Amendment 1, that proponents of Amendment 1 were encouraging voters to abstain from voting for governor in order to lower the threshold for passage of Amendment 1.  Clayton Dep. 38:18-39:9; George Dep. 43:17-24, 45:21-46:19.

83.     Plaintiffs did not contact Defendants before the election on Amendment 1 to communicate their concerns about Defendants' interpretation of article XI, section.  George Dep. 41:18-21, 42:14-20; Liff Dep. 32:14-22.

84.     Plaintiffs were contemplating bringing a lawsuit against the State regarding its method of determining whether Amendment 1 had passed before the election was held and had even prepared a draft complaint.  Rice Dep. 20:11-19; Webster-Clair Dep. 11:6-11, 18:3-25; Halloran Dep. 14:1-11.

19

85. Plaintiffs waited to bring their lawsuit until after the November 4, 2014 election was held and the unofficial results of that election had been reported showing that Amendment 1 had been approved and ratified. Dkt. 1.

## PROPOSED CONCLUSIONS OF LAW

### JURISDICTION

1. Plaintiffs' claims arise under federal law.

2. For a federal court to exercise subject matter jurisdiction over a claim, the party seeking relief must have standing to sue. To establish standing, the plaintiff must show (i) an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (ii) a causal connection between the injury and conduct complained of; and (iii) that it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir. 1996).

3. The injury that is necessary to establish standing must be one that was personally suffered by the plaintiff, not one suffered by third parties who are not before the court or one that is merely hypothetical or conjectural. *Heckler v. Matthews*, 465 U.S. 728, 738 (1984); *City of Detroit v. Franklin*, 4 F.3d 1367, 1372 (6th Cir. 1993).

4. How other people vote does not relate to a plaintiff's own exercise of his or her right to vote and does not constitute a concrete injury for purposes of standing. *Looper v. Boman*, 958 F. Supp. 341, 344 (M.D. Tenn. 1997).

5. Because a federal court is required to reexamine the issue of standing whenever it is in doubt, the law-of-the-case doctrine has no application to a court's earlier ruling on standing. *Tartt v. Wilson Cnty., Tenn.*, 982 F. Supp. 2d 810, 824 (M.D. Tenn. 2013).

6.     The injury that Plaintiffs allege to support their vote dilution claim—that their individual votes were not valued in the same way as other votes—did not actually occur.  Because the threshold for approval of Amendment 1 was higher than for ratification, passage of Amendment 1 hinged on whether there were more "yes" votes than "no" votes.  Plaintiffs' "no" votes had exactly the same weight as "yes" votes cast by proponents of Amendment 1 and had exactly the same ability to affect the outcome of the election.

7.     Because the injury on which Plaintiffs' vote dilution claim is based did not occur, Plaintiffs lack standing to assert their vote dilution claim.

8.     Plaintiffs rely on the same vote dilution injury to establish standing for their fundamental unfairness claim.  Because that alleged injury did not occur, they lack standing to assert their fundamental unfairness claim.

9.     Because Plaintiffs have not alleged or presented evidence that they personally were compelled to vote for governor in the November 2014 election, they lack standing to assert any compelled voting claim.

10.     Because Plaintiffs have not alleged or presented evidence that they personally were compelled to abstain from voting for governor in the November 2014 election, they lack standing to assert any compelled abstention claim.

<u>CLAIMS NOT PROPERLY BEFORE THE COURT</u>

11.     A party's failure to advance a claim in the pretrial order constitutes waiver or abandonment of that claim.  *McKinney v. Galvin*, 701 F.2d 584, 586 n.3 (6th Cir. 1983); *Gregory v. Shelby Cnty., Tenn.*, 220 F.3d 433, 442-43 (6th Cir. 2000); *Leigh v. Bureau of State Lottery*, 876 F.2d 104 (6th Cir. 1989) (table).

12.     Because Plaintiffs failed to allege in the pretrial order that Defendants' interpretation or application of article XI, section 3, constituted a fundamentally unfair voting scheme in violation of the Due Process Clause, they have waived or abandoned that claim and it is not properly before the Court.

