**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| TRACEY E. GEORGE, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-02182 |
| | ) | Chief Judge Sharp |
| WILLIAM EDWARD "BILL" HASLAM, | ) | Magistrate Judge Bryant |
| as Governor of the State of Tennessee, | ) | |
| in his official capacity, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

In accordance with the Court's February 12, 2016 Order [DE 104], Plaintiffs respectfully submit these proposed findings of fact and conclusions of law in connection with the Court's bench trial on the record. All materials cited herein are contained in the record before the Court, primarily through the deposition designations filed by Plaintiffs on February 7, 2016 [DE 89] and the Parties' Stipulations filed on February 10, 2016 [DE 96].

## I. Factual Background

1.      This case arising under 28 U.S.C. § 1983 presents a constitutional challenge by eight registered Tennessee voters who claim that their rights under the Fourteenth Amendment to the United States Constitution were violated by the manner in which Defendants tabulated votes and certified the results on proposed constitutional amendment 1 to the Tennessee Constitution ("Amendment 1") in the November 4, 2014 state and federal general election.

A.      The Parties

2.      Plaintiffs all are citizens of Tennessee, who (i) were eligible to vote and registered to vote in the November 4, 2014 election, (ii) voted in that election, (iii) voted in the gubernatorial

race, and (iv) voted against ratifying Amendment 1. *See* DE 96: Parties' Stipulations at ¶ 13, PageID 1800 ("Plaintiffs opposed the passage of Amendment 1 and voted 'no' on Amendment 1 in the November 4, 2014 general election."); *see also, e.g.*, DE 89-6: Dep. of M. Rice at 10:19-21, 14:10-15, PageID 1473-74 (providing that Meryl Rice voted for governor and against Amendment 1); DE 89-7: Dep. of K. Whalum at 21:10-12, 23:5-13, PageID 1523 (providing that Kenneth Whalum voted for governor and on Amendment 1); DE 89-8: Dep. of E. Clayton at 19:10-16, PageID 1566 (providing that Ellen Clayton voted on Amendment 1 and in the governor's race); DE 89-9: Dep. of D. Webster-Clair at 11:23-25, 14:21-23, 16-20-22 PageID 1607-08 (providing that Deborah Webster-Clair is a registered voter who voted for governor and on Amendment 1); DE 89-10: Dep. of T. Halloran at 9:22-25, PageID 1636 (providing that Teresa Halloran was a registered voter); DE 89-11: Dep. of T. George at 21:19-22, 22:13-22, PageID 1663 (providing that Tracey George voted in the November 2014 election, voted for governor, and voted on Amendment 1); DE 89-12: Dep. of J. Liff at 20:17-25, PageID 1719 (providing that Jan Liff voted for governor and on Amendment 1).

3.      Defendants are all officials of the State of Tennessee who have been sued in their official capacities. Defendants determined the manner in which votes on Amendment 1 would be counted and tabulated and then certified the results of the November 4, 2014 general election based on their determination. *See* DE 89-1: Rule 30(b)(6) Deposition/Deposition of M. Goins ("30(b)(6)/Goins Dep."), Vol. 1, at 104:6-19, PageID 1287. Defendants' actions were carried out under the color of state law pursuant to their statutory duties under Title 2 of the Tennessee Code. *See* DE 96: Parties' Stipulations at ¶ 8, PageID 1799. The parties stipulate that Defendants are persons within the meaning of 42 U.S.C. § 1983 for purposes of this action. *See id.* at ¶ 9.

B.      <u>The Tennessee Constitution</u>

4.      The Tennessee Constitution contains two methods for amending the document: the so-called "legislative" or "referendum" method and the "convention" method. Tenn. Const. Art. XI, § 3; *see also* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 234:11-19, PageID 1329. Both methods are found in Article XI, Section 3 of the Tennessee Constitution, which provides:

> Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives, and if the same shall be agreed to by a majority of all

the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals with the yeas and nays thereon, and referred to the general assembly then next to be chosen; and shall be published six months previous to the time of making such choice; and if in the general assembly then next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by two- thirds of all the members elected to each house, then it shall be the duty of the general assembly to submit such proposed amendment or amendments to the people at the next general election in which a Governor is to be chosen. And if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for Governor, voting in their favor, such amendment or amendments shall become a part of this Constitution. When any amendment or amendments to the Constitution shall be proposed in pursuance of the foregoing provisions the same shall at each of said sessions be read three times on three several days in each house.

The Legislature shall have the right by law to submit to the people, at any general election, the question of calling a convention to alter, reform, or abolish this Constitution, or to alter, reform or abolish any specified part or parts of it; and when, upon such submission, a majority of all the voters voting upon the proposal submitted shall approve the proposal to call a convention, the delegates to such convention shall be chosen at the next general election and the convention shall assemble for the consideration of such proposals as shall have received a favorable vote in said election, in such mode and manner as shall be prescribed. No change in, or amendment to, this Constitution proposed by such convention shall become effective, unless within the limitations of the call of the convention, and unless approved and ratified by a majority of the qualified voters voting separately on such change or amendment at an election to be held in such manner and on such date as may be fixed by the convention. No such convention shall be held oftener than once in six years.

This case concerns the method described in the first paragraph (hereinafter referred to as the "legislative method") and has no bearing or effect on the convention method set forth in the second paragraph of Article XI, Section 3.

C.    The November 4, 2014 Election

5.    On November 4, 2014, Tennessee held a general election. *See* Parties' Stipulation, DE 96: Parties' Stipulations at ¶ 1, PageID 1798. The ballot for the November 2014 general

election included the gubernatorial election and four proposed amendments to the Tennessee Constitution. *See id.* at ¶ 2. Proposed Amendment 1 on the November 4, 2014 ballot stated:

> Shall Article I of the Constitution of Tennessee be amended by adding the following language as a new, appropriately designated section:
>> Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion. The people retain the right through their elected state representatives and state senators to enact, amend, or repeal statutes regarding abortion, including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother.

*Id.* at ¶ 3. Amendment 1 was located on the ballot directly after the list of candidates for governor. *See id.* ¶ 4.

D.     The Tabulation Method Employed By Defendants

6.     Defendant Mark Goins, Tennessee's Coordinator of Elections, made the decision as to how to apply Article XI, Section 3 for the November 4, 2014 election. *See* DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 104:6-19, PageID 1287.

7.     After Amendment 1 was placed on the November 4, 2014 ballot, Defendants announced that they would consider Amendment 1 to have passed if the total votes in favor of Amendment 1 constituted a majority of the total number of votes cast in the gubernatorial race, regardless of whether those who voted in favor of Amendment 1 had also voted in the governor's race. *See, e.g.*, Associated Press, News Briefs from Around Tennessee at 1:58 a.m. EDT, THE WASHINGTON TIMES, October 29, 2014, http://www.washingtontimes.com/news/2014/oct/29/ news-briefs-from-around-tennessee-at-158-am-edt/?page=all (quoting Blake Fontenay, spokesperson for the Secretary of State of Tennessee, explaining "[w]hether people vote in the governor's race doesn't affect their eligibility to vote on the amendments"); Cari Wade Gervin, Your Guide to the four propositions of Tuesday's ballot, THE NASHVILLE SCENE, October 30, 2014, http://www.nashvillescene.com/nashville/your-guide-to-the-four-propositions-on-tuesdays-ballot /Content?oid=4759989 (quoting Fontenay's statement that "[t]here is no requirement to vote in any race"); *see also* DE 64: Answer at ¶ 5, PageID 788.

8.     The practical effect of the tabulation method announced by Defendants was that any voter who did not vote in the Governor's race but did vote on Amendment 1 would suppress the requisite threshold for Amendment 1's ratification. Conversely, an opponent of Amendment 1 would have to vote in the Governor's race in order for that voter to have an impact on the denominator used in determining whether the constitutional amendment exceeded the "voting-for-governor" threshold. Both proponents of and opponents to Amendment 1 were aware of the practical effects of the tabulation method Defendants had announced they would be using.

E.     The Campaign to "Double" Your Vote

9.     Prior to the November 4, 2014 election, some groups, organizations, and individuals publicly urged Tennessee voters not to vote in the Governor's race and to vote only for Amendment 1. One such group/individual produced and disseminated a video, titled "Double Your Vote on Amendment 1," that explained:

> You may know that if you vote yes on Amendment 1, you will be protecting women and children in Tennessee. The truth is you can double your vote by doing one simple thing, don't vote in the governor's race.
>
> Did you hear that? If you want to double your vote, don't vote in the governor's race.
>
> Okay. Let me explain. The reason behind it is a little-known statement in the Tennessee Constitution that says for a constitutional amendment to pass, it must receive one more vote than half the number of total votes cast in the governor's race. For example, if a million people vote in the governor's race, it doesn't matter which candidate they vote for. Then Amendment 1 needs 500,001 votes to pass. It doesn't matter if 500,000 people vote yes for Amendment 1 and only 3 vote against it. It will still fail since it doesn't have one more than half the total in the governor's race.
>
> I know you may think this is crazy. It doesn't matter. It's the law. What does it mean for us? Vote yes for Amendment 1 but don't vote in the governor's race. The less people who vote in the governor's race means it takes less votes to pass the amendment. In other words, if you vote yes on 1 but don't vote in the governor's race, you'll double your vote.

> Here's the deal, please tell your friends. Forward this video to them. Use social media and get out there and vote yes on Amendment 1, but don't vote in the governor's race.

DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 313:8-314:15, PageID 1349; *see also* "Tenn Williamson," *Double Your Vote on Amendment 1*, www.youtube.com/watch?v=7mnIgn-WXls (last visited March 18, 2016).

