# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

TRACEY E. GEORGE, ELLEN WRIGHT )
CLAYTON, DEBORAH WEBSTER-CLAIR, )
KENNETH T. WHALUM Jr., MERYL RICE, )
JAN LIFF, TERESA M. HALLORAN, and )
MARY HOWARD HAYES, )
                                    )
       Plaintiffs, )
                                    )
v. )     Case No.  3:14-2182
                                    )
WILLIAM EDWARD "BILL" HASLAM, as )
Governor the State of Tennessee, in his )
official capacity; et al. )
                                    )
       Defendants. )

---

## DEFENDANTS' REPLY TRIAL BRIEF

---

HERBERT H. SLATERY III
Attorney General and Reporter

ANDRÉE S. BLUMSTEIN
Solicitor General

LESLIE ANN BRIDGES
Senior Deputy of Public Protection Section
and Counsel to the Attorney General

JANET M. KLEINFELTER
Deputy Attorney General
Public Interest Division
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Janet.Kleinfelter@ag.tn.gov

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................9

I.      FACTUAL BACKGROUND...............................................................................9

II.     LEGAL BACKGROUND.................................................................................14

        A.      Defendants' Interpretation of Article XI, Section 3, Is Correct..............................14

               1.      Plaintiffs' reliance on *Snow v. City of Memphis* is misplaced ....................14

               2.      Defendants have consistently interpreted article XI, section 3, as a two-step process requiring both "approval" and "ratification" ............15

               3.      Defendants' interpretation is consistent with the practice of Previous state officials ..................................................................18

               4.      Well-settled rules of constitutional interpretation require this Court to defer to an interpretation that has long been followed by the legislative and executive branches of the State.......................................21

               5.      The proceedings of the 1953 Constitutional Convention support Defendants' interpretation of article XI, section 3.........................................23

               6.      Plaintiffs fail to acknowledge or otherwise address the Constitutional infirmities of their own interpretation ...................................25

III.    PLAINTIFFS HAVE FAILED TO ESTABLISH A VIOLATION OF THEIR FEDERAL CONSTITUTIONAL RIGHTS...........................................................27

        A.      Standard of review for Plaintiffs' Facial challenge to Article XI, Section 3.......................................................................................27

        B.      Plaintiffs Cannot Demonstrate a Dilution of Their Votes in Violation of The Equal Protection Clause ................................................29

        C.      Plaintiffs Have Failed to Prove Any Violation of The Due Process Clause ...........................................................................32

        D.      Defendants' Interpretation and Application of Article XI, Section 3 Does Not Compel Voters to Vote for Governor in Violation of the First and Fourteenth Amendments..........................................................35

     E.      Defendants' Interpretation and Application of Article XI, Section 3
             Does Not Force Voters to Vote for Governor in Violation of the
             First and Fourteenth Amendments ........................................................38

     F.      There is No Basis for Voiding the Election ...........................................39

CONCLUSION ...........................................................................................................40

CERTIFICATE OF SERVICE .....................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Legislative Black Caucus v. Alabama,*
    988 F.Supp.2d 1285 (M.D. Ala. 2013) .................................................................29

*Avery v. Midland Cnty.,*
    390 U.S. 474 (1968) ...........................................................................................29

*Ayers-Schaffner v. DiStefano,*
    37 F.3d 726 (1st Cir. 1994) ..................................................................................26

*Bennet v. Yoshina,*
    140 F.3d 1218 (9th Cir.1998) ...............................................................................33

*Bonas v. Town of N. Smithfield,*
    265 F.3d 69 (1st Cir. 2001) ...................................................................33, 34, 35

*Briscoe v. Kusper,*
    435 F.2d. 1046 (7th Cir. 1970) ......................................................................31, 34

*Broadrick v. Oklahoma,*
    413 U.S. 601, 613 (1973) ....................................................................................28

*City of Ann Arbor, Mich. v. Northwest Park Construction Corp.,*
    280 F.2d 212 (6th Cir. 1980) ...............................................................................28

*City of Memphis v. Hargett,*
    414 S.W.3d 88 (Tenn. 2013)................................................................................25

*CMR D.N. Corp. v. City of Phila.,*
    703 F.3d 612 (3d Cir. 2013).................................................................................27

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.,*
    508 U.S. 602 (1993).............................................................................................28

*Connection Distrib. Co. v. Holder,*
    557 F.3d 321 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 362 (U.S. 2009)...................28

*Cooey v. Strickland,*
    269 F.R.D. 643 (S.D. Ohio 2010) .........................................................................13

*Crawford v. Marion County Election Board,*
    553 U.S. 181 (2008)............................................................................................28

3

*Derryberry v. State Bd. of Election Comm'rs,*
    266 S.W. 102 (Tenn. 1924).........................................................................................21

*Doe v. Mich. Dep't of State Police,*
    490 F.3d 491 (6th Cir.2007) ...................................................................................30

*Dudum v. City and County of San Francisco,*
    No. 10-00504, 2010 WL 3619709 (N.D. Cal. Sept. 9, 2010), *aff'd by Dudum*
    *v. Arntz*, 640 F.3d 1098 (9th Cir. 2011) ..............................................................37

*Duncan v. Poythress,*
    657 F.2d 691 (5th Cir.1981) ...................................................................................34

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
    485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)...................................30

*Ezell v. City of Chi.,*
    651 F.3d 684 (7th Cir. 2011) ..................................................................................27

*FCC v. Beach Commc'ns, Inc.,*
    508 U.S. 307, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)........................................30

*Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.,*
    508 U.S. 307, 313, 113 S.Ct. 2096, 123 L.Ed.2d 211 (1993)................................30

*Fieger v. Michigan Supreme Court,*
    553 F.3d 955 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 1048 (U.S. 2010)...............28

*Gallagher v. Butler,*
    378 S.W.2d 161 (Tenn. 1964)..................................................................................21

*Gjersten v. Board of Election Comm'rs,*
    791 F.2d 472 (7th Cir. 1986) ..................................................................................40

*Griffin v. Burns,*
    570 F.2d 1065 (1st Cir.1978).............................................................................33, 35

*Hadley v. Junior Coll. Dist. Of Metro Kansas City, Mo.,*
    397 U.S. 50 (1970)..............................................................................................29, 30

*Harford Fire Ins. Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy,*
    740 F.2d 1362 (6th Cir. 1984) ................................................................................28

*Heller v. Doe by Doe,*
    509 U.S. 312 (1993)................................................................................................32

*Henry v. Connolly,*
    910 F.3d 1000 (1st Cir. 1990).................................................................................32

4

*In re Hickenlooper*,
312 P.3d 153 (Colo. 2013) ..................................................................................................26

*John Doe, IXV v. Mich. Dep't of State Police*
490 F.3d 491, 501 (6th Cir. 2007) ......................................................................................31

*Johnson v. Bredesen*,
624 F.3d 742 (6th Cir.2010) ...............................................................................................30

*League of Women Voters of Ohio v. Brunner*,
548 F.3d 463 (6th Cir. 2008) ..............................................................................................34

*Logan v. Public Employees Retirement Ass'n*,
-- F.Supp.3d--, 2016 WL 807973 (D. N.M. Jan. 11, 2016) .................................................40

*Mayhew v. Wilder*,
46 S.W.3d 760 (Tenn. Ct. App. 2001) .................................................................................22

*McDonald v. Board of Election Commissions*,
394 U.S. 802 (1969) .....................................................................................................28, 36

*Nashville, Chattanooga & St. Louis Railway v. Browning*,
310 U.S. 362 (1940) ............................................................................................................21

*Nolles v. State Committee for Reorganization of School Districts*,
524 F.3d 892 (8th Cir.2008) ...............................................................................................33

*Northeast Ohio Coalition for Homeless v. Husted*,
696 F.3d 580 (6th Cir. 2012) ..............................................................................................37

*Obama for Am. v. Husted*,
697 F.3d 423, 429 (6th Cir. 2012) ......................................................................................36

*Partnoy v. Shelley*,
277 F. Supp. 2d 1065 (S.D. Cal. 2003) ...............................................................................26

*Reynolds v. Sims*,
377 U.S. 533 (1964) ............................................................................................................29

*Roe v. Alabama*,
68 F.3d 404 (11th Cir. 1995) ...................................................................................33, 34, 35

*Shannon v. Jacobowitz*,
394 F.3d 90 (2d Cir. 2005) ..................................................................................................33

*Snow v. City of Memphis*,
527 S.W.2d 55 (Tenn. 1975) .....................................................................................14, 15, 20

5

*Snowden v. Hughes,*
  321 U.S. 1 (1944) ...........................................................................................32

*Southern Ry. Co. v. Dunn,*
  483 S.W.2d 101 (Tenn. 1972) ........................................................................21

*Spurlock v. Metro. Gov't of Nashville,*
  No. 3:09-CV-00756, 2012 WL 3064251 (M.D. Tenn. July 27, 2012) *aff'd sub*
  *nom. Spurlock v. Fox,* 716 F.3d 383 (6th Cir. 2013) ...............................30, 31

*State v. Nashville Baseball Club,*
  154 S.W. 1151 (Tenn. 1912) ......................................................................21, 22

