**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| TRACEY E. GEORGE, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-02182 |
| | ) | Chief Judge Sharp |
| WILLIAM EDWARD "BILL" HASLAM, | ) | Magistrate Judge Bryant |
| as Governor of the State of Tennessee, | ) | |
| in his official capacity, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

---

**PLAINTIFFS' RESPONSE TO DEFENDANTS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW and DEFENDANTS' TRIAL FILINGS**

---

In accordance with the Court's February 12, 2016 Order [DE 104], Plaintiffs respectfully submit this response in support of their own Proposed Findings of Fact and Conclusions of Law [DE 112] and in opposition to Defendants' Proposed Findings of Fact and Conclusions of Law [DE 110] and Defendants' Trial Brief [DE 111]. For the reasons stated herein and in Plaintiffs' Proposed Findings of Fact and Conclusions of Law [DE 112], the Court should (1) find Defendants' method of tabulating votes on Amendment 1 in the November 4, 2014 election disenfranchised Plaintiffs by diluting their vote, subjected Plaintiffs to a fundamentally unfair voting system, and compelled Plaintiffs to vote for governor, (2) hold that Article XI, Section 3 of the Tennessee Constitution—either facially or as Defendants applied it in the vote on Amendment 1—violates the due process and equal protection clauses, (3) enter a verdict in Plaintiffs' favor, and (4) award Plaintiffs' relief including issuing a declaration that Article XI, Section 3, either as-applied or facially, is unconstitutional, voiding the results of the vote on Amendment 1, providing

any other such relief as the Court deems appropriate, and awarding Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

## I. PRELIMINARY STATEMENT

As the Court is well aware, Plaintiffs are all Tennessee citizens and voters who were registered and eligible to vote in the November 4, 2014 state and federal general election, who voted in that election, who voted for a gubernatorial candidate, and who voted against proposed Constitutional Amendment Number 1 on that ballot ("Amendment 1"). *See* DE 112: Plaintiffs' Proposed Findings of Fact and Conclusions of Law at ¶ 2, PageID 2847-48. Defendants are officials of the State of Tennessee who determined the manner in which votes on Amendment 1 would be counted and tabulated and then certified the results of the November 4, 2014 general election based on their determination; Defendants were acting under color of law and, for the purposes of this lawsuit, are persons within the meaning of 42 U.S.C. § 1983. *See id*. at ¶ 3, PageID 2848.

The essence of Plaintiffs' claims is that Defendants' determination of the threshold for the passage of Amendment 1—regardless of whether it was consistent with or, as Plaintiffs' assert, contrary to the plain-language meaning of Article XI, Section 3 of the Tennessee Constitution—infringed on Plaintiffs and other voters' federal constitutional rights by (i) subjecting to dilution, and indeed diluting, Plaintiffs' votes by basing passage/ratification on the number of "yes" votes on the amendment as compared to total votes cast in the governor's race, (ii) creating a fundamentally unfair voting system by disenfranchising Plaintiffs and other opponents of Amendment 1 and commensurately by rewarding proponents of Amendment 1 who refrained from voting in the governor's race, (iii) inducing proponents of Amendment 1 to choose between increasing the likelihood of the passage of Amendment 1 and exercising their constitutional right

2

to vote in the governor's race, and (iv) compelling Plaintiffs and other voters against Amendment 1 to vote in the governor's race in order for their vote to count at all for purposes of ratification.

Although the Defendants could have avoided these vote dilution, fundamental unfairness, disenfranchisement, and compelled voting issues by basing ratification of Amendment 1 on whether a majority of the citizens who voted for governor also voted in favor of the proposed constitutional amendment, as is consistent with the plain text of Article XI, Section 3, Defendants elected not to do so. Instead, Defendants publicly declared prior to the election that voters need not vote in the governor's race for purposes of determining whether a constitutional amendment would be ratified. As a result, Amendment 1 supporters propagated a multichannel scheme using various methods, including word of mouth, phone calls, yard signs, mailers, leaflets, both traditional and social media, the Internet, and church bulletins to encourage publicly pro-Amendment 1 voters not to vote in the governor's race and thereby increase or "double" the weight of their votes on Amendment 1. As indicated by the election results that have been furnished by Defendants,[1] this scheme worked as—for the first time—the number of votes on a constitutional amendment exceeded the number of votes cast for governor. *See* DE 112 at ¶¶ 8-23, PageID 2851-2858.

Plaintiffs initiated this lawsuit on November 7, 2014, mere days after the preliminary results of the election in question were released (and while the official results were still being tabulated and before any official certification of the vote), asserting that Defendants' tabulation method failed to comply with the plain language in the latter portion of the first paragraph of Article XI, Section 3 of Tennessee's Constitution such that Plaintiffs' Fourteenth Amendment

---

[1] The vote totals for the November 4, 2014 general election were as follows: (i) 1,430,117 ballots were cast in the November 4, 2014 election; (ii) 1,353,728 votes were cast in the Governor's race; (iii) 729,163 votes were cast in favor of Amendment 1; and (iv) 657,192 votes were cast against Amendment 1. Based on these totals, there were 32,627 more votes on Amendment 1 (1,386,355) than in the gubernatorial race (1,353,728).

rights were violated. Moreover, Plaintiffs asserted that, regardless of whether it complied with Article XI, Section 3, Defendants' tabulation method pursuant to Article XI, Section 3 was unconstitutional—either as-applied to the November 4, 2014 vote on Amendment 1 and/or facially. Based on these violations, Plaintiffs now seek a judgment voiding the November 4, 2014 election results on Amendment 1 as certified by Defendants, declaring the first paragraph of Article XI, Section 3 unconstitutional either on its face or, at minimum, as applied through the method by which votes were tabulated and certified on Amendment 1, awarding Plaintiffs attorneys' fees, expenses and costs, and providing Plaintiffs with such other relief that may be available to them.

As Defendants emphasize in their filing, Plaintiffs initially also sought to have the Court issue an injunction ordering a recount of the vote on Amendment 1 pursuant to Plaintiffs' interpretation of Article XI, Section 3. *E.g.*, DE 51: First Amended Complaint at 18, PageID 600. Plaintiffs have not merely chosen to abandon this claim. Rather, Plaintiffs—relying on statements made by Defendants (who refused to provide data during discovery)—understand such a recount to be impossible. According to Defendants, they have no way of knowing how many voters who cast a ballot in favor of Amendment 1 did not vote in the Governor's race, DE 48-3: Pls.' First Set Requests for Admissions to Defs. at 9, PageID 496. Defendants further profess to not having custody or control over the copies of the ballots (either paper or electronic) cast in the November 4, 2014 general election.[2] Further, Defendants declined to obtain copies of these data even after this lawsuit was filed and after the data had been duplicated on the county level. DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 30:13-15, PageID 1269.

---

[2] Indeed, according to Defendants' own testimony, neither the Department of State nor the State Election commission has knowledge regarding (i) the computer and electronic storage infrastructure, capabilities, and procedures for votes cast in the November 4, 2014 election, (ii) the location, identity, maintenance, and preservation of physical records regarding votes cast in this election, and (iii) any backup systems or archival methods employed for the electronic data and any physical documents. DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 22:4-22, 25:4-19, PageID 1267-68.

4

Because Defendants did not obtain a complete data set then, it is now impossible to obtain such a set; complete data from the November 4, 2014 election, including data for the vote on Amendment 1, are no longer available because all of Van Buren County's ballot data for the November 2014 election were destroyed in a January 2015 fire that consumed the local administrative building in Spencer, TN where the data had been stored. Moreover, the parties stipulated that the vote-by-vote election data would not be relevant or pertinent to the issues to be tried by this Court. *See* DE 96: Parties' Stipulations at ¶ 12, PageID 1799; *see also* DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 27:24-28:2, PageID 1268. Accordingly, Defendants have left this Court with voiding the results of the November 4, 2014 election on Amendment 1 as the only recourse.

## II.     FACTUAL ISSUES

Defendants' Proposed Findings of Fact and Conclusions of Law coupled with their Trial Brief generate several issues that warrant preliminary attention. Perhaps the most pervasive of these is Defendants' reliance on numerous documents that have been introduced now for the first time in this case, and after Defendants asserted that they were irrelevant during discovery, and then presenting extrapolations and Defendants' own inferences from these documents as fact. In addition to offering and relying on these previously undisclosed documents, Defendants misstate several key portions of the record that merit correction.

**A.     Because Plaintiffs' interpretation of Article XI, Section 3 of the Tennessee Constitution is natural and comports with that provision's plain language, the Court need not look beyond it.**

As the Tennessee Supreme Court has explained time and again, the words of a constitutional provision such as Article XI, Section 3 should be interpreted to mean what they say. *See, e.g.*, *Hooker*, 437 S.W.3d at 426; *Gaia*, 717 S.W.2d at 885; *Chattanooga-Hamilton Cnty.*

5

*Hosp. Auth.*, 580 at 327; *Hatcher*, 521 S.W.2d at 803; *Hale*, 292 S.W.2d at 748. Under Article XI, Section 3's plain language, amendments to Tennessee's constitution must pass "by a majority of all the citizens of the state voting for governor, voting in their favor." Tenn. Const. Art. XI, Section 3. This remains true even under the so-called two-step process now advocated by Defendants because their second step, which they now tie to ratification, requires "a majority of all the citizens of the state voting for governor, voting in their favor." *Id*. Parsing that phrase, an amendment must pass not merely by a majority of all citizens of the state voting in its favor or by a majority of the number of citizens voting for governor; rather, to pass, an amendment must be ratified by a majority comprised of "all the citizens of the state voting for governor," meaning that voting for governor is critical to voting for an amendment. To adopt Defendants' approach and excise the requirement to have voted for governor in order to vote for amendments is to not give effect to all of the words and punctuation in the relevant language of Article XI, Section 3.

In an effort to generate support for their reading, Defendants attempt to parse in a vacuum specific words and phrases in Article XI, Section 3 in an effort to circumvent the plain language of the operative provision of Article XI, Section 3: ". . . And if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for governor, voting in their favor, such amendment or amendments shall become a part of this Constitution. . . ." First, Defendants attempt to read the use of the phrase "the people"—which Defendants decree clearly means the electorate as a whole—expansively to say that the plain language qualifiers of "voting for governor, voting in their favor" do not actually modify the provision's majority requirement. This fails to give meaning to every word and relevant punctuation mark in Article XI, Section 3 and thus is invalid.

6

Defendants next turn to the dictionary definitions of "approve" and "ratify" in an attempt to create support for the two-step interpretation they now advance. As Defendants note, "approve" and "ratify" are functionally synonymous although "ratify" can connote being the final step in a process. Indeed this connotation gives ratify its meaning in the context of Article XI, Section 3; the phrasing "approve and ratify" indicates that this submission of a proposed amendment to the people constitutes the final step in passing an amendment. The addition of "ratify" to signify that this vote is the final step in an amendment's being passed is critical because it signifies and emphasizes that the following sentence (which is also the last sentence describing the legislative method for amending the constitution)—"[w]hen any amendment or amendments to the Constitution shall be proposed in pursuance of the foregoing provisions the same shall at each of said sessions be read three times on three several days in each house—does not impose a subsequent step to a proposed amendment becoming a part of Tennessee's constitution.

In contrast to this natural language reading, Defendants attempt to partition "approve" and "ratify" to support the two-step process they now advocate. Such a reading, however, expands and moves beyond Article XI, Section 3's language. Rather, Defendants' interpretation attempts to rewrite Article XI, Section 3 to say that, in order to pass, a proposed constitutional amendment must be approved by a having a majority of votes cast on it be cast in its favor and ratified by receiving enough votes cast in its favor to constitute a majority of the votes cast for governor. This interpretation represents a stark departure from the actual text of Article XI, Section 3. As such, the Court should not credit it. Defendants cannot "amend or alter the Constitution under the guise of construction." *Mayhew*, 46 S.W.3d at 784 (citing *Ashe v. Leech*, 653 S.W.2d 398, 401 (Tenn. 1983)).