13.     A plaintiff may not assert new claims by including them in the pretrial order without ever seeking and obtaining leave from the Court to amend his or her pleadings.  *Norton v. City of Marietta, Okla.*, 432 F.3d 1145, 1151-52 (10th Cir. 2005); *Foley v. Aspen Ski Lodge Ltd. P'ship*, 208 F.3d 225 (10th Cir. 2000) (table).

14.     Allowing a plaintiff to assert new claims after the close of discovery creates significant prejudice to the opposing party.  *Duggins v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999).

15.     Because Plaintiffs never sought to leave to amend their complaint to assert their new compelled voting and compelled abstention theories, and because allowing Plaintiffs to assert those theories at this late stage would prejudice Defendants, those claims are not properly before this Court.

## ABSTENTION

16.     Abstention under *Pullman* is appropriate not only when resolution of a state law issue could render a decision on a federal constitutional issue unnecessary, but also when it would substantially modify the constitutional issue.  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 306 (1979); *Harman v. Forssenius*, 380 U.S. 528, 534 (1965); *Tyler v. Collins*, 709 F.2d 1106, 1108 (6th Cir. 1983).

17.     An authoritative interpretation of article XI, section 3, of the Tennessee Constitution would substantially modify Plaintiffs' fundamental unfairness claim because that

Case 3:14-cv-02182   Document 110   Filed 03/18/16   Page 22 of 35 PageID #: 2234

claim hinges largely, if not exclusively, on their allegation that Defendants' method of tabulating votes on Amendment 1 was contrary to article XI, section 3.

18.     An authoritative interpretation of article XI, section 3, would also substantially modify Plaintiffs' vote dilution claim because Plaintiffs allege that Defendants' interpretation of article XI, section 3, is not rationally related to the furtherance of any state interest because it violates state law.

19.     Any delay or other burden caused by abstention would be minimal in this case because a declaratory judgment action is already pending in the Williamson County Chancery Court that seeks a ruling on the proper interpretation of article XI, section 3.

20.     This Court should abstain under *Pullman* until the Tennessee courts have authoritatively construed article XI, section 3.

<u>INTERPRETATION OF ARTICLE XI, SECTION 3</u>

21.     When the Tennessee Supreme Court construes a provision of the Tennessee Constitution, the primary goal is to give the fullest possible effect to the intent of the Tennesseans who adopted it.  *Estate of Bell v. Shelby Cnty. Health Care Corp.*, 318 S.W.3d 823, 835 (Tenn. 2010).

22.     The text is the best indicator of a provision's purpose.  The text should be interpreted in a principled way that gives its words plain and ordinary meaning and that takes into account what the people who ratified the provision thought those words meant.  Every word in a provision should be rendered operative, rather than idle or meaningless, and no constitutional provision should be construed to impair or destroy another provision.  *Estate of Bell v. Shelby Cnty. Health Care Corp.*, 318 S.W.3d 823, 835 (Tenn. 2010); *Shelby Cnty. v. Hale*, 292 S.W.2d

23

745, 749 (Tenn. 1956); *Martin v. Beer Bd. for City of Dickson*, 908 S.W.2d 941, 947 (Tenn. Ct. App. 1995).

23.     The history, structure, and underlying values of the Constitution must also be taken into account.  The provision must be construed reasonably in light of the practices and usages that were well-known when the provision was passed.  A court may rely on historical documents, including constitutional convention proceedings, in undertaking this inquiry.  *Estate of Bell v. Shelby Cnty. Health Care Corp.*, 318 S.W.3d 823, 835 (Tenn. 2010); *Cleveland Surgery Ctr., L.P. v. Bradley Cnty. Mem'l Hosp.*, 30 S.W.3d 278, 282 (Tenn. 2000).

24.     Historical documents that are consulted in construing a constitutional provision are legal materials, not evidentiary materials, and therefore are not subject to the Federal Rules of Evidence.  *Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (Posner, J., in chambers); *Daggett v. Comm'n on Governmental Ethics & Election Practices*, 172 F.3d 104, 112 (1st Cir. 1999).