10. These groups, organizations, and individuals who encouraged voters not to vote in the Governor's race so as to increase the likelihood that Amendment 1 would pass disseminated their message through various channels, including word of mouth, phone calls, yard signs, mailers, leaflets, both traditional and social media, the Internet, and church bulletins. *See, e.g.*, Email from Lonnie Wilkey, Editor, B&R | Tennessee Baptist Convention, to David Fowler, President, Family Action Council of Tennessee and Family Action of Tennessee, "FW: Voice Mail Message," Oct. 23, 2014 (stating "We have a video our the TBC Facebook page which basically explains that if you do not vote for governor you vote counts double for Yes on 1 [sic] . . . ") [DE 97-1 at 113-14, PageID 1936-37]; Email exchange between David Fowler and Tim McCorkle, "Short video on voting for Amendment 1 and not in the Governors Race," Oct. 23, 2014 (providing links to truthon1.org and to the video "Double Your Vote on Amendment 1") [DE 97-1 at 111-12, PageID 1934-35]; Email from David Fowler to "Anne" mtnsummer9@gmail.com, "Amendment 1 and Governor," Nov. 3, 2014 (stating "There is a video at this link about how not voting in the Governor's race can 'double' your vote for Amendment 1.") [DE 97-1 at 117, PageID 1940]; DE 89-6: Rice Dep. at 36:11-37:15, PageID 1479-80 (testifying that Meryl Rice saw a video promoting this theory and learned that Dixie Hills Baptist Church in Bolivar, Tennessee, encouraged its parishioners to forgo voting for governor to increase their "yes" vote on Amendment 1); DE 89-7: Whalum Dep. at 61:17-62:8, PageID 1533 (testifying that Kenneth Whalum saw yard signs encouraging Amendment 1 supporters not to vote for governor); DE 89-8: Clayton Dep. at 45:22-46:24, PageID 1573 (testifying that proponents of this theory disseminated it from the pulpit, with signs, and via YouTube video); DE 89-10: Halloran Dep. at 25:10-17, 42:23-43:10, PageID 1640, 1644 (testifying that Teresa Halloran's church, St. Philip's Catholic Church in Williamson County, spread the "double your vote" theory); DE 89-11: George Dep. at 45:18-46:16, 48:12-50:8, 50:21-51:21, PageID 1669-70 (testifying that the theory was spread via video, by churches, and through grassroots distribution efforts); DE 89-12: Liff Dep. at 63:6-64:10, 64:15-67:24 PageID 1730-1

(testifying that this theory was encouraged by churches including the Cathedral of the Incarnation in Nashville, a Free Will Baptist Church near the fairgrounds in Nashville, a Baptist church in Cheatham County, and by congregations in Williamson County as well as via people handing out leaflets door-to-door, through word of mouth, and by mailer).

11.     By way of example, the church bulletin from the Cathedral of the Incarnation in Nashville (2500 West End Ave., Nashville, TN 37203) from October 12, 2014, explained:

> Bottom Line: you MUST VOTE and tell others. Amendment 1 must be approved by 50% + 1 of those casting a vote in the Governor's race. You do not need to vote for a governor, if you do not want too [sic]. In fact, not voting in the uncontested governor's race counts as a vote and a half for Amendment 1.

DE 5: Cathedral of the Incarnation, *Twenty Eighth Sunday in Ordinary Time—October 12, 2014*, at 4 PageID 35.

12.     Likewise, the Truth on Amendment 1 website advocated: "If you vote for Amendment 1 and don't vote in the governor's race, you will actually double your vote." Vote Yes on Amendment 1, truthon1.org, *archived at* https://web.archive.org/web/20150205150247/http://truthon1.org/ [DE 109-1, PageID 2158]; *see also* DE 97-1: Plaintiffs' Second Set of Requests for Admission at Nos. 74-78, PageID 1837-38 (admitting the authenticity, relevance, and admissibility of same). And the organization's Facebook page posted on October 30, 2014: "Contact your friends and ask them to commit to vote Yes on Amendment 1 and to consider not voting in the governor's race (to double their vote). Act like this entire election depends on who you get to vote Yes on Amendment 1." Truth on 1, Facebook Post "Contact your friends and ask them to commit . . . ," Oct. 30, 2014, https://www.facebook.com/truthonone/photos/a.728995877169543.1073741829.728583030544161/731810500221414/?type=3&permPage=1 [DE 109-2, PageID 2176]; *see also* DE 97-1: Plaintiffs' Second Set of Requests for Admission at Nos. 89-93, PageID 1840 (admitting the authenticity, relevance, and admissibility of same).

13.     Various news and media outlets reported on these efforts throughout the state. *See, e.g.,* Flyer Staff, The Nuances of Voting in Tennessee, THE MEMPHIS FLYER, Oct. 16, 2014, http://www.memphisflyer.com/memphis/the-nuances-of-voting-in-tennessee/Content?oid=3764208; Joey Garrison, Abortion amendment backers urged to sit out of gov's race, THE

TENNESSEAN, Oct. 27, 2014, http://www.tennessean.com/story/news/politics/2014/10/24/abortion-amendment-backers-urged-sit-govs-race/17848995/; Rachel Kinney, Clearing up confusion over Amendment 1, governor's race, WBIR.COM, Nov. 4, 2014, http://legacy.wbir.com/story/news/politics/elections/2014/11/04/amendment-one-governors-race-stirs-up-confusion/18455367/.

14.     Defendants do not deny that such a concerted campaign occurred, whereby supporters of Amendment 1 encouraged voters to vote for Amendment 1 and refrain from voting in the Governor's race. *See* DE 48-3: Pl.'s First Set Requests for Admissions to Defs. at 14, PageID 501. Indeed, Defendants concede that some voters skipped the Governor's race and only voted on Amendment 1. *See* DE 89-5: Hargett Dep. at 125:2-126:9, PageID 1459.

F.     Defendants' Reaction to the Campaign

15.     The evidence shows that Defendants were well aware of the so-called "double your vote" campaign well before the November 4, 2014 election. *See, e.g.*, DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, 287:16-288:24, PageID 1344; *id*. at 309:5-16, PageID 1348.

16.     For example, both Secretary of State Hargett and Coordinator of Elections Goins were aware of the video entitled "Double Your Vote on Amendment 1" being circulated and distributed by the group "Truth on 1" and YouTube user "Tenn Williamson." *See* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, 309:5-16, 311:25-317:9, PageID 1348-50; DE 89-5: Hargett Dep. 117:3-120:3, PageID 1457; *see also* "Tenn Williamson," *Double Your Vote on Amendment 1*, www.youtube.com/watch?v=7mnIgn-WXls (last visited March 17, 2016). On October 23, 2014, Defendant Goins sent Defendant Hargett an email with the subject line "Double your vote video on Amendment 1" containing a link to the website for Truth on 1, http://www.truthon1.org, which contained a copy of and link to the "Double Your vote on Amendment 1" YouTube Video. Email from Mark Goins to Tre Hargett, "Double your vote video on Amendment 1," Oct. 23, 2014 [DE 109-3, PageID 2177]; *see also* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 316:16-317:1, PageID 1350.[1]

---

[1] Documents that Defendant Hargett provided to his counsel shortly after the inception of this lawsuit and that were produced to Plaintiffs' counsel on February 3, 2016, reflect that Defendant

17.     Defendants had other exposure to and discussion of the theory being disseminated by certain Amendment 1 supporters that "yes" voters could increase the weight of their votes on Amendment 1 by skipping the governor's race. For example, on October 21, 2014, Twitter user Meredith MaGuirk, @circusmaguirk, tweeted at Defendant Hargett's account, @SecTreHargett, asking for clarification about how votes would be counted because "ps - it's all over fb (no vote gov = higher ammen count) + (yes vote gov or ammend vote doesn't count)." Defendants Hargett and Goins then had an email conversation about this Tweet with the subject line "Tweet from Meredith MaGuirk (@circucmaguirk)" wherein Defendant Hargett sent a screenshot of the tweet to Defendant Goins and discussed how to respond. *See* Email exchange between Tre Hargett and Mark Goins, "Tweet from Meredith MaGuirk (@circucmaguirk)," Oct. 21, 2014 [DE 109-5, PageID 2202].

18.     Similarly, on October 27, 2014, Defendants engaged in email correspondence with the subject line "media story" regarding a request made by Andrea Smothers (the Haywood County Administrator of Elections) for a press release from the Coordinator of Elections regarding the way votes on Amendment 1 were to be counted in light of the online campaign encouraging voters to skip the governor's race to "double" their votes for Amendment 1; in this email chain, they agreed not to send out a release. *See* Email exchange between Mark Goins, Tre Hargett, and Blake Fontenay, "media story," Oct. 27, 2014 [DE 109-6, PageID 2205].

19.     In the same way and on the same day, October 27, 2014, Defendants engaged in an email correspondence with the subject line "Question on Constitutional Amendment election -- on deadline" in regard to a request from Frank Daniels III of The Tennessean regarding how votes were to be counted under Article XI, Section 3 in light of the possibility that "amendment backers may choose to skip the governor's race to make their vote count more." *See* DE 109-7, PageID 2207. Similarly, on November 3, 2014, Secretary Hargett received an email blast from Bobbie Patray with the Tennessee Eagle Forum, bobbie@tneagleforum.com, with the subject line

─────────────────────

Hargett viewed and printed the contents of the website http://www.truthon1.org. *See* DE 109-4, PageID 2178. This website, as demonstrated by the printouts from Defendant Hargett, contained links to numerous videos, including to "Double Your Vote on Amendment 1." *Id.* The website's contents heavily overlap with the video's assertions, stating, for example, "[i]f you vote Yes on Amendment 1, but don't vote in the governor's race, then you actually double the impact of your vote." *Id.*

"And the days dwindle down to a precious few...for LIFE." Among other things, this email contained a graphic linking to www.truthon1.org. *See* Email from Tennessee Eagle Forum, bobbie@tneagleforum.com, to Tre Hargett, "And the days dwindle down to a precious few...for LIFE," Nov. 3, 2014 [DE 109-8, PageID 2209].

20.     In response to the "double your vote" campaign, Defendants elected not to make any official statement other than to publicly reiterate that Tennesseans need not vote in the governor's race in order have their votes counted on the proposed constitutional amendments. *See* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 299:1-12, 323:2-4, PageID 1346, 1352. Secretary of State Hargett and Coordinator Goins made it very plain to Tennessee voters that "no, you did not have to vote in the governor's race." DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 290:7-11, 292:3-18, PageID 1343-44; DE 89-5: Hargett Dep. at 115:25-116:10, PageID 1456.