*Taylor v. Roswell Indep. Sch. Dist.,*
  713 F.3d 25 (10th Cir. 2013) ..........................................................................27

*Tigrett v. Cooper,*
  855 F.Supp.2d 733 (W.D. Tenn. 2012) ..........................................................30

*U.S. v. Frandsen,*
  212 F.3d 1231 (11th Cir. 2000) .......................................................................27

*U.S. v. Hays,*
  515 U.S. at 744-45, 115 S.Ct. 2431 ................................................................33

*United States v. Salerno,*
  481 U.S. 739 (1987) ........................................................................................28

*United States v. Saylor,*
  322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944) ......................................34

*Warf v. Bd. of Elections of Green Cnty., Ky.,*
  619 F.3d 553 (6th Cir. 2010) .....................................................................33, 34

*Warren v. City of Athens, Ohio,*
  411 F.3d 697, 711 (6th Cir. 2005). .................................................................30

*Wash. State Grange v. Wash. State Republican Party,*
  128 S.Ct. at 1190 ............................................................................................28

## Statutes

42 U.S.C. § 1983 ...................................................................................................33

Tenn. Code Ann. § 2-11-202(a)(4) .......................................................................23

**Other Authorities**

Fed. R. Civ. P. 36..................................................................................................13

Fed. R. Civ. P. 36(a)(3)..........................................................................................13

Fed. R. Civ. P. 36(a)(6)..........................................................................................13

Article IV, Section 1, of the Tennessee Constitution............................................24, 25

Article XI, Section of the Tennessee Constitution............................................... *passim*

## INTRODUCTION

Pursuant to this Court's order of February 17, 2016 (D.E. 104), the parties have filed Proposed Findings of Fact and Conclusions of Law and supporting exhibits. (D.E. 110 and 112.)[1] Plaintiffs' Proposed Findings of Fact and Conclusions of Law fail to establish either that this Court has subject matter jurisdiction or that Defendants have violated Plaintiffs' federal constitutional rights. Defendants submit this Reply Brief to correct certain inaccuracies and omissions in the factual background offered by Plaintiffs and to explain why Plaintiffs' legal arguments are without merit.

## I.     FACTUAL BACKGROUND

Plaintiffs' discussion of the factual background is devoted largely to detailing the "double your vote" campaign on Amendment 1 and pointing out that Defendants were aware of the campaign but decided not to take any action. (D.E. 112 PageID # 2851-2856.) Defendants do not dispute that they were aware that some supporters of Amendment 1 were encouraging people not to vote for governor in an attempt to lower the threshold for ratification, (D.E. 110 PageID # 2230), just as some opponents of Amendment 1, including some of the Plaintiffs, were encouraging people to vote for governor to raise the threshold and prevent ratification[2] However, neither the campaign nor Defendants' awareness of the campaign is relevant to Plaintiffs' federal constitutional claims because there is no evidence that the Defendants participated in that campaign.

Moreover, even if these "campaign" facts were relevant, many of them are inaccurate and unsupported by the record. For example, one of Plaintiffs' proposed factual findings is that

---

[1] Defendants also filed a Trial Brief. (D.E. 111.)

[2] As noted in Defendants' Proposed Findings of Fact and Conclusions of Law and Trial Brief, opponents of Amendment 1, including some of the Plaintiffs, engaged in a campaign to encourage people to vote for governor in an attempt to raise the threshold for ratification. (D.E. 110 PageID # 2230; D.E. 111 PageID # 2822.)

8

"Secretary Hargett cosponsored legislation that was a precursor to Amendment 1." (D.E. 112 PageID # 2857 (¶ 22(i)).) However, neither the cited testimony of Secretary Hargett's or Coordinator Goins' supports such a finding. Similarly, another proposed factual finding is that the Defendants spoke to David Fowler and Brian Harris "prior to the November 4, 2014 election regarding what would become Amendment 1 and the process to be used by Defendants in determining whether it passed." (*Id*. at ¶ 22(iv).) However, what Coordinator Goins actually testified is that Mr. Fowler inquired about the order in which the four amendments would appear on the ballot and that Mr. Harris inquired as to where he could find voting results from prior elections on the Secretary of State's website. In fact, contrary to Plaintiffs' proposed finding, Mr. Goins specifically testified that he did not recall Mr. Fowler ever asking about how the votes would be counted on Amendment 1. (*Id*.)

Additionally, in Paragraph 15 of their Proposed Findings of Fact, Plaintiffs claim that "[t]he evidence shows that Defendants were well aware of the so-called 'double your vote' campaign *well* [emphasis added] before the November 4, 2014 election" and cite to pages 287-288 and 309 of Coordinator Goins' Deposition to support their claim. However, a review of these pages shows that Coordinator Goins testified to reading a single blog at some point before the election, but could not identify when and testified that he had not previously seen another exhibit relating to the "double your vote campaign" proffered by Plaintiffs. (Goins Dep., Vol. II, 287:16-288:24; 307:22-309:4.)[3]

---

[3] The only evidence Plaintiffs present that Coordinator Goins and Secretary Hargett became aware of the "double your vote" campaign before the election are five emails (D.E. 109-3, 109-5, 109-6, 109-7 and 109-8) dated October 21, 2014 or later. Consequently, Plaintiffs' proffered evidence shows Defendants, at best, became aware of the campaign 15 days before the November 4, 2014 election. In addition, one of the documents cited by Plaintiffs (D.E. 109-4), which is a printout of the website http://www.truthon1.org, on its face shows Secretary Hargett printed it out on December 29, 2014, almost two months after Plaintiffs filed this lawsuit.

9

In Subsection (v) of Paragraph 22, Plaintiff's once again misstate Defendants' deposition testimony by claiming "that after this lawsuit was filed, Secretary Hargett's first calls were to Bobbie Patray (the President of Tennessee Eagle Forum, a 'pro-family' organization affiliated with Phyllis Schafly's Eagle Forum organization) and David Fowler – two strong, vocal advocates of Amendment 1 – to discuss the lawsuit with them," for which they  cite to pages 82:8-84:3 and 118:2-5 of Secretary Hargett's deposition.  A review of these portions of Secretary Hargett's deposition, however, shows that Secretary Hargett's first calls about the lawsuit were to the Lieutenant Governor and the Speaker of the House and that he did not call David Fowler and Bobbie Patray until days later.  (Hargett Dep., 82:8-83:14.)

When the record evidence in this case is accurately presented, it is clear that Defendants had no involvement in any campaign for or against Amendment 1 and that there is nothing in the record to support any inference or finding that Defendants' method of determining whether Amendment 1 had passed was intended to discriminate against Plaintiffs or other opponents of Amendment 1.

Plaintiffs also mischaracterize other aspects of the factual record.  For example, Plaintiffs misstate the testimony concerning the State's ability to correlate votes on Amendment 1 with those voting for governor by claiming the State simply "chose not to do so," citing to pages 230:15-21 of Coordinator Goins' deposition.  (D.E. 112, PageID # 2859.)  Once again, however, a review of that deposition testimony shows that Coordinator Goins actually testified that correlating the votes could be done but would have to be done by hand and be "a very tedious process…[with] a substantial increase in budget…[a]nd that's not an easy process."  (Goins Dep., Vol II, 230:15-21.)

Plaintiffs also claim that Defendants "conceded" a number of points based on citations to deposition testimony, but the cited testimony contradicts these claims. For instance, Plaintiffs claim Defendants "conceded that there is no state interest, compelling or otherwise, 'to require voters to vote for governor as it pertains to the passage of an amendment to the Tennessee Constitution'" for which they cite page 103:4-17 of Coordinator Goins' deposition. (D.E. 112, PageID # 2887.) In his deposition, Coordinator Goins actually testified repeatedly that "[t]hat's not my authority to make that decision" and "I don't know that it's my authority to do that." (Goins Dep., Vol. I, p. 103:9-18). Similarly, contrary to Plaintiffs' claim, Defendants do not "concede that their voting system…compels [opponents of an amendment to vote in the governor's race]…if they want to effect the threshold for ratification" (D.E. 112, PageID # 2886 at ¶ 93), only that "I would think you would want to vote in the Governor's race." (Hargett Dep., p. 124:13-14.)

Plaintiffs also submit as a proposed factual finding the "Defendants' lack of knowledge as to whether officials within the Department of State had contact with the groups disseminating the 'double your vote' campaign," which Plaintiffs then characterize as "troubling." (D.E. 112, PageID # 2858 at ¶ 23.) But it is Plaintiffs' characterization of the evidence that is troubling because it is inaccurate. Mr. Goins was asked if anyone "within the Department of State, ha[d] contact with Yeson1TN, Tennessee Right to Life or the Cathedral of the Incarnation in connection with Amendment 1." *See* D.E. 89-2 PageID # 1347 at 304:17-21. Plaintiffs only made this inquiry to Mr. Goins, who is the Coordinator of Elections for the State of Tennessee and the Director of the Division of Elections within the Secretary of State's Office. Given that the Department of State has seven division (and two internal divisions),[4] Mr. Goins' lack of knowledge about other

---

[4] Secretary Hargett testified that the Department of State has the following division: Business Services, Charitable Solicitations and Charitable Gaming, Publications, Administrative Procedures, Elections, Records Management, and the Tennessee State Library and Archives (which includes nine regional libraries). Secretary Hargett further testified

officials within the Department of State is hardly "troubling," but rather perfectly reasonable. These are but a few examples of the inaccuracies, misstatements, and mischaracterizations that can be found throughout Plaintiffs' proposed factual findings.