Defendants' final effort to circumvent Article XI, Section 3's natural language is to assert that Plaintiffs' plain language reading creates a conflict with another provision of Tennessee's Constitution—Article IV, Section 1. As Defendants correctly state, courts are to avoid construing one constitutional provision in such a way that it conflicts with another. *E.g.*, *Estate of Bell*, 318 S.W.3d at 835. But Defendants' assertion that Plaintiffs' plain language reading of Article XI, Section 3 creates conflict with Article IV, Section 1 is incorrect. In pertinent part, Article IV, Section 1 of the Tennessee Constitution provides:

> Every person, being eighteen years of age, being a citizen of the United States, being a resident of the state for a period of time as prescribed by the General Assembly, and being duly registered in the county of residence for a period of time prior to the day of any election as prescribed by the General Assembly, shall be entitled to vote in all federal, state, and local elections held in the county or district in which such person resides. All such requirements shall be equal and uniform across the state, and there shall be no other qualification attached to the right of suffrage.

Nothing in that provision is incompatible with Plaintiffs' plain language reading of Article XI, Section 3. The strictures of Article XI, Section 3—as understood by Plaintiffs—are applied uniformly, and they do not impede any citizen's right to suffrage. Regardless of whether or how a voter were to choose to vote on an amendment or vote for governor, every eligible citizen has their right of suffrage preserved.[3]

Without the plain language of Article XI, Section 3 favoring their interpretation, Defendants then attempt to assert that the meaning of Article XI, Section 3 is ambiguous in an attempt to turn to a host of extra-textual documents that they assert supports their reading. Because

---

[3] Additionally, it bears mentioning that the current version of Article IV, Section 1 was adopted in 1978—twenty-five years after the modern version of Article XI, Section 3 came into effect. Thus, if one provision should be read to conform with another, it should be Article IV, Section 1 being read to conform with Article XI, Section 3. Had the introduction of Article IV, Section 1 meant to modify Article XI, Section 3, then it would have done so explicitly; as the Supreme Court has become fond of emphasizing, elephants do not come hidden in mouse holes. *See, e.g., Gonzalez v. Oregon,* 546 U.S. 243, 267 (2006); *Whitman v. Am. Trucking Ass'n,* 531 U.S. 457, 468 (2001); *FDA v. Brown & Williamson Tobacco Co.*, 529 U.S. 120, 160 (2000).

8

the plain language of Article XI, Section 3 is unambiguous, the Court need not go beyond the text of the Tennessee Constitution. But even if the Court were to move beyond the plain language, Defendants' reams of documents fail to support their position because they neither support Defendants' inferences (as Plaintiffs explain in their Proposed Findings of Fact and Conclusions of Law, *see, e.g.*, DE 112 at ¶¶ 47-62, PageID 2871-2876) nor are they properly before this Court, as Plaintiffs explain in the next section.

**B.** **The Court should not make any findings of fact based on materials that Defendants refused to disclose during discovery but on which Defendants now attempt to rely.**

Defendants' Proposed Findings of Fact and Conclusions of Law introduce, for the first time before this Court, reams of information that Defendants assert supports their interpretation of Article XI, Section 3. Just as these materials are new to the Court in this case, they are likewise new to Plaintiffs. But these documents should not have been new to Plaintiffs; rather, they all would have been captured by Plaintiffs' discovery requests had Defendants responded to them. In its January 28, 2016 Order, this Court stated that "[r]esponses to interrogatories, requests for production and requests for admissions shall be supplemented timely, if necessary, in accordance with Fed. R. Civ. P. 26(e) no later than thirty (30) days before trial, absent leave of Court." DE 82 at 2, PageID 1149. The Order then stated: "The Court may exclude evidence, or order other sanctions, for violation of a duty or deadline to supplement discovery responses." *Id*. The deadline for Defendants to supplement their discovery "responses" came and went without any supplementation. Accordingly, the Court should now exclude the numerous documents that were never disclosed during discovery but on which Defendants now attempt to rely.

9

1.     Defendants refused to participate in written discovery and steadfastly thwarted
Plaintiffs' discovery efforts throughout this entire case.

On December 23, 2014, Plaintiffs served their initial written discovery requests: eighteen

Interrogatories [previously filed with this court as DE 48-1, PageID 468], twenty-seven Requests

for Production [DE 48-2, PageID 478], and seventy-five Requests for Admission [DE 48-3,

PageID 488]. Neither this Court nor the Magistrate Judge ever stayed discovery. Rather, in the

Initial Case Management Order, the Magistrate Judge explicitly ordered that "[t]here shall be no

stay of discovery pending disposition of any motions unless otherwise ordered by the Court." DE

37 at 4, PageID 264.

The deadline for Defendants to respond to Plaintiffs' First Requests for Admission, First

Set of Interrogatories, and First Set of Requests for Production came and went on January 22,

2015. Defendants refused to produce any discovery or respond to any discovery requests. After

Plaintiffs pointed out this failure, Defendants emailed Plaintiffs' counsel untimely "responses" to

Plaintiffs' discovery requests. *See* DE 48-4: Defendants' Response to Plaintiffs' Request for

Production, PageID 505; DE 48-5: Defendants' Response to Plaintiffs First Set of Interrogatories,

PageID 516; DE 48-6: Defendants' Response to Plaintiffs' Requests for Admission, PageID 524.

These responses, however, neither answered any of the requests nor lodged any specific objections.

Instead, for each and every request, Defendants gave a rote recitation of blanket and generic

objections. The April 30, 2015 discovery deadline for written discovery passed without

Defendants' either propounding any written discovery on Plaintiffs or responding to any of

Plaintiffs' discovery requests.

Even after this Court's July 1, 2015 Order , *see* DE 62, PageID 764; DE 63, PageID 786,

Defendants still did not answer a single interrogatory, produce a single document, provide a single

privilege log, or substantiate a single discovery objection. Although Plaintiffs reached out to

Defendants on July 16, 2015, regarding the status of written discovery, Defendants declined to confer or resolve any actual objection to any specific discovery request. Instead, Defendants rested on their position that <u>all</u> of Plaintiffs' written discovery was objectionable and that <u>every</u> single discovery request was <u>not relevant</u>. These discovery requests sought the very documents that Defendants have now filed with the Court and cited in their Proposed Findings of Fact and Conclusions of Law.

Notwithstanding Defendants' refusal to participate in written discovery, Plaintiffs proceeded with taking depositions—during which time counsel for Defendants continued to refuse to provide responses to written discovery. As a part of this process, Plaintiffs sought to have a number of items that Defendants did not produce but which had become known to exist designated as late-filed exhibits. Although Plaintiffs' counsel's designation of late-filed exhibits could have provided Defendants another opportunity to introduce documents six months after the written discovery deadline, Defendants continued to hold fast to their refusal to provide Plaintiffs with <u>any</u> documents.[4]

In its Order granting Plaintiffs' earlier motion, this Court specifically ordered that written discovery responses be timely supplemented no later than thirty days before trial—*i.e.* by February 8, 2016 because, at that point, trial was still scheduled for March 8—and noted the potential for exclusion or sanctions if discovery was not supplemented. *See* DE 82 at 2, PageID 1149. Defendants did not supplement. In the same way, Defendants did not designate any deposition transcripts, as required by Fed. R. Civ. P. 26(a)(3) (A)(iii) and 26(a)(3)(B). At base, Defendants

---

[4] Defendants' depositions also revealed that a host of other potentially responsive emails and other digital documents had been and, as a part of the State's document retention/destruction protocol (as described by Plaintiffs because Defendants would not provide it), were continuing to be destroyed. Plaintiffs' Response in Opposition to Defendants' Motion in Limine describes this destruction of evidence in greater detail, *see* DE 97 at 14-17, PageID 1814-17 (incorporated by reference herein).

willfully and purposely refused to participate in discovery, to comply with the rules of procedure governing discovery, or to obey this Court's orders pertaining to discovery.[5]

> 2. <u>The Court should exclude and refuse to consider the documents Defendants refused to produce during discovery but on which Defendants now attempt to rely.</u>

Despite resolutely refusing to participate in written discovery and objecting to each and every one of Plaintiffs' discovery requests on a number of bases including relevance, Defendants have now attempted to introduce and rely on a number of documents never disclosed in discovery. Indeed, while every single document on which Defendants rely was not provided during discovery and the deposition transcripts on which Defendants attempt to rely were not designated, the following documents merit special mention because they have only now been put before Plaintiffs and the Court in this case:

- DE 110-8: Declaration of Andrew Dodd dated March 18, 2016

  - Ex. 1: pages in the *Journal of the Convention of the State of Tennessee Convened for the Purpose of Revising and Amending the Constitution Thereof* (1834) discussing the proposal ultimately adopted as the legislative method for amending the Tennessee Constitution

  - Ex. 2: an article titled "The Convention," that appeared in the NASHVILLE REPUBLICAN & STATE GAZETTE on July 29, 1834

  - Ex. 4: copy of a certification of election results from the August 4, 1853 election from the Roane County Election Commission

  - Ex. 5: an article titled, "The Election of Judges and Attorneys General by the People," that appeared in the DAILY UNION & AMERICAN on October 12, 1853

  - Ex. 7: 1887 Tenn. Public Acts, Senate Joint Resolution No. 7

  - Ex. 9: Official Statewide Tally Sheet from the Secretary of State for the September 29, 1887 election on a constitutional amendment regarding prohibition

---

[5] Although this Response focuses more on Defendants' noncompliance during regarding written discovery, Defendants also willfully refused to participate in discovery or otherwise act in good faith during depositions in this case. *See, e.g.*, DE 89-1: 30(b)(6)/Goins Dep., Vol 1., at 90:15-19, PageID 1284 (providing an admission from Defendants' Fed. R. Civ. P. 30(b)(6) designee of having not interviewed or spoken to any person to gain their knowledge or understanding with respect to the deposition topics).

- Ex. 10: an article titled, "The Amendment: What Vote Will It Require to Become a Law," that appeared in the DAILY AMERICAN on July 14, 1887

- Ex. 11: Sample Certification Documents and Statewide Totals from the November 8, 1904 election from Anderson, Bedford, Claiborne, Dyer, Franklin, Putnam, Rutherford, Stewart, and Sumner Counties

- Ex. 12: letter to the editor titled, "Constitutional Amendments," that appeared in the NASHVILLE AMERICAN on August 18, 1904

- Ex. 13: an article titled, "Election Returns," that appeared in the NASHVILLE AMERICAN on October 11, 1904

- Ex. 14: Sample Certification Document from the November 5, 1940 election from Bedford County

- Ex. 15: Statewide Certification Documents from the November 5, 1940 election

- Ex. 16: an article titled, "Beeler Expects Satisfactory Constitution Vote,'' that appeared in the NASHVILLE BANNER on October 12, 1950

- Ex. 17: an article titled, "Machines Legal in Referendum," that appeared in the TENNESSEAN on October 12, 1950

- Ex. 18: an article titled, "Voters Approve Constitution Change, But Too Few Voted," that appeared in the TENNESSEAN on November 8, 1950

- Ex. 19: an article titled, "Amendment Failed In November Vote, Board Certifies," that appeared in the NASHVILLE BANNER on November 21, 1950

- Ex. 20: an article titled, "Amendment Defeated, Official Count Shows," that appeared in the Tennessean on November 21, 1950

- Ex. 21: Statewide Certification of the November 7, 1950 election

- Ex. 23: an article "Amending Process Stalls Delegates to Convention," that appeared in the KINGSPORT NEWS on May 23, 1953

- Ex. 28: an article titled, "Oldest Constitution Hardest to Amend," that appeared in the TENNESSEAN on October 15, 1953

- Ex. 29: an article titled, "Group Favoring Passage of Roads Amendment Waging Strong Battle," that appeared in the KINGSPORT TIMES on October 30, 1958

- Ex. 30: an article titled, "Constitutional Amendment Vote," that appeared in the KINGSPORT TIMES on April 15, 1966

- Ex. 31: Notice and Certified Results of the November 8, 1966 general election

- Ex. 32: an article titled, "Sheriff Term on Ballot," that appeared in the KINGSPORT TIMES on October 13, 1970

- Ex. 33: Certified Results of the November 3, 1970 election

- Ex. 34: Certified Results of the November 2, 1982 election

- Ex. 35: an article titled, "Victims' Rights May Make State Constitution," that appeared in the TENNESSEAN on April 29, 1998

DE 110-8, PageID 2363-2702. The Court has several different independently sufficient bases for excluding these documents.