25.     Newspapers published contemporaneously with the deliberations of a legislative body are considered reliable evidence of legislative intent and the common understanding of a provision, particularly when other recorded history is lacking.  *Morse v. Republican Party of Va.*, 517 U.S. 186, 206 n.22 (1996); *Loewen v. Turnipseed*, 488 F. Supp. 1138, 1149 (N.D. Miss 1980); *Adams v. City of Boston*, 963 N.E.2d 694, 702 n.17 (Mass. 2012); *Mich. United Conservation Clubs v. Sec'y of State*, 630 N.W.2d 297, 304 (Mich. 2001).

26.     A court construing a constitutional provision must also consider how the provision has been interpreted by the legislative and executive branches of the State.  An interpretation not emanating from a judicial decision, but adopted by the legislative or executive branches and long accepted by the public, will usually be accepted as correct by the Tennessee courts.  *State v.*

*Nashville Baseball Club*, 154 S.W. 1151, 1154 (Tenn. 1913); *Am. Civil Liberties Union of Tenn. v. Darnell*, 195 S.W.3d 612, 626 n.12 (Tenn. 2006); *Southern Ry. Co. v. Dunn*, 483 S.W.2d 101, 103 (Tenn. 1972); *Williams v. Carr*, 404 S.W.2d 522, 529 (Tenn. 1966); *LaFever v. Ware*, 365 S.W.2d 44, 47 (Tenn. 1963); *New England Mut. Life Ins. Co. v. Reese*, 83 S.W.2d 238, 241 (Tenn. 1935); *Derryberry v. State Bd. of Election Comm'rs*, 266 S.W. 102, 105 (Tenn. 1924).

27.     A federal court should construe a state law to avoid constitutional difficulty. *Green Party of Tenn. v. Hargett*, 700 F.3d 816, 825 (6th Cir. 2012).

28.     The Tennessee Supreme Court has not ruled on the proper interpretation of the first paragraph of article XI, section 3.  The issue before the Tennessee Supreme Court in *Snow v. City of Memphis*, 527 S.W.2d 55 (Tenn. 1975), concerned the second paragraph of article XI, section 3, and that court discussed the ratification requirement of the first paragraph only in dicta.  That discussion, moreover, does not support Plaintiffs' interpretation of the first paragraph of article XI, section 3.

29.     Defendants' interpretation of article XI, section 3, of the Tennessee Constitution is consistent with its plain language, legislative history, and interpretation by the legislative and executive branches.

30.     The plain language of article XI, section 3, requires that, in order to pass, an amendment proposed through the legislative method must be both approved and ratified.

31.     Approved must mean something different than ratified or, otherwise, the term approved would be rendered meaningless.

32.     The term "ratify" is often used to refer specifically to the last in a series of necessary steps or consents.  *Black's Law Dictionary* 1376 (9th ed. 2009).  Approval and ratification are two necessary steps.

25

33.     The most natural reading of the requirement that the people approve a constitutional amendment is that the amendment must receive more "yes" votes than "no" votes.  *Black's Law Dictionary* 118 (9th ed. 2009); 67A C.J.S. *Parliamentary Law* § 7 (2015).

34.     The most natural reading of the requirement that the people ratify an amendment "by a majority of all the citizens of the State voting for Governor, voting in their favor" is that the number of "yes" votes cast on the amendment must be greater than half of the total number of votes cast for governor.  67A C.J.S. *Parliamentary Law* § 7 (2015).

35.     The plain language of article XI, section 3, does not make voting for governor a precondition for voting on a proposed amendment.  Instead, the provision requires that proposed amendments be submitted to "the people," which is most naturally read to refer to the general electorate rather than a subset of voters who voted for governor.

36.     Plaintiffs' reading of article XI, section 3, would conflict with article IV, section 1, of the Tennessee Constitution because it would impose an additional qualification on the right to vote for constitutional amendments.  *City of Memphis v. Hargett*, 414 S.W.3d 88, 108 (Tenn. 2013)

37.     Plaintiffs' reading of article XI, section 3, would also violate the U.S. Constitution by imposing a severe burden on voters' First and Fourteenth Amendment rights without furthering any compelling state interest.  *Ayers-Schaffner v. DiStefano,* 37 F.3d 726, 727 (1st Cir. 1994); *Partnoy v. Shelley*, 277 F. Supp. 2d 1065, 1071 (S.D. Cal. 2003); *In re Hickenlooper*, 312 P.3d 153, 155 (Colo. 2013).