21.     Prior to the November 4, 2014 election, attorney John Jay Hooker submitted a well-publicized letter challenging Defendants as to their announced counting methodology. This letter noted the language of Article XI, Section 3 at issue here, advanced a plain language reading that parallels that of the Plaintiffs, and requested that Governor Haslam join Mr. Hooker in seeking a declaratory judgment regarding this issue. *E.g.*, TN Press Release Center, *Hooker Seeks Clarification on TN Constitutional Amendment Voting Process*, TN REPORT, Oct. 28, 2014, http://tnreport.com/2014/10/28/hooker-seeks-clarity-tn-constitutional-amendment-voting-process/. Defendants declined to take action or otherwise respond to Mr. Hooker, except to continue to announce publicly that they would consider Amendment 1 to have passed if the total votes in favor of Amendment 1 constituted a majority of the total number of votes cast in the gubernatorial race, regardless of whether those who voted in favor of Amendment 1 had also voted in the governor's race. *See* DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 64:7-65:1, PageID 1277-78.[2]

---

[2] The record reflects that in a conversation prior to the November 4, 2014 election, Secretary Hargett notified Governor Haslam that "there's the possibility we get sued" because "a lawyer [John Jay Hooker] has called Davidson County Election Commission . . . about how votes are going to be counted." DE 89-5: Hargett Dep. at 102:6-13, PageID 1453. Governor Haslam told Secretary Hargett that "you should tell them they need to vote in the Governor's race." *Id.* at 102:14-15, PageID 1453.

22.      For the purposes of its analysis below, the Court can assume that Defendants' conduct in both interpreting Article XI, Section 3 and in responding to the "double your vote" campaign was in good faith and carried out without regard to their personal opinions of or support for Amendment 1. Nonetheless, the Court notes that the Plaintiffs have presented the following facts:

(i)      that Secretary Hargett cosponsored legislation that was a precursor to Amendment 1, DE 89-3: 30(b)(6)/Goins Dep., Vol. 3, at 481:19-22, PageID 1397; DE 89-5: Hargett Dep., at 41:24-42:1, PageID 1438;

(ii)      that Defendants individually favored passage of Amendment 1, DE 48-3: Pl.'s First Set Requests for Admissions to Defs. at 14, PageID 501;

(iii)      that both Coordinator of Elections Goins and Secretary of State Hargett were endorsed by Tennessee Right to Life while in the state legislature, DE 89-3: 30(b)(6)/Goins Dep., Vol. 3, at 481:19-22, PageID 1397; DE 89-5: Hargett Dep., at 41:24-42:1, PageID 1438;

(iv)      that Defendants spoke to or met with individuals such as David Fowler (the President of the Family Action Council of Tennessee and its lobbying affiliate, Family Action of Tennessee, as well as the political treasurer for the single-measure campaign committee Tennesseans for Yes on 1) and Brian Harris (a coordinator for Yes on 1 and president of Tennessee Right to Life) prior to the November 4, 2014 election regarding what would become Amendment 1 and the process to be used by Defendants in determining whether it passed, DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 337:21-340:8, PageID 1355-56; DE 89-3, 30(b)(6)/Goins Dep., Vol. 3, at 368:3-15, PageID 1369; and

(v)      that after this lawsuit was filed, Secretary Hargett's first calls were to Bobbie Patray (the President of Tennessee Eagle Forum, a "pro-family" organization affiliated with Phyllis Schlafly's Eagle Forum organization) and David Fowler—two strong, vocal advocates of Amendment 1—to discuss the lawsuit with them, *see* DE 89-5: Hargett Dep. at 82:8-84:3, 118:2-5, PageID 1448, 1457.

23.     And although the Court is troubled by Defendants' lack of knowledge as to whether officials within the Department of State had contact with the groups disseminating the "double your vote" campaign, the Court need not address this issue based on its ruling below. *See* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 304:17-21, PageID 1347; *see also* DE 89-3: 30(b)(6)/Goins Dep., Vol. 3, at 358:13-19, PageID 1367.

G.     Election Results

24.     The vote totals for the November 4, 2014 general election were as follows: (i) 1,430,117 ballots were cast in the November 4, 2014 election; (ii) 1,353,728 votes were cast in the Governor's race; (iii) 729,163 votes were cast in favor of Amendment 1; and (iv) 657,192 votes were cast against Amendment 1. *See* DE 96: Parties' Stipulations at ¶ 5, PageID 1798. Based on these totals, there were 32,627 more votes on Amendment 1 (1,386,355) than in the gubernatorial race (1,353,728).

25.     The November 4, 2014 election was the first time since Article XI, Section 3 of the Tennessee Constitution was amended in 1953 that more votes were cast on a proposed constitutional amendment than in the Governor's race. *See* DE 96: Parties' Stipulations at ¶ 6, PageID 1799; DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 300:20-301:18, PageID 1346.[3]

26.     Defendants do not know the number of "people who voted for governor voted in favor of Amendment 1." DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 106:4-107:2, PageID 1288. Defendants concede that they "have no way of knowing" whether "Amendment 1 would still pass if Article XI, Section 3, Paragraph 1 was applied as suggested by the Plaintiffs in this case." DE 89-5: Hargett Dep. at 112:5-9, PageID 1455. Subtracting the difference in the number of total votes cast in the election and total votes for governor from the total number of votes for Amendment 1

---

[3] The total vote on Amendment 2 (1,357,161) also exceeded the total number of votes cast for governor. This outcome is not unexpected given than some voters who skipped the governor's race to increase the weight of their vote in favor of Amendment 1 also may have voted on Amendment 2. But while there were 32,627 more votes on Amendment 1 than in the gubernatorial race, there were only 3,433 more votes on Amendment 2 than for governor—a difference of nearly 10 times. This almost ten-times difference between the number of votes in excess of the number of votes for governor on Amendment 1 and Amendment 2 indicates there was a coordinated scheme to manipulate the vote on Amendment 1 in a way that did not occur for Amendment 2 (and certainly not for Amendments 3 or 4).

demonstrates that the current election data can only confirm that, at maximum, 652,774 votes in favor of Amendment 1 were cast by voters who also voted for governor, which falls 24,091 votes short of the 676,865 vote required for Amendment 1 to pass.

27.     According to Defendants, although they could have correlated votes on Amendment 1 with those voting for governor, *see* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 230:15-21, PageID 1328, they chose not do so. Instead, in certifying the passage of Amendment 1, Governor William Haslam, Secretary of State Tre Hargett, and Attorney General Herbert Slatery III simply counted all the votes cast in favor of Amendment 1 regardless of whether the voter also voted in the Governor's race. *See* DE 96: Parties' Stipulations at ¶ 11, PageID 1799.

28.     Based on this tabulation method, on December 8, 2014, Governor Haslam, Secretary Hargett, and Attorney General Slatery certified that Amendment 1 had passed. *See* DE 96: Parties' Stipulations at ¶ 7, PageID 1799. Defendants' certification of the results of the November 4, 2014 general election was carried out pursuant to their statutory duties under Title 2 of the Tennessee Code. *Id.* at ¶ 8.

H.     Plaintiffs' Claims

29.     Plaintiffs have challenged the legislative method set forth in Article XI, Section 3 both facially and as applied in the November 4, 2014 election with respect to Amendment 1 as violating Plaintiffs' and other voters' federal constitutional rights, including equal protection and due process (which includes the First Amendment) by (i) diluting Plaintiffs' votes by basing ratification on the number of "yes" votes on the amendment as compared to total votes cast in the governor's race, (ii) disenfranchising Plaintiffs and other Tennessee voters by rewarding proponents of Amendment 1 who refrained from voting in the governor's race, (iii) forcing proponents of Amendment 1 to choose between increasing the likelihood of the passage of Amendment 1 and exercising their constitutional right to vote in the governor's race, and (iv) compelling Plaintiffs and other voters against Amendment 1 to vote in the governor's race in order for their vote to count at all for purposes of the ratification threshold.

30.     Plaintiffs assert that Defendants could have avoided vote dilution and disenfranchisement by basing ratification of Amendment 1 on whether a majority of the citizens

who voted for governor also voted in favor of the proposed constitutional amendment, which Plaintiffs claim is consistent with the plain text of Article XI, Section 3. Defendants, on the other hand, assert that their reading is consistent with the plain language of Article XI, Section 3 and that Plaintiffs' interpretation runs afoul of the First Amendment prohibition on compelled voting as it would require "yes" voters casting a ballot on a proposed constitutional amendment to also vote in the governor's race.

## II. Legal Discussion

A.    Construction of Article XI, Section 3

31.    The specific language of Article XI, Section 3 states that "if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for governor, voting in their favor, such amendment or amendments shall become a part of this Constitution." Tenn. Const. Art. XI, Section 3. Determination of the meaning of that language is a matter of law. *See Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) (citation omitted) ("Issues of constitutional interpretation are questions of law").

32.    "The courts are to construe constitutional provisions as written without reading any ambiguities into them." *State ex rel. Sonnenberg v. Gaia*, 717 S.W.2d 883, 885 (1986) (citing *Chattanooga-Hamilton Co. Hosp. Auth. v. Chattanooga*, 580 S.W.2d 322, 327 (Tenn. 1979). As the Tennessee Supreme Court recently stated:

> When a provision clearly means one thing, courts should not give it another meaning. The intent of the people adopting the Constitution should be given effect as that meaning is found in the instrument itself, and courts must presume that the language in the Constitution has been used with sufficient precision to convey that intent . . . Constitutional provisions will be taken literally unless the language is ambiguous. When the words are free from ambiguity and doubt and express plainly and clearly the sense of the framers of the Constitution there is no need to resort to other means of interpretation. S*helby County v. Hale,* 200 Tenn. 503, 292 S.W.2d 745, 748 (1956). . . .

*Hooker v. Haslam*, 437 S.W.3d 409, 426 (Tenn. 2014).

33.    Plaintiffs read "by a majority of all the citizens of the state voting for governor" to mean that, in order for a proposed constitutional amendment to be ratified, it must receive a majority of the votes cast in its favor from those voters who voted for Governor. In other words, an "amendment must pass not merely by a majority of all citizens of the state voting in its favor or by a majority of the number of citizens voting for governor; rather, to pass, an amendment must be ratified by a majority comprised of 'all the citizens of the state voting for governor,' *i.e.*, voting for governor is critical to voting for an amendment." DE 57: Pl.'s Resp. to Def.'s Motion to

Dismiss Amended Complaint at 16, PageID 731. Plaintiffs' reading of the constitutional requirement for the passage of an amendment in Tennessee is perfectly natural.

34.     In *Snow v. City of Memphis*, 527 S.W.2d 55 (Tenn. 1975), the Tennessee Supreme Court considered a challenge to the Constitutional Convention of 1971 relating to the classification of property. In discussing the issue, the court provided "[a] brief review of the background and events leading directly to the amendment of Article XI, Section 3 of our Constitution, dealing with the Convention method of amendment," and, in doing so, reviewed 1945 legislation that authorized the appointment of a Constitution Revision Committee that "was to make a study of the needs for revision of the Constitution of Tennessee and present its recommendations to the 1947 Session of the General Assembly." *Id.* at 61. Commenting on the results of that study, the Tennessee Supreme Court observed:

> Said commission recommended that nine sections of the Constitution be changed and devoted much of its report to the procedure best calculated to bring about the suggested changes. Eleven efforts to amend the 1870 Constitution by the legislative method had failed because of the obstacle of obtaining voter ratification of a majority of those voting for representatives. We judicially note that in said efforts to amend by that process, only a small percentage of the voters who voted for representatives cast ballots either for or against constitutional amendments, leaving the required majority of those voting for representative unattainable.