Plaintiffs also erroneously base a number of their proposed factual findings and legal conclusions on their Requests to Admit. Plaintiffs apparently assume that Defendants failed to respond timely to the Requests to Admit and that, consequently, the requests should be deemed admitted. But Defendants are wrong on both scores. The record plainly shows that Defendants did in fact timely respond to the Requests to Admit. Within 30 days of service, Defendants responded by making specific and valid objections to each request to admit. (D.E. 48-6). Federal Rule of Civil Procedure 36 makes clear that a matter is deemed admitted only if a party fails to serve either "a written answer or *objection* addressed to the matter" within 30 days of being served with the request. Fed. R. Civ. P. 36(a)(3) (emphasis added); *see also Cooey v. Strickland*, 269 F.R.D. 643, 647 (S.D. Ohio 2010) ("This thirty day period includes the time that a party has to raise objections to discovery requests."). Plaintiffs cite no authority for their erroneous view that responding to discovery within the thirty-day period by raising well-founded objections somehow constitutes a failure to respond that could lead to a matter being deemed admitted.

Rule 36 also makes clear that if the Court overrules an objection, the request is not deemed admitted as Plaintiffs seem to think. Rather, the Rule provides only that "[u]nless the court finds the objection justified, it *must* order that an answer be served." Fed. R. Civ. P. 36(a)(6) (emphasis added). There is no admission by default. Accordingly, there is no authority under the Federal Rules of Civil Procedure and no basis in the record for Plaintiffs to take the position that their Requests to Admit should be deemed admitted.

---

that the Department has two internal divisions, Information Systems and Fiscal. *See* Excerpts from Deposition of Secretary Hargett (6:13 – 18:12) attached hereto as Exhibit 1 and incorporated herein by this reference.

## II. LEGAL BACKGROUND

### A.  Defendants' Interpretation of Article XI, Section 3, Is Correct.

Defendants have already explained at length that the plain language and legislative history of article XI, section 3, as well as its longstanding interpretation by the State's legislative and executive branches, leave no doubt that Defendants' interpretation of that provision is correct and that Plaintiffs' contrary interpretation is untenable.  (D.E. 110, PageID # 2217-25, 2235-39; D.E. 111, PageID # 2803-17.)  Plaintiffs, by contrast, fail to offer any persuasive reason to adopt their interpretation of article XI, section 3.

#### 1.  Plaintiffs' reliance on *Snow v. City of Memphis* is misplaced.

Significantly, Plaintiffs finally acknowledge that the Tennessee Supreme Court's discussion of the ratification requirement in the first paragraph of article XI, section 3, in *Snow v. City of Memphis*, 527 S.W.2d 55 (Tenn. 1975), is merely dictum and not an authoritative interpretation of that provision.  (D.E. 112 PageID # 2862, ¶¶ 34-35).  But they persist in their erroneous assertion that this non-binding dictum somehow supports their interpretation.  *Id*. at ¶ 35.

In the paragraph of *Snow* on which Plaintiffs rely, the Tennessee Supreme Court notes that, between 1870 and 1953, eleven amendments proposed through the legislative method had failed "because of the obstacle of obtaining voter ratification by a majority of all those voting for representatives."  527 S.W.2d at 61.  The amendments failed to reach the required threshold because "only a small percentage of the voters who voted for representatives cast their ballots either for or against constitutional amendments"—*i.e.*, support for those amendments was not sufficiently broad.  *Id*.  The Supreme Court's discussion provides no support for the notion that only voters who voted for representatives were allowed to vote on the amendments or that, in

13

counting the votes, the State somehow correlated the votes to ensure that only votes cast by voters who also voted for representatives were counted. Rather, it simply recognizes that, by requiring an amendment to receive not only more "yes" votes than "no" votes, but also a majority of the total votes cast for representatives, the ratification requirement of the legislative method had made it difficult for an amendment to pass—exactly as it was intended to do.

Moreover, this paragraph in *Snow* directly contradicts Plaintiffs' assertion that the election on Amendment 1 was the first time in which the application of article XI, section 3, had "any bearing on the ultimate outcome" of the election. (D.E. 112 PageID # 2872 at ¶ 51.) To the contrary, it was precisely because the State has consistently applied article XI, section 3, to require that an amendment receive not only more "yes" votes than "no" votes, but also a majority of the total votes cast for representatives or governor, that so many proposed amendments had failed to pass. What was unique about the election on Amendment 1 (and Amendment 2, for that matter) is that voter turnout for the elections on those amendments was so great that the threshold for approval of the amendment was higher than for ratification.

### 2. Defendants have consistently interpreted article XI, section 3, as a two-step process requiring both "approval" and "ratification".

Plaintiffs assert that Defendants "interjected their so-called 'two-step' reading" of article XI, section 3, "during the course of this litigation." (*Id.* at ¶¶ 37, 39). But a review of both the pleadings and the record evidence in this case flatly contradict this assertion. As early as the filing of their motion to dismiss the amended complaint, Defendants cited to a document that was published on the Secretary of State's website in 2002 and clearly explains that, in order to pass, a proposed amendment must be both approved, by receiving more "yes" votes than "no" votes, and ratified, by receiving a majority of the total votes cast for governor. (D.E. 53 PageID # 695 n.9 and 699.) Specifically, that document stated as follows:

14

**Counting the votes**

In order for the amendment to pass and become part of the Constitution, two things must happen:

> (1) The amendment must get more "yes" votes than "no" votes; and
>
> (2) The number of "yes" votes must get a majority of the votes cast in the gubernatorial election.

To determine the votes needed, all votes for all candidates for governor are added together. This number is divided by two or halved. The number of "yes" votes must exceed that number. If the number of "yes" votes exceeds the number, the Constitutional amendment passes and becomes part of the Constitution.

**Voting**

Despite the fact that the number of votes cast for governor is used to determine the outcome, it is not necessary to vote in the governor's race in order to vote on the Constitutional amendment. Likewise, it is not necessary to vote for an amendment in order to vote in the governor's race.

Thompson Decl., D.E. 110-11 PageID # 2769.[5]

Defendants also clearly articulated these two separate requirements in their answer to the amended complaint, where they explained no less than *eight* times that their interpretation of article XI, section 3, requires an amendment to be both approved, by receiving more "yes" votes than "no" votes, and ratified, by receiving a majority of the total votes cast for governor. (D.E. 64 PageID # 787-806 at ¶¶ 5, 6, 7, 42, 43, 63, 64 and 65.) Defendants also specifically responded to

---

[5] Plaintiffs attempt to discount Mr. Thompson's testimony by asserting that Defendants "were unable to testify whether anyone actually considered the wording of Paragraph 1 of Article XI, Section 3 in deciding how to tabulate and count the vote in the 2002 election." D.E. 112 PageID # 2871-82 at ¶ 49. But this does not change the fact that Mr. Thompson, who was the Coordinator of Elections at the time, in fact applied this interpretation in determining whether a proposed amendment had passed or the fact that Mr. Thompson's affidavit makes clear that he had looked to the language of article XI, section 3 in doing so. *See* D.E. 110-11 PageID # 2757. Plaintiffs offer no evidence to dispute Mr. Thompson's testimony. Indeed, Plaintiffs fail to offer any evidence that article XI, section 3, has even been interpreted or applied by any state officials in the manner that Plaintiffs propose.

15

Plaintiffs' misstatement that under the Defendants' interpretation, a vote against an amendment is meaningless:

> Defendants deny the allegations in paragraph no. 64. Article XI, Section of the Tennessee Constitution requires both approval and ratification of a constitutional amendment. To be approved, an amendment must receive a majority of the total votes cast on the amendment. To be ratified, an amendment must receive a majority of the total votes cast in the gubernatorial election. Defendants deny that, under their tabulation method, someone who opposes an amendment can only meaningfully register his or her opposition by voting for governor and not voting on the amendment. Defendants further deny that a vote against an amendment is meaningless, because, under Defendants' tabulation method, an amendment must first be approved by a majority of the votes cast on the amendment. If a majority of vote cast on an amendment are *against* the amendment, the amendment is not approved and there is no need to determine if the amendment has also been ratified.

*Id*. at ¶ 64 (emphasis in original).