<u>a.</u>　　<u>The Court should exclude these documents pursuant to its Order of January 28, 2016.</u>

None of these documents were ever provided to Plaintiffs during discovery. Yet, as Mr. Dodd's affidavit and the substance of the documents themselves reveal, these same documents undeniably were covered by and responsive to a number of Plaintiffs discovery requests. Although the bulk of these documents would have been responsive to more than one request, all of them would have been responsive to the following Requests for Production:

Request No. 6: Produce all documents, including communications, related to the determination or discussion of the methodology that was utilized to count votes on the amendments.

Request No. 8: Produce all documents, including communications, related to the methodology utilized to count votes on the amendments.

Request No. 11: Produce all documents that support your position that the state has interpreted the constitution the same way since it was written in 1953.

Request No. 14: Produce the research that has been performed as referred to in Mark Goins's statement quoted in the Nashville Post article dated November 10, 2014. *See* Andrea Zelinski, Hargett, *Goins unsure of vote totals in Amendment 1 suit*, THE NASHVILLE

14

POST, November 10, 2014, http://www.nashvillepost.com/blogs/postpolitics/2014/11/10/hargett_goins_unsure_of_vote_totals_in_amendment_1_suit.

Request No. 18: Produce all requests prior to this lawsuit being filed for legal guidance or opinions regarding the proper methodology by which to count the votes prior to this lawsuit being filed.

Request No. 19: Produce all legal guidance received prior to this Lawsuit being filed regarding the proper methodology by which to count the votes in the November 4 election.

DE 48-2 at 6, 8, PageID 483, 485. These requests should have yielded all of the itemized documents above had Defendants participated in discovery as required by this Court's orders and the Federal Rules of Civil Procedure; instead, because Defendants did not comply, Plaintiffs did not receive any of the documents until the eve, or indeed the moment, of this trial on the papers. Accordingly, these documents are subject to being excluded based on the terms of this Court's January 28, 2016 Order. *See* DE 82 at 2, PageID 1149. Because these documents should have been produced, the Court should exclude them now.

> b. This Court should exclude these documents based on Defendants previously and consistently insisting that they were not relevant for the purposes of discovery and thus cannot be relevant to this trial on the papers.

This Court's January 28, 2016 Order provides only one of several bases for excluding these documents. Indeed, Defendants themselves had asserted throughout the first fifteen months of this now-seventeen month litigation process that these documents were irrelevant. As noted in the procedural review above, Defendants objected to each and every one of Plaintiffs' discovery requests by offering a litany of boilerplate objections, including the consistent objection that the materials sought or questions asked were not relevant and further not reasonably calculated to lead to the discovery of admissible evidence.[6] Defendants never withdrew these objections, and they

---

[6] Defendants objected to <u>each and every</u> one of the twenty-seven requests in Plaintiffs' First Requests for Production on the basis that the requests were not relevant. DE 48-4 at 2-10, PageID 506-514 (objecting to each request because, *inter alia*, it "is not relevant" and "is not reasonably calculated to lead to the discovery of admissible evidence"). In the same way, Defendants objected to every single interrogatory in Plaintiffs' First Set of Interrogatories because,

remain Defendants' stated position to this day. Thus, according to Defendants, the following items

and topics—among many others—are not relevant to this case:

- Documents supporting Defendants' claim that the state has interpreted the provision of Article XI, Section 3 of Tennessee's Constitution at issue in this suit the same way since 1953. *See* Requests for Production Nos. 8-9; *see also* Requests for Production Nos. 13, 16-17; Interrogatory No. 12.

- Documents providing instructions or guidance to election commissions or election workers regarding the November 4, 2014 election. *See* Request for Production No. 15.

- Documents regarding instances since 1953 in which any person or entity has questioned or otherwise raised the issue of the proper methodology for counting ballots for constitutional amendments pursuant to the state constitution. *See* Interrogatory No. 13

- Information regarding requests for legal guidance or opinions regarding the proper methodology by which to count votes on an amendment and documents regarding legal guidance received prior to this Lawsuit being filed regarding the proper methodology by which to count the votes in the November 4 election. *See* Request for Production Nos. 18-19.

- Communications among any of the defendants or between any of the defendants and any other state official with respect to the methodology of counting ballots for the November 4, 2014 election. *See* Interrogatory No. 3.

*See generally* DE 48-4; DE 48-5. And Defendants asserted not only that all these topics and

materials were irrelevant, but also that Plaintiffs' requests and interrogatories regarding this

information were not reasonably calculated to lead to the discovery of admissible evidence.[7]

---

according to Defendants, they were not relevant or likely to lead to admissible evidence. DE 48-5 at 2-7, PageID 517-522.

[7] Defendants also asserted numerous times that complying with Plaintiffs' discovery requests would be unduly burdensome, including three global objections based on purported undue burden in response to Plaintiffs' Requests for Production and Plaintiffs' Interrogatories plus specific objections on the same supposed undue burden grounds to twenty six of Plaintiffs' twenty seven Requests for Production and all but four of Plaintiffs' Interrogatories. But, by the time of these objections, Defendants Goins and Hargett had already collected items those responsive email materials that were eventually (thirteen months later) furnished to Plaintiffs. Moreover, as demonstrated by Defendants' filings now, Defendants' agents and employees, including Andrew Dodd, had likewise already conducted and collected responsive materials. Defendants could have provided these documents without incurring any additional burden, yet they refused to do so until now, longer after all discovery deadlines had passed and after Plaintiffs would have any opportunity to test these materials prior to this trial on the papers.

16

Again, given these objections, all of the documents listed above that have now been provided by Defendants should be deemed, according to Defendants' own long-standing assertions, irrelevant and thus should be excluded by this Court.

The Federal Rules of Civil Procedure reflect both the Supreme Court's and Congress's recognition that "mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). For materials to be irrelevant for the purposes of discovery, they are not only inadmissible, but also not reasonably related to materials that could lead to admissible evidence.[8] Given that discovery covers a wider range of evidence than what is admissible at trial and that Defendants unilaterally deemed all of these topic irrelevant, Defendants should now be bound by this relevancy position. Accordingly Plaintiffs respectfully request that this Court bar these trial materials Defendants are now attempting to proffer but that Defendants have continuously asserted were "not relevant."

<u>c.</u>    <u>The Court should exclude these materials pursuant to Fed. R. Civ. P. 37 as sanctions for Defendants persistent refusal to obey discovery rules and orders in this case.</u>

Finally, the Court should also exclude this late-proffered evidence pursuant to Fed. R. Civ. P. 37. Defendants total refusal to participate in discovery (and thus their failure to provide any of the items listed above on which they now rely) defied not only the general timing and sequence of discovery contemplated by the Federal Rules of Civil Procedure, but also specifically disregarded the operative discovery orders in this case—the Court's Initial Case Management Order [DE 37,

---

[8] As this Court has recognized, "'the scope of discovery under the Federal Rules of Civil Procedure is traditionally quite broad,' and Rule 26 must be 'construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case.'" *Reitz v. City of Mt. Juliet*, 680 F. Supp. 2d 888, 891 (M.D. Tenn. 2010) (quoting *Conti v. Am. Axle & Mfg.,* 326 F. App'x 900, 904 (6th Cir. 2009)). Indeed, as Rule 26 itself explains "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1); *see also, e.g.*, *Genesco, Inc. v. Visa U.S.A., Inc.*, 302 F.R.D. 168, 184 (M.D. Tenn. 2014) (acknowledging that evidence need not be admissible to be discoverable); *Miller v. Fed. Express Corp.*, 186 F.R.D. 376, 383 (W.D. Tenn. 1999).

PageID 260], which the Court entered pursuant to Fed. R. Civ. P. 26(f) on January 12, 2015, and this Court's January 28, 2016 Order regarding, among other things, Defendants' duty to supplement or face exclusion [DE 82, PageID 1148].[9] Moreover, by only now disclosing and attempting to introduce this panoply of documents on which Defendants relied and continue to rely, Defendants have engaged in exactly the sort of "trial by ambush" behavior about which Plaintiffs have long expressed concern. *See, e.g.*, DE 76 at 10, PageID 862.

The Court has the inherent authority to ensure compliance with pre-trial procedures, *e.g.*, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-45 (1991); *Link v. Wabash Railroad Co.,* 370 U.S. 626, 630 (1962), which includes the authority to limit a party's introduction of documents at trial. *See, e.g.*, *Jordan v. City of Detroit*, 557 F. App'x 450, 456-57 (6th Cir. 2014); *Ready Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010); *United States v. Reaves*, 636 F. Supp. 1575, 178-1580 (E.D. Ky. 1986).

Beyond the Court's inherent powers, Rule 37 of the Federal Rules of Civil Procedure also provides two different grounds on which to limit Defendants at trial. First, Fed. R. Civ. P. 37(b)(2)(A) provides a range of consequences for a party's refusal to obey a discovery order including "prohibiting the disobedient party . . . from introducing designated matters in evidence."[10] Second, this Court also has authority pursuant to Fed. R. Civ. P. 37(d) to "order

---

[9] Defendants' longstanding refusal to participate in discovery prejudices both Plaintiffs and the Court by creating an information asymmetry that is antithetical to the system of discovery completed by the Supreme Court, Congress, and the Federal Rules. By withholding these items until this trial on the papers commenced, Defendants deprived Plaintiffs of any opportunity to probe at these documents or question Defendants about them. Given the way in which Defendants' reliance on previous documents about which Plaintiffs were aware (*i.e.* those documents filed accompanying Defendants' motions to dismiss) buckled under question, *see generally, e.g.*, DE 112 at 17-23, 27- 30, PageID 2863-69, 2873-76, such probing would not have been unwarranted.

[10] Such action is justified because Defendants have not only failed to comply with the Initial Case Management Order but also wholly ignored this Court's much later, January 28, 2016 Order regarding supplementing discovery. Accordingly, Fed. R. Civ. P. 37(b)(2)(A) further authorizes this Court to exclude the evidence Defendants now attempt to introduce. In this context, courts have reiterated that exclusion of evidence is a valid and viable sanction for a party's failure to abide by a discovery order. *See, e.g.*, *Indep. Producers Grp. v. Librarian of Cong.*, 792 F.3d 132, 139 (D.C.

18

sanctions . . . . [when] a party, after being properly served with interrogatories under Rule 33 or a request for inspection under Rule 34, fails to serve its answers, objections, or written responses." Fed. R. Civ. P. 37(d)(1)(A)(ii). Rule 37(d)(2) further clarifies that this failure to respond "is <u>not</u> excused on the ground that the discovery sought was objectionable, unless the party failing to act has a <u>pending</u> motion for a protective order under Rule 26(c)" (emphasis added). Because Defendants' "objections" to Plaintiffs' discovery requests were so broad and nonspecific that they are not valid[11] and because Defendants' have not had a pending Rule 26(c) motion since their motion to stay was denied nine months ago, Defendants have therefore not responded to Plaintiffs' discovery requests for the purposes of Rule 37(d). Exclusion is thus appropriate. Accordingly, the Court should exercise its authority to exclude all of Defendants newly offered evidence. [12]

---

Cir. 2015) (citing *Perdue Farms, Inc., Cookin' Good Division v. National Labor Relations Bd.,* 144 F.3d 830, 834 (D.C. Cir. 1998)).