38.     The legislative history of both the current version of the first paragraph of article XI, section 3, and its predecessor in the Tennessee Constitution of 1834 shows that both the delegates who adopted the provision and the public who ratified it understood the ratification requirement to mean that the number of "yes" votes on a proposed amendment must be a majority

of the total number of votes cast for representatives (before 1953) or for governor (after 1953). That history also shows that neither the delegates nor the public understood article XI, section 3, to make voting for representatives or governor a precondition to voting on a proposed amendment.

39. The interpretation of article XI, section 3, by the legislative and executive branches throughout history shows that both branches understood the ratification requirement to mean that the number of "yes" votes on a proposed amendment must be a majority of the total number of votes cast for representatives (before 1953) or for governor (after 1953), and not that voting for governor or representatives is a precondition to voting on a proposed amendment.

40. Defendants' interpretation of the first paragraph of article XI, section 3, of the Tennessee Constitution is the correct interpretation. That provision requires that, in order to pass, an amendment must be (i) approved, by receiving "yes" votes equal to a majority of the total votes cast on the amendment; and (ii) ratified, by receiving "yes" votes equal to a majority of the total number of votes cast for governor. That provision does not require that a voter first vote for governor in order to have his or her vote on a proposed amendment counted.

LEGAL STANDARD

41. The level of scrutiny to be applied in evaluating a state election law or practice depends on the degree of burden imposed on the fundamental right to vote. An election regulation that imposes no burden on the fundamental right to vote and does not discriminate on the basis of a protected class is subject only to rational basis review. Regulations that are only minimally burdensome and nondiscriminatory are subject to a standard akin to rational basis review and will survive if they further important regulatory interests. Regulations that impose a severe burden are subject to strict scrutiny. For regulations falling between these two extremes, the court must weigh the burden on the plaintiff against the state's asserted interest and chosen means of pursuing it.

27

*Ohio Council 8 Am. Fed'n of State v. Husted*, No. 14-3678, 2016 WL 537398, at *3 (6th Cir. Feb. 11, 2016); *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 545-46 (6th Cir. 2015); *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012).

42.     States are afforded considerable leeway to manage election processes, especially their own state elections.  *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 191 (1999); *Warf v. Bd. of Elections of Green Cnty., Ky.*, 619 F.3d 553, 559 (6th Cir. 2010).

<u>VOTE DILUTION</u>

43.     Plaintiffs' vote dilution claim fails on the merits because Plaintiffs' votes on Amendment 1 were not actually diluted; the threshold for approval of Amendment 1 was higher than the threshold for ratification, so Plaintiffs' "no" votes on Amendment 1 had exactly the same ability to affect the outcome of the election as "yes" votes cast by proponents of Amendment 1.

44.     The "one-person, one vote" principle applies only in representative elections, not in referendum elections.  *Town of Lockport, N.Y. v. Citizens for Community Action at Local Level, Inc.*, 430 U.S. 259, 265 (1977); *Tigrett v. Cooper*, 855 F. Supp. 2d 733, 755-56 (W.D. Tenn. 2012).

45.     Vote dilution that occurs in a referendum election and is non-discriminatory does not burden the fundamental right to vote and is therefore subject only to rational basis review. *Town of Lockport, N.Y. v. Citizens for Community Action at Local Level, Inc.*, 430 U.S. 259, 265 (1977); *Gordon v. Lance*, 403 U.S. 1, 6-8 (1971); *Walker v. Exeter Region Co-op Sch. Dist.*, 284 F.3d 42, 47 (1st Cir. 2002); *Brady v. Ohman*, 153 F.3d 726 (10th Cir. 1998) (table);  *Gray v. Town of Darien*, 927 F.2d 69, 70 (2d Cir. 1991); *Hall v. Thornton*, 445 F.2d 834, 835 (4th Cir. 1971) (per curiam); *Tigrett v. Cooper*, 855 F. Supp. 2d 733, 755-56 (W.D. Tenn. 2012).

46.     To prevail on a vote dilution claim under the Equal Protection Clause, a plaintiff must show that the defendant intended to discriminate against a particular group, not merely that

there was a disproportionate impact on that group.  *Smith v. Boyle*, 144 F.3d 1060, 1064 (7th Cir. 1998).