*Id.*[4]

35.     As Defendants point out, *Snow*'s observation about "obtaining voter ratification of a majority of those voting for representatives" may well be *dicta* in that it was not central to the holding of the case. Even so, it lends support to Plaintiffs' reading of the provision at issue. That reading is certainly no more an "idiosyncratic interpretation of Article XI, § 3 of the Tennessee Constitution," DE 62: Memo. at 14, PageID 777 (quoting DE 60 at 5, PageID 756) than Defendants' assertion that the provision "simply refers to the quantity or number of votes required to carry an amendment, *i.e.*, if the number of citizens voting in favor of an amendment exceeds the

---

[4] In an accompanying footnote, the *Snow* court set forth the relevant language of Article XI, Section 3 which is identical to the present language, except that "voting for governor" read as "voting for Representatives" in the 1870 version of that constitutional provision.

majority of citizens voting for Governor then an amendment is ratified." DE 53: Def.'s Memo. in support of Mot. to Dismiss Pl.'s First Am. Complaint at 22, PageID 697.

36.     Turning to Defendants' reading, Defendants' initially took the position in this lawsuit that "for a proposed amendment to pass, it must receive votes equal to the majority of the total votes cast for governor." Rule 30(b)(6) Deposition/Deposition of Mark Goins (Oct. 26, 2015) at 103:20-104:19. As this Court pointed out in its earlier memorandum decision addressing Defendants' motion to dismiss, "[u]nder Defendants' implementation of Article XI, Section 3, negative votes are effectively meaningless – indeed, they are irrelevant and do not count. What is important is whether the total number of 'yes' votes on an Amendment is one voter more than 50% of the number of voters who voted for governor. Thus, for example, if 2,000,000 persons participated in an election, but only 1,000,000 people voted in the gubernatorial race, an Amendment will be deemed approved so long as it received 500,001 'yes' votes, even if 1,499,999 votes were cast against the amendment." DE 62 at 17, PageID 780.

37.     During the course of the litigation, Defendants injected their so-called "two-step" reading, in which they now claim that the phrase "if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for governor, voting in their favor" embodies a two-step process. Defendants describe their two-step process as follows:

Q.      What was that two-step process?

A.      The two-step process, as I've explained, is you look at the number of votes that -- the number of voters who voted in the gubernatorial election. So you add those numbers up for the different candidates, and then you divide that in half, and then you look to add one to that. That gives you -- that's where it needs to get in order to be ratified.

        For it to be approved, you look at the number of yes votes and no votes on the individual amendment, so that's a two-step process. You're looking to see if more voters voted yes as opposed to voting no, and then you're looking to see if it reached that number of the total in the governor's race.

DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 201:1-14, PageID 1312.

38.     As the following testimony reveals, Defendants struggle to conform their two-step process with the actual language of Article XI, Section 3:

Q.     Where does Paragraph 1 of Article XI, Section 3 discuss this two-step process as you described?

MS. KLEINFELTER: Object to the form….

A.     Okay. And if the people shall approve and ratify such amendment or amendments by majority of all the citizens of the State voting for governor – so that's one of the steps where you look at the total number of votes. Voting in their favor is where the other step is, yes and no. So it has to have the majority of those voting on that amendment.

Q.     So what you're telling me is the clause, voting in their favor, refers to -- let me -- what's step one and what's step two? Is step one the [50] percent plus one of the people voting in the governor's race, or is it whether it has more yes votes than no votes on the actual amendment?

A.     I don't know that it matters the order of step one or step two, but step one -- step one would be the total that's cast in the governor's race that you would add up. If you're looking at how it's written, that would be number one. Number two, voting in their favor.

Q.     Okay.

A.     But if you reverse those, it wouldn't matter.

Q.     I want to be able to ask you about the steps. And so for step two, this voting in their favor refers to the number of yes votes versus number of no votes on the actual amendment, and that's it?

A.     Yes.

Q.     And by majority of all citizens of the State voting for governor, that's step one. Is that right?

A.     Right.

Q.     Okay. So –

A.      Well, I would go and add, and if the people shall approve and ratify such amendment. I would include the entire clause.

Q.      Okay. Explain that to me. What's the difference between approve and ratify?

A.      Well, I think it's a two-step process. I think, first, approve is the yes and nos.

Q.      Yes and nos of --

A.      The voters would approve if there's more yes than no.

Q.      All right. So that was step two of what you just told me before?

A.      Right.

* * *

Q.      Okay. So you're making a distinction between the word approve and ratify?

A.      Well, I think it's there. I mean, approve and ratify.

Q.      So what's the threshold? See, if we look earlier in Section 3, we see that there's various criteria in the Senate or House of Representatives. The first time, it has to be approved by a majority. And the second time, it has to be approved by two-thirds.

A.      Correct.

Q.      What's the criteria for approve in what you originally described as step two and now have described as step one?

A.      All right. You've confused me.

MS. KLEINFELTER: Object to the form.

Q.      What's the first thing that has to happen under this provision with respect to looking at whether voters have approved and ratified such amendment or amendments?

19

A.    I can't separate the two. Either one can happen first. It's the same conclusion either way.

* * *

Q.    So voting in their favor refers to what then? Refers to --

A.    Majority cast.

Q.    Of which step?

A.    That would apply on the amendment, more yes votes than no votes.

* * *

Q.    So when I look at an earlier provision of Section 3, I see sometimes it's a majority, and sometimes it's two-thirds. So I understand, you're saying, for a constitutional amendment to pass under this provision, it first has to have a majority of yes votes versus no votes?

A.    Yes, because if you do not have, the process is over.

Q.    And why is that?

A.    Because if they did not vote in their favor, then it failed.

Q.    So voting in their favor, what does that modify? Does that modify the citizens of the State voting for governor, or does that modify something else?

MS. KLEINFELTER: Object to the form.

A.    That's the people who voted on the amendment.


Q.    What is the purpose of requiring a majority of all the citizens of the State voting for governor?

MS. KLEINFELTER: Object to the form.

A.    It's what the founders put in the constitution.

Q.      Do you know why it's there?

A.      I don't.

Q.      What is the purpose of the two-step process as you've described it?

A.      That's the process that was chosen by the founders.

Q.      Is there any policy reasons behind that? You said you've done some research. You think you understand why they chose these words.

MS. KLEINFELTER: Object to the form. I don't think that's what he's testified to.

Q.      Is it meant to make it more or less difficult to pass the constitutional amendment by having the two-step process?

A.      Well, anything I gave you would be a guess or speculation.

DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 201:15-207:17, PageID 1312-1313.

39.     Defendants' difficulty in explaining their "two-step process" reflects the tortured nature of their reading of the plain language, which is rendered all the more unnatural by their description of the first step as "the true vote" or "the major test" while seeking to relegate the "ratification" step to something other than the "true" vote:

Q.      If I'm an opponent of a proposed constitutional amendment, how does my vote count on the 50 percent plus one criteria as you have explained it?

MS. KLEINFELTER: Object to the form.

A.      I still don't understand what you're asking.

Q.      How is the 50 percent plus one determined?

A.      The number of votes cast for -- the total number of votes cast for governor is divided in half and then you look to one more than that half number.

Q.     If I'm an opponent of a constitutional amendment and I do not vote for governor, how does my vote matter with respect to what you've described as the second step?

MS. KLEINFELTER: Object to the form.

A.     The vote is the first vote, the true vote. If you're against it, you can vote no. If you're for it, you can vote yes. That's the true vote.

Q.     So a 50 percent plus one requirement is only determined by those people who vote for governor, correct?

MS. KLEINFELTER: Object to the form.

A.     Two-step process. First step, as I've shared with you, is the yeses versus noes. The second step is the total number of votes cast in the governor's race divided by half plus one.

                    * * *

Q.     For a constitutional amendment to pass, according to your version, in your interpretation of the Constitution, it must pass both steps; is that correct?

A.     Must meet the -- it must be approved and it must meet the threshold.

Q.     Threshold being 50 percent plus one?

A.     Yes.

Q.     And that threshold is dependent upon how many people vote for governor.

A.     Totaled up, yes.

* * *

Q.     And if I don't vote for governor, that threshold is less?

A.     Yes. And if I vote for governor and I don't vote for the constitutional amendment, it can be more. I mean, if I don't do it -- I mean, if I vote for -- if I could care less about the governor -- if I care less about the constitutional amendment. If I vote for governor, it still can be more.

Q.     So if I vote –

A.      In answer to your -- yes.

DE 89-2: Goins Dep., Vol. 2, at 293:19-296:22, 315:14-24, PageID 1344-45, 1350; *see also id*. at 327:10, PageID 1353 ("It's the first test. That's the major test").

* * *

40.     The Court finds that Article XI, Section 3's words should mean what they say: to be ratified by the referendum method, amendments to Tennessee's constitution must pass "by a majority of all the citizens of the state voting for governor, voting in their favor." Tenn. Const. Art. XI, § 3. This applies regardless of the so-called two-step process now advocated by Defendants as even under Defendants' reading, their second step requires "a majority of all the citizens of the state voting for governor, voting in their favor." Tenn. Const. Art. XI, § 3.

41.     Parsing that phrase, an amendment must pass not merely by a majority of all citizens of the state voting in its favor or by a majority of the number of citizens voting for governor; rather, to pass, an amendment must be ratified by a majority comprised of "all the citizens of the state voting for governor," *i.e.*, voting for governor is critical to voting for an amendment. To adopt the Defendants' approach and excise the requirement to have voted for governor in order to vote for amendments is to not give effect to all of the words and punctuation in the relevant language of Article XI, Section 3.[5]

B.      Prior Interpretations of Article XI, Section 3

42.     Defendants nonetheless have asserted that their interpretation should carry the day because Article XI, Section 3 has been applied according to their interpretation since 1953 and essentially the same way since 1834. Assuming for the sake of argument that Defendants are correct about the historical application, Defendants' tradition argument falters because it

---

[5] Indeed, Defendants admitted during discovery that Article XI, Section 3 of the Tennessee Constitution requires that an amendment to the Tennessee Constitution be ratified only when a majority of the qualified voters who voted for governor also vote in favor of the amendment. DE 48-3: Pl.'s First Set Requests for Admissions to Defs., PageID 499.

misconstrues the case on which it relied, *Nashville, Chattanooga & St. Louis Railway v. Browning*, 310 U.S. 362 (1940).