Plaintiffs also repeatedly manipulate, omit, and cherry pick from Coordinator Goins' deposition testimony about his interpretation of article XI, section 3. For example, in Paragraph 38, Plaintiffs spend over three pages quoting Coordinator Goins' testimony regarding his interpretation, while omitting several parts of his testimony (Goins Dep., Vol. I, p. 203:19-24; 204:22-205:10) that would undermine their contention that "Defendants struggle to conform their two-step process with the actual language of Article XI, section 3." (D.E. 112, PageID # 2864). Similarly, in Paragraph 39, Plaintiffs present what looks like continuous testimony from Coordinator Goins regarding his interpretation of article XI, section 3, when in actuality Plaintiffs have omitted almost 46 pages of testimony. (D.E. 112, PageID # 2868 (omitting by way of second

ellipsis pages 269:23-315:13 of Coordinator Goins' testimony).)[6] Significantly, Plaintiffs exclude the following testimony by Coordinator Goins:

> A. I don't agree with the statement, 'You can double your vote.'
>
> Q. And why is that?
>
> A. Because I don't think you are doubling your vote. I think the vote is whether it's approved, yes or no. That's the true vote. That's where everyone comes and votes. The more yeses, if it has more yeses, it's going to pass and if it has more noes, it's not.
>
> Q. Well, what about the second step?
>
> A. Well, the second step is a threshold. It's a number you have to obtain.
>
> Q. And if I don't vote for governor, that threshold is less?
>
> A. Yes, And if I vote for governor and I don't vote for the constitutional amendment, it can be more.

(315:2-18).

Thus, contrary to Plaintiffs' assertions, Defendants have consistently interpreted article XI, section 3, to require a proposed an amendment to be both approved, by receiving more "yes" votes than "no" votes, and ratified, by receiving "yes" votes constituting a majority of the total votes cast for governor.

### 3. Defendants' interpretation is consistent with the practice of previous state officials.

Plaintiffs have presented *no* evidence in support of their interpretation of Article XI, section 3 other than their repeated, ipse dixit, assertions about the "plain language" of the provision. Defendants, on the other hand, have provided the Court with overwhelming evidence that the

---

[6] Plaintiffs also omit Coordinator Goins' clarification that the Constitution does not have a "major" or "minor" test, only that whether the amendment passed by a majority vote "would be the very first test you would look at." (Goins Dep., Vol. II, p. 327:15-22.)

legislative and executive branches of the State have long interpreted and applied article XI, section 3, in exactly the same manner as Defendants. In particular, Defendants have provided the returns from elections on proposed constitutional amendments as far back as 1853—all of which reported (1) the total votes in favor of an amendment, (2) the total votes against an amendment, and (3) the total votes for representatives. *See* D.E. 110-9 PageID # 2402-03 (1853 election returns), 2420-2434 (1904 November election returns), 2447-2454 (1940 November election returns), 2466-2468 (1950 November election returns).[7] If, as Plaintiffs contend, article XI, section 3, requires a proposed constitutional amendment to "receive a majority of the votes cast in its favor from those voters who voted for Governor," (D.E. 112 PageID # at ¶ 33), there would have been no need for election officials to have recorded any of the votes against a proposed constitutional amendment— since under Plaintiffs' interpretation, only the votes in favor of an amendment are counted if the voter also voted for governor (or representative prior to 1953). Yet, the undisputed evidence reflects that election officials repeatedly counted both the votes for and against a proposed amendment to determine if the amendment had been approved by the people before determining if it had been ratified.

Perhaps the clearest example demonstrating this two-step process can be found in the 1887 election on a prohibition constitutional amendment. The General Assembly passed a resolution (Public Ch. 86) setting the election on the prohibition amendment on the last Thursday in September 1887. This election was a stand-alone election, meaning that there were no other

---

[7] Plaintiffs continue to complain that these documents were not provided to them in response to their discovery requests and mischaracterize the State's objections to these requests as being one of relevance. However, the basis of the Defendants' objections—as has been repeatedly stated throughout these proceedings—is that these documents are all public records equally accessible to both parties. Indeed, as reflected in the Declaration of Andrew Dodd (D.E. 110-8), these records could be accessed through minimal research efforts.

18

elections on the ballot, including elections for representatives. Section 3 of that Public Act specifically directed that

> it shall be the duty of every officer holding the election on the day aforesaid to have tickets prepared sufficient in number for each voter in his respective district, which shall be written or printed in the following forms, to-wit: Those for the amendment shall have on them "For the proposed Amendment;" those against the amendment shall have on them "Against the proposed amendment."

(D.E. 110-9 PageID # 2417.) Section 4 further mandated that it "shall be the duty of the officer or officers, clerks and judges holding the election in the different districts and voting precincts in each county, to make due return thereof of the number of votes cast for and against the amendment to the Sheriff . . . ." (*Id*.). The official results of that election reflect that the amendment received 117,504 votes in favor of the amendment and 145,197 votes *against* the amendment. (D.E. 110-9 PageID # 2420). This amendment was not "approved" by the people and consequently, there was no need to determine if it had been "ratified." However, under Plaintiffs' interpretation of Article XI, Section, simply the fact that the amendment received more votes against it than in favor of it would not suffice to determine whether the amendment had passed. Instead, under Plaintiffs' interpretation, it would have been necessary to determine if the individuals who had voted on the amendment had also voted for a representative in either the 1886 elections (or wait until the 1888 elections) to determine first if their vote should be counted and then to determine if the majority of votes in favor of the amendment were from voters who voted for representatives.[8]

---

[8] To the extent Plaintiffs argue that the records concerning this proposed constitutional amendment and other proposed amendments prior to 1953 are not relevant because they pertain to proposed constitutional amendments that failed to pass under a prior version of Article XI, Section 3, this argument is without merit. As Plaintiffs have repeatedly pointed out to the Court, the Tennessee Supreme Court in *Snow v. City of Memphis*, 527 S.W.2d 55 (Tenn. 1975), specifically noted that the relevant language of Article XI, Section 3 is *identical* to the present language, except that "voting for governor" read as 'voting for Representatives" in the 1870 version of that constitutional provision. *See* D.E. 112 PageID # 2862 n.4. As such, the manner in which article XI, section 3 was interpreted and applied with respect to proposed constitutional amendments prior to 1953 is clearly relevant to the issue of the proper interpretation of that provision.

**4.** **Well-settled rules of constitutional interpretation require this Court to defer to an interpretation that has long been followed by the legislative and executive branches of the State.**

Plaintiffs assert that historical evidence as to prior interpretations of article XI, section 3, by the legislative and executive branches of the State is irrelevant because Defendants have misconstrued *Nashville, Chattanooga & St. Louis Railway v. Browning*, 310 U.S. 362 (1940). Plaintiffs further assert that Defendants' interpretation is not entitled to any deference akin to *Chevron* deference because the State Election Commission never interpreted article XI, section 3, and Secretary Hargett did not consult with "anyone in the Legislative Branch to get their interpretation, their input, their advice, [or] their construction" of that provision. (D.E. 112 PageID # 2870-71 at ¶¶ 42-47). Those arguments miss the mark.

First, Defendants do not rely solely on *Browning*, but rather on a long line of Tennessee Supreme Court cases holding that "[a] construction of a statute or the Constitution, not emanating from judicial decision, but adopted by the legislative or executive departments of the state, and long accepted by the various agencies of government and the people, will usually be accepted as correct by the courts." *State v. Nashville Baseball Club*, 154 S.W. 1151, 1156 (Tenn. 1912); *see also Gallagher v. Butler*, 378 S.W.2d 161, 168 (Tenn. 1964) ("Familiar rule of statutory construction, where a statute is of doubtful meaning and subject to construction, that administrative interpretations, especially where they are unchallenged over a long period of time, are accorded persuasive weight by the court . . . ."). In at least two cases, the Tennessee Supreme Court has applied this well-established principle when interpreting article XI, section 3—the very constitutional provision at issue here. *See Southern Ry. Co. v. Dunn*, 483 S.W.2d 101, 103 (Tenn. 1972); *Derryberry v. State Bd. of Election Comm'rs*, 266 S.W. 102, 105 (Tenn. 1924). As discussed at length in Defendants' Trial Brief, *see* D.E. 111 PageID # 2812-2819, the General

20

Assembly and the Secretary of State have consistently interpreted and applied the ratification requirement of article XI, section 3, to require only a comparison of the total votes cast in favor of an amendment with the total votes cast for representatives or (after 1953) for governor—not a voter-by-voter correlation of votes cast for representatives or governor with votes cast on the amendment. [9] This interpretation, "long accepted by the various agencies of government and the people," should be accepted as correct. *Nashville Baseball Club*, 154 S.W. at 1154.[10]

Second, Defendants have never argued that their interpretation is entitled to any kind of formal deference akin to *Chevron* deference. As explained above, Defendants' argument is simply that the longstanding practice of state officials is highly relevant—if not dispositive—in determining the meaning of a provision of the Tennessee Constitution given the Tennessee Supreme Court's repeated pronouncements to that effect. In any event, Plaintiffs' response to their

---

[9] It also bears mentioning that the General Assembly has repeatedly enacted legislation based on authority granted by constitutional amendments that were proposed through the legislative method and passed as required by article XI, section 3, without questioning the executive branch's interpretation or application of article XI, section 3. For example, one of the amendments on the ballot in November 1998 was an amendment concerning the rights of victims. The amendment authorized the General Assembly "to enact substantive and procedural laws to define, implement, preserve and protect the rights guaranteed to victims by this section." Defendants' interpretation of article XI, section 3, was used to tabulate the votes on that amendment and it was certified as having passed by the then-Governor, Secretary of State and Attorney General. Thereafter, the General Assembly enacted legislation to implement these rights guaranteed to victims. *See* 2000 Public Acts Ch. 790. Similarly, Defendants' interpretation of article XI, section 3, was used to tabulate the votes on the lottery amendment in 2002, and after the lottery amendment was certified as having passed in 2002, the General Assembly enacted legislation to implement the Tennessee Education Lottery. *See* 2003 Public Acts. Ch. 297. Had the General Assembly had any concerns over the interpretation and application of article XI, section 3, to these amendments, presumably they would have sought a determination as to the correct interpretation before enacting this implementing legislation.