[11] Defendants' professed objections were both boilerplate and non-specific, and Defendants failed to respond to portions of Plaintiffs' requests that were not objectionable. Accordingly, these purported "objections" are insufficient to satisfy the rules. *See* Fed. R. Civ. P. 33(b)(3)-(4) (explaining that "[t]he grounds for objecting to an interrogatory must be stated with specificity" and all interrogatories must be answered to the extent they are not objectionable). Courts have repeatedly held that such non-specific objections are insufficient and are equivalent to not answering at all. *See Mulero-Abreu v. P.R. Police Dep't,* 675 F.3d 88, 93 (1st Cir. 2012) ("blanket objection to all of the interrogatories [and requests for production]—including those asking for basic information—is equally impuissant."); *Redland Soccer Club, Inc. v. Dep't of the Army,* 55 F.3d 827, 856 (3d Cir. 1995) (explaining that objecting to interrogatories on the unsupported assertions that they are overly broad, burdensome, oppressive, and irrelevant is not an adequate objection and that the objector must show specifically how each interrogatory is not relevant or how each question is overly broad, burdensome, or oppressive); *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles,* 894 F.2d 1482, 1485 (5th Cir. 1990) ("[The] party resisting discovery must show specifically how . . . each interrogatory is not relevant or how each question is overly broad, burdensome or oppressive . . . . We see no reason to distinguish the standards governing responses to interrogatories from those that govern responses to production requests."); *Josephs v. Harris Corp.,* 677 F.2d 985, 991-92 (3d Cir. 1982) (concluding that broad objections to all interrogatories failed to qualify as successful objections); *Dollar v. Long Mfg., N.C., Inc.*, 561 F.2d 613, 616-17 (5th Cir. 1977) (explaining that evasive or incomplete answers constitute the legal equivalent of an absolute failure to reply).

[12] To the extent the Court opts not to exclude any of these documents, the Court should not be lulled by Defendants' assertion that all of these documents, which Defendants assert pertain to the legislative history and prior interpretations of Article XI, Section 3, are merely "legislative facts." Legislative facts are those facts that are separate from the facts of a particular case and that instead have relevance to legal reasoning. *See, e.g., Toth v. Grand Trunk R.R.,* 306 F.3d 335, 349 (6th Cir. 2002) ("'legislative facts . . . are facts which have relevance to legal reasoning . . . whether in the formulation of a legal principle or ruling by a judge . . . or in the enactment of a legislative body.") (*quoting* Fed. R. Evid. 201 advisory committee's note (1972)) (internal quotation marks omitted). Defendants, however, are not attempting to provide prior judicial rulings or enactments of legislative bodies that speak to Article XI, Section 3 of the Tennessee Constitution. Rather, Defendants instead attempt to draw inferences from the materials on which they claim to have relied in making the decisions regarding Article XI, Section 3's interpretation that led to this case or on

19

**C.    The Court should reject Defendants' proposed findings of fact that rely on invalid evidence.**

Because the Court should exclude Defendants' newly and untimely introduced materials, it should likewise refuse to make any findings of fact based on them. *See generally* DE 110 at ¶¶ 21-51, PageID 2217-2225. These include the following proposed facts from Defendants:

First, in Paragraphs 23-26, Defendants rely on a July 29, 1834 article from the Nashville Republican & State Gazette, "The Convention" as well as an excerpt from the *Journal of the Convention of the State of Tennessee Convened for the Purpose of Revising and Amending the Constitution*, *see* DE 110-9 at 2-28, PageID 2371-97, to make a number of assertions about the history of the provision of Article XI, Section 3 at issue. Along with relying on materials that should be excluded, ¶ 26 is particularly problematic in that Defendants' attempt to infer from the lack of an explicit statement to the effect of "under Article XI, Section 3 you must vote for representative to have you vote count for an amendment" that this reading must be incorrect. Moreover, Plaintiffs would note that these documents never mention the two-step process Defendants now advocate.

Similarly, in Paragraph 29, Defendants rely on another previously undisclosed newspaper article regarding a purported debate about the numerical threshold for the calculation of citizens voting "for representatives" under the precursor to the current Article XI, Section 3 that was never resolved because the proposed amendment failed. Again, the Court should not countenance this assertion both because it relies on materials that should be excluded and because it attempts to draw inference from an untested newspaper article summarizing an ultimately unresolved debate.

which they rely now—including irrelevant excerpts from no-longer-applicable nineteen century law or newspaper articles from the last century. Most of these documents themselves do not present legislative facts, whether Defendants actually relied on these documents is not legislative fact, and any inference Defendants attempt to advance from these documents are decidedly not legislative facts.

20

Paragraphs 31 and 32 suffer from the same flaw because Defendants draw inferences and make assertions from a slew of newly introduced newspaper articles that are neither properly before this court nor actually supportive of the points for which Defendants cite them. Defendants previously classified these articles as irrelevant such that they did not need to be disclosed during discovery, and Defendants thus should not be permitted to attempt to extrapolate from them now.

In the same way, the Court should reject Paragraph 38 of Defendants' proposed findings of fact because it is grounded in materials Defendants previously classified as irrelevant. Moreover, Defendant Goins—testifying for Defendants as Coordinator of Elections and as the Fed. R. Civ. P. 30(b)(6) designee for both the Department of State and the State Election Commission—has explained that he is not familiar with any of the authors of these 1953 articles (when authors are provided), that he is not aware of the KINGSPORT TIMES NEWS's circulation or readership in 1953, that he is not aware of the underlying sources on which the articles were based (aside from a very limited number of quotations attributed to individual delegates within the articles), and that he is unaware if there were any issues regarding the accuracy of the pieces. *See, e.g.*, DE 89-2: 30(b)(6/Goins Dep., Vol. 2, at 255:8-10, 256:6-24, 257:21-25, 259:1-260:4, 260:22-261:5; 261:21-262:25; 264:21-265:7, PageID 1335-37. Moreover, and more tellingly, Defendant Goins's testimony effectively concedes that none of the 1953 Articles explicitly mention the two-step reading of Article XI, Section 3 that Defendants now advance by which a proposed constitutional amendment must receive more votes in favor of it than against it and must also receive enough votes in its favor to constitute a majority in the gubernatorial race. *See id.* at 259:14-260:4, 262:18-25 266:2-23, 267:25-268:13, 268:21-269:25, PageID 1336-38.[13]

---

[13] Plaintiffs' Memorandum in Support of Plaintiff's Motion in Limine #2 (Exclusion of 1953 KINGSPORT TIMES NEWS Articles) provides a detailed breakdown of the flaws in each article addressed therein that renders each article irrelevant for the purposes of this case. *See* DE 85 at 3-5, PageID 1159-1161 (incorporated by reference herein).

Defendants' proposed Paragraphs 40-47 attempt to rely on exhibits never before provided in this lawsuit and previously deemed irrelevant by Defendants as well as a relying heavily on a declaration from Brook Thompson that was likewise never discussed or produced during the discovery period. The Court should not make factual findings based on this wholly new information—particularly given that it was proffered long after discovery in this case had ended and that Defendants had previously deemed it irrelevant such that it did not merit production.[14]

And finally, paragraph 49 of Defendants' proposed findings of fact again relies entirely on newspaper articles that are subject to exclusion and largely only support Defendants' assertions inferentially, rather than explicitly.

## D. Defendants likewise mischaracterize other documents before the Court.

Moving beyond Defendants' factual assertions premised on invalid evidence, Plaintiffs are still compelled to correct several other instances where Defendants fail to present a complete picture of the facts as reflected in the record before this Court.

First, in Paragraph 27 of their proposed findings of fact, Defendants discuss an 1844 act passed by the General Assembly to submit a proposed constitutional amendment (that pertained to partitioning certain counties) to the people in 1845. What Defendants neglect to mention, however, is that Defendants Goins previously acknowledged that these resolutions do not provide any

---

[14] Even if the Court were to rely on assertions in this untimely and previously unproduced declaration, evidence generated as a part of a state court proceeding—namely an Affidavit from Mr. Thompson's boss, former Secretary of State Riley Darnell—casts serious doubt about assertions in Mr. Thompson's Declaration. *See* Darnell Aff. in *Hargett v. George* (Williamson County Chancery Court, Civil Action No. 44460) at ¶¶ 4-5, 11 (stating, among other things, that Defendants Goins and Hargett's direct predecessors, Coordinator of Elections Brook Thompson and Secretary of State Riley Darnell, did not have any discussions specifically pertaining to interpreting Article XI, Section 3; that neither of Secretary Darnell nor Coordinator Thompson considered the possibility that, under Defendant's interpretation of Article XI, Section 3 of the Tennessee Constitution, there could be a coordinated effort to get voters not to vote for governor in an effort to manipulate and artificially suppress the threshold for an amendment to pass; and that had they considered this possibility, they may have opted for a different interpretation of Article XI, Section 3) [attached hereto as **Exhibit 1**].

information about how votes on these proposed amendments are to be tabulated. DE 89-2: 30(b)(6)/Goins Dep., Vol. 2, at 274:15-25, PageID 1340. In the same way, Defendants decline to note that the timing of submitting an amendment as it existed in 1845 has been obviated by the current version of Article XI, Section 3's provision that proposed amendments are to be submitted at an election when the governor is to be chosen.

Similarly, in Paragraph 35 of their proposed findings, Defendants assert that the reason the delegates to the 1953 Constitutional Convention opted to substitute "voting for Representatives" with "voting for governor" was because of the difficult in ascertaining the vote for representatives, particularly in districts where more than one representative was elected. Although Defendants are correct in noting that this was a difficulty identified by the delegates, this reasoning alone, which Defendants capture through statements from Delegate McGinnis[15] did not lead to votes for governor, rather than votes for Representative, being substituted in the revised version of Article XI, Section 3. Rather, in both of the instances Defendants cite, Delegate McGinnis was advocating for ensuring that the vote for the amendment occurred at the same time as the race to which its threshold was tied—not advocating for substituting "governor" for "Representatives." *See* DE 110-9 at 199, 286 PageID 2568, 2655.

In the same way, Defendants overreach in asserting in Paragraph 37 of their proposed findings of fact that the delegates to the 1953 Constitutional Convention understood the "ratification" requirement to comport with Defendants' interpretation. As an initial matter and as described in Plaintiffs' Proposed Findings of Fact and Conclusions of Law, nothing in the *Journal and Proceedings* of the 1953 Constitutional Convention actually mentions the two-step process

---

[15] As explained in Plaintiffs' Proposed Findings of Fact and Conclusions of Law, statements from Delegate McInnis—as someone who opposed the majority report and what ultimately became the current version of Article XI, Section 3—provide limited interpretive insight. *See* DE 112 at 28-29, PageID 2874-75.

23

Defendants' advance. Moreover, Defendants' cherry-picked and out-of-context quotations from three of the numerous delegates reflects each of those delegate's retrospective understanding of the provision that was then in effect, prior to the 1953 revisions. *See* DE 110-9 at 177-78, 191, 254, PageID 2546-47, 2560, 2623.

**E.    The Court should not be misled by Defendants' distortions of this case's specific facts.**

Defendants make two claims that conflict with the specific facts of this case. First, in Paragraph 78, Defendants' assert that Plaintiffs have presented no evidence that any voter actually abstained from voting for governor in an effort to lower the ratification threshold for Amendment 1. As demonstrated by their witness list, *see* DE 98 at 2-4, PageID 1945-47, Plaintiffs were prepared to call a number of witnesses on this point, but Defendants conceded at the pretrial conference the obviousness of the "double your vote" campaign, and the election results speak for themselves. Plaintiffs nonetheless have still presented ample evidence indicating that Amendment 1 supporters purposely declined to vote for governor so as to maximize the relative weight of their votes on Amendment 1. The robust campaign by Amendment 1's supporters to not vote for governor in order to "double their vote" on Amendment 1 provides evidence that voters engaged in this scheme. *See, e.g.*, DE 112 at ¶¶ 9-14, PageID 2851-54.

In the same way, the results of the election themselves demonstrate that this campaign succeeded: for the first time in Tennessee history, there were more votes for a proposed constitutional amendment, Amendment 1, than there were for governor. This increase was not trivial and indicates that the "double your vote" scheme propagated by Amendment 1's supporters worked. For all of Defendants' emphasis on voter turnout percentages in the gubernatorial race in 2014 compared to prior years, viewing this percentage in a vacuum misses the mark by failing to consider also the difference in turnout on Amendment 1 versus turnout for the governor's race or

24

total voter turnout in this election as compared to turnout for other recent constitutional amendments placed on the ballot via the legislative method under Article XI, Section 3. Reviewing those percentages demonstrates the highly unusual nature of the vote on Amendment 1 and underscores the fact that the "double your vote" campaign by Amendment 1's supporters worked.