47.     There is no evidence in the record to support a finding that Defendants' interpretation and application of article XI, section 3, in the election on Amendment 1 was intended to discriminate against an identifiable class.

48.     Assuming the vote dilution alleged by Plaintiffs actually occurred, that claim warrants only rational basis review because that vote dilution occurred in the context of a referendum election and was not intended to discriminate against an identifiable class.

49.     Under rational basis review, a challenged law or practice will be upheld if it is rationally related to a legitimate governmental purpose.  *Heller v. Doe by Doe*, 509 U.S. 312, 320 (1993).

50.     The State of Tennessee has a legitimate interest in ensuring that amendments to the Tennessee Constitution are broadly supported and in preventing small interest groups from exerting undue influence on the fundamental law of the State.  *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 293, 296-97 (6th Cir. 1993); *Brady v. Ohman*, 153 F.3d 726 (10th Cir. 1998) (table).

51.     Article XI, section 3, of the Tennessee Constitution is rationally related to achieving that legitimate state interest.  The election for governor typically generates broad interest among voters, making the total number of votes cast in that election a good measure for the degree of support needed to make a change to the State's fundamental law.

52.     Because Defendants' interpretation and application of article XI, section 3, is rationally related to a legitimate governmental interest, Plaintiffs' vote dilution claim fails on the merits.

29

53.     Defendants' interpretation and application of article XI, section 3, would still pass muster under a higher level of scrutiny because it is necessary to achieve the State's important and compelling interest in ensuring that constitutional amendments are broadly supported and preventing undue influence by small interest groups. *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 293, 296-97 (6th Cir. 1993); *Brady v. Ohman*, 153 F.3d 726 (10th Cir. 1998) (table).

54.     To the extent that proponents of Amendment 1 engaged in a campaign to encourage voters to abstain from voting for governor in order to lower the threshold for passage of Amendment 1, there is no evidence in the record to support a finding that Defendants participated in or encouraged that campaign.

55.     Because any such campaign was carried out by private actors and was wholly independent from the State, it does not constitute state action that could violate the Equal Protection Clause or support an inference that Defendants acted with discriminatory intent. *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172 (1972).

56.     At best for Plaintiffs, the existence of a campaign by proponents of Amendment 1 to encourage voters to abstain from voting for governor establishes that Defendants' interpretation of article XI, section 3, permitted voters to independently engage in strategic voting.

57.     The mere fact that an election practice makes it possible for voters to independently engage in strategic voting does not burden the fundamental right to vote or warrant heightened scrutiny. *Dudum v. City and Cnty. of S.F.*, No. 10-00504, 2010 WL 3619709, *11 (N.D. Cal. Sept. 9, 2010), *aff'd by Dudum v. Arntz*, 640 F.3d 1098 (9th Cir. 2011),

58.     Courts have long condoned election practices that permit "bullet voting," a form of strategic voting that dilutes the votes of other voters, and have never suggested that those practices

are constitutionally problematic. *Thornburg v. Gingles*, 478 U.S. 30, 38 n.5; *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1113 & n.3 (5th Cir. 1991); *Reed v. Town of Babylon*, 914 F. Supp. 843, 849 & n.2 (E.D.N.Y. 1996).

## FUNDAMENTAL UNFAIRNESS

59.     A State's election practices will violate the substantive component of the Due Process only in the exceptional case where a state's voting system is fundamentally unfair. *Warf v. Bd. of Elections of Green Cnty., Ky.*, 619 F.3d 553, 559 (6th Cir. 2010).

60.     For a court to strike down an election based on this theory, a plaintiffs must show (1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures. *Bennett v. Yoshina*, 140 F.3d 1218, 1226-27 (9th Cir. 1998).

61.     Defendants' interpretation and application of article XI, section 3, in the November 2014 election on Amendment 1 was consistent with, and not a departure from, both previous election practice and official pronouncements about how votes on the proposed constitutional amendments would be counted.

62.     Defendants' interpretation and application of article XI, section 3, in the November 2014 election on Amendment 1 complied with article XI, section 3.

63.     Plaintiffs' fundamental unfairness claim fails on the merits because Defendants' interpretation and application of article XI, section 3, complied with Tennessee law; was consistent with previous election practice and the expectations and reliance interests of voters; and did not result in the disenfranchisement of any voters.