43.     *Browning* presented a commerce clause and equal protection challenge to the method by which Tennessee assessed an ad valorem railway tax. *Id*. 363-65. The railroad petitioner in *Browning* challenged this assessment scheme under the Equal Protection clause not on the basis of the state's interpretation of the law itself, but rather on the grounds that two state entities were applying the law disparately to the railway's disadvantage. *Id.* at 367. In that context, the Supreme Court explained that settled state practice—such as the disparate application of a tax assessment in *Browning*—can establish state law, which the Supreme Court will decline to disturb via an equal protection challenge. *Id.* at 369.

44.     The *Browning* court, however, takes pains to emphasize that state tradition or state law "cannot supplant constitutional guarantees." *Id.* Defendants in this case have attempted to stretch *Browning*'s holding to cover this case's dissimilar facts (where a state is alleged to have been violating federal rights and its own constitution—not choosing to apply a law in one of several permissible ways) to attempt to supplant federal constitutional guarantees. If Defendants have not been complying with Article XI, Section 3, then no amount of state tradition can excuse this noncompliance or rewrite the provision.[6] *See Mayhew v. Wilder*, 46 S.W.3d 760, 784 (Tenn. Ct. App. 2001) (citing *Ashe v. Leech,* 653 S.W.2d 398, 401 (Tenn. 1983)) (proscribing "amend[ing] or alter[ing] the Constitution under the guise of construction"). Defendants' assertion that "we've always done it this way" offers no safe harbor and certainly would offer no grounds to condone Defendants' violations of Plaintiffs' federal constitutional rights.

45.     Defendants' deference argument is further flawed. Importing a concept from administrative law, Defendants assert that the Court should defer to their interpretation of Article XI, Section 3 because their interpretation is longstanding and has gone unchallenged for a long period of time. No such deference is warranted here.

---

[6] Conversely, should the Court disagree with Plaintiffs' plain language reading, this reliance on tradition such that it amounts to law is nonetheless misplaced because, as *Browning* states, tradition cannot override the rights guaranteed by the U.S. Constitution, including the Fourteenth Amendment Rights to due process and equal protection at issue in this case.

46.     Although Defendants correctly note that federal courts facing an ambiguous statute give deference to the agency that regularly interprets and works with the statute in question, this deference applies only when the agency's interpretation is one of several the statute could permit. But where, as here, an interpretation defies the statute's plain language, courts do not defer. *Cf. Public Employees Ret. Sys. v. Betts*, 492 U.S. 158, 171 (1989) ("But, of course, no deference is due to agency interpretations at odds with the plain language of the statute itself. Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language.").

47.     Moreover, the record in this case does not support deference. For example, the State Election Commission never opined or otherwise interpreted the meaning of Article XI, Section 3. DE 89-1 Goins Dep., Vol. 1, at 84:24-86:8, PageID 1282-83. It was also acknowledged that Secretary of State Hargett never went to "anyone in the Legislative Branch to get their interpretation, their input, their advice, [or] their construction." DE 89-5: Hargett Dep. at 104:19-22, PageID 1453.

48.     Since 1953, there have been proposed constitutional amendments on the ballot in 1982, 1998, 2002, 2006, and 2010. Defendants testified that they do not know "how Article XI, Section 3 was applied" in the 1982 election. DE 89-3: Hargett Dep. at 108:1-3, PageID 1454. Likewise, Defendants could not identify "who decided to interpret Paragraph 1 of Article XI, Section 3 for purposes of the 1998 election," DE 89-1 Goins Dep., Vol. 1, at 186:10-13, PageID 1308, and concede that based on the vote totals in the 1998 election, "it was not necessary to correlate those two [proposed constitutional amendments on the ballot that year]." *Id.* at 182:18-23, PageID 1307. In any event, Defendants concede they are unaware "if anyone took a moment to consider the wording of Paragraph 1 of Article XI, Section 3 in deciding how to tabulate and count the vote on these constitutional amendments on the ballot in the 1998 election." *Id.* at 186:23-187:4, PageID 1308.

49.     Defendants do point to a document purportedly from 2002 setting forth an interpretation by the then Coordinator of Elections interpreting Article XI, Section 3 in the same manner as Defendants do now. Defendants, however, were unable to testify whether anyone actually considered the wording of Paragraph 1 of Article XI, Section 3 in deciding how to tabulate

and count the vote in the 2002 election. DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 195:23-196:7, PageID 1310. And at their Rule 30(b)(6) deposition, Defendants were asked whether the 2002 document was the only one of its kind that exists and Defendants testified that they did not know. DE 89-3: 30(b)(6)/Goins Dep., Vol. 3, at 454:17-455:2, PageID 1391.

50.    Indeed, during discovery, Plaintiffs asked Defendants to "produce the documents on which [Defendants] relied to articulate publicly that the state has always interpreted the constitution the same way since it was written in 1953" along with "all documents that support [Defendants'] position that the state has interpreted the constitution the same way since it was written in 1953." DE 48-2: Pl.'s First Set of Requests for Production to Defs. at Nos. 9-11; 5-8, PageID 482-85.[7] Defendants refused to respond and objected on the basis of relevance. Defendants cannot refuse to answer questions about prior interpretations on the basis that they are not relevant and then ask this Court to consider them as pertinent and relevant information. As this Court has recognized, "'the scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad,' and Rule 26 must be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'" *Reitz v. City of Mt. Juliet*, 680 F. Supp. 2d 888, 891 (M.D. Tenn. 2010) (quoting *Conti v. Am. Axle & Mfg.*, 326 F. App'x 900, 904 (6th Cir. 2009)). Defendants' position that the prior interpretations were not relevant during discovery, necessarily mean that they are not relevant now.

51.    Nonetheless, even assuming Defendants have always applied Article XI, Section 3 the same way, the fact remains that this interpretation was not primed for a challenge until the vote on Amendment 1. In prior elections—as well as in the votes on Amendments 2, 3, and 4 on the November 4, 2014 ballot—the application of Article XI, Section 3 has not had any bearing on the ultimate outcome. But the vote on Amendment 1 was different: for the first time, a large-scale campaign was organized and effectuated to enhance the value of yes votes by capitalizing on this tabulation method; for the first time, significantly more people voted on an amendment than voted

---

[7] Likewise, Plaintiffs asked Defendants to "identify all instances since 1953 in which any person or entity has questioned or otherwise raised the issue of the proper methodology for counting ballots for constitutional amendments pursuant to the state constitution." DE 48-1: Pl.'s First Set of Interrogatories to Defs. at No. 13, PageID 474. Again, Defendants refused to respond and objected on the basis of relevance.

for governor; and for the first time, the application of Article XI, Section 3 could have made a difference in the outcome of an amendment vote.

52.     Accordingly, the Court finds that both as a legal matter and as a factual matter, Defendants' prior interpretation should not and cannot alter the plain meaning of the first paragraph of Article XI, Section 3 of the Tennessee Constitution.

C.      Proceedings of the Constitutional Convention

53.     Where there is doubt about the meaning of the language in a constitutional provision "it is the first obligation of the Court to go to the proceedings of the Constitutional Convention which adopted th[e] provision and see from these proceedings what the framers of this resolution intended it to mean." *Hale*, 292 S.W.3d at 510; *see also Snow*, 527 S.W.2d at 59 (a court "may, *sua sponte*, make use of a journal of proceedings of constitutional conventions when an issue presented makes such use relevant"). In this regard, Defendants argue that the drafters of Article XI, Section 3 meant for that provision to mean an amendment may be ratified if the "yes" votes on the amendment constituted a majority of the total votes cast for governor.

54.     Because the Court finds no ambiguity in the language of Article XI, Section 3, the analysis of that text begins and ends with the words themselves. *See, e.g.*, *Sebelius v. Cloer*, 133 S. Ct. at 1896; *Cohen,* 885 S.W.2d at 63. Nonetheless, were the Court to consider the proceedings from the Constitutional Convention in 1953, the Court finds that the history itself fails to provide any additional clarity and, if anything, cuts against Defendants' interpretation.

55.     The Majority Report contained in the *Journal and Proceedings* from 1953 does not advocate or discuss the language that was eventually proposed to voters; instead, it advocated in favor of continued use of "representative" rather than "governor." *See* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 242:15-243:13, PageID 1331-32. Likewise, the discussions from the *Journal and Proceedings* do not anywhere discuss a "two-step" process as now advanced by Defendants. *See, e.g., id.* at 245:5-19, PageID 1332.

56.     The reports and statements in the *Journal and Proceedings* do, however, reflect an intent that the "Constitution should be difficult to amend; it is the Constitution of the majority and it is the Constitution of the minority also." DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 243:19-24,

PageID 1332. And Defendants do not dispute this intent. *See, e.g.*, DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 95:8-9, PageID 1285. Such an intent is more consistent with this Court's reading, which imposes a requirement over and beyond a simple yes/no majority, as opposed to the reading advocated by Defendants, which both renders the Tennessee Constitution amendable by a simple majority and subjects its majority requirement to potential manipulation as was seen in the vote on Amendment 1.

57.     This Court's reading is further supported by the changes in 1953 to Article XI, Section 3, wherein the language was changed to require that proposed constitutional amendments may only be voted on during an election in which the governor is to be chosen. DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 97:1-18, PageID 1286. As Defendants acknowledge, the changes in 1953 "tied it to a governor – the governor's election." *Id.* at 208:3-6, PageID 1313. This change is consistent with the Court's reading of the plain language. Likewise, after the changes in 1953 tying passage of proposed constitutional amendments to the governor's race, Tennessee law was changed to require that proposed constitutional amendments "be printed upon the ballot directly after the list of candidates for governor," which again supports the plain language reading found by the Court. *See* Tenn. Code Ann. § 2-5-208(f)(1); *see also* DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 214:9-13, PageID 1315.

58.     In support of their reading, Defendants excerpt certain statements from Delegates Gilreath and Sims contained in the *Journal and Proceedings*.[8] The quotations cited from Delegates Gilreath and Sims reflect their retrospective understanding of the pre-1953 version of Article XI, Section 3. And attempting to rely on Delegate McGinniss's comments—which Defendants characterize as "[p]erhaps most instructive," DE 53: Def.'s Mem. in Support of Mot. to Dismiss First Amended Complaint at 7, PageID 682—plunges into the fraught waters of attempting to infer the intent of one position from a characterization made by that position's opponent, because Delegate McGinniss opposed the proposed Majority Report about which he was speaking. Delegate McGinniss favored the Substitute Minority Report over the Majority Report and indeed

---

[8] Defendants have recited various passages from the Journal of Proceedings but have not presented the Court will all of the relevant pages. *See, e.g.,* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 241:17-20, PageID 1331 ("don't know" whether "includes all of the relevant pages from the Journal of Proceedings"); *id*. at 246:20-25, PageID 1332.

spoke against the Majority Report. *See* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 247:1-248:3, PageID 1333. Delegate McGinniss's comments on the majority report are not "most instructive" and instead are of negligible interpretative value. *See, e.g.*, *Shell Oil Co. v. Iowa Dep't of Revenue*, 488 U.S. 19, 29 (1988) (declining to accord interpretative weight to characterizations by a bill's opponent); *NLRB v. Fruit & Vegetable Packers & Warehousemen*, 377 U.S. 58, 66 (1964) ("[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents"); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394-395 (1951) ("The fears and doubts of the opposition are no authoritative guide to the construction of legislation."). As Defendants acknowledge, "neither the Minority Report nor the Substitute Minority Report reflects the final language of Article XI, Section 3, as it was adopted in 1953." DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 238:23-239:2, PageID 1330-1331.

59.     Indeed, the Substitute Minority Report relied upon by Defendants actually proposed requiring a two-thirds majority of the voters voting on a proposed amendment in lieu of the majority of the citizens of the state voting for governor, voting in its favor, which the delegates viewed as more stringent than requiring a two-thirds majority. *See* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 239:16-240:3, PageID 1331. In fact, Delegate Gilreath, whose statements on which Defendants rely, opposed the Substitute Minority Report and its suggestion of a two-thirds standard as being antithetical to the founder's intent that a "Constitution should be difficult to amend." *Id.* at 243:25-244:18, PageID 1332.

60.     Accordingly, Defendants' citations to the *Journal and Proceedings* fail to support their interpretation. Moreover, it is important to recognize that Tennessee voters were not provided any "legislative history" or other "drafters' intent" documentation when they voted on approving Article XI, Section 3's current language. DE 48-3: Pl.'s First Set Requests for Admissions to Defs. at 15, PageID 502; *Cf.* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 271:10-15, PageID 1339.

61.     Courts must construe Tennessee's constitutional provisions with respect to the intentions of the persons, *i.e.*, the voters, who adopted the provision at issue, *see Cleveland Surgery Ctr., L.P. v. Bradley Cnty. Mem'l Hosp.,* 30 S.W.3d 278, 281-82 (Tenn. 2000); *Shelby Cnty. v. Hale,* 292 S.W.2d 745, 748 (Tenn. 1956), which is reflected in the text of the Constitution itself, *Hatcher v. Bell,* 521 S.W.2d 799, 803 (Tenn. 1974).

62.     Therefore the Court finds that the history of Article XI, Section 3, if anything, supports the Court's reading and cuts against Defendants' interpretation.

D.     Due Process and Equal Protection

63.     Defendants' application of Article XI, Section 3 constitutes both a denial of due process and equal protection to Plaintiffs under the Fourteenth Amendment of the United States Constitution. The Supreme Court "has consistently held in a long series of cases, that in situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it is as practicable, as any other person's." *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 54 (1970) (string citation omitted). Here, Plaintiffs votes were not afforded the same weight as those cast by other voters—specifically those other voters who voted for Amendment 1 and who did not vote in the governor's race. *See, e.g.*, *Avery v. Midland Cnty.*, 390 U.S. 474, 476 (1968) (holding that a qualified voter in a local election also has a constitutional right to have his vote counted with substantially the same weight as that of any other voter). And in the same way, Defendants' tabulation method created a fundamentally unfair voting system by which Plaintiffs and others' who opposed Amendment 1 were compelled to vote for governor in order to have their vote count equally compared to votes cast by voters who favored Amendment 1 and voted for governor.

64.     Defendants' conduct—by disregarding Article XI, Section 3 and counting votes from voters who did not vote for governor—discriminates against a discrete group of voters: people who voted for governor. In this regard, Defendants employed and publicized a methodology of counting ballots contrary to the requirements of the Tennessee Constitution and which undermined the integrity of the election on Amendment 1 and disenfranchised voters. DE 48-3: Pl.'s First Set Requests for Admissions to Defs. at 15, at PageID 493-494.

65.     Indeed, Defendants take the position that it is "speculative" whether "Amendment 1 would have passed if the votes were tabulated as suggested by the Plaintiffs in this case." DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 107:4-14, PageID 1288. Defendants admit that voter confidence is jeopardized when a person's vote is "effectively cancelled by someone who wasn't eligible to cast a ballot." DE 48-3: Pl.'s First Set Requests for Admissions to Defs. at 11, PageID 498.

66.     The Court, however, finds that it is unnecessary to rest its decision on its interpretation of Article XI, Section 3, because regardless of whether Defendants acted contrary to or consistent with Article XI, Section 3, Defendants' conduct violated Plaintiffs' equal protection and due process rights guaranteed under the Fourteenth Amendment as explained below.

67.     It is axiomatic that a state can act consistently with its own constitution or statutes and still violate a plaintiff's federal constitutional rights. *See*, *e.g.*, *Romer v. Evans*, 517 U.S. 620 (1996); *Williams v. Rhodes*, 393 U.S. 23 (1968); *Loving v. Virginia*, 388 U.S. 1 (1967); *Reitman v. Mulkey*, 387 U.S. 369 (1967); *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966); *Carrington v. Rash*, 380 U.S. 89 (1965); *McLaughlin v. State of Florida*, 379 U.S. 184 (1964); *Reynolds v. Sims*, 377 U.S. 533 (1964). For the reasons set forth below, the Court finds that Defendants' interpretation of Article XI, Section 3, both facially and as applied in this matter, violates Plaintiffs' constitutional rights.

*Fundamentally Unfair Voting System*

68.     As citizens of Tennessee who were eligible and properly registered to vote, Plaintiffs enjoy the fundamental right to vote in Tennessee elections. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964); *accord Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012). Plaintiffs' voting rights claims "strike[] at the heart of the political process." *Judge v. Quinn*, 612 F.3d 537, 545 (7th Cir. 2010).

69.     "The Due Process clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair." *League of Women Voters v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (citing *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1978)).

70.     Based on Defendants' calculation method, a vote on Amendment 1 from anyone who voted for governor—regardless of whether the vote was for or against Amendment 1—has less value than a vote for Amendment 1 from someone who did not vote for governor. By devaluing Amendment 1 votes from voters who voted for governor, Defendants carried out "an officially-

31

sponsored election procedure which, in its basic aspect, was flawed. Due process, '[r]epresenting a profound attitude of fairness between man and man, and more particularly between individual and government,' is implicated in such a situation." *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978) (quoting *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 163 (1951) (Frankfurter, J., concurring)).

71.     In *United States v. Saylor*, 322 U.S. 385, 388-39 (1944), the Supreme Court explained that a state election violated federal due process when election officials' conduct resulted in fraudulent or fundamentally unfair voting results. In *Saylor*, the Supreme Court found that election officials engaging in ballot stuffing violated due process. 322 U.S. at 388-39. Although Defendants themselves did not cast more than one vote for Amendment 1, their tabulation method yielded a comparable result by according certain votes greater weight. Like the officials in *Saylor*, Defendants' conduct valued certain votes over other votes.

72.     Similarly, in *Roe v. State of Alabama*, the Eleventh Circuit explained that Alabama's counting of contested absentee ballots (which, until the election in question, had not been counted) implicated fundamental fairness because, among other reasons, counting those contested ballots "effectively 'stuff[ed] the ballot box.'" 43 F.3d 574, 581 (11th Cir.) *certified question answered sub nom. Roe v. Mobile Cnty. Appointment Bd.*, 676 So. 2d 1206 (Ala. 1995); *cf. Briscoe v. Kusper*, 435 F.2d 1046, 1055 (7th Cir. 1970), (holding that changing voting rules and then refusing to count votes from voters who were not informed of the change created a fundamentally unfair system).

73.     As Defendants acknowledge, conduct violates fundamental fairness "when the complained-of conduct discriminates against a discrete group of voters, *see, e.g.*, *United States v. Hays*, 515 U.S. 737, 744-45 (1995)." Def.'s Mem. in Support of Mot. to Dismiss at 19, PageID 93. Under the tabulation method employed by Defendants, any voter who did not vote in the Governor's race but did vote on Amendment 1, had the effect of lowering the requisite threshold for ratification of Amendment 1. Conversely, under the method for tabulation utilized by Defendants, an opponent of a constitutional amendment is compelled to vote in the Governor's race in order for that voter to have an impact on the denominator used in determining whether a constitutional amendment has obtained the threshold for ratification.

74. By basing the threshold for ratification on only those voters who cast a ballot for Governor (and only then, requiring voters to vote on one of the listed candidates for governors since write-ins were disregarded by Defendants), a proponent of a constitutional amendment must also vote in the Governor's race in order to have their vote count towards ratification of the amendment. Based on Defendants' calculation method, a vote on Amendment 1 from anyone who voted for governor, regardless of whether the vote was for or against Amendment 1, has less value than a vote for Amendment 1 from someone who did not vote for governor. By devaluing Amendment 1 votes from voters who voted for governor, Defendants have violated fundamental fairness. As Defendants themselves have admitted, no vote from an eligible citizen should count double, count as a vote-and-a-half, or count any more than any other eligible citizen's vote. DE 48-3: Pl.'s First Set Requests for Admissions to Defs. at 10, PageID 497. This admission is squarely consistent with the Supreme Court's statements that eligible citizens' votes should be afforded the same weight. *See, e.g.*, *Hadley*, 397 U.S. at 54; *Avery*, 390 U.S. at 476.

75. The Court notes that Plaintiffs are not the first ones to raise the fundamental unfairness of this voting scheme. As reflected in the *Journal and Proceedings*, Delegate Sims spoke against the pre-1953 version of Article XI, Section 3 (before it was linked to the governor's race) noting that it was "crazy" to have a system whereby a voter could not vote in a legislative race so as to increase the chance of an amendment passing. *See* DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 250:1-253:6, PageID 1333-34. Indeed, Delegate Sims took the same position as these Plaintiffs today and gave an impassioned speech describing the pre-1953 version of Article XI, Section 3 as embodied in the Majority Report as "un-American." *Id.*[9]

76. The Court agrees with Delegate Sims and finds that Article XI, Section 3, as applied by Defendants in the November 4, 2014 election with respect to Amendment 1, violates the due process protections guaranteed by the Fourteenth Amendment.

---

[9] Delegate Sims advocated in favor of replacing the pre-1953 version of Article XI, Section 3 with a straight-forward two-thirds requirement, which he explained "would be American and would still leave us one of the most conservative amendment clauses." *Id.*

*Equal Protection*

77.     The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Equal Protection clause provides that "a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn*, 405 U.S. at 336. "The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555.

78.     "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). "In decision after decision, [the Supreme] Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (string citations omitted). "The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555).

79.     "If one person's vote is given less weight . . . his right to equal voting participation is impaired . . . ." *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 55 (1970). Defendants' vote tabulation method violates the Equal Protection clause by collectively counting the votes of two classes of people—Plaintiffs, along with those voters like them, who voted in the gubernatorial race as well as on Amendment 1 and those who did not vote for governor and merely voted on Amendment 1—to the detriment of Plaintiffs and others who voted for governor. By counting votes for Amendment 1 from voters' who did not vote for governor while basing Amendment 1's passage threshold on the number of votes in the gubernatorial race, Defendants permitted and indeed encouraged voters to overweight their votes on Amendment 1 by increasing the number of votes in favor of Amendment 1 without correspondingly increasing the number of total votes needed for Amendment 1 to be ratified. Conversely, Plaintiffs, by virtue of having exercised their right to vote for governor, have had their votes diluted—and thus their franchise impaired—when they attempted to exercise their right to vote not to approve Amendment 1.

34

80.     Under the tabulation method adopted by Defendants, anyone who wanted to vote against Amendment 1 needed to vote for governor to have their vote count. Yet, under Defendants' method, someone favoring Amendment 1 may vote for governor and for the amendment (and thereby decrease the relative weight of their vote for the amendment) or just vote for the amendment (and thereby increase the relative weight of the vote for the amendment). But, using Defendants' tabulation, someone who opposes an amendment can only meaningfully register this opposition by voting for governor. Under such a voting scheme, a vote from someone who does not vote in the gubernatorial race and who votes against an amendment may be permissible, but it is meaningless: such a vote would not factor into either the numerator (votes in favor of Amendment 1) or the denominator (votes cast in the gubernatorial race) of Defendants' ratification fraction and thus has no influence.[10]

81.     By merely comparing the number of votes for Amendment 1 with the number of votes for governor, Defendants award unequal voting strength to voters who did not vote in the gubernatorial race but did vote on Amendment 1. This distribution of unequal voting strength is anathema to equal protection of the laws. *See, e.g.*, *Moore*, 394 U.S. at 819.

82.     Defendants have previously argued that Plaintiffs' equal protection claims fail because Plaintiffs, as a group, were not treated differently from any other group. To bolster this conclusion, Defendants pointed to the Supreme Court case *Gordon v. Lance*, 403 U.S. 1 (1971). *Gordon* addressed West Virginia's requirement that political subdivisions of the state could only increase taxes above those established in West Virginia's Constitution or incur bonded indebtedness if 60% of the voters in a referendum election approved these actions. *Id.* at 2-3. The *Gordon* plaintiffs voted in favor of additional taxes and a bond issuance in a 1968 referendum

---

[10] Put differently, the three permutations of votes on Amendment 1—(1) not voting for governor and voting against Amendment 1, (2) voting for governor and voting against Amendment 1, (3) voting for governor and voting in favor of Amendment 1, and (4) not voting for governor and voting in favor of Amendment 1—counted for three different amounts in Defendants' ratification calculation. Option 1 (not voting for either) was a valueless vote because it neither added to the numerator nor the denominator; Options 2 and 3 (voting for governor and voting for/against the Amendment) have the same weight regarding the ratification threshold because both added to the denominator (as well as the numerator for those who favored Amendment 1); and Option 4 (voting for Amendment 1 but not for governor) had the greatest influence on whether Amendment 1 was ratified under Defendants' calculation by adding to the numerator without adding to the denominator.

election, and although more than a majority of voters favored both of these actions, neither earned the requisite 60% vote to pass. *Id.* at 3. The plaintiffs filed suit asserting that 60% vote threshold violated the equal protection clause by disproportionately empowering a minority. *Id.* The Supreme Court disagreed, explaining that departing from a strict majority rule may empower the minority but that this threshold applied equally to all voters. *Id.* at 5-6. Although the *Gordon* plaintiffs had to assemble more than a simple majority, the value of their votes remained the same relative to all other voters in the state.

83.     By contrast, Plaintiffs' individual votes were not equally weighed under Defendants' vote tabulation fraction. Whereas any vote on Amendment 1 from someone who voted for governor raised the denominator (by increasing the number of votes in the gubernatorial race) and may raise the numerator (depending on whether that voter favors Amendment 1), Defendants' vote tabulation method permitted voters to increase only the numerator of the ratification voting fraction by voting in favor of Amendment 1 without voting in the governor's race. These numerator-only votes in favor of Amendment 1 afforded a greater relative weight than either Plaintiffs' votes against Amendment 1 or votes for Amendment 1 from voters who voted in the gubernatorial race.

84.     Thus, the votes from Plaintiffs—and anyone who voted in the gubernatorial race— received less weight than votes from those who did not. Whereas there was no equal protection violation in *Gordon* because every voter's vote received equal weight, Plaintiffs have proven an equal protection violation here because their votes have not been afforded the same weight as votes from other voters who did not vote for governor. Defendants agree that "if someone votes for governor but does not also vote for the amendment," then "the threshold would be higher" and conversely "the threshold would be lower if someone did not vote in the governor's race." DE 89-3, 30(b)(6)/Goins Dep., Vol. 3, at 368:23-369:14, PageID 1369; *see also* DE 89-3: Hargett Dep. at 124:6-7, PageID 1458 ("The threshold is made up of only those votes cast in the Governor's race.").

85.     Defendants also relied on the Ninth Circuit decision in *Angle v. Miller*, 673 F.3d 1122 (9th Cir. 2012), to try to undercut Plaintiffs' equal protection claim. *Angle* presented an equal protection challenge to Nevada's "All Districts Rule," which required that proponents of direct

legislation initiatives secure a certain percentage of signatures in each of Nevada's three equally apportioned congressional districts. *Id.* at 1126-27. The *Angle* plaintiffs claimed that this requirement violated the Equal Protection Clause's prohibition on vote dilution because it permitted a minority of the state's population to veto the wishes of the majority with regard to ballot initiatives. *Id.* at 1127. These claims, which the Ninth Circuit rejected, were premised on different grounds than the instant lawsuit. The plaintiffs in *Angle* argued that their votes were diluted and their equal protection rights were violated because votes were counted on a district-by-district basis and because the "All Districts Rule" undercut simply majority rule. Plaintiffs here do not rely on such arguments. Rather, Plaintiffs have shown that their individual votes have been devalued and that Defendants' unequal weighing of votes violates the Equal Protection Clause.

86.     Defendants attempt to connect Plaintiffs to the *Angle* and *Gordon* plaintiffs by asserting that Plaintiffs' only common element is having voting against Amendment 1. To the contrary Plaintiffs are also united by each having voted for governor. In this way, Plaintiffs' Equal Protection claims better parallel the logic of cases involving unequal apportionment or imbalanced county-unit systems such that some votes are valued more than others. *See, e.g.*, *Moore v. Ogilvie*, 394 U.S. 814, 819 (1969); *Reynolds*, 377 U.S. at 555; *Gray v. Sanders*, 372 U.S. 368, 380 (1963); *see also Baker v. Carr,* 369 U.S. 186 (1962). Like those cases—and unlike *Angle* or *Gordon*, where each vote was equally weighed but the threshold to effect change was above a simple majority— Plaintiffs' votes have not been afforded the same relative weight working toward a majority threshold as other votes cast on the same issue. As the Supreme Court explained in *Gray v. Sanders*:

> Every voter's vote is entitled to be counted once. It must be correctly counted and reported. As stated in *United States v. Mosley*, 238 U.S. 383, 386 [(1913)] , "the right to have one's vote counted" has the same dignity as "the right to put a ballot in a box." It can be protected from the diluting effect of illegal ballots. *Ex parte Siebold*, 100 U.S. 371 [(1879)]; *United States v. Saylor*, 322 U.S. 385 [(1944)].

372 U.S. at 380.

87.     When Defendants are not defending their actions in the November 4, 2014 election, they readily agree and recognize these principles. *See, e.g.*, Tre Hargett, *The Blue Pages Newsletter*, Vol. 3, No. 2 (explaining exercising one's right to vote is one of the most important

expressions of a free society); Hargett, *Guest column: Photo ID bill will help stop voter fraud*, The Commercial Appeal, February 23, 2011, http://www.commercialappeal.com/opinion/guest-column-photo-id-bill-will-help-stop-voter (stating that "[o]ur process is guided by the principle that each participant in an election gets one vote, which counts for no less (and no more) than any other participant's vote. As a voter, I want to be confident that the ballot I cast will have as much influence as the ballot cast by my neighbor down the street" and asserting that ballot integrity is important to prevent counting even a single vote that should not have been counted); Hargett, *Hargett: Updated voter rolls ensure fair elections*, Knoxville News-Sentinel, January 9, 2010, http://www.knoxnews.com/opinion/columnists/updated-voter-rolls-ensure-fair-elections-by-tre (stating that voter confidence is jeopardized when a person's vote is "effectively cancelled by someone who wasn't eligible to cast a ballot.").

88.    Defendants' testimony in this case is consistent with these past assertions: Defendants agree that the State cannot "disenfranchise someone for not voting for a race." DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 101:4-5, PageID 1287; *see also id*. at 102:4-7 (defining disenfranchisement as to "discourage people from voting or actually prevent them from voting").

89.    The denial of equal protection of the law to Plaintiffs is not rationally related to the furtherance of any legitimate governmental interest, let alone narrowly tailored to substantially advance any governmental interest. Moreover, Defendants' tabulation method encouraged voters who favored Amendment 1 not to vote for governor, thereby effectively deterring those voters from exercising their fundamental right to vote. Accordingly, Defendants' disenfranchisement of Plaintiffs lacks any rational basis, let alone survives strict scrutiny under the Equal Protection Clause.

### Compelled Voting

90.    The notion of a compelled vote derives generally from the First and Fourteenth Amendments and from the Supreme Court's opinion in *Wooley v. Maynard*, 430 U.S. 705 (1977). In *Wooley*, the Court explained that the First Amendment, as incorporated through the Fourteenth, protects the right to "refrain from speaking at all," that "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind,'" and that "[a] system which secures the right to proselytize religious, political, and

ideological causes must also guarantee the concomitant right to decline to foster such concepts." *Id.* at 714; *see generally, e.g.*, *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 5, 8 (1947) (acknowledging the First Amendment to apply to states through the Fourteenth Amendment's due process clause). In light of this right, a voting system that necessitates voting in one election before voters can effectively vote in another threatens those voters' First and Fourteenth Amendment rights because it compels voters to speak on one issue before permitting them to speak on another. *See Wooley*, 403 U.S. at 714. Faced with compelled voting issues, a court must "weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against the "justifications for the burden imposed by its rule." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

91.     Federal courts have invalidated state laws imposing conditions precedent on voting because they impose a severe burden on voters' First and Fourteenth Amendment rights without furthering any compelling state interest. In *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 727 (1st Cir. 1994), for example, the First Circuit considered "whether a state may condition the right to vote in one election on whether that right was exercised in a preceding election." The court was unable to "conceive of a governmental interest sufficiently strong to limit the right to vote to only a portion of the qualified electorate" and invalidated the condition as an unconstitutional burden on the right to vote. *Id.* at 730-31.

92.     In *Partnoy v. Shelley,* 277 F. Supp. 2d 1064 (S.D. Ca. 2003)—a case involving the 2003 recall election of California Governor Gray Davis—the district court for the Southern District of California considered a state election law providing that "[n]o vote cast in the recall election shall be counted for any candidate unless the voter also voted for or against the recall of the officer sought to be recalled." *Id*. at 1071 (internal quotation marks omitted). The court explained that any "restriction on the franchise other than residence, age, and citizenship must promote a compelling state interest in order to survive constitutional attack." *Id.* at 1076 (internal quotation marks omitted). The court concluded that the law at issue, by conditioning the right to vote on a successor governor on casting an earlier vote on the recall issue, had substantially burdened the right to vote without a sufficiently compelling state interest. *Id.* at 1078. It further concluded that the law violated the First Amendment by forcing voters to take a position on the question of recall in order to vote on a replacement. *Id.* The Colorado Supreme Court recently invalidated a provision of the

Colorado Constitution that was comparable to the statute at issue in *Partnoy*, similarly concluding that the provision violated the First and Fourteenth Amendments to the U.S. Constitution. *See In re Hickenlooper*, 312 P.3d 153, 155 (Colo. 2013).

93.     Defendants concede that their voting system encourages opponents of a proposed constitutional amendment to vote for someone in governor's race and in fact compels them to do so if they want to affect the threshold for ratification. *See* DE 89-5: Hargett Dep. at 124:3-14, PageID 1458.

94.     Defendants' tabulation method not only compels anyone who wants to vote against an amendment to also vote for governor, but it also does so in an unequal manner by not imposing the same burden on those voters favoring an amendment. Under Defendants' method, a voter against Amendment 1 was compelled to vote for governor to have his or her vote count on Amendment 1; a vote from someone who does not vote in the gubernatorial race and who votes against an amendment is permissible but meaningless: it would not factor into either the numerator (votes in favor of Amendment 1) or the denominator (votes cast in the gubernatorial race) of Defendants' ratification fraction and thus has no meaning. Someone favoring an amendment under Defendants' scheme faced no such compulsion and could have voted for governor and for the amendment (and thereby decrease the relative weight of their vote for the amendment such that it equaled that of a voter who voted for governor and voted against the amendment) or just vote for the amendment (and thereby increase the relative weight of the vote for the amendment).

95.     The November 4, 2014 election highlighted this Faustian choice for opponents of Amendment 1, given that the gubernatorial race involved a Democratic nominee whose only ascertainable attribute was that he shared a name with a popular cartoon character. As Defendants themselves have acknowledged, "Charlie Brown . . . wasn't the strongest candidate [a]nd, you know, if someone wanted to skip the governor's race and not vote for Charlie Brown, I don't think they should be penalized." DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 101:16-19, PageID 1287.

96.     Yet, opponents of Amendment 1 were penalized for not voting for governor while opponents of Amendment 1 were rewarded for the same choice. As Defendants themselves acknowledge, "it's illegal" to either "prevent someone from voting" or to "discourage people from voting." DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 102:4-12, PageID 1287. And Defendants have

conceded that there is no state interest, compelling or otherwise, "to require voters to vote for governor as it pertains to the passage of an amendment to the Tennessee Constitution." *Id.* at 103:4-17.

* * *

97.     Regardless of whether it was consistent with or contrary to the plain language of Article XI, Section 3 of the Tennessee Constitution, Defendants' determination of the threshold for the ratification of proposed constitutional amendment No. 1 on the November 4, 2014 general election ballot violated Plaintiffs' and other voters' federal constitutional rights, including equal protection and due process (which also incorporates the First Amendment), by (i) diluting Plaintiffs' votes by basing ratification on the number of "yes" votes on the amendment as compared to total votes cast in the governor's race, (ii) disenfranchising Plaintiffs and other Tennessee voters by rewarding proponents of Amendment 1 who refrained from voting in the governor's race, (iii) forcing proponents of Amendment 1 to choose between increasing the likelihood of the passage of Amendment 1 and exercising their constitutional right to vote in the governor's race, and (iv) compelling Plaintiffs and other voters against Amendment 1 to vote in the governor's race in order for their vote to count at all for purposes of ratification.

E.     Remedy

98.     Plaintiffs have sought a judgment voiding the November 4, 2014 election results on Amendment 1 as certified by Defendants, declaring unconstitutional the first paragraph of Article XI, Section 3 on its face and/or as applied through the method by which votes were tabulated and certified on Amendment 1, awarding Plaintiffs attorneys' fees, expenses and costs, and providing Plaintiffs with such other relief that may be available to them.

99.     Defendants assert that rather than void the November 4, 2014 election on Amendment 1, this Court should first order Defendants to count the recount the vote in accordance with this Court's interpretation of Article XI, Section 3. Defendants, however, take the position that this Court's reading of Article XI, Section 3 "violates the First and Fourteenth Amendment rights of voters and, therefore, it must be struck down as contrary to the U.S. Constitution." *See*

Def.'s Memorandum in Support of Motion to Dismiss at 23; DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 100:21-102:12, PageID 1286.

100.     This court need not mandate that Defendants uphold or enforce a provision in the state constitution that they acknowledge to be federally unconstitutional. *Cf. Freytag v. C.I.R.*, 501 U.S. 868, 906 (1991) (Scalia, J. concurring) (acknowledging the principle of disregarding laws that are unconstitutional); *Myers v. United States*, 272 U.S. 52 (1926) (sustaining the view that the executive branch need not enforce a statute it recognizes to be unconstitutional); *see generally, e.g.*, *Reynolds*, 377 U.S. at 533 (acknowledging that when federal and state constitutional laws conflict, the supremacy clause "of course" controls). Because this Court cannot require Defendants to uphold a state constitutional provision that Defendants believe to violate the federal constitution, a recount would serve no purpose.

101.     In any event, Defendants have no way of knowing how many voters who cast a ballot in favor of Amendment 1 did not vote in the Governor's race, DE 48-3: Pl.'s First Set Requests for Admissions to Defs. at 9, PageID 496. Defendants profess to not having custody or control over the copies of the ballots (paper or electronic) cast in the November 4, 2014 general election. Indeed, neither the Department of State nor the State Election commission has knowledge regarding (i) the computer and electronic storage infrastructure, capabilities, and procedures for votes cast in the November 4, 2014 election, (ii) the location, identity, maintenance, and preservation of physical records regarding votes cast in this election, and (iii) any backup systems or archival methods employed for the electronic data and any physical documents. DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 22:4-22, 25:4-19, PageID 1267-68. And Defendants declined to obtain copies of the data even after they had been duplicated on the county level. *Id.* at 30:13-15, PageID 1269. And by not obtaining such copies, the complete data is now lost forever because all of Van Buren County's ballot data for the November 2014 election was destroyed in January 2015 fire that consumed the local administrative building in Spencer, TN where it was stored.

102.     For perhaps all of these reasons, the parties stipulated that the election data would not be relevant or pertinent to the issues to be tried by the Court. *See* DE 96: Parties' Stipulations at ¶ 12, PageID 1799; *see also* DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 27:24-28:2, PageID 1268.

Accordingly, the only recourse available to the Court is to void the results of the November 4, 2014 election on Amendment 1.

Respectfully submitted,

By:      /s/ *William L. Harbison*

William L. Harbison (B.P.R. No. 7012)
C. Dewey Branstetter Jr. (B.P.R. No. 9367)
Phillip F. Cramer (B.P.R. No. 20697)
Hunter C. Branstetter (B.P.R. No. 32004)
SHERRARD & ROE, PLC
150 3rd Avenue South, Suite 1100
Nashville, Tennessee 37201
Tel.: (615) 742-4200
Fax: (615) 742-4559
bharbison@sherrardroe.com
dbranstetter@sherrardroe.com
pcramer@sherrardroe.com
hbranstetter@sherrardroe.com

Anita S. Earls (*Pro Hac Vice*)
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 West NC Highway 54, Suite 101
Durham, North Carolina 27707
Tel.: (919) 794-4198
anita@scsj.org

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of the foregoing was served upon the following:

| Counsel | Counsel for: | Via: |
|---|---|---|
| Janet M. Kleinfelter<br>Leslie Ann Bridges<br>Office of the Attorney General and Reporter<br>Public Interest Division<br>P.O. Box 20207<br>Nashville, TN 37202<br>(615) 741-7403<br><br>janet.kleinfelter@ag.tn.gov<br>leslie.bridges@ag.tn.gov | Defendants | ☐ United States Mail, postage prepaid<br>☐ Hand-delivery<br>☐ Facsimile transmission<br>☐ E-Mail<br>☐ Fed Ex<br>☒ CM/ECF |

This 18th day of March, 2016.

        /s/ *William L. Harbison*
        William L. Harbison