[10] In their proposed legal conclusions, Plaintiffs appear to be asserting that, by relying on this long-accepted interpretation of article XI, section 3, Defendants are attempting to "rewrite" that constitutional provision, citing to *Mayhew v. Wilder*, 46 S.W.3d 760, 784 (Tenn. Ct. App. 2001), as "proscribing 'amend[ing] or alter[ing] the Constitution under the guise of construction." (D.E. 112 PageID # 2870 at ¶ 44). Plaintiffs' reliance on *Mayhew* is misplaced. The cited language from *Mayhew* was directed not toward government officials charged with administering a provision of the Constitution, but rather to the court: "When discharging their responsibility to construe the Constitution, the courts may not amend or alter the Constitution under the guise of construction." The court goes on to note that in construing constitutional text, courts must give its "ordinary and inherent meaning" and must construe it "in light of the practices and usages that were well know when the provision at issue was adopted." 46 S.W.3d at 784 (internal citations omitted). Defendants' interpretation of article XI, section 3 is entirely consistent with these statements.

21

strawman argument reflects a fundamental misunderstanding about which state officials have the duty and authority to construe article XI, section 3. Whether the State Election Commission has opined on the meaning of article XI, section 3, is beside the point, because no statute grants the State Election Commission authority to interpret the election laws. Rather, the General Assembly has charged the Coordinator of Elections with the duty to "[a]uthoritatively interpret the election laws for all persons administering them." Tenn. Code Ann. § 2-11-202(a)(4).

5. **The proceedings of the 1953 Constitutional Convention support Defendants' interpretation of article XI, section 3.**

Plaintiffs also assert that the proceedings of the 1953 Constitutional Convention "cut against" Defendants' interpretation of that provision. (D.E. 112 PageID # 2873 at ¶ 54).[11] But, as discussed in Defendants' Trial Brief, statements made by both supporters and opponents of the majority proposal reflect a common understanding about how the ratification requirement operated in practice—an understanding that is consistent with Defendants' interpretation of article XI, section 3. *See* D.E. 110-9 PageID # 2546-47, 2560, 2604, 2623. For example, in responding to a question about whether previous amendments had come close to passing, Delegate Gilreath simply reported the total number of votes for and against each amendment and the total number of votes for representatives, without in any way suggesting that only voters who voted for representatives could vote on the amendments. *Id.* at 2546-47. And, as previously noted, Delegate Sims, who was an opponent of the majority proposal, stated that, when he had favored an amendment, he "advised [his] friends not to vote in uncontested legislative races because it would give the

---

[11] This argument demonstrates another of the inaccuracies found throughout Plaintiffs' Proposed Findings of Fact and Conclusions of Law. Plaintiffs assert that "Defendants have received various passages from the Journal of Proceedings but have not presented the Court [with] all of the relevant pages." (D.E. 112 PageID # 2874 n.8.) On the contrary, Defendants have attached every page from the Journal and Proceedings of the Limited Constitutional Convention of 1953 that even mentions article XI, section 3. *See* D.E. 110-9 PageID # 2472-2661. Conversely, Plaintiffs are the ones who have chosen to only selectively include pages from the Journal and Proceedings—and only as exhibits to the Deposition of Coordinator Goins. (D.E. 112 PageID # 2874 n.8.)

22

amendment a better chance." *Id.* at 2623. This advice would have made little sense if a voter could not vote on an amendment without first voting for representatives.[12]

More importantly, had the members of the 1953 Limited Constitutional Convention intended to make voting in the gubernatorial election a condition precedent to voting for a constitutional amendment, there would certainly have been at least some mention of that intent reflected in the record of the proceedings. This is particularly true since these same members were also considering an amendment to article IV, section 1 of the Tennessee Constitution, which governs the qualifications to vote in all local, state and federal elections. Indeed, during that same constitutional convention, the members adopted a resolution that, among other things eliminated the poll tax as a qualification to vote and added the following language to article IV, section 1: "and there shall be no other qualification attached to the right of suffrage." This resolution was subsequently approved by the people in the same referendum election that approved the change to article XI, section 3. The absence of any discussion that voting in the gubernatorial election was an additional qualification in order to vote in a constitutional referendum election only further demonstrates that the individuals who drafted or ultimately ratified the resolutions to amend article XI, section 3, and article IV, section 1, never intended to make voting for representatives or governor a precondition for voting on an amendment. Plaintiffs do not and cannot point to any statement in the convention proceedings or any other historical evidence that article XI, section 3, has ever been interpreted in that absurd manner.

---

[12] In paragraph 75 of their proposed legal conclusions, Plaintiffs mischaracterize the statements of Delegate Sims. *See* D.E. 112 PageID # 2879. Delegate Sims did not describe the prior version of article XI, section 3, as "un-American." Rather, he described adoption of the substitute minority report as "American," stating: "Let us clear up this confusion by substituting two-thirds for a majority of those voting for members of the House of Representatives. Such a step would be American, and would still leave us one of the most conservative amending clauses." (D.E. 110-9 PageID # 2623).

23

**6. Plaintiffs fail to acknowledge or otherwise address the constitutional infirmities of their own interpretation.**

Plaintiffs spend over half of their proposed legal conclusions attempting to discredit the Defendants' interpretation of article XI, section 3. Yet, although Plaintiffs have previously acknowledged that *their* proposed interpretation of article XI, section 3, would raise First Amendment concerns, they make no attempt to even address the serious constitutional infirmities with their own interpretation of article XI, section 3.[13] As discussed in Defendants' Trial Brief, Plaintiffs' interpretation would squarely conflict with article IV, section 1, of the Tennessee Constitution, which provides as follows:

> Every person, being eighteen years of age, being a citizen of the United States, being a resident of the State for a period of time as prescribed by the General Assembly, and being duly registered in the county of residence for a period of time prior to the day of any election as prescribed by the General Assembly, shall be entitled to vote in all federal, state, and local elections held in the county or district in which such persons resides. All such requirements shall be equal and uniform across the state, and there shall be no other qualification attached to the right of suffrage.

Tenn. Const. art. IV, § 1. The Tennessee Supreme Court has held that these enumerated qualifications—one must be at least eighteen years of age, a United States citizen, a Tennessee resident for a period of time as prescribed by the General Assembly, and registered to vote in the county of residence for a period of time prescribed by the General Assembly—"constitute the *exclusive criteria* for the right to vote." *See City of Memphis v. Hargett*, 414 S.W.3d 88, 108 (Tenn. 2013) (emphasis added).[14] Plaintiffs' interpretation of article XI, section 3, would

---

[13] During the course of the pre-trial conference before this Court on February 16, 2016, counsel for the Plaintiffs acknowledged that their interpretation of article XI, section 3, was constitutionally suspect because it compelled a voter to vote for governor in order to vote on a constitutional amendment in violation of the voter's First Amendment rights. *See* D.E. 108 PageID# 2125.

[14] In light of the Tennessee Supreme Court's determination that these constitute the exclusive criteria for the right to vote, the language in article IV, section 1 that "[a]ll such requirements shall be equal and uniform across the state," clearly applies to these criteria.

undoubtedly impose an additional qualification on the right to vote for constitutional amendments by compelling a voter to vote for governor before voting on an amendment.

Plaintiffs' interpretation would also violate the voting rights of Tennesseans under the U.S. Constitution. Courts have repeatedly invalidated state laws imposing conditions precedent on voting because they impose a severe burden on voters' First and Fourteenth Amendment rights without furthering any compelling state interest. *See, e.g.*, *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 727 (1st Cir. 1994) (holding that a state may not "condition the right to vote in one election on whether that right was exercised in a preceding election"); *Partnoy v. Shelley*, 277 F. Supp. 2d 1065, 1071 (S.D. Cal. 2003) (in case arising from the recall election of California Governor Gray Davis, invalidating California law providing that "[n]o vote cast in the recall election shall be counted for any candidate unless the voter also voted for or against the recall of the officer sought to be recalled"); *In re Hickenlooper*, 312 P.3d 153, 155 (Colo. 2013) (invalidating provision of Colorado Constitution similar to statute at issue in *Partnoy*). Plaintiffs do not counter to this compelling precedent at all. Not only that, they misread the very same cases as supportive of their argument that *Defendants'* interpretation of article XI, section 3, which at most creates an incentive for opponents of an amendment to vote for governor but in no way *requires* a voter to vote for governor, would violate the U.S. Constitution. If Plaintiffs believe that an interpretation that merely creates an incentive to vote in a particular manner is constitutionally problematic, then they have essentially conceded that their interpretation—which would *require* voters to vote on for governor in order to vote on a proposed amendment—would be unconstitutional.

Plaintiffs offer no logical or persuasive reason to adopt their interpretation, nor have the offered any credible counter to Defendants' interpretation. They have not pointed to any historical evidence that supports their interpretation, and their textual arguments fall flat, especially given

that their interpretation would plainly violate both the Tennessee and U.S. Constitutions.  There is every reason to construe article XI, section 3, as Tennessee has long done, and there is no reason to adopt Plaintiffs' tortured interpretation of that provision.

III.    PLAINTIFFS HAVE FAILED TO ESTABLISH A VIOLATION OF THEIR FEDERAL CONSTITUTIONAL RIGHTS.

**A.  Standard of Review For Plaintiffs' Facial Challenge to Article XI, Section 3.**

Despite previously representing to the Court that their lawsuit is limited to Defendants' interpretation and application of article XI, section 3, in the election on Amendment 1,  (D.E. 108 PageID # 2144-45 at 22:2-7, 23:1), Plaintiffs now claim that they are also challenging article XI, section 3, on its face, (D.E. 112 PageID # 2859, 2887 at ¶¶ 29, 98.)    A facial challenge, as distinguished from an as-applied challenge, seeks to invalidate a statute or regulation itself.  *U.S. v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000).

Plaintiffs' facial challenge has several important consequences.  First, it provides all the more reason for this Court to abstain under *Pullman* until the Tennessee courts have had an opportunity to authoritatively construe article XI, section 3.  That is because this Court cannot possibly rule on the facial validity of article XI, section 3, without first determining what the text of that provision means.  *See, e.g.*, *CMR D.N. Corp. v. City of Phila.*, 703 F.3d 612, 624 (3d Cir. 2013) ("[I]n a facial challenge, the claimed constitutional violation inheres in the *terms of the statute*, not its application[.]" (emphasis added)); *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 39 (10th Cir. 2013) (similar); *Ezell v. City of Chi.*, 651 F.3d 684, 697 (7th Cir. 2011) (similar).  Second, it makes Plaintiffs' requested relief—a judgment voiding the election only on Amendment 1 and not any of the other amendments—wholly inappropriate.  If Plaintiffs intend to challenge article XI, section 3, on its face—that is, in *all of its applications*—then they may not cherry pick only certain amendments for this Court to void.

26

"[A] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully," *United States v. Salerno*, 481 U.S. 739, 745 (1987), and the Supreme Court and the Sixth Circuit Court of Appeals have both recognized that a claimant who makes a facial attack on a law is requesting "strong medicine" that should be granted "sparingly and only as a last resort." *Fieger v. Michigan Supreme Court*, 553 F.3d 955, 960-61 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 1048 (U.S. 2010) (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). Thus, before a federal court will invalidate a state law on its face, the claimant must show one of two things: (1) that there truly are "no" or at least few "circumstances" in "which the Act would be valid"; or (2) that a court cannot sever the unconstitutional textual provisions of the law or enjoin its unconstitutional applications. *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 335 (6th Cir. 2009), *cert. denied*, 130 S.Ct. 362 (U.S. 2009) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987) and *Wash. State Grange v. Wash. State Republican Party*, 128 S.Ct. at 1190)); *see also Crawford v. Marion County Election Board*, 553 U.S. 181, 200 (2008). "To do otherwise would amount to a judicial trespass – a court's striking of a law in all of its applications even though the legislature has the prerogative and presumed objective to regulate some of them." *Id.*

Additionally, in making any judgment about the constitutionality of state laws, federal courts are to presume that the state acted constitutionally in making the laws. *See McDonald v. Board of Election Commissions*, 394 U.S. 802, 809 (1969); *Harford Fire Ins. Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy*, 740 F.2d 1362, 1366 (6th Cir. 1984); *City of Ann Arbor, Mich. v. Northwest Park Construction Corp.*, 280 F.2d 212, 223 (6th Cir. 1980). Furthermore, courts must avoid construction of laws that would render a law unconstitutional. *See, e.g., Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 628-29 (1993).

27

**B. Plaintiffs Cannot Demonstrate a Dilution of Their Votes in Violation of The Equal Protection Clause.**

Plaintiffs' principal challenge is that Defendants' interpretation and application of article XI, section 3, impermissibly diluted the votes of Plaintiffs and other voters like them who both voted for governor and voted "no" on Amendment 1 by giving greater power to voters who abstained from voting for governor and voted "yes" on the amendment. This argument ignores, however, the actual results of the November 2014 election, and those results clearly demonstrate that Plaintiffs' votes were not diluted. Because the number of votes on Amendment 1 exceeded the number of votes cast for governor, the decisive calculation in determining whether the amendment had passed was whether it had been approved—that is, whether it received more "yes" votes than "no" votes. In that calculation, each vote on the amendment had exactly the same weight and exactly the same ability to affect the outcome of the election. Consequently, Plaintiffs simply have no claim of vote dilution resulting from Defendants' interpretation and application of article XI, section 3 to Amendment 1.

Furthermore, even if the number of votes on Amendment 1 had not exceeded the votes cast for governor, Plaintiffs still would not be able to establish a viable claim of vote dilution. Plaintiffs seem to think that if any vote dilution at all occurred, then their claim would automatically be subject to strict scrutiny. But that is not the case. Plaintiffs rely on *Hadley v. Junior Coll. Dist. Of Metro Kansas City, Mo*., 397 U.S. 50 (1970), and *Avery v. Midland Cnty*., 390 U.S. 474 (1968) to establish their vote dilution claim under the "one person, one vote" principle first articulated in *Reynolds v. Sims*, 377 U.S. 533, 558 (1964). However, these cases make clear that the "one person, one vote" principle only applies to the popular elections of officials to perform governmental functions. *See Hadley*, 397 U.S. at 56; *Avery*, 390 U.S. at 485; *see also Alabama Legislative Black Caucus v. Alabama,* 988 F.Supp.2d 1285, 1311 (M.D. Ala.

28

2013) (noting that the Supreme Court made clear in *Hadley* that the requirement of one person, one vote applies only when "a state or local government decides to select persons by popular election to perform governmental functions") (citation omitted)). It does not apply to other kinds of elections, such as referendum elections. *See Tigrett v. Cooper*, 855 F.Supp.2d 733, 755-57 (W.D. Tenn. 2012) (concluding that that vote dilution challenges arising from referendum elections are subject only to rational basis review, unless they involve discrimination against a suspect class).

Because Plaintiffs' vote dilution claim involves a referendum election, it is subject only to a rational basis standard of review. To survive rational basis scrutiny, article XI, section 3, and Defendants' interpretation thereof, need only be "rationally related to legitimate government interests," *Doe v. Mich. Dep't of State Police,* 490 F.3d 491, 501 (6th Cir.2007) (internal quotation marks and citation omitted), and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). To show that a government action lacks rational basis, the challenging party must negate any conceivable basis to support the action or demonstrate the motive was animus or ill will. *Spurlock v. Metro. Gov't of Nashville,* No. 3:09-CV-00756, 2012 WL 3064251, at *43 (M.D. Tenn. July 27, 2012) *aff'd sub nom. Spurlock v. Fox*, 716 F.3d 383 (6th Cir. 2013) (citing *Warren v. City of Athens, Ohio,* 411 F.3d 697, 711 (6th Cir.2005)). Thus, the Court's analysis must seek "'any reasonably conceivable state of facts' "and resort to "'every reasonable construction' "to uphold the government action. *Johnson v. Bredesen,* 624 F.3d 742, 746–47 (6th Cir.2010) (quoting *Fed. Commc'ns Comm'n v. Beach Commc'ns, Inc.* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), and *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485

U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988)). This "highly deferential" standard of review results a declaration of unconstitutionality "only in rare or exceptional circumstances." *Spurlock*, at *43 (quoting *Mich. Dep't of State Police,* 490 F.3d at 501).

Plaintiffs have not proven, and cannot, prove that Defendants' interpretation of article XI, section 3, is not rationally related to the State's legitimate interest in protecting its constitutional amendment process from undue influence by small interest groups. Indeed, Plaintiffs acknowledge that the "reports and statements in the Journal and Proceedings [of the 1953 Constitutional Convention] . . . reflect an intent that the 'Constitution should be difficult to amend; it is the Constitution of the majority and it is the Constitution of the minority also.'" (D.E. 112 PageID # 2873 at ¶ 56). The requirement that a proposed amendment receive not only more "yes" votes than "no" votes, but also "yes" votes equal to more than half of the total votes cast for governor, is undoubtedly rationally related to that legitimate purpose.

Plaintiffs also cannot demonstrate that Defendants' interpretation and application of article XI, section 3 to Amendment 1 (or any of the other amendments in the November 2014) was motived by ill will or the intent to discriminate against any identifiable group. The Equal Protection Clause has long been limited to instances of purposeful or invidious discrimination. Thus, the gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action. *See Briscoe v. Kusper*, 435 F.2d 1046, 1052 (7th Cir. 1970). Plaintiffs have failed to establish any such classification or otherwise identifiable group.[15] The law is also clear that to sustain a claim under the Equal Protection Clause, it is incumbent on the Plaintiffs to demonstrate that Defendants intended to treat

---

[15] Contrary to Plaintiffs' assertions, "people voting for governor" simply does not constitute an identifiable class or group for purposes of the Equal Protection Clause. If it did, then any election practice that diluted the votes of some group of voters—for example, in the case of a supermajority requirement, voters who are in favor of the proposal at issue—would discriminate against an "identifiable class."

them unequally in interpreting and applying Article XI, Section 3. *See Snowden v. Hughes*, 321 U.S. 1, 8 (1944). However, Plaintiffs have cited to no such evidence and, indeed, the Plaintiffs all testified that they had no knowledge or evidence of such discriminatory intent. *See* D.E. 110-1 PageID# 2254, 2262; D.E. 110-2 PageID # 2274, 2283-84; D.E. 110-3 PageID # 2303, 2311-2315; D.E. 110-4 PageID # 2324.

At bottom, what Plaintiffs are arguing is that their interpretation of article XI, section 3, is the preferable method for achieving the legitimate state purpose of making the Constitution difficult to amend. (D.E. 112 PageID # 2874 at ¶ 56.) However, the Supreme Court has instructed that, under rational basis review, a court must "disregard the existence of alternative methods of furthering the objective that we, as individuals, perhaps would have preferred." *Heller v. Doe by Doe*, 509 U.S. 312, 330 (1993). (internal quotation marks omitted)); *see also Henry v. Connolly*, 910 F.3d 1000, 1004 (1st Cir. 1990) ("It is not for a federal court to say that a constitutionally adequate procedural arrangement, duly adopted by the Commonwealth, is worse or less fair, than some alternative formulation."). It is not enough for Plaintiffs to show that their interpretation of article XI, section 3, would achieve the same purpose as Defendants' interpretation. And because Plaintiffs have failed to show that Defendants' interpretation is not a rational means to achieve that purpose, they have failed to prove any violation of the Equal Protection Clause.

## C. Plaintiffs Have Failed to Prove Any Violation of The Due Process Clause.

Plaintiffs have asserted that Defendants' interpretation of article XI, section 3, rendered the election on Amendment 1 fundamentally unfair in violation of their substantive due process rights and, therefore, that election should be declared void. Multiple courts, including the Sixth Circuit, have determined that election law, as it pertains to state and local election, is for the most part a preserve within the exclusive competence of the state courts and that "'[o]nly in extraordinary

circumstances will a challenge to a state [or local] election rise to the level of a constitutional deprivation.'" *Warf v. Bd. of Elections of Green Cnty., Ky.*, 619 F.3d 553, 559 (6th Cir. 2010); *Nolles v. State Committee for Reorganization of School Districts,* 524 F.3d 892, 898 (8th Cir.2008); *Shannon v. Jacobowitz*, 394 F.3d 90, 94 (2d Cir. 2005); *Bonas v. Town of N. Smithfield,* 265 F.3d 69, 74 (1st Cir.2001). To receive federal relief under 42 U.S.C. § 1983, a plaintiff must prove that the state's action was so willfully malicious as to interfere with the fairness of the election, not merely a "garden variety election dispute." *See Bennet v. Yoshina,* 140 F.3d 1218, 1226 (9th Cir.1998) (drawing a distinction between "garden variety" election irregularities and a pervasive error that undermines the integrity of the vote). Thus, federal courts should reserve § 1983 relief to cases where "the election process itself reaches the point of patent unfairness," that is, "where broad-gauged unfairness permeates an election, even if derived from apparently neutral action." *Griffin v. Burns,* 570 F.2d 1065, 1077 (1st Cir.1978).

In *Warf*, the Sixth Circuit identified those "exceptional case[s] where a state's voting system is fundamentally unfair":

> Such an exceptional case may arise, for example, if a state employs "non-uniform rules, standards and procedures," that result in significant disenfranchisement and vote dilution, *Brunner*, 548 F.3d at 478, or significantly departs from previous state election practice, *see Roe v. Alabama*, 43 F.3d 574, 580-81 (11th Cir. 1995) (intervening where failure to exclude contested absentee ballots constitutes a post-election departure from previous state practice); *Griffin,* 570 F.2d at 1079 (intervening where state court disrupted seven-year practice of voting by absentee and shut-in ballot).

619 F.3d at 559. Other examples of the exceptional case allowing voters to challenge a state election procedure in federal court are when the complained of conduct discriminates against a *discrete* group of voters, *see, e.g., Hays,* 515 U.S. at 744–45, 115 S.Ct. 2431 (plaintiffs residing in racially gerrymandered districts could challenge redistricting as racially discriminatory); when

election officials refuse to hold an election required by state law, resulting in a complete disenfranchisement, *see, e.g. Duncan v. Poythress,* 657 F.2d 691, 693 (5th Cir.1981) (holding "that the due process clause of the fourteenth amendment ... protects against the disenfranchisement of a state electorate in violation of state election law" where state officials refused to hold an election for a vacant Supreme Court justice seat as required by state law) (subsequent history omitted); *Bonas v. Town of N. Smithfield,* 265 F.3d 69, 74-75 (1st Cir. 2001) (holding that town officials violated voters' due process rights by refusing to hold a local election as mandated by state and local rules); or when the willful and *illegal* conduct of election officials results in fraudulently obtained or fundamentally unfair voting results, *see, e.g., United States v. Saylor,* 322 U.S. 385, 388–89, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944) (illegal ballot stuffing); *Roe v. Alabama*, 68 F.3d 404 (11th Cir. 1995) (holding that it would be fundamentally unfair for election officials to count already-cast absentee ballots in compliance with state law where doing so would be inconsistent with the State's prior practice); *Briscoe v. Kusper,* 435 F.2d at 1055 (holding that city board of election commissioners violated voters' rights to substantive due process by changing voting rules without informing voters of new requirements for voting and then refusing to count their votes).

Plaintiffs' substantive due process claims are substantially dissimilar from any of these "exceptional" or "extraordinary" cases in which a "state's voting system is fundamentally unfair." *Warf*, 619 F.3d at 559. The Defendants did not use "non-uniform rules, standards, and procedures," but rather applied the same method of counting votes to all four proposed constitutional amendments on the November 2014 ballot. *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008). The Defendants certainly did not engage in any illegal conduct, *see U.S. v. Saylor*, 322 U.S. at 388–89, nor did their interpretation and application of article XI, section 3, result in the "total and complete disenfranchisement of the electorate as a

33

whole." *Bonas*, 265 F.3d at 75. Most importantly, Defendants did not depart from past election practices in interpreting and applying article XI, section 3. To the contrary, the State has consistently interpreted and applied article XI, section 3, in precisely the same manner as Defendants for over 150 years. *See Griffin v. Burns*, 570 F.2d at 1079.

Plaintiffs' substantive due process claim asks the Court to step in and invalidate the State's longstanding and consistent interpretation of article XI, section 3, in favor of Plaintiffs' erroneous interpretation—an interpretation that is contrary to the plain language of that provision, has never been followed in previous elections, and was never communicated to voters prior to the 2014 election. In short, it is Plaintiffs' substantive due process claim—not Defendants' interpretation of article XI, section 3—that would impermissibly change the rules of the game, after the game is over. *See Roe v. Alabama*, 68 F.3d 404, 406-08 (11th Cir. 1995) and *Griffin*, 570 F.2d at 1077.

Defendants' interpretation and application of article XI, section 3, in the election on Amendment 1 complied with that provision and was consistent with both prior election practice and voters' expectations. Defendants did not change the "rules of the game" after the election. This Court should decline Plaintiffs' invitation to do so and instead conclude that Plaintiffs have failed to establish a violation of the Due Process Clause.

**D.    Defendants' Interpretation and Application of Article XI, Section 3 Does Not Compel Voters to Vote for Governor in Violation of the First and Fourteenth Amendments.**

Plaintiffs argued for the first time in the Joint Proposed Pretrial Order that Defendants' interpretation of article XI, section 3, violates the First and Fourteenth Amendments by "compelling Plaintiffs and other voters against Amendment 1 to vote in the governor's race in order for their vote to count at all for purposes of ratification." D.E. 95 at 2 (PageID # 1792). Plaintiffs have failed to establish a violation of their First or Fourteenth Amendment rights, however, because they have presented no factual or legal support for their claim.

34

In order to trigger heightened scrutiny under the *Anderson-Burdick* standard, a plaintiff must provide evidence that the challenged election practice places an *actual*, not hypothetical, burden on the fundamental right to vote. *See McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969); *Obama for Am.*, 697 F.3d 423, 429 (6th Cir. 2012). In *McDonald*, for example, the U.S. Supreme Court applied rational basis review to an Illinois law that denied unsentenced inmates access to absentee ballots because "there [was] nothing in the record to indicate that the [law] has an impact on [the inmates'] ability to exercise the fundamental right to vote." 394 U.S. at 807. The Court noted that it could not "assume, with nothing in the record to support such an assumption, that Illinois has in fact precluded [the inmates] from voting." *Id.* at 808.

Here, nothing in the record supports a finding that Plaintiffs' fundamental right to vote is burdened. It is beyond dispute that Defendants' interpretation of article XI, section 3, of the Tennessee Constitution (in contrast to Plaintiffs' interpretation of that provision) does not actually compel anyone to vote for governor. Rather, Plaintiffs' apparent argument is that they and other opponents of Amendment 1 had an incentive to vote for governor to increase the threshold required for ratification and make passage less likely. Plaintiffs have presented no evidence, however, that their right to vote was actually burdened—*i.e.*, that this incentive was so strong that it caused Plaintiffs or any voters to vote for governor when they otherwise would have abstained. In fact, one of the plaintiffs, Ellen Wright Clayton, when asked "[w]hat [she] would do if [she] . . . wanted to vote in a referendum in an election but did not want to vote for governor," testified that this hypothetical "would not take place" in her case because she "always vote[s] for governor when [she] vote[s] on an amendment." D.E. 110-2 PageID # 2268. In other words, Plaintiffs' case is

35

built on the existence of a theoretical trade-off that no Plaintiff (and, as far as the record shows, no other voter) was ever actually forced to make.

Plaintiffs' claim of compelled voting also lacks support in the law. They essentially argue that any election scheme that creates an incentive for voters to vote strategically burdens the right to vote. But courts have flatly rejected that argument. In *Dudum v. City and County of San Francisco*, No. 10-00504, 2010 WL 3619709 (N.D. Cal. Sept. 9, 2010), *aff'd by Dudum v. Arntz*, 640 F.3d 1098 (9th Cir. 2011), the U.S. District Court for the Northern District of California considered a challenge to San Francisco's instant runoff system that, in lieu of holding a standalone runoff election if a single candidate failed to earn a majority of votes, allowed voters to vote for three candidates in order of preference during the initial election. *See id.* at *1-2 (describing instant runoff system). The plaintiffs in that case argued that the system either "systematically denie[d] complete access to voters who tend to favor unpopular candidates or forces them to adopt positions on unpalatable candidates in order to particulate in a meaningful fashion." *Id.* at *8. While the court acknowledged that San Francisco's system may encourage a voter to "carefully try to cast his or her preferences with the final rounds in mind," it concluded that "[t]he fact that an election scheme *may* incentivize strategic voting surely does not operate as a severe burden on the franchise." *Id.* at *11. If it did, the court reasoned, then "voters in a plurality scheme who prefer third party candidates but are wary of 'wasting' their votes and so vote strategically might all have winning constitutional claims." *Id.*

Because Plaintiffs have failed to establish any actual burden on their fundamental right to vote, their compelled voting claim warrants only rational basis review. *See, e.g.*, *Northeast Ohio Coalition for Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) ("[A] rational basis standard applies to state regulations that do not burden the fundamental right to vote."). For the reasons

36

already explained above, *see* pp. 24-27, *supra*, Defendants' interpretation of article XI, section 3, meets that standard as well as any higher form of scrutiny the Court may apply.

## E. Defendants' Interpretation and Application of Article XI, Section 3, Does Not Force Voters to Abstain from Voting for Governor in Violation of the First and Fourteenth Amendments.

Plaintiffs' compelled abstention claim fails for largely the same reasons as their compelled voting claim. Plaintiffs have presented no factual evidence that any proponent of Amendment 1 actually felt forced to abstain from voting for governor in order to increase the likelihood that Amendment 1 would pass. To the contrary, Plaintiffs testified that they were not aware of any individual who in fact abstained from voting for governor to influence the outcome of the election on Amendment 1. *See, e.g.*, D.E. 110-2, Dep. of Ellen Clayton at 57:17-20, 67:8-12; 83:10-84:2; D.E. 110-3, Dep. of Tracy George at 88:25-89:3, 94:2-95:6. They also acknowledged that voters who abstained from voting for governor could have done so for any number of reasons. *See, e.g.*, D.E. 110-3, Dep. of Tracy George at 71:8-72:6; D.E. 110-1, Dep. of Deborah Webster-Clair at 46:15-17.

Indeed, Plaintiffs have presented no evidence that the percentage of voters voting for governor in the 2014 election was markedly lower than in other years when an incumbent governor was on the ballot. Nor could they. Voting data from prior elections shows that, in 2014, approximately 95% of voters voting in the election voted for governor. *See* D.E. 110-10 PageID # 2174. Incumbent governors were also on the ballot in 1998 and 2006, and the percentage of voters voting for governor in those years was 95% and 97%, respectively. *Id.* Plaintiffs apparently want the Court to infer from the fact that more votes were cast on Amendment 1 than for governor that voters who abstained from voting for governor did so to affect the outcome on Amendment 1. Given that voter turnout for governor was comparable to other elections in which an incumbent

37

was on the ballot, however, the far more plausible explanation for the disparity between votes for governor and votes on Amendment 1 is that more voters *wanted* to vote on Amendment 1 than for governor.

Plaintiffs also lack any legal support for their compelled abstention claim. As explained above, *see* p.32-33, *supra*, the mere fact that an election regulation may, hypothetically, provide an incentive to vote strategically, does not establish a burden on the fundamental right to vote. Because Plaintiffs cannot show any actual burden on the right to vote, their compelled abstention claim is also subject to rational basis review. For the reasons already explained, *see* pp. 24-27, Defendants' interpretation of article XI, section 3, easily satisfies that standard and any higher standard the Court may deem applicable.

## F.     There is No Basis for Voiding the Election.

Plaintiffs are asking the Court to void the election on Amendment 1 based on nothing more than speculation that the outcome of that election might have been different if Plaintiffs' interpretation of article XI, section 3, had been followed. The most Plaintiffs can prove with any certainty is that 32,627 more voters voted on Amendment 1 than voted for governor. Even if we make the unlikely assumption that each and every one of those voters voted "yes" on Amendment 1 and exclude those votes, Amendment 1 still would have received 696,536 "yes" votes and would have been approved, because 696,536 is more than the number of "no" votes (657,192). And Amendment 1 still would have been ratified, because 696,536 is more than half of the total number of votes cast for governor, or 676,865. Plaintiffs' contention that the other 43,762 voters who did not vote for governor *might have* voted on Amendment 1 is pure speculation and provides no basis for this Court to impose the drastic remedy of voiding the election on Amendment 1.

As one court has recently noted

38

When a federal court is asked to review a state election, the need for care and caution is even more prominent, because federalism is at play. . . . The federal courts should be careful that all state law issues that arise from state elections are not moved across the street from state court to federal court in the guise of protecting the First Amendment association and due process rights. Otherwise, the federal court will become the preferred venue of some party or individual for resolving all state election disputes.

The Court does not suggest that federal courts have no role in protecting the electoral system, be it federal or state elections.

***

[F]ederal and state courts do halt violations of equal protection, such as discrimination on race, religion, or nationality. Unless the case involves these expansive categories of discrimination or suspect or protected categories, the federal courts should be reluctant to micro-manage state elections.

*Logan v. Public Employees Retirement Ass'n*, -- F.Supp.3d--, 2016 WL 807973, at *22 (D. N.M. Jan. 11, 2016); *see also Gjersten v. Board of Election Comm'rs*, 791 F.2d 472, 478 (7th Cir. 1986) ("A federal court reaching into the state political process to invalidate an election necessarily implicates important concerns of federalism and state sovereignty. It should not resort to this intrusive remedy until it has carefully weighed all equitable considerations.").

## CONCLUSION

Plaintiffs have not met their substantial burden of proof demonstrating that article XI, section 3 is either facially unconstitutional, or that Defendants' interpretation and application of that provision to the amendments in the November 2014 election, including Amendment 1, is unconstitutional under either the First or Fourteenth Amendments. Accordingly, Plaintiffs are not entitled to any of the relief requested and certainly are not entitled to the "intrusive remedy" of voiding the election on Amendment 1. Accordingly, Defendants are entitled to an order (i) dismissing Plaintiffs' claims for lack of standing and (ii) holding that Plaintiffs' fundamental unfairness, compelled voting, and compelled abstention claims are not properly before the Court;

or (iii) if, if the Court nevertheless reaches the merits of Plaintiffs' claims, holding that Plaintiffs have failed to establish a violation of their federal constitutional rights.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

ANDRÉE S. BLUMSTEIN
Solicitor General

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER
Deputy Attorney General
Public Interest Division
Office of the Tennessee Attorney
General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Janet.Kleinfelter@ag.tn.gov

/s/ Leslie Ann Bridges
LESLIE ANN BRIDGES
Senior Deputy of Public Protection Section
and Counsel to the Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-4710
Leslie.Bridges@ag.tn.gov

## CERTIFICATE OF SERVICE

        I hereby certify that on the 1st day of April, 2016, a copy of the foregoing Defendants' Reply Trial Brief has been served upon the following persons via the Electronic Case Filing (ECF) System:

William L. Harbison
C. Dewey Branstetter Jr.
Phillip F. Cramer
Hunter C. Branstetter
Sherrard & Roe, PLC
150 3rd Avenue South, Suite 1100
Nashville, Tennessee 37201
bharbison@sherrardroe.com
dbranstetter@sherrardroe.com
pcramer@sherrardroe.com
hbranstetter@sherrardroe.com

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER

41