In the November 4, 2014 election, 96.94% of the voters who cast ballots voted on Amendment 1.[16] This percentage is substantially higher than the equivalent percentage on past constitutional amendments: 88.68% for the single amendment in 2010; 93.5% and 87.77% for the two amendments in 2006; 92.1% and 78.57% for the two amendments in 2002; and 74.79% and 74.68% for the two amendments in 1998. And the contrast between the number of votes cast on an amendment versus the votes cast for governor are even more stark. The 1,386,355 votes on Amendment 1 are equivalent to 102.41% of the votes cast in the governor's race in 2014.[17] In the past, this percentage of votes on amendment as compared to votes for governor have been: 89.73% in 2010; 96.06% and 90.17% in 2006; 94.01% and 80.21% in 2002, and 78.6% and 78.49% in 1998. This percentage for Amendment 1 is also roughly 16 percentage points higher than the mean of this percentage from the 1998, 2002, 2006, and 2010 elections (86.75%). This stark departure from past voting trends again indicates that numerous voters who favored Amendment 1 opted to cast ballots in accordance with the "double your vote" strategy.

Second, contrary to Defendants' assertion in Paragraph 79 of their proposed findings of fact, Plaintiffs have provided evidence that they felt compelled to vote for governor so as to ensure their vote on Amendment 1 counted. For example, at the very end of her deposition and after earlier

---

[16] For the other amendments on the 2014 ballot, 95.53% of the voters who cast ballots voted on Amendment 2, 93.24% voted on Amendment 3, and 90.77% voted on Amendment 4.

[17] Turning to the other amendments on the 2014 ballot these percentages are: 100.92% for Amendment 2, 98.5% for Amendment 3, and 95.89% for Amendment 4.

25

discussing earlier the notion of needing to vote for governor in order to ensure that her "no" vote on Amendment 1 counted, Plaintiff Meryl Rice stated the following:

> Q.    I just have one more question, and this is -- you know, I'm asking you this, just your opinion, what you would do or what would you do if there was·a gubernatorial election and you didn't want to vote for any of the candidates for governor but there was a constitutional amendment on the ballot and you wanted to vote on that amendment, what would you do?

> MR. D. BRANSTETTER: I'm going to object to the form. But go ahead and answer.

> A.    I'd vote for a governor.

> Q.    Even though there wasn't a candidate that you wanted to vote for?

> A.    Well, that was the situation this time, but I voted for him anyway.

> MS. KLEINFELTER: Okay. I think that's it.

DE 89-6: Rice Dep. at 130:20-131:12, PageID 1503. Based on this testimony and similar testimony from other Plaintiffs, *e.g.*, DE 10-7: Whalum Dep. at 46:8-20, PageID 1529, Defendants' assertion that Plaintiffs have failed to present evidence that they (or any other voter) voted for governor to ensure that their vote on Amendment 1 was counted is flatly wrong.

### III.    LEGAL DISCUSSION

**A.    All of Plaintiffs' civil rights claims are justiciable and properly before this Court.**

Attempting to derail this litigation, dodge the merits of this case, and revisit old arguments, Defendants assert that this case is not justiciable or that this case is not properly before this Court. As this Court has already ruled, these contentions are without merit.

    1.    Plaintiffs have standing to bring all of their claims.

Defendants are not wrong in their assertion that standing, as a jurisdictional issue that permeates every level of a case, *e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10 (1974), can be

revisited and reexamined whenever it is in doubt. *See, e.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990); *Nat'l Air Traffic Controllers Ass'n v. Sec'y of Dep't of Transp.*, 654 F.3d 654, 660 (6th Cir. 2011). But standing here is not in doubt and thus does not merit revisiting. Indeed, Defendants here have conceded that Plaintiffs have standing by bringing the state-court lawsuit *Hargett v. George*, which is premised entirely on the existence of this lawsuit and thus premised on Plaintiffs having standing to pursue this lawsuit.

This Court previously concluded that Plaintiffs "have standing" because "[r]ead fairly, and stripped to its essence, Plaintiffs' claimed injury is that their individual votes on Amendment 1 were not counted and valued the same way as other votes, making their injury distinct." DE 62 at 11, PageID 744. The Court held that Plaintiffs' "alleged injuries are specific to them, and those like them, who (1) were registered to vote; (2) voted in the November 4, 2014 election; (3) voted in the gubernatorial race in that election; (4) voted against Amendment 1, and (5) (allegedly) had the relative values of their particular votes devalued." *Id*. "As such," the Court concluded, "theirs is not a generalized grievance about a law not being followed that is applicable to all, a point best exemplified by the fact that those voters who cast ballots only in favor of Amendment 1 were allegedly not injured." *Id*. This remains true.

Plaintiffs still have standing because they have "suffered a[n actual] concrete and particularized injury" through the dilution of their votes, being subjected to a fundamentally unfair election process, and being compelled to vote, "that the injury is fairly traceable to the defendant" based on Defendants' tabulation method and application of Article XI, Section 3 of Tennessee's Constitution, and "that it is likely that a favorable decision will redress that injury" by this Court's voiding of the constitutionally deficient results on Amendment 1. *Mass. v. E.P.A.*, 549 U.S. 497, 517 (2007) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Whereas

27

Defendants' previously targeted Plaintiffs' standing on the basis that their alleged injury was not specific to them, Defendants now appear to assert that Plaintiffs have not, in fact, suffered an injury at all. Regarding Plaintiffs' vote dilution and fundamental unfairness claims, Defendants assert that Plaintiffs votes were not, in fact, diluted such that they suffered no injury. Regardless of whether this Court ultimately adopts Plaintiffs' or Defendants' interpretation of Article XI, Section 3, this assertion is flatly incorrect.

As discussed in greater detail below, Plaintiffs rely on a natural reading of Article XI, Section 3 of the Tennessee Constitution's plain language to understand "by a majority of all the citizens of the state voting for governor" to mean what it says, *i.e.,* in order for a proposed constitutional amendment to be approved and ratified, it must receive a majority of the votes cast in its favor from those voters who voted for Governor. Put differently, an amendment must pass not merely by a majority of all citizens of the state voting in its favor or by a majority of the number of citizens voting for governor; rather, to pass, an amendment must be ratified by a majority comprised of "all the citizens of the state voting for governor"—*i.e.*, voting for governor is critical to voting for an amendment. By counting votes for Amendment 1 from voters who did not vote for governor while basing Amendment 1's passage threshold on the number of votes in the gubernatorial race, Defendants permitted—and, as demonstrated by the scheme propagated by Amendment 1's supporters, effectively encouraged—voters to overweight their votes on Amendment 1 by increasing the number of votes in favor of Amendment 1 without correspondingly increasing the number of total votes needed for Amendment 1 to be ratified. Conversely, Plaintiffs, by virtue of having exercised their right to vote for governor, have had their votes diluted and thereby had their franchise impaired when they attempted to exercise their right to vote not to approve Amendment 1.

This dilution, and thus disenfranchisement, issue remains under the two-step method now advanced by Defendants. Under this method, a proposed constitutional amendment must be both "approved" (*i.e.*, receive more votes in its favor than against it) and must be "ratified" (*i.e.*, receive sufficient votes in its favor to constitute a majority of the number of votes cast in the gubernatorial race). Under Defendants' interpretation as it is now articulated, these are both necessary steps— an amendment that is approved but not ratified does not pass and an amendment that is ratified but not approved does not pass. Applying their reading, Defendants assert that, because Amendment 1 was approved, Plaintiffs suffered no injury. This assertion ignores the fact that the relative weights of votes on an Amendment at Defendants' "ratification" step not only could be subject to manipulation, but indeed were also subject to such manipulation in the case of Amendment 1.[18] Regardless of which party's reading of Article XI, Section 3 the Court applies, Plaintiffs votes were devalued.

Defendants also assert that Plaintiffs lack standing to bring their compelled voting claim because Plaintiffs fail to provide evidence that they, or anyone else, actually felt compelled to vote for governor in order to have their vote on Amendment 1 count. As demonstrated in Section II.E., however, this assertion is incorrect because at least some Plaintiffs felt compelled to vote for governor, despite not having a candidate for whom they wanted to vote, in order to ensure that

---

[18] At Defendants' "ratification" step, there were four permutations of votes on Amendment 1: (1) not voting for governor and voting against Amendment 1, (2) voting for governor and voting against Amendment 1, (3) voting for governor and voting in favor of Amendment 1, and (4) not voting for governor and voting in favor of Amendment 1. But these different permutations count for three different amounts for Defendants tabulation of ratification. Option 1 (not voting for either) creates a valueless vote because it neither adds to the numerator (voting for Amendment 1) nor the denominator (total number of votes cast for governor); Options 2 and 3 (voting for governor and voting for/against the amendment) have the same weight regarding the ratification threshold because both added to the denominator (as well as the numerator for those who favored Amendment 1); and Option 4 (voting for Amendment 1 but not for governor) has the greatest influence on ratification using Plaintiffs' interpretation because it adds to the numerator without adding to the denominator.

their vote on Amendment 1 counted. Besides, Defendants themselves were the first to raise the issue of compelled voting.

2.     <u>Defendants' assertion that Plaintiffs should have filed suit sooner has no merit.</u>

In a line of argument that, at times, appears to run counter to Defendant's own assertions regarding standing, Defendants now also assert that Plaintiffs' claim should not be considered or that Plaintiffs are not entitled to relief because Plaintiffs were being wily or engaged in gamesmanship by waiting until after the November 4, 2014 election to challenge the way in which the votes on Amendment 1 were tabulated.[19] This assertion, however, misses the mark.

First, before the election, John Jay Hooker, through a letter written and sent to Defendants, put Defendants on notice about the very issues regarding Defendants' application of Article XI, Section 3 that Plaintiffs' have asserted here. Defendants were publically invited to act in a declaratory judgment action and declined to do so. Moreover, given Defendants' total silence in response to Mr. Hooker's letter, Plaintiffs could not know exactly how Defendants were going to apply Article XI, Section 3 until they did so. Defendants' shifting interpretation of Article XI, Section 3 over the course of this lawsuit further emphasizes this point.

Second, Defendants did not actually tabulate the vote on Amendment 1 until November 4, 2014 and afterward. Given how robustly and persistently Defendants have contested standing here, Plaintiffs can only imagine that Defendants would have done so had Plaintiffs attempted to file suit before the election. Plaintiffs could not fully challenge Defendants' tabulation method until after the election.

Finally, as a matter of practicality, had the results on Amendment 1 (as compared to the votes for governor and later the total election turnout) failed to indicate that pro-Amendment 1

---

[19] As a preliminary matter, this argument was neither asserted in Defendants' answer nor advanced in the Pretrial Order; as such, Defendants waived it and should not be permitted to assert it now.

voters had engaged in their "double your vote" scheme or had Amendment 1 passed so overwhelmingly that it would have been apparent that the "double your vote" scheme had no material impact on the eventual outcome, Plaintiffs may have hesitated to file this lawsuit. In the same way, had Amendment 1 failed, it is possible a different set of plaintiffs would have been more appropriate. *Cf. Looper v. Boman*, 958 F. Supp. 341, 345 (M.D. Tenn. 1997) (holding that the plaintiff—the victor in the race for Putnam County Assessor of Property—lacked standing to seek prospective relief). In all likelihood, such considerations weighed on prospective plaintiffs who may have sought to challenge Amendments 2, 3, and 4 on the November 4, 2014 ballot.

Although some out-of-circuit federal cases have indicated that federal courts will not award relief when plaintiffs who could have brought a claim before an election gambles on the chance of receiving a favorable result and then files suit after their side loses, *see, e.g.*, *Hendon v. N. Carolina State Bd. of Elec.*, 710 F.2d 177, 182 (4th Cir. 1983) (citing *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973)), this case does not present such a situation because before the occurrences of the November 4, 2014 election, Plaintiffs' claims were not justiciable in the same manner as they were after the election. Moreover, even the cases Defendants cite recognize that not every challenge to an election process can be brought before the election. For example, in *Bell v. Southwell*, the Fifth Circuit takes pains to contrast the duty to challenge a pre-election constitutional violation before the election occurs with situations in which the violation does not actually occur until the election itself such that a post-election challenge is appropriate. 376 F.2d 659, 663 (5th Cir. 1967) (explaining that when violations do not actually occur until election day, voters need not challenge before then on the mere anticipation that their rights could be violated—even where there were some pre-election some indications that those voters right could potentially be violated). On the

circumstances of this case, Plaintiffs not only have standing to assert their claims, but also remain entitled to all of the relief they seek, including voiding the outcome on Amendment 1.

       3.      <ins>Despite Defendants efforts to circumvent this Court's rulings by filing a parallel lawsuit in Williamson County Chancery Court, abstention is not appropriate in this case.</ins>

Just as Defendants revive their challenges to Defendants' standing, they likewise attempt to revisit their argument that this Court should abstain for entertaining this case, and just as with Defendants' resurrected standing argument fails, so too does Defendants' argument for abstention. In its earlier Order, this Court explained "that exceptional circumstances do not exist to justify abstention." DE 62 at 19, PageID 782. The Court further reasoned:

> Leaving aside the seemingly straight-forward words "by a majority of all the citizens of the state voting for governor," a state court's definitive interpretation that Article XI, Section 3 says what Defendants claim would not moot this litigation because (1) Plaintiffs allege that "[r]egardless of whether Defendants' tabulation method was contrary to or consistent with Article XI, Section 3, it subjected Plaintiffs — who voted both for governor and against Amendment 1 — to a coordinated scheme that violated their federally-secured due process and equal protection rights"; and (2) they specifically seek a declaration that "Defendants' vote tabulation method violates the rights of due process and equal protection guaranteed by the Fourteenth Amendment[.]"

*Id.* at 19-20, PageID 782-83 (quoting DE 51: First Amended Complaint at 3 ¶ 8 & 18 ¶ 2). This same reasoning still holds true. Defendants now assert that *Pullman* abstention is appropriate on the basis that *Hargett v. George*, a parallel lawsuit that Defendants Hargett and Goins filed against Plaintiffs, is pending in Williamson County Chancery Court. Defendants' decision to file a state-court lawsuit after this case had been pending for nine months and after this Court had denied their motion to dismiss does not, however, now compel the Court to relinquish its jurisdiction. *See Town of Lockport v. Citizens for Cmty. Action at the Local Level, Inc.*, 430 U.S. 259, 264 n.8 (1977) ("[P]rinciples of comity . . . do not require that a federal court abandon jurisdiction it has properly acquired simply because a similar suit is later filed in a state court.").

32

Contrary to Defendants' assertions, this duplicative state-court lawsuit—even if it were to be resolved in Defendants' favor—would neither render a decision in this case unnecessary nor substantially change the contours of the constitutional issues in this case. In this federal civil rights litigation, the issues skew toward retrospective. Indeed, for the as-applied aspects of Plaintiffs' claims, the issue is essentially entirely retrospective—whether Defendants' interpretation and application of Article XI, Section 3 as it pertained to Amendment 1 in the November 4, 2014 election complied either with the plain language of Tennessee's Constitution or with the protections enshrined in the U.S. Constitution. By contrast, the issues as framed by Defendants Hargett and Goins (who are there the plaintiffs) in the state-court declaratory judgment action, *Hargett v. George*, are prospective; the plaintiffs in that suit seek clarification of Article XI, Section 3's meaning so that they can apply it going forward in future elections. But a prospective declaration from the Williamson County Chancery Court will not retrospectively change the interpretation and application Defendants used in November 2014 when they tabulated the voted on Amendment 1, and as Defendants have repeatedly state to both this Court and the Williamson County Chancery Court, they will not revisit the results of the vote on Amendment 1 absent an order from this Court. Accordingly, the outcome of the state court case—even if it were to be in Defendants' favor—would not resolve or so materially alter the claims in this case that *Pullman* abstention would be appropriate.

4.   Plaintiffs properly pled and advanced each of their claims.

Defendants' final attempt to dodge having to face the merits of some of Plaintiffs' claims is to assert incorrectly that Plaintiffs' either failed to plead or failed to advance certain due process claims such that they are now waived. In essence, Defendants attempt to knock out all of Plaintiffs' claims under the due process clause of the Fourteenth Amendment. First, Defendants assert that

Plaintiffs' have waived their fundamental unfairness claim under the due process clause of the Fourteenth Amendment by neglecting to assert it in the Joint Proposed Pretrial Order. Defendants assert that because Plaintiffs' Short Summary of Plaintiffs' Theory"—in which Plaintiffs were limited to a single page—does not include the exact words "fundamental unfairness," Plaintiffs did not assert and thus have waived this claim.

Plaintiffs did not fail to advance their fundamental unfairness theory; rather romanette (ii) in the "Short Summary of Plaintiffs' Theory" provides the substance of that claim. It specifically outlines Plaintiffs' factual basis for this claim and directly alleges violations of the due process clause of the Fourteenth Amendment. Although Plaintiffs did not specific use the phrase "fundamentally unfair," none of the cases on which Defendants rely to assert waiver require such a totemic invocation; indeed, courts generally avoid such talismanic phrasing requirements. *Cf. United States v. Kwai Fun Wong*, 135 S. Ct. 1625, 1634 (2015); *California v. Prysock*, 453 U.S. 355, 359 (1981); *Harajli v. Huron Twp.*, 365 F.3d 501, 506 (6th Cir. 2004). As such, Plaintiffs have not waived or abandoned any aspect of their Fourteenth Amendment due process claims.

Defendants also attempt to skirt the compelled voting aspect of Plaintiffs' due process claim by asserting, in essence, that it was not pled and that they were ambushed with it after the close of discovery. Again, this is incorrect. The notion of compelled voting, although derived initially through the First Amendment, applies to state and state officials like Defendants through the Fourteenth Amendment's due process clause. *See, e.g.*, *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 5, 8 (1947). Plaintiffs' compelled voting claims are part and parcel of the due process violations Plaintiffs assert.

Moreover, Defendants cannot claim to have been in any way caught off-guard by Plaintiffs' compelled voting claims. Indeed, Defendants themselves briefed the issue of compelled voting

34

into this case in their original Motion to Dismiss papers. *See* DE 25 at 20-23, PageID 94-97.

Thereafter, compelled voting and Plaintiffs' assertion that Defendants' tabulation method required

a constitutionally deficient compelled vote from Plaintiffs and other opponents of Amendment 1

persisted at every step of this case, including, among other places: Defendants' second Motion to

Dismiss [*e.g.*, DE 53 at 26, PageID 701] and Plaintiffs' Response thereto [*e.g.* DE 57 at 26, PageID

741], this Court's ruling on those same motions [*e.g.* DE 62 at 17-18, PageID 780-81], Defendants'

depositions [*e.g.*, DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 101:110-104:5, PageID 1287], and

Plaintiffs' depositions [*e.g.*, DE 89-6: Rice Dep. at 130:20-131:12, PageID 1503]. In sum,

Plaintiffs' compelled voting claim was properly raised, and Defendants were well-aware of this

claim long before the close of discovery.[20]

**B.** **Plaintiffs have proved that Defendants' interpretation of Article XI, Section 3 of the Tennessee Constitution diluted their votes on Amendment 1 in violation of the Fourteenth Amendment's equal protection clause.**

Voting is a "precious" and "fundamental" right, *Harper v. Va. State Bd. of Elections*, 383

U.S. 663, 670, (1966), such that "[o]ther rights, even the most basic, are illusory if the right to vote

is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17, (1964). *See also Yick Wo v. Hopkins,* 118

U.S. 356, 370 (1886) (explaining that the right to vote is "preservative of all rights"). Indeed, "a

citizen has a constitutionally protected right to participate in elections on an equal basis with other

citizens in the jurisdiction." *Dunn v. Blumstein,* 405 U.S. 330, 336 (1972). "Having once granted

the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value

one person's vote over that of another." *Bush,* 531 U.S. at 104-05; *see also Wesberry,* 376 U.S. at

17 ("Our Constitution leaves no room for classification of people in a way that unnecessarily

abridges [the right to vote.]").

---

[20] Further, even if this claim were not well-established and pled, Defendants cannot credibly claim to have been prejudiced by a lack of discovery on it, given that Defendants never propounded any discovery on Plaintiffs.

"The Equal Protection Clause applies when a state either classifies voters in disparate ways, or places restrictions on the right to vote." *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012) (internal quotation marks and citations omitted). In this case, Defendants have classified, treated, and valued the votes from Plaintiffs and others who voted against Amendment 1 and also voted for governor differently from votes cast by those voters who voted for Amendment 1 and opted not to vote for governor. Through this disparate classification and treatment, Defendants have diluted Plaintiffs' votes and thereby denied Plaintiffs' fundamental right of franchise.

Defendants' advance a multi-prong but ultimately misguided assault on Plaintiffs' equal protection vote-dilution claim. Defendants first attempt to challenge this claim by asserting that Plaintiffs votes were not, in fact, diluted because there were more votes on Amendment 1 than there were for governor. Defendants rely on this fact to assert that their "approval" more-yes-than-no-votes requirement actually provided the threshold for passage, rather than "ratification" as Defendants define it. Yet even under Defendants' interpretation of Article XI, Section 3, this argument misses the mark in two ways. First, as noted in Section II.A. above, "approval" and "ratification"—as Defendants define those terms—are two independent, necessary steps for an amendment to pass. That the "approval" threshold for an amendment appears to be higher than the ratification threshold does not obviate the need to also satisfy the ratification threshold. Second, Defendants wholly ignore the reality that, under their definition of ratification, Amendment 1's supporters could artificially suppress the threshold for ratification by not voting for governor while voting in favor of Amendment 1.

The unprecedented outcome of there being more votes on an amendment than there were for governor indicates that this threshold was, in fact, suppressed. *See* Section II.E. above. As Plaintiffs have asserted and demonstrated throughout the course of this case, Defendants'

36

tabulation method not only permitted but also incentivized supporters of Amendment 1 to cast votes in favor of Amendment 1 that were weighed differentially—and indeed that were afforded greater weight—than any votes cast against Amendment 1, so long as those voters were willing to forego their vote for governor.

In the face of this reality, Defendants next attempt to diminish this vote dilution by equating it to strategic voting through the process of "single-shot" or bullet voting.[21] As Defendants generally assert, a system that may incentivize strategic voting or that shifts the threshold for an election away from a pure majority does not necessarily impose a burden on franchise so severe that it fails constitutional muster. *See generally Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 362 (1997). And in particular, Defendants correctly note that courts have permitted the practice of bullet voting. *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 38 n.5-n.6, 54 (1986). But the way in which Defendants' tabulation method caused vote dilution goes far beyond the circumstances of a system that permits bulleting vote in two critical ways.

First, when a voter engages in bullet voting, the choice not to vote for more than one candidate is limited to the single race in which that voter opts to self-limit (often in an effort to maximize the likelihood of a desired outcome). Under Defendants' tabulation method under Article XI, Section 3 of Tennessee's Constitution, however, this decision not to vote spans over two separate races: the vote for governor and the vote on Amendment 1. Unlike in bullet voting, Amendment 1 supporters who subscribed to the "double your vote" theory wholly abstained from

---

[21] Bullet voting is a tactic by which voters who have the option to cast a vote for more than one candidate in a single race opt instead to vote for only one candidate. Voters can choose to do this strategically in an effort to increase the likelihood that a single candidate wins. *See, e.g.*, *City of Rome v. United States*, 446 U.S. 156, 184 n.19 (1980) *abrogated by Shelby Cnty. v. Holder*, 133 S. Ct. 2612 (2013) (providing a hypothetical illustration of how bullet voting can be used strategically).

37

the governor's race (as opposed to casting a single vote out of several potential votes) and thereby rendered their votes on Amendment 1, a wholly separate race, more powerful.

Second, and more critically, whereas the decision to bullet vote is available to any and all voters (at least in races such as a bloc vote where bullet voting is possible), the system applied by Defendants was subject to unilateral, viewpoint-specific manipulation: only those voters who favored Amendment 1 had the option to forego voting for governor and thereby increase the weight of their vote on Amendment 1. In contrast, Plaintiffs and other voters who opposed Amendment 1 were left with two decidedly lesser options: vote for governor and against Amendment 1 to cast a diluted vote or vote against Amendment 1 without voting for governor and cast a vote that did not count at all. The strategic voting systems that have been condoned by courts in the past have not permitted this one-way manipulation and instead have been system in which any voter has the option of deciding to cast a bullet vote or other strategic vote; to Plaintiffs' knowledge, no court has approved a system that created and invited one-sided or viewpoint-limited strategic voting and thereby caused vote dilution. *See, e.g.*, *Gingles*, 748 U.S. at 38-39; *City of Rome*, 446 U.S. at 184, *abrogated by Shelby Cnty.*, 133 S. Ct. 2612; *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1113 (5th Cir 1991).

In a similar way, the circumstances of this case are eminently distinguishable from cases such as *Gordon v. Lance*, 403 U.S. 1 (1971), where the threshold required for a resolution or amendment to pass is greater than a simple majority. *Gordon* addressed West Virginia's requirement that political subdivisions could only undertake certain actions (levying higher taxes and incurring bond debt) if 60% of the voters in a referendum election approved them. *Id*. at 2-3. The *Gordon* plaintiffs voted in favor of these actions during a referendum election and then challenged the election's outcome because more than a majority of voters had favored both of

38

these actions but neither action crossed the 60% threshold necessary for it to pass. *Id.* at 3. There, the Supreme Court explained that departing from a strict majority rule may empower a minority but that this threshold applied equally to all voters such that equal protection was not violated. *Id.* at 5-6. Although, the *Gordon* plaintiffs had to assemble more than a simple majority, the value of their votes remained the same relative to all other voters in the state—that is, every vote cast had the same weight and same impact to reach (or prevent) the requisite 60% threshold.

Here, in stark contrast, the votes on Amendment 1 were not all allotted equal relative weight during what Defendants define to be the "ratification." Rather, as explained in Section III.A.1 above, the four different possible permutations of voting on Amendment 1 and voting for governor resulted in three different weights for those votes. Moreover, Plaintiffs' votes specifically were afforded less weight than those cast by pro-Amendment 1 voters who did not vote for governor. This unequal ability for voters on only one side of an issue (here the voters who favored Amendment 1) to shift the threshold for ratification is an element unique to this case and one that differentiates this case from instances of simple strategic voting or a requirement over and beyond a simple majority. And this singular style of vote dilution was created specifically by Defendants' interpretation and application of Article XI, Section 3.[22]

Unable to circumvent the circumstances of this case—that Defendants' application of Article XI, Section 3 (or, if the Court holds that Defendants' interpretation is correct, Article XI,

_____

[22] To be abundantly clear, the Court need not find that Defendants' conduct in interpreting Article XI, Section 3 (or in responding to the "double your vote" campaign) was undertaken in bad-faith effort merely to assure that Amendment 1, an amendment they personally favored, would be able to pass or that Defendants themselves engaged in actively propagating the "double your vote" scheme. *See* DE 112: Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 22, PageID 2857. But the record in this case demonstrates that Defendants were well aware of the practical implications of their interpretation—*i.e.* that voters such as Plaintiffs would have their "no" votes diluted and devalued by votes from "yes" voters who did not vote in the governor's race—and nonetheless continued to implement it. Defendants thereby discriminated against a discrete group of Tennessee citizens: those who were registered to vote in the November 4, 2014 election, who actually voted in that election, who voted for governor, and who voted against Amendment 1.

39

Section 3 itself) diluted Plaintiffs' votes and thereby disenfranchised Plaintiffs—Defendants attempt to obtain a more lenient standard of review by minimizing Plaintiffs' right to cast a ballot that is of equal weight with all others in a race in an attempt. Defendants are correct that the principle of "one man, one vote"—while ironclad and immutable in instances pertaining to apportionment of votes for elected representatives—is afforded more flexibility when applied to direct votes on items such as single-shot questions or referenda. *See Town of Lockport v. Citizens for Cmty. Action at Local Level*, *Inc.*, 430 U.S. 259, 265 (1977). This flexibility permits the sort of implementing voting thresholds that are higher than a simple majority such as the one at issue in cases like *Gordon*. *See* 403 U.S. at 5-6.

In the same way, this flexibility permits disparate apportionment to the constituents in a special-purpose unit of government (such as a utility district) so as to provide increased influence for those parties who are most affected by the special-purpose unit's functions. *See, e.g.*, *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 734 (1973); *see also Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 632 (1969) (requiring "exacting precision" for the identification of such interested groups or classes).

The flexibility recognized in *Lockport*, however, does not eliminate wholesale the equal protection clause's requirement that citizens within a jurisdiction be afforded a right to participate in elections on an equal basis. *See generally Dunn*, 405 U.S. at 336. The instances in which this requirement is afforded some flexibility as provided in *Lockett* and comparable cases do not address situations such as the one in this case, in which certain voters have their votes discriminated against and diminished (while others have their voting power increased) based solely on viewpoint, rather than some other interest. *E.g. Lockport*, 430 U.S. at 268-69.

40

When faced with an equal protection challenge to a voting system—and indeed to evaluate the bulk challenges to laws pertaining to the right to vote—courts apply the flexible standard articulated by the Supreme Court in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992), to base their level of scrutiny on the precise character of the state's action and the nature of the burden on voters. *See, e.g.*, *Obama for Am. v. Husted*, 697 F.3d 423, 428 (6th Cir. 2012); *Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004). Where, as in this case, there are severe infringements on the plaintiffs' fundamental right to vote, strict scrutiny applies. *See Burdick*, 504 U.S. at 434; *see also Harper*, 383 U.S. 663, 670 (1966) ("We have long been mindful that where fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined."). Because Defendants' discriminatory implementation of Article XI, Section 3 to the vote on Amendment 1 was narrowly tailored to achieve a compelling governmental interest, it fails strict scrutiny.

Indeed, were the Court to adopt a less stringent standard of review as Defendants advocate, Defendants' vote tabulation methodology still would not withstand constitutional scrutiny because this methodology is not, in fact, even rationally related to the interest Defendants assert. Defendants' claim that their tabulation methodology advances the legitimate government interest of ensuring that constitutional amendments have broad support and that small interest groups cannot exert undue influence on the Tennessee's fundamental laws. In essence, these are two sides of the same coin, and although this governmental interest is undeniably legitimate, it is not served by Defendants' application of Article XI, Section 3.

But Defendants' methodology, rather than preventing undue influence from an interest group and ensuring broad turnout, instead actually invites manipulation. The vote on Amendment

41

1 itself demonstrates this fact through the existence and indeed the success of the "double your vote" campaign propagated by certain of Amendment 1's supporters. Because Defendants' tabulation methodology for Amendment 1 does not, in fact, rationally relate to these interests, it does not survive even rational basis review—to say nothing of the strict scrutiny it warrants.

### C. Defendants' method of tabulating the vote on Amendment 1 created a fundamentally unfair voting system in violation of the Fourteenth Amendment's due process clause.

As the Sixth Circuit has explained, "[t]he Due Process clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair." *League of Women Voters v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (citing *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1978)); *accord Warf v. Bd. of Elections of Green Cnty.*, 619 F.3d 553, 559 (6th Cir 2010) (quoting with approval). Under Defendants' tabulation method, a vote on Amendment 1 from anyone who voted for governor—regardless of whether the vote was for or against Amendment 1—has less value than a vote for Amendment 1 from someone who did not vote for governor. By devaluing Amendment 1 votes from voters who voted for governor, Defendants have carried out "an officially-sponsored election procedure which, in its basic aspect, was flawed" such that "[d]ue process, '[r]epresenting a profound attitude of fairness between man and man, and more particularly between individual and government,' is implicated . . . ." *Griffin v. Burns*, 570 F.2d 1065, 1078 (1st Cir. 1978) (quoting *Joint Anti-Fascist Committee v. McGrath*, 341 U.S. 123, 163 (1951) (Frankfurter, J., concurring)).

Defendants assert that this Court should apply the two-step framework from the Ninth Circuit case *Bennett v. Yoshina*, 140 F.3d 1218 (9th Cir. 1998) *as amended on denial of reh'g and en banc reh'g* (June 23, 1998). Notably, neither the Sixth Circuit nor any of Tennessee's federal courts have ever adopted this structure for fundamental unfairness due process claims. Nonetheless, Plaintiffs still prevail under *Bennett v. Yoshina*'s framework. Under this rubric—

42

which the Ninth Circuit notes is not exhaustive or exclusive—a court is to strike down an election based on the principle of fundamental unfairness when there is (1) a "likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that result[ed] from a change in the election procedures." *Id*. at 1226-27; *see also id*. at 1227 n.3. For Amendment 1, this occurred in two ways.

First, in the November 4, 2014 vote on Amendment 1, Plaintiffs and other voters like them relied on the election procedures established by Article XI, Section 3 of Tennessee's Constitution—*i.e.*, that they needed to vote for governor to be able to vote on Amendment 1. Given that this provision is the governing instruction establishing how the Tennessee Constitution is to be amended, this reliance was neither unfounded nor unlikely. As described above, however, Plaintiffs and these other voters had their on votes against Amendment 1 diluted and thus were disenfranchised. *See generally Reynolds*, 377 U.S. at 555 ("The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

Second and obversely, Amendment 1 supporters who were aware of Defendants' pre-election statements such as "there is not requirement to vote in any race" would likely have relied on these statements to understand that they did not need to vote for governor in order to have their vote against Amendment 1 count.[23] But, under Defendants' tabulation method for Amendment 1's "ratification," votes from these voters, in fact, did not count because they neither contributed to the tabulation equations numerator (votes for Amendment 1) or denominator (total votes cast for

---

[23] Notably, although Defendants made statements like "[w]hether people vote in the governor's race doesn't affect their eligibility to vote on the amendments" to the media, Defendants did not—and in fact, explicitly decided not to— issue any sort of formal release regarding how the votes were to be tabulated on Amendment 1. *See, e.g.*, DE 109-6, PageID 2205.

governor). In this way, Defendants' tabulation method again created a fundamentally unfair voting system by which voters who wanted to vote against Amendment 1 but who did not vote in the governor's race were disenfranchised because the votes they cast against Amendment 1 were wholly deprived of value. *See Yoshina*, 140 F.3d at 1227.

Given that this due process violation goes to Plaintiffs' fundamental right to vote and Defendants' interference therewith, it should be subject to strict scrutiny. *See generally Warf*, 619 F.3d at 559. And at minimum, it is subject not to pure rational basis review as Defendants' assert but rather to the flexible *Anderson-Burdick* standard. *See Obama for Am.*, 697 F.3d at 429 (explaining that this framework applies to a broad range of right-to-vote issues) (citing *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 204 (2008) (Scalia, J., concurring)). These burdens do not pass constitutional muster even under this lower standard. As explained in the preceding section, the precise interests Defendants assert—ensuring broad support for constitutional amendments and preventing undue influence by small groups—are not served by and thus do not in any way justify the burdens Defendants' tabulation method imposes on Plaintiffs' right to vote.

**E.   Defendants' tabulation method unconstitutionally compelled voters who wanted to vote against Amendment 1 to vote for governor.**

A voting system that necessitates voting in one election before voters can effectively vote in another threatens voters' First and Fourteenth Amendment rights because it compels voters to speak on one issue before permitting them to speak on another. *See, e.g.*, *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 727 (1st Cir. 1994); *Partnoy v. Shelley,* 277 F. Supp. 2d 1064 (S.D. Ca. 2003) *as modified on reconsideration* (Aug. 21, 2003); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977). As explained in Plaintiffs' Proposed Findings of Fact and Conclusions of Law, *see* DE 112 at ¶¶ 90-96, PageID 2884-87, Defendants' application of Article XI, Section 3 to the vote on Amendment 1 created just such a system by requiring that opponents of a proposed

44

constitutional amendment such as Amendment 1 vote for someone in governor's race if they want to affect the threshold for ratification as it is defined by Defendants. *See also* DE 89-5: Hargett Dep. at 124:3-14, PageID 1458.

Defendants do not appear to contest this fact. Rather, Defendants focus on their assertion that no evidence in the record to indicate that their interpretation of Article XI, Section 3 compelled any opponents of Amendment 1 to vote for governor. Yet Plaintiffs' testimony demonstrates, *e.g.* DE 89-6: Rice Dep. at 130:20-131:12, PageID 1503, they that were, in fact, compelled to vote for governor (even in a race where they otherwise would not have) in order to ensure that their vote on Amendment 1 factored into Defendants' tabulation.

Defendants' only other answer to Plaintiff's compelled voting claim is to assert that their tabulation method merely encouraged strategic voting, rather than compelling a vote. As discussed in Section III.B. above, Defendants' interpretation of Article XI, Section 3 goes far beyond merely permitting strategic voting. Rather, it creates a system by which opponents of Amendment 1 are compelled to vote for governor lest their vote against Amendment 1 not count, whereas proponents of Amendment 1 were rewarded with the choice either to vote both for governor and the amendment and thereby cast a vote on Amendment 1 of comparable weight to Plaintiffs' or to abstain from voting for governor and thereby increase the weight of their vote on Amendment 1. As the court in *Partnoy* explained, compelling someone to vote (under Defendants' formulation, only Plaintiffs and those voters like them) on a separate issue upon which they do not wish to vote (*i.e.*, to vote for governor to be able to cast a meaningful vote against Amendment 1) "effects a severe restriction on their constitutional right to vote." *Partnoy*, 277 F. Supp. 2d at 1073; *see also In re Hickenlooper*, 312 P.3d 153, 155 (Colo. 2013) (striking down a comparable provision in the Colorado Constitution).

Because Plaintiffs have provided evidence that Defendants' interpretation and application of Article XI, Section 3 placed an actual—as opposed to merely hypothetical—burden on the fundamental right to vote, this triggers heightened scrutiny. *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807-09 (1969); *Obama for Am.*, 697 F.3d at 429. Accordingly, to be constitutional, the restriction on the right to vote posed by Defendants' method must be narrowly drawn to advance a state interest of compelling importance. *See Burdick*, 504 U.S. at 434. Here again, Defendants' asserted interest—ensuring broad support and preventing undue influence by small interest groups—are not advanced by Defendants' application and interpretation of Article XI, Section 3 and thus would not even suffice under rational basis review. And Defendants' method is certainly not narrowly drawn. Accordingly, Defendants' interpretation and application of Article XI, Section 3 (or, should the Court be persuaded by Defendants' reading of this provision, Article XI, Section 3 itself) is unconstitutional.[24]

## IV.    REMEDY

In light of these violations of Plaintiffs' equal protection and due process rights and the circumstances as they now exist in this case, voiding the results of the vote on Amendment 1 is the proper relief in this case, regardless of whether the Court holds that Defendants' violated Plaintiffs' rights by misapplying Article XI, Section 3 to the vote on Amendment 1 or the Court determines that Article XI, Section 3 of the Tennessee Constitution is itself facially invalid.

Plaintiffs initially also sought to have the Court issue an injunction ordering a recount of the vote on Amendment 1 pursuant to Plaintiffs' interpretation of Article XI, Section 3. *E.g.*, DE

---

[24] Applying the plain language of Article XI, Section 3 as advanced by Plaintiffs does not create any new compelled voting issues; rather, it levels the playing field in a viewpoint-neutral way. Plaintiffs' plain language reading gives supporters and opponents of amendments the same set of options—either vote for governor and have your vote on the amendment factor into the tabulation or abstain from the gubernatorial race and cast what amounts to a ceremonial vote on amendments. This parity reinforces Plaintiffs' plain language reading of Article XI, Section 3 and militates against Defendants' reading.

46

51: First Amended Complaint at 18, PageID 600.[25] But, based on the pleadings, representations to the Court, and statements made by Defendants (who, notably, refused to provide any voting data in discovery), Plaintiffs understand that such a recount is impossible.[26] Defendants declined to obtain copies of the Amendment 1 voting data even after Plaintiffs filed this lawsuit (which, again, was before Defendants certified the election results) and after the data had been duplicated on the county level. DE 89-1: 30(b)(6)/Goins Dep., Vol. 1, at 30:13-15, PageID 1269. Now a complete data set from the November 4, 2014 election—including data for the vote on Amendment 1—is no longer available because all of Van Buren County's ballot data for that election was destroyed in a fire. Without the ability to perform a recount, Defendants have left this Court with voiding the results of the November 4, 2014 election on Amendment 1 as the only recourse.

Plaintiffs acknowledge that voiding an election is a remedy that courts should not undertake without first weighing the relevant equitable considerations. *See Gjersten v. Bd. of Election Comm'rs for City of Chicago*, 791 F.2d 472, 478 (7th Cir. 1986). Because this consideration of a case's equities is fact-specific, courts have not managed to articulate a test of uniform applicability. But the various tests that have been applied each militate toward voiding the vote on Amendment 1. For example, the Southern District of New York—as affirmed by the Second Circuit—has suggested that an election result should be set aside if the constitutional violations therein "could

---

[25] Plaintiffs original complaint, *see* DE 1, sought to enjoin Defendants Haslam, Hargett, and Slatery from certifying the vote on Amendment 1. Because that certification subsequently occurred and as indicated by Plaintiffs failures to pursue this request for relief in their Amended Complaint or in the Pretrial Order, Plaintiffs have, in fact, abandoned as a request for relief that the vote on Amendment 1 not be certified.

[26] Defendants position regarding a recount has shifted at least three times over the course of this litigation. Defendants first argued that (although it would be "tedious" and expensive), the Court—if it finds in Plaintiffs favor— should order a recount before voiding the vote on Amendment 1. Conversely, Defendants have later represented that a recount is impossible given the state and availability of the voting data on Amendment 1. Now, however, Defendants assert that Plaintiffs are not entitled to a recount not because such a recount is impossible given the data, but rather because "[i]t would be improper to simply recount the votes in any event because Tennessee voters went to the polls with the expectation that their votes on the amendments would be counted regardless of whether they voted for governor." DE 111: Defs.' Trial Br. at 45, n.17, PageID 2844.

47

very well have modified the outcome of the election." *See Coalition for Educ. v. Bd. of Elections,* 370 F. Supp. 42, 57 (S.D.N.Y. 1974), *aff'd,* 495 F.2d 1090 (2d Cir. 1974). Similarly, the Seventh Circuit has condoned voiding an election where there is a "reasonable possibility" that the unconstitutional factors "affected the outcome of the election." *Smith v. Cherry,* 489 F.2d 1098, 1103 (7th Cir. 1973).

As indicated by the election results based on the numbers that are known, Defendants' unconstitutional tabulation method both had a "reasonable possibility" of and "could very well" have affected the outcome of the vote on Amendment 1. There were a total of 1,430,117 votes cast in the November 4, 2014 election. Subtracting the difference in the number of total votes cast in the election and total votes for governor from the total number of votes for Amendment 1 demonstrates that the current election data can only confirm that, at maximum, 652,774 votes in favor of Amendment 1 were cast in compliance with Article XI, Section 3. These 652,744 "certain" votes fall 24,091 votes short of the 676,865 vote required to ratify Amendment 1 and indicate the distinct likelihood that, had Defendants' not violated Plaintiffs' constitutional rights, Amendment 1 would not have passed.[27]

These numbers also indicate that the vote on Amendment 1 is subject to being set aside under Tennessee's own "incurably uncertain" standard. As this Court has recognized "[t]his 'incurably uncertain' standard can be found in Tennessee Supreme Court opinions dating back 140 years." *Kurita v. State Primary Bd. of Tenn. Dem. Party*, No. 3:08-0948, 2008 WL 4601574, at *16 (M.D. Tenn. Oct. 14, 2008) *aff'd*, 472 F. App'x 398 (6th Cir. 2012) (citing *Barry v. Lauck,* 45 Tenn. 588, 1868 WL 2159 *2 (Tenn. 1868)). This standard, as explained by the Tennessee

---

[27] Put differently: A = total votes cast for governor (1,353,728); B = total votes cast in election (1,430,117); and C = total votes for Amendment 1 (729,163). The equation $C - (B - A) \leq (A / 2) + 1$, Amendment 1 may not have passed because, when the November 4, 2014 election yields $729,163 - (1,430,117 - 1,353,728) \leq (1,353,728/2) + 1$, which holds true as $652,774 \leq 676,865$.

Supreme Court provides that courts may "void elections upon a sufficient quantum of proof that fraud or illegality so permeated the conduct of the election as to render it incurably uncertain, even though it cannot be shown to a mathematical certainty that the result might have been different." *Emery v. Robertson County Election Comm'n,* 586 S.W.2d 103, 109 (Tenn. 1979); *see also Kurita*, 2008 WL 4601574, at *16 (quoting this same provision).

In the face of these equities justifying setting aside the results of the vote on Amendment 1, Defendants' only defense is to assert that Plaintiffs should not be entitled to relief because they were "sandbagging" or being "wily" by not filing suit before the election on November 4, 2014. But, as Plaintiffs have already explained in their section addressing justiciability, *see* Section III.A.2 above, this accusation is wholly misplaced. Accordingly, given that Plaintiffs' constitutional rights were violated and that the equitable considerations justify—if not demand— that the election be set aside, Plaintiffs respectfully request that this Court void the results of the vote on Amendment 1.[28] Plaintiffs also respectfully ask that this Court award them their costs and fees pursuant to 42 U.S.C. § 1983 and § 1988, as well as any other relief that this Court deems appropriate

## V.    CONCLUSION

For the foregoing reasons as well as those detailed in Plaintiffs' Proposed Findings of Fact and Conclusions of Law [DE 112], Plaintiffs respectfully request that the Court: (1) find Defendants' method of tabulating votes on Amendment 1 in the November 4, 2014 election violated the due process and equal protection clauses of the Fourteenth Amendment by disenfranchising Plaintiffs

---

[28] It bears mentioning that the Court's voiding the vote on Amendment 1 would not compel the court to do likewise for Amendments 2, 3, and 4 that were on the same ballot. As a preliminary matter, these amendments are not before the court in this case and are not before pending the Court in any other case to Plaintiffs' knowledge. But even if they were, the same equitable considerations that warrant voiding the vote on Amendment 1—most critically the possibility that the outcome of the election would have been different—are not present.

49

via vote dilution, subjecting Plaintiffs to a fundamentally unfair voting system, and compelling Plaintiffs to vote for governor, (2) hold that Article XI, Section 3 of the Tennessee Constitution—either facially or as Defendants applied in the vote on Amendment 1—violates the due process and equal protection clauses, (3) enter a verdict in Plaintiffs' favor, and (4) award Plaintiffs' relief including issuing a declaration that Article XI, Section 3, either as-applied or facially, is unconstitutional, voiding the results of the vote on Amendment 1, providing any other such relief as the Court deems appropriate, and awarding Plaintiffs their costs and attorneys' fees pursuant to 42 U.S.C. §§ 1983 and 1988.

Respectfully submitted,


By:      /s/ *William L. Harbison*
      William L. Harbison (B.P.R. No. 7012)
      C. Dewey Branstetter Jr. (B.P.R. No. 9367)
      Phillip F. Cramer (B.P.R. No. 20697)
      Hunter C. Branstetter (B.P.R. No. 32004)
      SHERRARD & ROE, PLC
      150 3rd Avenue South, Suite 1100
      Nashville, Tennessee 37201
      Tel.: (615) 742-4200
      Fax: (615) 742-4539
      bharbison@sherrardroe.com
      dbranstetter@sherrardroe.com
      pcramer@sherrardroe.com
      hbranstetter@sherrardroe.com

      Anita S. Earls (*Pro Hac Vice*)
      SOUTHERN COALITION FOR SOCIAL JUSTICE
      1415 West NC Highway 54, Suite 101
      Durham, North Carolina 27707
      Tel.: (919) 794-4198
      anita@scsj.org


      *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

     The undersigned hereby certifies that a true and exact copy of the foregoing was served upon the following:

| Counsel | Counsel for: | Via: |
|---|---|---|
| Janet M. Kleinfelter<br>Leslie Ann Bridges<br>Office of the Attorney General and Reporter<br>Public Interest Division<br>P.O. Box 20207<br>Nashville, TN 37202<br>(615) 741-7403<br><br>janet.kleinfelter@ag.tn.gov<br>leslie.bridges@ag.tn.gov | Defendants | ☐ United States Mail, postage prepaid<br>☐ Hand-delivery<br>☐ Facsimile transmission<br>☐ E-Mail<br>☐ Fed Ex<br>☒ CM/ECF |

This 1st day of April, 2016.


               /s/ *William L. Harbison*
               William L. Harbison