31

COMPELLED VOTING AND COMPELLED ABSTENTION

64.     A plaintiff must provide evidence that the challenged election practice places an actual, not hypothetical, burden on the fundamental right to vote, in order to trigger heightened scrutiny. *McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807-09 (1969); *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012).

65.     There is no evidence in the record to support a finding that Defendants' interpretation of article XI, section 3, actually burdened the fundamental right to vote by compelling opponents of Amendment 1 to vote for governor or by compelling proponents of Amendment 1 to abstain from voting for governor.

66.     An election practice that merely creates an incentive for voters to vote strategically does not burden the fundamental right to vote. *Dudum v. City and Cnty. of S.F.*, No. 10-00504, 2010 WL 3619709, at *8, 11 (N.D. Cal. Sept. 9, 2010), *aff'd by Dudum v. Artnz*, 640 F.3d 1098 (9th Cir. 2011).

67.     Because Plaintiffs have failed to establish an actual burden on their fundamental right to vote, their compelled voting claim is subject only to rational basis review. *Northeast Ohio Coalition for Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012).

68.     Defendants' interpretation and application of article XI, section 3, in the November 2014 election on Amendment survives rational basis review because it is rationally related to the State's legitimate interest in ensuring broad support for constitutional amendments and preventing undue influence by small interest groups. *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 293, 296-97 (6th Cir. 1993); *Brady v. Ohman*, 153 F.3d 726 (10th Cir. 1998) (table).

69.     Defendants' interpretation and application of article XI, section 3, would also pass muster under a higher level of scrutiny because it is necessary to achieve the State's important and

32

compelling interest in ensuring that constitutional amendments are broadly supported and preventing undue influence by small interest groups. *Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 293, 296-97 (6th Cir. 1993); *Brady v. Ohman*, 153 F.3d 726 (10th Cir. 1998) (table).

## RELIEF

70. A federal court's voiding of an election is a drastic, if not staggering, remedy that implicates important concerns of federalism and state sovereignty. *Bell v. Southwell*, 376 F.2d 659, 662 (5th Cir. 1967); *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988); *Curry v. Baker*, 802 F.2d 1302, 1315 n.7 (11th Cir. 1986); *Gjersten v. Bd. of Election Comm'rs for City of Chi.*, 791 F.2d 472, 478 (7th Cir. 1986).

71. A court should not resort to this intrusive remedy without weighing all equitable considerations. *Gjersten v. Bd. of Election Comm'rs for City of Chi.*, 791 F.2d 472, 478 (7th Cir. 1986).

72. A plaintiff who could have challenged an election practice before the election but failed to do so will not be permitted to obtain the equitable remedy of voiding the election. *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1180 (9th Cir. 1988); *Hendon v. N.C. State Bd. of Elections*, 710 F.2d 177, 182-83 (4th Cir. 1983).

73. Plaintiffs are not entitled to the equitable remedy of voiding the election on Amendment 1 because they could have, but did not, challenge Defendants' interpretation of article XI, section 3, of the Tennessee Constitution before the election.[3]

---

[3] Defendants reserve the right to propose additional conclusions of law about the appropriate remedy in this case if the Court concludes that Plaintiffs have prevailed on any of their claims.

33

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

ANDRÉE S. BLUMSTEIN
Solicitor General

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER
Deputy Attorney General
Public Interest Division
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Janet.Kleinfelter@ag.tn.gov

/s/ Leslie Ann Bridges
LESLIE ANN BRIDGES
Senior Deputy of Public Protection Section
and Counsel to the Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-4710
Leslie.Bridges@ag.tn.gov

34

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of March, 2016, a copy of the foregoing Defendants'

Proposed Findings of Fact and Conclusions of Law has been served upon the following persons

via the Electronic Case Filing (ECF) System:

William L. Harbison
C. Dewey Branstetter Jr.
Phillip F. Cramer
Hunter C. Branstetter
Sherrard & Roe, PLC
150 3rd Avenue South, Suite 1100
Nashville, Tennessee 37201
bharbison@sherrardroe.com
dbranstetter@sherrardroe.com
pcramer@sherrardroe.com
hbranstetter@sherrardroe.com

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER