UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TRACEY E. GEORGE, ELLEN WRIGHT CLAYTON, DEBORAH WEBSTER-CLAIR, KENNETH T. WHALUM Jr., MERYL RICE, JAN LIFF, TERESA M. HALLORAN, and MARY HOWARD HAYES, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) No. 3:14-02182 ) Judge Sharp |
| WILLIAM EDWARD "BILL" HASLAM, as Governor of the State of Tennessee, in his official capacity, TRE HARGETT, as Secretary of State, in his official capacity, MARK GOINS, as Coordinator of Elections, in his official capacity; HERBERT H. SLATERY III, as Attorney General & Reporter of the State of Tennessee, in his official capacity; STATE ELECTION COMMITTEE OF TENNESSEE; JUDY BLACKBURN, as a member of the State Election Commission, in her official capacity; DONNA BARRETT, as a member of the State Election Commission, in her official capacity; GREG DUCKETT, as a member of the State Election Commission, in his official capacity; TOMMY HEAD, as a member of the State Election Commission, in his official capacity; JIMMY WALLACE, as a member of the State Election Commission, in his official capacity; TOM WHEELER, as a member of the State Election Commission, in his official capacity; and KENT YOUNCE, as a member of the State Election Commission, in his official capacity; | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

2

*"And if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for Governor, voting in their favor, such amendment or amendments shall become a part of this Constitution."*
Article XI, Section 3 of the Tennessee Constitution

This seemingly simple 172 year old sentence – unchanged save for a single word substitution more than six decades ago – is at the center of a Fourteenth Amendment challenge to the way votes were tabulated and certified on proposed constitutional Amendment 1 to the Tennessee Constitution in the November 4, 2014 state and federal general election ("the 2014 Election"). The matter was tried to the Court on the papers, and oral arguments were heard on April 5, 2016.

Having reviewed the parties' proposed findings and conclusions (Docket Nos. 110 & 112), their trial briefs and replies (Docket Nos. 111, 115 & 116), the oral arguments at the hearing, the record, and the exhibits received in evidence, the Court hereby enters the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. Except where the Court discusses different evidence on a specific issue, any contrary evidence on that matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts it deems to be immaterial to the issues presented. Finally, to the extent that a finding of fact constitutes a conclusion of law, the Court so concludes; to the extent that a conclusion of law constitutes a finding of fact, the Court so finds.[1]

# I. **Findings of Fact**

---

[1] In this regard, the Court notes that the following Findings of Fact include both legislative and adjudicative fact, the former of which are "facts that bear on the justification for legislation, as distinct from facts concerning the conduct of parties in a particular case ('adjudicative facts')." Moore v. Madigan, 702 F.3d 933, 942 (7th Cir. 2012); see Fed. R. Evid. 201(a) advisory committee's note. Because "[o]nly adjudicative facts are determined in trials," id., the Court does not technically make findings on the legislative facts, but only presents them in the factual findings to place the parties' legal arguments in context.

3

1. Plaintiffs are eight registered voters who voted in the 2014 Election. More specifically, Tracey E. George and Ellen Wright Clayton are professors at Vanderbilt University and reside in Nashville, Tennessee; Deborah Webster-Clair is an Obstetrician and Gynecologist who resides in Brentwood, Tennessee; Kenneth T. Whalum Jr. is the pastor of New Olivet Baptist Church in Memphis, Tennessee ,where he also resides; Meryl Rice is a social worker and small business owner who resides in Whiteville, Tennessee; Jan Liff is a registered nurse who resides Nashville; Teresa M. Halloran is the volunteer coordinator for Meals on Wheels in Franklin, Tennessee where she also resides; and Mary Howard Hayes, a Gallatin, Tennessee resident, is the former Director of the Public Health Department of Sumner County, Tennessee.

2. Defendants include the State Election Committee of Tennessee and eleven state officials who are sued in their official capacities. Those state officials are Governor William Haslam; Tre Hargett, the Secretary of State; Mark Goins, the Coordinator of Elections; Herbert Slatery III, the Attorney General and Reporter; and members (or former members) of the State Election Commission Judy Blackburn, Donna Barrett, Greg Duckett, Tommy Head, Jimmy Wallace, Tom Wheeler, and Kent Younce.

3. The 2014 Election was for state and federal offices, and included the race for Governor in which Defendant Haslam (the incumbent Republican Governor) was running for reelection against Democrat Charlie Brown and several third-party and independent candidates, including John Jay Hooker.

4. Also on the ballot were referendums on four proposed amendments to the Tennessee Constitution: Amendment 1 related to abortion; Amendment 2 related to the selection of appellate judges; Amendment 3 related to the prohibition of a state income tax; and Amendment 4 related to

charitable gaming events held by veterans' groups. The four proposed amendments were printed on the ballot directly after the list of candidates for governor as required by Tenn. Code Ann. § 2-5-208.[2]

5. Proposed Amendment 1, the passage of which led to the filing of this lawsuit, read:

Shall Article I of the Constitution of Tennessee be amended by adding the following language as a new, appropriately designated section:

Nothing in this Constitution secures or protects a right to abortion or requires the funding of an abortion. The people retain the right through their elected state representatives and state senators to enact, amend, or repeal statutes regarding abortion, including, but not limited to, circumstances of pregnancy resulting from rape or incest or when necessary to save the life of the mother.

(Parties Stipulation ¶ 1).

6. All four proposed Amendments were placed on the ballot in accordance with Article XI Section 3 of the Tennessee Constitution. Article XI contains two methods for amending the Tennessee Constitution, the "legislative" (or sometimes called the "referendum") method and the "convention" method. At issue in this case is the legislative method for constitutional amendment.

7. The current language governing the legislative method was adopted during the Constitutional Convention of 1953 and provides as follows:

---

[2] So far as relevant, the statute provides:

[W]henever the question of a state constitutional amendment is submitted to the vote of the people pursuant to article XI, § 3, paragraph 1 of the Tennessee Constitution, it shall be printed upon the ballot directly after the list of candidates for governor followed by the words "Yes" and "No", so that the voter can vote a preference by making a cross mark (X) opposite the proper word. Any question submitted to the people shall be worded in such manner that a "yes" vote would indicate support for the measure and a "no" vote would indicate opposition.

Tenn. Code Ann. § 2-5-208(f)(1).

Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives, and if the same shall be agreed to by a majority of all the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals with the yeas and nays thereon, and referred to the general assembly then next to be chosen; and shall be published six months previous to the time of making such choice; and if in the general assembly then next chosen as aforesaid, such proposed amendment or amendments shall be agreed to by two-thirds of all the members elected to each house, then it shall be the duty of the general assembly to submit such proposed amendment or amendments to the people at the next general election in which a Governor is to be chosen. And if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for Governor, voting in their favor, such amendment or amendments shall become a part of this Constitution. When any amendment or amendments to the Constitution shall be proposed in pursuance of the foregoing provisions the same shall at each of said sessions be read three times on three several days in each house.

Tenn. Const. Art. XI, § 3.

8.  The legislative method was first adopted during the Constitutional Convention of 1834. This method was seen as providing a more convenient and less expensive way to amend the Constitution than calling a constitutional convention, while at the same time insuring that amending the constitution did not become too easy of a process.

9.  The language found in the present version of Article XI, Section 3 is substantially the same as that found in its original iteration,[3] with two exceptions.  First, the language "voting for representatives" in the 1834 Constitution was replaced with "voting for Governor," at least in part

---

[3]  In relevant part, Article XI, Section 3 of the 1834 Constitution provided that, after a proposed amendment was passed by two successive legislature, then

it shall be the duty of the General Assembly to submit such proposed amendment or amendments to the people, in such manner, and at such time as the General Assembly shall prescribe. And if the people shall approve and ratify such amendment or amendments, by a majority of all the citizens of the State, voting for representatives, voting in their favor, such amendment or amendments shall become part of this constitution.

6

due "the difficulty [in] the requirement that a majority of all those voting for representatives, not just a majority of those voting on the amendment, must approve any amendment proposed by the legislature."  (Docket No. 110-09 at 198).  Second, the 1834 requirement that the General Assembly submit a proposed amendment to the people "at such time as the General Assembly shall prescribe" was replaced with "at the next general election in which a Governor is to be chosen."

10.  A good portion of the 1953 Constitutional Convention was devoted to determining whether the legislative method of Article XI, Section 3 should be amended.  A majority proposal from the Committee on the Amendment Process, and the one that ultimately prevailed, was to leave the ratification requirement unchanged (save for the two differences noted above).  The minority proposal was to require ratification by only a majority of those voting on the amendment.  A substitute minority report proposed requiring ratification by a two-thirds majority of those voting on the amendments.

11.  Defendants submit as proposed findings that "[d]elegates to the Constitutional Convention of 1953 understood the ratification requirements of article XI, section 3, to require a comparison of the number of votes casts in favor of the amendment to the total number of votes for representatives or governors," and that "[t]here is no evidence that either the delegates to the Constitutional Convention 1953 or the public understood article XI, section 3, to make voting for representatives a precondition for having one's vote on a proposed constitutional amendment counted." (Docket No. 110, at 10,  ¶¶ 37 & 39).  The Court does not make that finding because the evidence presented on the issue is conflicting at best.

12. Even though support for Defendants' proposed findings can be found in the 1953 Journal and Proceeding of the Limited Constitutional Convention, State of Tennessee ("1953 Journal"), as

well as contemporaneous reporting of the proceedings published in *The Tennessean* and the *Kingsport News* newspapers, that evidence is far from conclusive.

For example, in responding to a request to supply statistical data about the passage of prior amendments, Delegate Gilreath simply reported the total number of votes for and against each amendment and the total number of votes for representatives, without in any way suggesting that only voters who voted for representatives could vote on the amendments. However, immediately before reciting those statistics, Delegate Gilreath said, "I have often marveled at the simplicity of the amending process under Section 3; all on the earth it requires is that a majority voting for representatives shall vote for a constitutional amendment and it is amended; it is simle [sic] and it is certain," (Docket No. 110-9 at 177). This statement at least plausibly suggests the requirement that those voting on an amendment also vote for representative. (Id. at 198).

Further, while Defendants rely on Delegate Sims' advice to his "friends not to vote in uncontested legislative races because it would give the amendment a better chance," (id. at 254) and assert this "would have made little sense if a voter could not vote on an amendment without first voting for representatives," (Docket No. 115 at 21-22), Delegate Sims labeled this process "crazy" (Docket No. 110-9 at 254). In fact, he earlier stated "that the present requirement of 'those voting for members of the House of Representatives'" was "ambiguous." He urged his fellow delegates to "clear up this confusion" by altering that requirement to a simple "two-thirds" vote for an amendment. But in making this suggestion, Sims stated that § 3 would require "a majority of those voting for members of the House of Representatives." Sims's phrasing arguably suggests that he thought that, under § 3, a voter must first vote for a representative in order for his or her vote on a proposed amendment to count.

8

Additionally, several delegates stated that under the preconvention version of Article XI, Section 3, it was difficult to count votes. This included Delegate Sims, who, in commenting on the ambiguity of the phrase "those voting for member of the House of Representatives" lamented "that the number can never be mathematically ascertained." (Id.). Since counting the number of votes for and against an amendment and counting the number of votes for a representative would both appear to be a straightforward processes, it could be that the difficulty stemmed from trying to ascertain who of those voting for and against an amendment also voted for representatives. (Id. at 201).

In short, the record, assuming it is complete, is far from definitive regarding what the Delegates at the 1953 convention were thinking. The record is even less clear as to what the public may have understood. And, tellingly, neither the 1953 Journal excerpts, nor the contemporary newspaper articles explicitly mention the two-step reading of Article XI, Section 3 that Defendants now advance.

13. Regardless of the intent of the drafters at the 1953 convention, at least since 1995, and likely for long before then, whether a proposed constitutional amendment passed was based on counting the number of "yes" and "no" votes, counting the total number of votes casts in the governor's race and comparing the two.[4] That is, there was no effort to correlate the votes to count only votes on an amendment that were cast by voters who voted for governor.

---

[4] In addition to the 2014 Election, Defendants have submitted certified results for 1970, 1982, 1998, 2002, 2006, and 2010 elections which seems to show that this was the method used. There is no evidence before the Court that any other method was used to calculate whether an amendment passed since Article XI, Section 3 was amended in 1953.

9

14. Brook Thompson, the Coordinator of Elections for the State of Tennessee from 1995 to 2009, has filed a declaration in which he claims that he interpreted article XI, section 3, to require an amendment to be (a) approved, by receiving "yes" votes equal to more than half of the votes cast on the amendment, and (b) ratified by receiving "yes" votes equal to more than half of the total votes cast for governor. Thus, he did not interpret Article XI, Section 3, to mean that a voter must first vote for governor in order to have his or her vote on a proposed amendment counted. This interpretation was followed by Mr. Thompson when determining whether proposed amendments that appeared on the ballot in the general elections of 1998, 2002 and 2006 had been passed.

15. Two amendments appeared on the ballot in each of the 1998, 2002 and 2006 ballots. On the 2002 ballot was a proposed amendment to establish a state lottery and to abolish the $50 limit on fines without a jury trial. Under Mr. Thompson's direction, his office prepared what he characterizes as a Frequently Asked Question sheet ("FAQ sheet") that was titled "Constitutional Amendment Issues." That document, placed on the Secretary of State's Website and otherwise made available to the public, stated in pertinent part:

**Counting the Votes**

In order for the amendment to pass and become part of the Constitution, two things must happen:

1. The amendment must get more "yes" votes than "no" votes; and

2. The number of "yes" votes must be a majority of the votes cast in the gubernatorial election.

To determine the votes needed, all votes for all candidates for governor are added together. This number is divided by two or halved. The number of "yes" votes must exceed that number. If the number of "yes" votes exceeds the number, the Constitutional amendment passes and becomes part of the Constitution.

10

**Voting**
Despite the fact that the number of votes cast for governor is used to determine the outcome, it is not necessary to vote in the governor's race in order to vote on the Constitutional amendment. Likewise, it is not necessary to vote for an amendment in order to vote in the governor's race.

(Docket No. 110-11 at 14). A similar information sheet appeared on the Secretary of State's website before the 2006 election in which voters considered an amendment relating to the definition of marriage as being between one man and one woman, and an amendment that would allow the legislature to implement a grant of property tax relief to citizens sixty-five years of age and older.

16. In February 2009, Defendant Goins was appointed Coordinator of Elections by the Secretary of State. During his tenure, four proposed amendments appeared on the ballot, one during the 2010 general election, and four during the 2014 election, including the amendment at issue in this case.

17. Defendant Goins has filed a declaration in which he states that when the proposed amendment appeared on the ballot in the 2010 general election, he interpreted Article XI, Section 3 to mean that, in order to pass, an amendment must be (a) approved, by receiving "yes" votes equal to more than half of the total votes cast on the amendment; and (b) ratified, by receiving "yes" votes equal to more than half of the total votes cast for governor. Like Mr. Thompson, he did not interpret Article XI, Section 3, to mean that a voter must first vote for governor in order to have his or her vote on a proposed amendment counted.

18. Mr. Goins claims that he reached this interpretation based on his reading of the text of Article XI, Section 3, and from conversations with his staff about how the provision had been interpreted and applied in previous elections. Those conversations included discussions with Beth Henry-Robinson, the Assistant Coordinator of Elections, who had been with the Division of

11

Elections since 1995, and had been involved in the counting of votes on the proposed amendments in the 1998, 2002 and 2006 elections. Ms. Henry-Robinson also showed Mr. Goins the FAQ sheets utilized during the earlier elections involving proposed constitutional amendments. Mr. Goins staff prepared a similar information sheet for the 2010 election that included a proposed amendment giving citizens the personal right to hunt and fish. That information sheet contained the identical language used by Mr. Goins' predecessor relating to "Counting the Votes" and "Voting."

19. Before the 2014 election, the Division of Elections received inquiries regarding how the votes on the proposed constitutional amendments would be counted. One such inquiry came from the Davidson County Election Commission and asked whether Article XI, Section 3, required a voter to first vote for governor in order to have his or her vote on a proposed constitutional amendment counted. Defendants Hargett and Goins claim that they further researched the issue and talked to prior election officials in an effort to confirm their belief that the answer to the question was "no." 20. Blake Fonteney, a spokesman for the Secretary of State, explained to members of the media that there was no requirement that voters first vote for governor in order to have their votes on the proposed amendments counted. This position was made known to the public through newspaper articles. For example, the Nashville Scene reported Mr. Fonteney as indicating that "you [a voter] do not actually have to vote for a gubernatorial candidate in order for your vote for or against an amendment to count (or vice versa)," and quoted him as saying "'[t]here's no requirement to vote in any race." Cari Wade Gervin, Your Guide to the four propositions of Tuesday's ballot, THE NASHVILLE SCENE, October 30, 2014, http://www.nashvillescene.com/ nashville/your-guide-to-the-four-propositions-on-tuesdays-ballot/Content?oid=4759989 (all Websites last visited April 21, 2016).

12

21.    Apparently because of the way that votes were to be counted, assorted groups, organizations, and individuals encouraged voters either to vote or not vote for governor in order to affect the denominator that would be utilized to determine whether Amendment 1 passed.  That is, those in favor of Amendment 1 were urged to vote only for Amendment 1 and not for governor; those opposed were urged to vote against Amendment 1 and also for governor.

22.  Far and away, the largest campaigns were by those who favored passage of Amendment 1.  They spread their message – encouraging voters not to vote in the Governor's race so as to increase the likelihood that Amendment 1 would pass – by phone calls, yard signs, mailers, leaflets, newspapers, the Internet, and church bulletins.  A few examples give the flavor of the messages and their wide-spread scope:

A.  A video titled "Double Your Vote on Amendment 1" explained:

You may know that if you vote yes on Amendment 1, you will be protecting women and children in Tennessee. The truth is you can double your vote by doing one simple thing don't vote in the governor's race.

Did you hear that? If you want to double your vote, don't vote in the governor's race. Okay. Let me explain. The reason behind it is a little-known statement in the Tennessee Constitution that says for a constitutional amendment to pass, it must receive one more vote than half the number of total votes cast in the governor's race.

For example, if a million people vote in the governor's race, it doesn't matter which candidate they vote for. Then Amendment 1 needs 500,001 votes to pass. It doesn't matter if 500,000 people vote yes for Amendment 1 and only 3 vote against it. It will still fail since it doesn't have one more than half the total in the governor's race.

I know you may think this is crazy. It doesn't matter. It's the law. What does it mean for us? Vote yes for Amendment 1 but don't vote in the governor's race. The less people who vote in the governor's race means it takes less votes to pass the amendment. In other words, if you vote yes on 1 but don't vote in the governor's race, you'll double your vote.

Here's the deal, please tell your friends. Forward this video to them. Use social media and get out there and vote yes on Amendment 1, but don't vote in the

13

governor's race.

"Double Your Vote on Amendment 1," www.youtube.com/watch?v=7mnIgn-WXls

B. The October 12, 2014 Cathedral of the Incarnation Church's bulletin in Nashville

contained a half-page devoted to "Yes on 1" that contained the following statement:

Bottom Line: you MUST VOTE and tell others. Amendment 1 must be approved by
50% + 1 of those casting a vote in the Governor's race. You do not need to vote for
a governor, if you do not want too [sic]. In fact, not voting in the uncontested
governor's race counts as a vote and a half for Amendment 1.
(Docket No. 5 at 4).

C. A Website titled "truthon1.org" with accompanying Facebook page was

developed which contained videos and written material favoring voting in favor of

Amendment 1, but not for governor. Typical are banners that stated:

"IF YOU WANT TO DOUBLE YOUR
VOTE, DON'T VOTE IN THE GOVERNOR'S RACE";

"DON'T VOTE? WHAT?

*You read that right*

If you vote Yes on Amendment but don't vote for in the governor's
race, then you actually double the impact of your vote. Don't vote
for governor this election cycle";

and

ONE MORE THAN HALF

To pass amendment 1

The reason behind this is a little known law in the Tennessee
Constitution that says for a Constitutional Amendment to pass, it
must receive 1 more vote than half the number of votes cast in the
governor's race.

(Docket No. 109 at 1, 5 & 6).

23 The campaign to vote in favor of Amendment 1, but not for governor was covered by

news and media outlets in the state. This included an October 16, 2014 editorial in the *Memphis*

14

*Flyer*, an article in *The Tennessean* on October 27, 2014, and a November 4, 2014 article on the website of Knoxville television station WBIR.

24.   At least some of the Defendants, including Secretary of State Hargett and Coordinator of Elections Goins, were aware of the "double your vote" campaign before the November 4, 2014 election. This is hardly surprising given the publicity the campaign received.[5]  However, there is no evidence that any of the Defendants participated in the campaigns or that any of them acted in anything less than good faith in conducting the election and tabulating the results.

25.   When voters went to the polls on November 4, 2014, all registered and qualified voters were eligible to vote on any or all of the four proposed constitutional amendments, regardless of whether they voted for governor.

26.   The certified election results from the 95 county election commissions showed the Governor Haslam was reelected and that all four Amendments passed.  A total of 1,430,117 voters voted in the 2014 election.  A breakdown of those votes as it pertains to this case is as follows:

   • 1,353,728 votes were cast for governor, meaning that approximately 95% of the voters voted for governor.[6]

---

[5]  Additionally, on October 28, 2014, Mr. Hooker wrote Governor Haslam an open letter in which he asked that the Governor either join him in a declaratory judgment action or advise the people of the state that to vote for an amendment a voter must also vote in the governor's race.  From the terms of the letter, however, Mr. Hooker's concern was with Amendment 2 relating the selection of judges, a matter that was unquestionably dear to Mr. Hooker's heart, given the number of lawsuits he filed over the years on the issue. See, e.g., Hooker v. Haslam, 437 S.W.3d 409 (Tenn. 2014); Hooker v. Haslam, 393 S.W.3d 156 (Tenn. 2012); Johnson v. Bredesen, 356 Fed. App'x 781 (6th Cir. 2009); Hooker v. Anderson, 12 Fed. App'x 323 (6th Cir. 2001).

[6]  According to Defendants, this percentage is not substantially different from the percentage in recent elections: in 2010, approximately 99% of voters who voted in the election voted for governor; in 2006 that figure was 97%; in 2002 the figure was 98%; in 1998 the figure was 95% ; and, in 1994, 97% of voters who voted in the election voted for governor.  Not a lot can be drawn from this, however, because the percentage (96.94%) of voters who cast ballots in the 2014 election voted on Amendment 1 at a higher rate than the equivalent percentage on past constitutional amendments: 88.68% for the single amendment in 2010; 93.5%

15

•1,386,355 votes were cast on Amendment 1. Of those, 729,163 votes were cast in favor of Amendment 1, and 657,192 votes were cast against Amendment 1.

27.   Defendant Goins determined Amendment 1 passed because (a) the number of "yes" votes (729,163) exceeded a majority (693,178) of the total votes cast on the amendment (1,365,355), and (b) the number of "yes" votes on the amendment (729,163) exceeded a majority (676,865) of the total votes cast for governor (1,353,728).

28.   On December 8, 2014, and in accordance with their statutory duties, Governor Haslam, Attorney General Slatery, and Secretary Hargett certified the results of the 2014 Election, including the results for the election on Amendment 1.

29.   Each of the Plaintiffs voted in the 2014 Election, voted in the gubernatorial race, and voted against ratifying Amendment 1.

30.   The 2014 Election was the first time since Article XI, Section 3 of the Tennessee Constitution was amended in 1953 that more votes were cast on a proposed constitutional amendment than in the Governor's race.

31.   Three days after the 2014 Election, Plaintiff filed suit in this Court. The First Amended Complaint is in two counts. Count I alleges the denial of due process due to a fundamentally unfair voting scheme; Count II alleges the denial of equal protection of the law due to disenfranchisement through vote dilution. Plaintiffs seek the following forms of relief: (i) a declaration that Article XI, Section 3, of the Tennessee Constitution requires that Defendants tabulate the votes on Amendment 1 based only on the number of only voters who both voted for governor and voted on Amendment

_____

and 87.77% for the two amendments in 2006; 92.1% and 78.57% for the two amendments in 2002; and 74.79% and 74.68% for the two amendments in 1998.

1; (ii) a declaration that Defendants' vote tabulation method violates the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment; (iii) a declaration that the election results for Amendment 1, as currently certified, are void; (iv) an injunction requiring Defendants to recount the vote on Amendment 1 to correlate votes in the governor's race with votes on Amendment 1; (v) if Defendants are unable to correlate the votes or if Plaintiffs' interpretation of Article XI, Section 3 is unconstitutional, a declaration that the 2014 Election vote on Amendment 1 is void; and (vi) costs, expenses, and reasonable attorney's fees.

32. Election data for each county in Tennessee is kept and secured at the county level. Since this suit was filed, Defendants have not attempted to recount the ballots to determine whether Amendment 1 would have passed had it been based on the number of voters who vote on Amendment 1 and also voted for governor. Nevertheless, such a recount is possible for each of the 95 counties, save one. On January 7, 2015, a fire destroyed the county administration building in Van Buren County, along with the election machines stored therein. However, Van Buren county is a relatively small county with a small voter population.

## II. Conclusions of Law

From the parties' perspectives, what this Court characterized at the outset as a seemingly simple sentence is subject to two different readings, one of which potentially places the passage of Amendment 1 into doubt. The difference in the readings, in its simplest form, is whether voting for governor is a precondition to having a vote on an amendment count. Prior to reaching the substantive arguments on the proper interpretation and its application, however, the Court must address several preliminary matters concerning Plaintiffs' claims.

## A. Standing, Abstention, Abandonment and Waiver

Defendants first argue that Plaintiffs lack standing. They lack standing to assert a vote dilution or a fundamental unfairness claim, the argument goes, because they suffered no injury in fact inasmuch as the "no" votes cast by voters like Plaintiff were weighed the same as those who voted in favor of Amendment 1 but abstained from voting for governor. And, they lack standing to assert a compelled voting (or compelled abstention) claim because they have not proven they were personally compelled to vote for governor or abstain. The Court is unpersuaded by either argument.

Standing was discussed in some detail in this Court's prior ruling. George v. Haslam, 112 F. Supp. 3d 700, 707-09 (M.D. Tenn. 2015). That is typical, as "[m]ost standing cases consider whether a plaintiff has satisfied the requirement when filing suit[.]" Hollingsworth v. Perry, 133 S. Ct. 2652, 2661 (2013). Nevertheless, because "Article III demands that an 'actual controversy' persist throughout all stages of litigation," id., and "standing is '[o]ne element' of the Constitution's case-or-controversy limitation on federal judicial authority, expressed in Article III," Arizona State Legislature v. Arizona Independent Redistricting Commission, 135 S. Ct. 2652, 2663 (2015) (citation omitted), "[a] plaintiff must maintain standing throughout all stages of [the] litigation." City Commc'ns, Inc. v. City of Detroit, 888 F.2d 1081, 1086 (6th Cir. 1989)

As this Court pointed out in its prior ruling:

The constitutional requirements for standing were explained by the Supreme Court in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992):

First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained – the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will

18

be redressed by a favorable decision.

(internal quotation marks, citations, and footnote omitted).

George, 112 F. Supp. 3d at 706-07.   This Court went on to conclude:

> Read fairly, and stripped to its essence, Plaintiffs' claimed injury is that their individual votes on Amendment 1 were not counted and valued the same way as other votes, making their injury distinct.  Their alleged injuries are specific to them, and those like them, who (1) were registered to vote; (2) voted in the November 4, 2014 election; (3) voted in the gubernatorial race in that election; (4) voted against Amendment 1, and (5) (allegedly) had the relative values of their particular votes devalued. As such, theirs is not a generalized grievance about a law not being followed that is applicable to all, a point best exemplified by the fact that those voters who cast ballots only in favor of Amendment 1 were allegedly not injured.  In short, Plaintiffs claim "a plain, direct and adequate interest in maintaining the effectiveness of their votes." . . .
>
> "Where a plaintiff's voting rights are curtailed, the injury is sufficiently concrete to count as an injury in fact" because, in such cases, "the plaintiffs 'are asserting a plain, direct and adequate interest in maintaining the effectiveness of their votes," . . . not merely a claim of "the right possessed by every citizen to require that the government be administered according to law." . . .

George, 112 F. Supp. 3d at 709.

Nothing has changed since the foregoing observations were made.  This Court's conclusion remains the same notwithstanding Defendants argument that "[t]he evidence presented in this case" reveals Plaintiffs' "premise to be completely flawed[,] . . . because the decisive calculation for determining whether Amendment 1 passed was a simple comparison of 'yes' and 'no' votes on the amendment, with each vote having exactly the same power to affect the outcome of the vote[.]" (Docket No. 36 at 26 & 27).  Such an argument, the Court believes, conflates standing with the merits of the case, yet "one must not 'confus[e] weakness on the merits with absence of Article III standing.'"  Arizona State Legislature v. Arizona Indep. Redistricting Comm'n, 135 S. Ct. 2652, 2663 (2015) (quoting Davis v. United States, 131 S.Ct. 2419, 2434, n. 10 (2011); see also, Warth

v. Seldin, 422 U.S. 490, 500, 95 S. Ct. 2197, 2206 (1975) ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal"); Arreola v. Godinez, 546 F.3d 788, 794-95 (7th Cir. 2008) ("Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing. Standing is a prerequisite to filing suit, while the underlying merits of a claim . . . determine whether the plaintiff is entitled to relief.").

Defendants next argue that "Plaintiffs plainly lack standing to assert any compelled voting claim because they have not alleged or adduced any evidence that they personally were compelled to vote for governor." (Docket No. 37 at 28). As support, Defendants cite the following exchange from the deposition testimony of Plaintiff Clayton:

> Q. . . . So is it your position that your civil rights are violated when a voter chooses not to vote for governor but votes for a referendum?
>
> A. Yes.
>
> Q. What would you do if you wanted to vote for – or in, I will rephrase, if you wanted to vote in a referendum in an election but did not want to vote for governor?
>
> A. I actually always vote for governor when I vote on an amendment.
>
> Q. So that hypothetical would not take place?
>
> A. It would not take place.

(Docket 89-8, Clayton Depo. at 56).

No doubt, to establish constitutional standing a plaintiff must show that he or she was injured by a defendant's actions; generalized grievances usually do not suffice. See Lance v. Coffman, 549 U.S. 437, 439-441 (2007); Green Party of Tenn. v. Hargett, 767 F.3d 533, 543 (6th Cir. 2014) Smith v. Jefferson Cty. Bd. of Sch. Commis., 641 F.3d 197, 207 (6th Cir. 2011). The Supreme Court essentially said as much in Lujan: "In requiring a particular injury, the Court meant that 'the injury

must affect the plaintiff in a personal and individual way.'" Ariz. Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 131 S.Ct. 1436, 1442, 179 L.Ed.2d 523 (2011) (quoting Lujan, 504 U.S. at 560 n. 11).

Nevertheless, Defendants' single citation to Plaintiff Clayton's testimony is an insufficient basis on which to dismiss Plaintiffs' compelled voting claim because "only one plaintiff needs to have standing in order for the suit to move forward." Parsons v. U.S. Dep't of Justice, 801 F.3d 701, 711 (6th Cir. 2015) (citing Horne v. Flores, 557 U.S. 433, 446–47 (2009)). Plaintiff Rice appears to have said the exact opposite of Plaintiff Clayton, to wit, that she would vote for governor (even when she did not want to) in order to vote on a referendum, (Docket No. 89-6 Rice Depo. at 130-131), and Plaintiff Webster-Clair voiced the opinion that in order to vote on a constitutional amendment, a voter was required to vote for governor (Docket No. 89-9, Webster-Clair Depo. at 56).

Nor will the Court ignore the compelled voting claim on the grounds that a separate cause of action was not pled for that claim. Count I of the Amended Complaint alleges "a fundamentally unfair system of vote tabulation that severely burdens Plaintiffs' right to vote," and that "[b]y devaluing Amendment 1 votes from voters who voted for governor, Defendants have violated fundamental fairness" in violation of the Due Process Clause of the Fourteenth Amendment. (Docket No. 51, Amended Complaint ¶¶ 53-54). While the term "compelled voting" never appears in the Amended Complaint as such, all the rules require is sufficient notice of the claim. Indeed, "the 'simplified notice pleading standard' of the Federal Rules 'relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 585 (2007) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)).

21

The potential that compelled voting was an issue has been in play since at least the filing of the Motion to Dismiss and the Court's ruling thereon.  Further, and while it is true that once a case gets beyond the motion to dismiss stage "the liberal pleading standards under <u>Swierkiewicz</u> and [the Federal Rules] are inapplicable'" <u>Tucker v. Union of Needletrades, Industrial & Textile Employees</u>, 407 F.3d 784, 788 (6th Cir. 2005) (citation omitted, bracket in original),  as the above-mentioned citations to deposition testimony make clear, at least some of the Plaintiffs were specifically asked about whether they felt compelled to vote in a particular way and said that they did.  Additionally, and while Defendants' lodged an objection "[t]o the extent that Plaintiffs seek to amend their pleadings to raise new constitutional claims," Plaintiffs' theory of the case, as set forth in the Joint Proposed Pretrial Order, included the claims that the tabulation method employed "forc[ed] proponents of Amendment 1 to choose between increasing the likelihood of the passage of Amendment 1 and exercising their constitutional right to vote in the governor's race, and . . . compell[ed] Plaintiffs and other voters against Amendment 1 to vote in the governor's race in order for their vote to count at all for purposes of ratification." (Docket No. 95 at 1-2).  Defendants simply cannot claim unfair surprise. <u>Cf</u>.  <u>Goodson v. Bank of Am., N.A.</u>, 600 F. App'x 422, 427 (6th Cir. 2015) (citation omitted) ("A plaintiff may not raise a new theory for the first time in opposition to summary judgment because '[t]o permit a plaintiff to do otherwise would subject defendants to unfair surprise.'").

Similarly, the Court will not dismiss Plaintiffs' fundamental unfairness claim, although it presents somewhat the procedural converse of the compelled voting claim.  Defendants object to inclusion of the fundamental unfairness claim because it was allegedly abandoned and not specifically mentioned in the Joint Pretrial Order.  This is a somewhat curious position to take

because, as just noted, in that same document Defendant also objected to trying anything that was not specifically pled in the Amended Complaint and they concede that "Plaintiffs' First Amended Complaint includes a claim under the Due Process Clause that Plaintiffs were subjected to a fundamentally unfair voting scheme." (Docket No. 111 at 29). Regardless, and while the precise phrase "fundamentally unfair" does not appear in the Pretrial Order, the substance of the claim certainly does. Besides, Rule 16(e) of the Federal Rules of Civil Procedure allows the Court to amend the pretrial order "to prevent manifest injustice," Fed. R. Civ. P. 16(e), and it would be manifestly unjust and an abuse of discretion not to consider a claim which was specifically pled, has been a part of this case since the inception, has been fully litigated, and has caused no prejudice to Defendants. See, Jones v. Potter, 488 F.3d 397, 411 (6th Cir. 2007) (citation omitted) ("district courts have broad discretion to modify or enforce pretrial orders"); Hunt v. Cty. of Orange, 672 F.3d 606, 616 (9th Cir. 2012) (factors to consider under Rule 16(e) include "(1) the degree of prejudice or surprise to the defendants if the order is modified; (2) the ability of the defendants to cure any prejudice; (3) the impact of the modification on the orderly and efficient conduct of the case; and (4) any degree of willfulness or bad faith on the part of the party seeking the modification"); Manley v. AmBase Corp., 337 F.3d 237, 249 (2nd Cir. 2003) (a pretrial order is not "a legal 'strait-jacket' binding the parties and court to an unwavering course at trial").

Defendants also argue that this Court should abstain from ruling on Plaintiffs' claims pursuant to the abstention doctrine announced in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496 (1941) until the Tennessee courts have authoritatively construed Article XI, Section 3. As an alternative, Defendants request that the Court certify the question to the Tennessee Supreme Court. These arguments, too, were considered in some detail, but rejected in this Court's ruling on

Defendants' Motion to Dismiss. <u>George</u>, 112 F. Supp.3d 713-15. Nevertheless, and unlike the issue of standing, there is a changed circumstance that requires mention.

Some nine months after this case was filed, and after the Court had issued its adverse ruling on Defendants' Motion to Dismiss, Defendants filed a parallel action in state court. For unexplained reasons, that case, styled <u>Hargett v. George</u>, Civil No. 44460 (2015), was filed in the Williamson County Chancery Court, even though the Davidson County Chancery Court would seem to have been the most logical venue. Regardless, the fact that Defendants chose to file the parallel suit does not warrant abstention because "principles of comity and federalism do not require a federal court to abandon jurisdiction it has properly acquired simply because a similar suit is later filed in state court." <u>Town of Lockport v. Citizens for Cmty. Action at Local Level, Inc.</u>, 430 U.S. 259, 264 n.8 (1977).

Moreover, the relief sought between the two cases is different. Here, and particularly as it relates to Plaintiffs' as-applied claims, the issue is retrospective: did the tabulation method utilized to count the votes on Amendment 1 violate either Article XI, Section 3 or the federal constitution? In contrast, the issue in the Williamson County declaratory judgment action is prospective: how should that provision of the Tennessee Constitution be applied in future elections?

Just yesterday, Judge Michael Binkley issued a ruling in the state case and found that Defendants' interpretation and application of Article XI, Section 3 was correct. As expected, Judge Binkley did not base his ruling on the federal constitution,[7] and the difference between the two cases

---

[7] Even so, and "[a]lthough not being disposed to instruct the United States District Court for the Middle District of Tennessee how to apply the federal constitution," Judge Binkley went on to "point out . . . that the Supreme Court of the United States has ruled that otherwise plain and unambiguous statutory provisions should be construed so as to effectuate the underlying fundamental purpose of the statute." <u>Hargett v. George</u>, Case No. 44460, Slip. Op. at 15 n.1 (April 21, 2016).

24

segues back into the primary reasons that this Court declined to abstain previously: (1) federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," <u>Colorado River Water Conservation District v. United States</u>, 424 U.S. 800, 817 (1976), and (2) <u>Pullman</u> abstention "is appropriate only where state law is unclear and a clarification of that law would preclude the need to adjudicate the federal question," <u>Hunter v. Hamilton County Board of Elections</u>, 635 F.3d 219, 233 (6th Cir.2011). "[T]he purpose of <u>Pullman</u> abstention is not to afford state courts an opportunity to adjudicate an issue that is functionally identical to the federal question," but rather, "to avoid resolving the federal question by encouraging a state-law determination that may moot the federal controversy." <u>San Remo Hotel, L.P. v. City and Cty. of San Francisco</u>, 545 U.S. 323, 339, 125 S.Ct. 2491, 162 L.Ed.2d 315 (2005).

Judge Binkley's recent determination as to how Article XI, Section 3 should be applied going forward does not address the question of whether its application in the 2014 Election violated the United States Constitution. Moreover, [i]n considering abstention, [a court] must take into account the nature of the controversy and the importance of the right allegedly impaired," and it has been held that "voting rights cases are particularly inappropriate for abstention." <u>Siegel v. LePore</u>, 234 F.3d 1163, 1174 (11th Cir. 2000); <u>see</u> <u>also</u>, <u>C-Y Dev. Co. v. City of Redlands</u>, 703 F.2d 375, 381 (9th Cir. 1983) (while "there is no *per se* civil rights exception to the abstention doctrine . . . the Supreme Court has demonstrated a reluctance to order abstention in cases involving certain civil rights claims, such as voting rights").

This Court's decision not to abstain is not undertaken lightly. Even though Judge Binkley has given his interpretation of the pertinent sentence in Article XI, Section 3, that ruling is subject

25

to review,[8] and "[a] State's highest court is unquestionably 'the ultimate exposito[r] of state law.'" Riley v. Kennedy, 553 U.S. 406, 425 (2008) (quoting Mullaney v. Wilbur, 421 U.S. 684, 691 (1975)).

The "recognition of the role of state courts as the final expositors of state law implies no disregard for the primacy of the federal judiciary in deciding questions of federal law." Id. While "the state courts share equivalently with the federal courts the responsibility of protecting constitutional guarantees," The News-Journal Corp. v. Foxman, 939 F.2d 1499, 1508 (11th Cir. 1991), and a "state court is "duty bound to enforce the provisions of the United States Constitution," Adrian Energy Associates v. Michigan Public Service Commission, 481 F.3d 414, 422 (6th Cir. 2007), the Williamson County Chancery Court was simply not called upon to decide the issues presented to this Court.

## B. Interpretation of Article XI, Section 3

As noted at the outset, the specific language at the center of this case states that "if the people shall approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for governor, voting in their favor, such amendment or amendments shall become a part of this Constitution." Tenn. Const. Art. XI, Sec. 3. Plaintiffs read this language to mean that "in order for a proposed constitutional amendment to be ratified, it must receive a majority of the votes cast in its favor from those voters who voted for Governor." (Docket No. 116 at 28). In other words, an "amendment must pass not merely by a majority of all citizens of the state voting in its favor or by a majority of the number of citizens voting for governor; rather, to pass, an amendment must be

---

[8] It may be, however, that the state court Defendants (Plaintiffs here) choose not to file an appeal, leaving the prospect that the only other decision on the issue is a Chancery Court case.

26

ratified by a majority comprised of 'all the citizens of the state voting for governor,' i.e., voting for governor is critical to voting for an amendment." (Id.).

Defendants' interpretation is a bit more complicated and involves a two-step process. They read the language to mean that, "in order to pass, an amendment must be both: (i) approved, by receiving 'yes' votes equal to more than half of the total votes cast on amendment; and (ii) ratified, by receiving 'yes' votes equal to more than half of the total votes cast for governor." (Docket No. 111 at 4-5). As further amplification, Defendants write:

> Put another way, [an] amendment must at least get a majority of the votes cast on the amendment. If more people vote for governor than for the amendment, however, the threshold for passage increases to a majority of the total votes cast for governor. In practice, when the number of votes cast on an amendment exceeds the number of votes cast for governor, all that matters is whether the amendment was approved, because the threshold for approval will always be higher than for ratification in that scenario.

> For example, if 200 people vote on an amendment, with 90 people voting in favor of the amendment and 110 against, and only 100 people vote for governor, the amendment would not pass. It would not be approved, because the 90 "yes" votes cast on the amendment would not be more than half of the 200 total votes cast on the amendment. While it would meet the ratification threshold, because the 90 "yes" votes are more than half of the 100 total votes cast for governor, it still would not pass because it did not meet the higher threshold necessary for approval.

> Under Defendants' interpretation of Article XI, Section 3, voting for governor is not a precondition for voting on an amendment or for having one's vote on an amendment counted. To the contrary, under Defendants' interpretation, any registered and qualified voter may cast a vote on a proposed amendment, and all votes cast on an amendment are counted in determining whether the amendment has passed.

(Id. at 5).[9]

---

[9] This two-step process was not explained until Defendants made their trial filings. Prior to then, the Court understood that, for an amendment to pass, the total number of "yes" votes on the amendment had to be one voter more than 50% of the number of voters who voted for governor, effectively making the negative votes meaningless. As the Court explained:

"Issues of constitutional interpretation are questions of law." Waters v. Farr, 291 S.W.3d 873, 882 (Tenn. 2009) (citation omitted). "The courts are to construe constitutional provisions as written without reading any ambiguities into them." State ex rel. Sonnenberg v. Gaia, 717 S.W.2d 883, 885 (1986) (citing Chattanooga-Hamilton Co. Hosp. Auth. v. Chattanooga, 580 S.W.2d 322, 327 (Tenn.1979). As the Tennessee Supreme Court has stated:

> When a provision clearly means one thing, courts should not give it another meaning. The intent of the people adopting the Constitution should be given effect as that meaning is found in the instrument itself, and courts must presume that the language in the Constitution has been used with sufficient precision to convey that intent. . . Constitutional provisions will be taken literally unless the language is ambiguous.
>
> When the words are free from ambiguity and doubt and express plainly and clearly the sense of the framers of the Constitution there is no need to resort to other means of interpretation. Shelby County v. Hale, 200 Tenn. 503, 292 S.W.2d 745, 748 (1956). . . .

Hooker v. Haslam, 437 S.W.3d 409, 426 (Tenn. 2014); see also, Mills v. Fulmarque, Inc., 360 S.W.3d 362, 368 (Tenn. 2012) ("The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose.").

In the prior ruling on Defendants' Motion to Dismiss, the Court observed that "Plaintiffs' reading of the constitutional requirement for the passage of an amendment in Tennessee seems

---

Thus, for example, if 2,000,000 persons participated in an election, but only 1,000,000 people voted in the gubernatorial race, an Amendment will be deemed approved so long as it received 500,001 "yes" votes, even if 1,499,999 votes were cast against the amendment. As a consequence, those who favor a proposed Amendment may feel compelled to forego voting for governor so as to decrease the votes required to pass the amendment, while those who have a particular interest in seeing a proposed Amendment fail may feel compelled to vote for governor so as to increase the number which serves as the benchmark for tabulating whether an amendment passes.

George, 112 F. Supp.3d at 713.

perfectly natural." <u>George</u>, 112 F. Supp. 3d at 711.  Having had the opportunity to consider the complete record, and "[e]xercising caution appropriate to a federal court called upon to interpret a state constitution," <u>Phan v. Commonwealth of Virigina</u>, 806 F.2d 516, 524 (4th Cir. 1986),  the Court now finds that Plaintiffs' reading is not only perfectly natural, but also correct.

Defendants fault Plaintiffs for "spend[ing] over half of their proposed legal conclusions attempting to discredit the Defendants' interpretation of Article XI, Section 3,"  (Docket No. 115 at 24), an argument that might have had some purchase if Plaintiffs were making straw man arguments, which they do not.  Besides Plaintiffs' approach is hardly startling.  In the Court's opinion and with all due deference to Judge Binkely, the phrase "approve and ratify such amendment or amendments by a majority of all the citizens of the state voting for governor" suggest only one interpretation – voters must vote for governor in addition to voting on a proposed amendment – making it difficult to say much more.  <u>See</u>, <u>Norfolk S. Ry. Co. v. Perez</u>, 778 F.3d 507, 512 (6th Cir. 2015) ("We must presume that Congress says what it means and means what it says . . . and therefore must apply a statute as it is written, giving its terms the ordinary meaning that they carried when the statute was enacted"); <u>Bandy v. Duncan</u>, 665 S.W.2d 387, 391 (Tenn. Ct. App. 1983) ("In the instant case the language is explicit and we find little room for interpretation.  In short, the statute means what it says").

Unlike Plaintiff's interpretation, Defendants' interpretation of the language involves a two-step process, something they say is necessary to give effect to the terms "approve" and "ratify."  That is, the requirement that the people "approve" a constitutional amendment means that the amendment must receive more "yes" than "no" votes; the requirement that the people ratify an amendment "by a majority of all the citizens of the State voting for Governor, voting in their favor"

29

means that the "yes" votes cast on the amendment must be greater than half the total number of votes cast for governor. This reading does not make voting for governor a precondition for voting on a proposed amendment because the phrase "the people" "is most naturally read to refer to the general electorate rather than a subset of voters who voted for governor." (Docket No. 110 at 26).

This Court agrees with Defendants that "approve" and "ratify," while functionally synonymous, can have different meanings since the latter often connotes the final step in a process. The Court also agrees with Defendants that "approve" means that there are more votes in favor of the amendment than against it because Article XI, Section 3 requires "voting in their favor," meaning the one or more amendments. However, the Court disagrees with Defendants' contention that "[t]he most natural reading of the requirement that the people ratify an amendment 'by a majority of all the citizens of the State voting for Governor, voting in their favor'" is that the number of 'yes' votes cast on the amendment must be greater than half of the total number of votes cast for governor." (Docket No. 110 at 25). Such an interpretation adds words not found in the language of Article XI, Section 3; specifically, it adds the words "the total number of votes cast for governor," when, in fact, it says "citizens of the state voting for Governor."

The Court also does not agree with Defendants' assertion that Plaintiffs' interpretation of Article XI, Section 3, "would undoubtedly impose an additional qualification on the right to vote for constitutional amendments" in violation of Article IV, Section 1 of the Tennessee Constitution. (Docket No. 115 at 24). That latter constitutional provision provides:

> Every person, being eighteen years of age, being a citizen of the United States, being a resident of the State for a period of time as prescribed by the General Assembly, and being duly registered in the county of residence for a period of time prior to the day of any election as prescribed by the General Assembly, shall be entitled to vote in all federal, state, and local elections held in the county or district in which such person resides. All such requirements shall be equal and uniform across the state,

30

and there shall be no other qualification attached to the right of suffrage.

Tenn. Const. Art. IV, § 1. While the Tennessee Supreme Court in <u>City of Memphis v. Hargett</u>, 414 S.W.3d 88, 101 (Tenn. 2013), a voter identification case, held that the enumerated qualifications – age, citizenship, and residency – "constitute the exclusive criteria for the right to vote," <u>id</u>. at 108, the plain reading of Article XI, Section 3 does not impose an additional requirement on a citizen's right to vote. As Plaintiffs' point out, "[r]egardless of whether or how a voter were to choose to vote on an amendment or vote for governor, every eligible citizen has their right of suffrage preserved." (Docket No. 116 at 8).

Apart from a potential violation of Article IV, Section 1 of the Tennessee Constitution, Defendants argue that the requirement that an amendment voter also vote for governor violates the First Amendment to the United States Constitution because it imposes "a condition precedent on voting . . . without furthering any compelling state interest." (Docket No. 115 at 25). This argument, of course, presupposes that having each voter's vote count equally on an issue is not a compelling interest. And, if having a broad-based, state-wide support is truly the compelling reason, it would seem to make more sense to require that those voting for governor also vote for a proposed amendment as opposed to counting voters who may have voted only because they had a vested interest in the outcome of the local candidate races.

Regardless, and whatever validity this argument may have, it applies to Defendants' tabulation procedure as well, because both proposed interpretations peg the votes in one election to the votes in another election, although Plaintiffs' version does so in a more palatable way. Certainly Defendants do not seek a ruling that finds Article XI, Section 3 constitutionally infirm, particularly when it may be that, no matter which interpretation is used, the results are the same, *viz*, Amendment

31

1 passed.

Because Article XI, Section 3's meaning is clear, the Court need not go any further in trying to discern the intent of the drafters. <u>Hooker</u>, 437 S.W.3d at 42; <u>see</u> <u>also</u>, <u>Mayhew v. Wilder</u>, 46 S.W.3d 760, 784-85 (Tenn. Ct. App. 2001) (while the "construction of constitutional provisions must respect the intentions of the persons who adopted the constitutional provision at issue," a court "must be guided chiefly by the text of the Constitution itself," as "[t]hese intentions are reflected in the text of the Constitution itself"). Yet even were it proper to go beyond the clear language of Article XI, Section 3, the information Defendants supply about the 1953 Constitutional Convention is conflicting at best, as noted in this Court's findings, and may be read as supporting this Court's interpretation. Moreover, Article XI, Section 3 has a lengthy history and discussion about other proceedings and that constitutional provision lend support to the conclusion that the link required is majority of those who voted for governor, not a majority of those who voted in a gubernatorial election.

In <u>Snow v. City of Memphis</u>, 527 S.W.2d 55 (Tenn. 1975), the Tennessee Supreme Courtconsidered a challenge to the Constitutional Convention of 1971 relating to the classification of property. In discussing the issue, the court provided "[a] brief review of the background and events leading directly to the amendment of Article XI, Section 3 of our Constitution, dealing with the Convention method of amendment," and, in doing so, reviewed 1945 legislation that authorized the appointment of a Constitution Revision Committee that "was to make a study of the needs for revision of the Constitution of Tennessee and present its recommendations to the 1947 Session of the General Assembly." <u>Id</u>. at 61. Commenting on the results of that study, the Tennessee Supreme Court observed:

32

Said commission recommended that nine sections of the Constitution be changed and devoted much of its report to the procedure best calculated to bring about the suggested changes. Eleven efforts to amend the 1870 Constitution by the legislative method had failed because of the obstacle of obtaining voter ratification of a majority of those voting for representatives. We judicially note that in said efforts to amend by that process, only a small percentage of the voters who voted for representatives cast ballots either for or against constitutional amendments, leaving the required majority of those voting for representative unattainable.

Id.[10]

The statement that "only a small percentage of the voters who voted for representatives cast ballots either for or against constitutional amendments" certainly suggests that votes on amendments were to be based only on those who also voted for representatives. Moreover, the statement about "obtaining voter ratification of a majority of those voting for representatives" is in keeping with this Court's interpretation of what is contemplated by the word "ratify," and not, as Defendants would have it, that "yes" votes must be more than half of the total votes cast for governor in order for an amendment to pass.

To be sure, and as this Court pointed out in its prior ruling, the quoted language from Snow is dicta because the issue there was the second paragraph of Article XI, Section 3. But dicta need not be ignored; it can be persuasive. In re Estate of Davis, 308 S.W.3d 832, 841 (Tenn. 2010); see, Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 274 (3d Cir. 2007) (dicta from the United States Supreme Court, while not binding, "are highly persuasive" and should not be "view[ed] lightly"). And dicta can support the plain reading of a statute. See, Morey v. Milano, 151 F. Supp. 2d 1051, 1064 (D.N.M. 2001) (stating that "dicta in two New Mexico Supreme Court cases support the plain reading of the statute").

_____

[10] In an accompanying footnote, the court set forth the relevant language of Article XI, Section 3 which is identical to the present language, except that, as previously noted, "voting for Governor" read "voting for representative" in the 1870 version.

Case 3:14-cv-02182   Document 119   Filed 04/22/16   Page 32 of 51 PageID #: 3044

Finally on the issue of interpretation, Defendants string-cite several Tennessee Supreme Court cases in their proposed conclusions of law for the proposition that a court "construing a constitutional provision must also consider how the provision has been interpreted by the legislative and executive branches of the State," and that "an interpretation not emanating from a judicial decision, but adopted by the legislative or executive branches and long accepted by the public, will usually be accepted as correct by the Tennessee courts." (Docket No. 110 at 24).[11] In their reply brief, Defendants state that in two of those cases "the Tennessee Supreme Court has applied this well-established principle when interpreting article XI, section 3 – the very constitutional provision at issue here." (Docket No. 115 at 20).[12] Lastly, they suggest that the United States Supreme Court decision in Nashville, Chattanooga & St. Louis Railway v. Browning, 310 U.S. 362 (1940) provides general support for their position.

The cases on which Defendants rely are entirely inapposite and none can be read as remotely suggesting that the way something has always been done makes it constitutionally correct. For example, Nashville Baseball Club, the lead case on which many of the others cases and Judge Binkley relied, involved a determination that a statute banning the playing of baseball on Sunday was illegally enacted because the final bill had not been passed in three readings before the Senate. The real issue, however, was the effect of *stare decisis* because, in a case decided years earlier, the

---

[11] Those case are: Am. Civil Liberties Union of Tenn. v. Darnell, 195 S.W.3d 612, 626 n.12 (Tenn. 2006); Southern Ry. Co. v. Dunn, 483 S.W.2d 101 (Tenn. 1972); Williams v. Carr, 404 S.W.2d 522, 529 (Tenn. 1966); LaFever v. Ware, 365 S.W.2d 44, 47 (Tenn. 1963); New England Mut. Life Ins. Co. v. Reese, 83 S.W.2d 238, 241 (Tenn. 1935); Derryberry v. State Bd. of Election Comm'rs, 266 S.W. 102, 105 (Tenn. 1924); and State v. Nashville Baseball Club, 154 S.W. 1151 (Tenn. 1913).

[12] Actually, Darnell also involved an interpretation of Article XI, Section 3, but was resolved on the basis of lack of standing. The Tennessee Supreme Court "expressed no opinion on whether the Chancellor properly interpreted Article XI, Section 3[.]" 195 S.W.3d at 626.

Tennessee Supreme Court had affirmed the conviction of a man for violating the statute. Tellingly, the Tennessee Supreme Court observed that there has "[n]ever been any difficulty about the construction of this act, nor is there any controversy here about the meaning of the constitutional provision." 154 S.W. at 1154. It went on to make several observations worthy of note here: (1) "[w]here there is no particular reason for applying the rule of *stare decisis*, this court has not hesitated to hold an act unconstitutional, even though it had been in force many years, and had been recognized in numerous reported decisions; (2) "'[i]t is not the province or practice of this court to seek out constitutional defects in the acts of the General Assembly" and "'[t]he fact . . . that an act has been construed and enforced and passed upon by this court is not conclusive of its validity and constitutionality, and this question may be raised at any time when the facts and pleadings justify its consideration'"; and (3) "'if an error [in construction] has been committed, and becomes plain and palpable, the court will not decline to correct it, even though it may have been reasserted and acquiesced in for a long number of years." Id. at 1155 (citations omitted).

Derryberry and Dunn, which Defendants characterize as involving "the very constitutional provision at issue here," had to do with the calling (Derryberry) and timing (Dunn) of a constitutional convention. Even though the court in Derryberry observed that the "practical construction of the Legislature, extending over a period of so many years, is entitled to great weight," 266 S.W. at 105, (language quoted in Dunn), it actually construed the convention provision of Article XI, Section 3. That court also observed that "'the will of the people, as declared in the Constitution, is the final law; and the will of the Legislature is only law when it is in harmony with, or at least is not opposed to, that controlling instrument which governs the legislative body equally with the private citizen.'" Id. at 105-06.

35

Browning was a challenge to an assessment under Tennessee's ad valorem tax laws in which the Supreme Court stated that "[d]eeply embedded traditional ways of carrying out state policy, such as those of which petitioner complains, are often tougher and truer law than the dead words of the written text." 310 U.S. at 369. The Court also wrote, however, that "[s]ettled state practice" may establish what state law is, but it "cannot supplant constitutional guarantees." Id. See Nw. Airlines v. State of Minnesota, 322 U.S. 292, 298, 64 S. Ct. 950, 953, 88 L. Ed. 1283 (1944) (stating the Browning "merely sustained . . . a familiar and frequently sanctioned formula" for the apportionment of taxes based on mileage and that the "essence of the Browning holding" is that "[m]athematical exactitude in making the apportionment has never been a constitutional requirement").

The Court finds it unnecessary to go any farther on this issue, other than to observe two things. First, none of the cases cited by Defendants involved a direct voter challenge, yet "[a] voting rights claim strikes at the heart of the political process." Judge v. Quinn, 612 F.3d 537, 545 (7th Cir. 2010). Second, even if Defendants' decision to tabulate the 2014 Election votes was based upon how votes had previously been counted and therefore subject to some deference, "the responsibility for determining the meaning of the Constitution of this State rests in the last analysis with the judiciary." LaFever, 366 S.W.2d at 400.

## C. Constitutional Implications of the Method Used to Count Votes on Amendment 1

Defendants argue that the method they utilized in counting the votes on Amendment 1 is subject to rationale basis review. This is understandable given the extremely deferential nature of such review:

> . . . Even foolish and misdirected provisions are generally valid if subject only to rational basis review. As we have said, a statute is subject to a "strong presumption of validity" under rational basis review, and we will uphold it "if there is any reasonably conceivable state of facts that could provide a rational basis." Walker v.

36

Bain, 257 F.3d 660, 668 (6th Cir. 2001). See also, Heller v. Doe, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). Those seeking to invalidate a statute using rational basis review must "negative every conceivable basis that might support it." Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973). Our standards for accepting a justification for the regulatory scheme are far from daunting. A proffered explanation for the statute need not be supported by an exquisite evidentiary record; rather we will be satisfied with the government's "rational speculation" linking the regulation to a legitimate purpose, even "unsupported by evidence or empirical data." FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Under rational basis review, it is "'constitutionally irrelevant [what] reasoning in fact underlay the legislative decision.'" Railroad Retirement Bd. v. Fritz, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (quoting, Flemming v. Nestor, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960)).

Craigmiles v. Giles, 312 F.3d 220, 223-24 (6th Cir. 2002).

In Craigmiles, the Sixth Circuit went on to state that, "[t]he Supreme Court has established a tripartite rubric for analyzing challenges under the Equal Protection and Due Process clauses" and that, "[w]hen a statute regulates certain 'fundamental rights' (e.g. voting or abortion) or distinguishes between people on the basis of certain 'suspect characteristics' (e.g. race or national origin), the statute is subject to 'strict scrutiny.'" Id. at 223. However, in a more recent case, the Sixth Circuit indicated that, at least with respect to voting rights, the determination of the proper rubric to be utilized is more nuanced:

> If a plaintiff alleges only that a state treated him or her differently than similarly situated voters, without a corresponding burden on the fundamental right to vote, a straightforward rational basis standard of review should be used. . . . On the other extreme, when a state's classification "severely" burdens the fundamental right to vote, as with poll taxes, strict scrutiny is the appropriate standard. . . .
>
> Most cases fall in between these two extremes. When a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, we review the claim using the "flexible standard" outlined in Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and Burdick v. Takushi, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). . . . Although Anderson and Burdick were both ballot-access cases, the Supreme Court has confirmed their vitality in a much broader range of voting rights contexts. . . .

37

Obama for Am. v. Husted, 697 F.3d 423, 429 (6th Cir. 2012); see also Green Party, 791 F.3d at 684

(citations omitted) (stating that "[i]f the burden on the right to vote is 'severe,' the statute will be

subject to strict scrutiny"; "[i]f the burden is 'reasonable' and 'nondiscriminatory,' the statute will

be subject to rational basis"; and "[i]f the burden lies somewhere in between, courts will weigh" the

state's interest against the burden on plaintiff).

      This case falls squarely between the two extremes because Plaintiffs claim that different

voters were treated differently as a result of Defendants' chosen tabulation method, and "when a

state regulation is found to treat voters differently in a way that burdens the fundamental right to

vote, the Anderson–Burdick standard applies." Id. This mid-level standard of review is as follows:

> A court considering a challenge to a state election law must weigh
> "the character and magnitude of the asserted injury to the rights
> protected by the First and Fourteenth Amendments that the plaintiff
> seeks to vindicate" against "the precise interests put forward by the
> State as justifications for the burden imposed by its rule," taking into
> consideration "the extent to which those interests make it necessary
> to burden the plaintiffs' rights."

Burdick, 504 U.S. at 434 (quoting Anderson, 460 U.S. at 789).

      Turning to the stated justification, Defendants assert that the tabulation method they utilize

is meant to "ensure that constitutional amendments are broadly supported and to prevent small

interest groups from exercising undue influence on the State's fundamental law." (Docket No. 111

at 38). These are indeed laudatory goals and undeniably legitimate. See Taxpayers United for

Assessment Cuts v. Austin, 994 F.2d 291, 297 (6th Cir. 1993) (state "has a strong interest in ensuring

that proposals are not submitted for enactment into law unless they have sufficient support"); see

also Tex. Indep. Party v. Kirk, 84 F.3d 178, 186 (5th Cir. 1996) ("state has a legitimate goal of

requiring a demonstration of sufficient public support to gain access to the ballot"); Libertarian Party

of Me. v. Diamond, 992 F.2d 365, 371 (1st Cir. 1993) (collecting numerous cases for the proposition that states have a legitimate interest in protecting the electoral process by ensuring that all candidates for nomination have strong public support).

If the real goal is in fact to prevent certain interests groups from exerting undue influence, then it may have failed in the 2014 Election on Amendment 1. In any event, when the stated interest is weighed against the burden placed on Plaintiffs' right to vote in a meaningful manner, the Court finds that the selected method utilized by Defendants violated Plaintiffs' Fourteenth Amendment rights. That conclusion remains whether Plaintiffs' or Defendants' understanding of the meaning of Article XI, Section 3 is correct.

"The right to vote is a 'precious' and 'fundamental' right," and "'[o]ther rights, even the most basic, are illusory if the right to vote is undermined.'" Obama for Am., 697 F.3d at 428 (quoting, Westbury v. Sanders, 376 U.S. 1, 17 (1964)). Indeed, the right to vote is so fundamental that it is "preservative of all rights," Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886), and, therefore, "any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." Reynolds v. Sims, 377 U.S. 533, 562 (1964).

Nevertheless, the conduct of state elections are generally state affairs and "[c]ourts 'have long recognized that not every state election dispute implicates federal constitutional rights.'" Warf v. Bd. of Elections of Green Cty., 619 F.3d 553, 559 (6th Cir. 2010) (Burton v. Georgia, 953 F.2d 1266, 1268 (11th Cir.1992)). As a consequence, the Sixth Circuit has

> held that "[t]he Due Process clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair." . . . . "[D]ue process is implicated where the entire election process including as part thereof the state's administrative and judicial corrective process fails on its face to afford fundamental fairness." . . . . Such an exceptional case may arise, for example, if a state employs "non-uniform rules, standards and procedures," that result in

significant disenfranchisement and vote dilution, . . . or significantly departs from previous state election practice . . .[.]  Federal courts, however, "have uniformly declined to endorse action[s] under [§ ] 1983 with respect to garden variety election irregularities." . . .

Id. (internal citations omitted).

If this Court is correct that "a majority of all the citizens of the state voting for Governor" means that voting for governor is a precondition to having a vote on an amendment count, then Defendants' decision to utilize their now-articulated two-step process was fundamentally unfair because it was "an officially-sponsored election procedure which, it its basic respects, was flawed[.]'" Id. (citation omitted).  The process was flawed because it did not follow the clear language of the Tennessee Constitution.  In arguing otherwise, Defendants quote the Ninth Circuit's decision in Bennett v. Yoshina, 140 F.3d 1218, 1226-27 (9th Cir. 1998), for the proposition that "two elements must be present" for there to be an fundamental unfairness claim: "'(1) likely reliance by voters on an established election procedure and/or official pronouncements about what the procedure will be in the coming election; and (2) significant disenfranchisement that results from a change in the election procedures." (Docket No. 111 at 42).  They assert those elements cannot be met here because

> Defendants' interpretation and application of Article XI, Section 3, in the referendum on Amendment 1 was entirely consistent with the interpretation and practice of previous state officials, . . . as well as with contemporaneous official pronouncements by the Secretary of State's spokesperson about how the votes would be counted[.]  It is therefore inconceivable that voters were relying on or expecting the State to interpret or apply Article XI, Section 3, in any other manner—and certainly not in the absurd manner pressed by Plaintiffs.  Indeed, if anything would be fundamentally unfair, it would be for this Court to void the election on Amendment 1 or force Defendants to recount the votes on Amendment 1 pursuant to Plaintiffs' proposed method when no voters were ever informed before the election that they must vote for governor in order to have their votes on the amendments counted.

40

(Id.).

Contrary to Defendants' position, this Court does not believe it to be inconceivable that voters would expect the votes to be counted in accordance with the language of the state constitution, or that counting them that way would be absurd. Moreover, the court in Bennett stated that it was not setting forth "an exhaustive description of the electoral problems that might be fundamentally unfair." Id. at 1227 n.3. In fact, it made clear that courts "have drawn a distinction between 'garden variety' election irregularities and a pervasive error that undermines the integrity of the vote," the former of which "do not violate the Due Process Clause, even if they control the outcome of the vote or election," while the latter renders the election "invalid." Id. at 1226.

"Like beauty, fundamental fairness frequently lies in the eye of the beholder," and the court "do[es] not pretend that it is a simple matter to segregate run-of-the-mill electoral disputes from those that can appropriately be characterized as harbingers of patent and fundamental unfairness." Bonas v. Town of N. Smithfield, 265 F.3d 69, 75 (1st Cir. 2001). Nevertheless, this is not, as Defendants would have it, a "'garden variety election dispute." (Docket No. 115 at 32, citation omitted).

The Ninth Circuit in "Bennett cited several cases that illustrate garden variety irregularities, and "include[d] human error in miscounting votes, delays in the arrival of voting machines, technical deficiencies in printing ballots, and malfunctioning voting machines." Krieger v. City of Peoria, 2014 WL 4187500, at *3 (D. Ariz. Aug. 22, 2014). "The cited cases hold that such common irregularities should be resolved through state-law remedies and do not amount to a violation of constitutionally protected rights." Id. Those types of situations are markedly different, however,

41

from "cases where a federal role is appropriate," such as when "broad-gauge unfairness permeates an election, even if derived from apparently neutral action." Griffin v. Burns, 570 F.2d 1065, 1077 (1st Cir. 1978); see, Duncan v. Poythress, 657 F.2d 691, 704 (5th Cir. 1981) ("the constitution offers no guarantee against insubstantial election irregularities," but "[i]t is fundamentally unfair and constitutionally impermissible for public officials to disenfranchise voters in violation of state law").

Even if this Court's reading of Article XI, Section 3, is incorrect, Defendants' two-step counting method violated not only Plaintiffs' right to due process right, but also equal protection of the law.

The right to vote, being both "'precious' and 'fundamental,'" is protected by the equal protection clause of the Fourteenth Amendment. Obama for Am., 697 F.3d at 428. That protection applies beyond the initial grant of the right. As the Supreme Court has explained:

> The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another. . . . It must be remembered that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."

Bush v. Gore, 531 U.S. 98, 104-05, 121 S. Ct. 525, 530, 148 L. Ed. 2d 388 (2000)

The language in Bush is hardly surprising since, "[i]n decision after decision, [the Supreme] Court has made clear that a citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." Dunn v. Blumstein, 405 U.S. 330, 336 (1972) (collecting cases). "The consistent theme of those decisions is that the right to vote in an election is protected by the United States Constitution against dilution or debasement." Id. Indeed, the Supreme Court "has consistently held in a long series of

42

case, that in situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it as practicable, as any other person's." Hadley v. Junior Coll. Dist. of Metro. Kansas City Mo., 397 U.S. 50, 54 (1970). These principles apply to all sorts of elections for, "[w]hen a court is asked to decide whether a State is required by the Constitution to give each qualified voter the same power in an election open to all, there is no discernible, valid reason why constitutional distinctions should be drawn on the basis of the purpose of the election." Id. "If one person's vote is given less weight through unequal apportionment, his right to equal voting participation is impaired just as much when he votes for a school board member as when he votes for a state legislator." Id. At 55.

In this case, Plaintiffs voted for governor and against Amendment 1. Their votes, however, were not given the same weight as those who voted for Amendment 1 but did not vote in the governor's race. This is because the way the votes were counted, voters who did not vote in the Governor's race but who voted on Amendment 1 effectively lowered the requisite threshold passage of Amendment 1. Conversely, an opponent of Amendment 1 (or any of the other three Amendments under consideration in the 2014 Election) was compelled to vote in the Governor's race in order for his or her vote to have an impact on the denominator used in determining whether a constitutional amendment had obtained the threshold for passage.

In other words, a vote on Amendment 1 from anyone who voted for governor, regardless of whether the vote was for or against Amendment 1, had less value than a vote for Amendment 1 from someone who did not vote for governor. As Plaintiffs explain, there were actually four possible permutations of votes on Amendment 1 during the ratification step with three different vote values:

(1) not voting for governor and voting against Amendment 1, (2) voting for governor and voting against Amendment 1, (3) voting for governor and voting in favor of Amendment 1, and (4) not voting for governor and voting in favor of Amendment 1. But these different permutations count for three different amounts for Defendants tabulation of ratification. Option 1 (not voting for either) creates a valueless vote because it neither adds to the numerator (voting for Amendment 1) nor the denominator (total number of votes cast for governor); Options 2 and 3 (voting for governor and voting for/against the amendment) have the same weight regarding the ratification threshold because both added to the denominator (as well as the numerator for those who favored Amendment 1); and Option 4 (voting for Amendment 1 but not for governor) has the greatest influence on ratification using Plaintiffs' interpretation because it adds to the numerator without adding to the denominator.

(Docket No. 116 at 29 n.18).

Each citizen's vote should count the same; some should not count double, or one and one-half times, or any other increment more than another citizen's vote. On this the parties seemingly agree. Plaintiffs' votes, however, were devalued and their voting rights debased. See, Reynolds v. Sims, 377 U.S. 533, 555 (1964) ("the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise") ; Gray v. Sanders, 372 U.S. 368, 380 (1963) ("Every voter's vote is entitled to be counted once).

Moreover, the method utilized by Defendants violated the Equal Protection Clause by collectively counting the votes of two classes of people: (1) Plaintiffs, along with those voters like them, who voted in the gubernatorial race as well as on Amendment 1; and (2) those who did not vote for governor and merely voted on Amendment 1. By counting votes for Amendment 1 from voters who did not vote for governor while basing its passage threshold on the number of votes in the gubernatorial race without a corresponding increase in the number of votes needed for ratification, Defendants knowingly condoned, if not encouraged, voters to give their votes more

44

value on Amendment 1 by not voting for governor. This comes at the expense of those voters, like Plaintiffs who chose to exercise their fundamental right to vote both on the governor's race and on the amendments. However, "[t]he idea that one group can be granted greater voting strength than another is hostile to the one man, one vote basis of our representative government." <u>Moore v. Ogilvie</u>, 394 U.S. 814, 819, 89 S. Ct. 1493, 1496, 23 L. Ed. 2d 1 (1969).

The Court fully recognizes that the principle of "one person, one vote" as confirmed most recently by the Supreme Court in <u>Evenwel v. Abbott</u>, 136 S.Ct. 1120 (2016) relates to the election of representatives, specifically, "in voting for their legislators, all citizens have an equal interest in representative democracy, and that the concept of equal protection therefore requires that their votes be given equal weight." <u>Town of Lockport</u>, 430 U.S. at 265. The court also recognizes this principle does not fully transfer to other circumstances, such as where a "referendum puts one discrete issue to the voters," <u>id</u>. or where legislation apportions a special purpose unit (such as a water district) in favor of those most affected by unit's functions, <u>Salyer Land Co. v. Tulare Water District</u>, 410 U.S. 719, 794 (1973). Still, the Court does not read cases like <u>Town of Lockport</u> and <u>Salyer</u> as eliminating the general requirement that citizens be afforded the right to participate in elections on an equal basis, or approving a system that allows certain voters to have their votes diminished while other have their voting power increased based solely on viewpoint.

Voters are often faced with strategic choices. But it is one thing to have real choices; quite another to be forced to vote in a particular fashion so as to have your vote count the most, or at least the same as everyone else's. The latter lends itself to manipulation. That clearly was the intent of certain groups in favor of Amendment 1, who essentially told voters to get more bang for their buck by voting for Amendment 1 and abstaining from voting for governor. This was entirely within their

prerogative and not this Court's concern.  What is of concern is whether Plaintiffs, and others who did not favor Amendment 1, were treated unequally in a constitutional sense.

Defendants insist that the method they utilized was constitutional because it is akin to bullet voting.  Bullet voting or single-shot voting "is a strategy that 'enables a minority group to win some at-large seats if it concentrates its vote behind a limited number of candidates and if the vote of the majority is divided among a number of candidates.'" United States v. Charleston Cty., S.C., 365 F.3d 341, 351 (4th Cir. 2004) (quoting Thornburg v. Gingles, 478 U.S. 30, 38-29 n.4 (1986)).  Bullet voting is generally unobjectionable because the practice provides a way for minorities to aggregate and exercise their political power.  See, Westwego Citizens for a Better Gov't v. City of Westwego, 946 F.2d 1109, (noting that an "anti-single shot provision . . . forces minority voters to cast votes for white candidates whom the minority voters may not favor thereby increasing the vote totals of those white candidates").   What occurred here, however, is objectionable.

Leaving aside that the results from bullet voting for particular candidates is transitory and does not have the permanency of the enactment of a constitutional amendment, when a voter engages in bullet voting, the choice not to vote for more than one candidate is limited to the single race, whereas Defendants' tabulation method affected two separate races – the vote for governor and the vote on Amendment 1. Unlike in bullet voting, Amendment 1 supporters who subscribed to the "double your vote" theory likely abstained from the governor's race, so as to make their votes on Amendment 1 – a wholly separate race – count more.  Those who opposed Amendment 1 likely felt compelled to vote for governor.  See, Ayers-Schaffner v. DiStefano, 37 F.3d 726, 727 (1st Cir. 1994) (stating that a state may not condition the right to vote in one election on whether that right was exercised in a previous election and holding that "depriving a qualified voter of the right to cast a

ballot because of failure to vote in an earlier election is almost inconceivable"); Partnoy v. Shelley, 277 F. Supp.2d 1064, 1065 (S.D. Cal. 2003) (holding state election code provision that required voters in a recall election to vote on the recall issue or have their votes concerning potential successors forfeited violated due process and equal protection); In re Hickenlooper, 312 P.3d 153 (Colo. 2013) (holding that state constitutional provision virtually identical to the code provision in Partnoy violated First and Fourteenth Amendment).

Additionally, the decision to bullet vote (when possible) is available to any and all voters. Here, in contrast, only those voters who favored Amendment 1 had the option to forego voting for governor and thereby increase the weight of their vote on Amendment 1, while Plaintiffs and others who opposed Amendment 1, were left with two lesser options: vote for governor and against Amendment 1 and cast a diluted vote, or vote against Amendment 1 without voting for governor and cast a vote that really did not count at all.

The Court likewise finds Defendants' reliance on case such as Gordon v. Lance, 403 U.S. 1 (1971) inapt. There, the Supreme Court held that a West Virginia law prohibiting political subdivisions from incurring bond indebtedness or increasing tax rates without the approval of 60% of voters in a referendum election did not violate the Equal Protection clause. Although acknowledging that "any departure from strict majority rule gives disproportionate power to the minority," the Court held that the requirement at issue did not violate the Equal Protection Clause because it did not "discriminate against or authorize discrimination against any identifiable class." Id. at 6. The Court saw "no constitutional distinction between the 60% requirement in the present case and a state requirement that a given issue be approved by the majority of voters." Id. at 7.

Based on the above language and the "[l]ower courts [that] have followed Gordon in

47

upholding similar state and local requirements under rational basis review," Defendants argue:

> Plaintiffs cannot establish that the ratification requirement of Article XI, Section 3, discriminates against any identifiable group, much less that it was intended to do so. The ratification requirement applies to all proposed constitutional amendments, regardless of subject matter or which group is supporting or opposing the amendment. Plaintiffs' circular logic suggesting that Article XI, Section 3, intentionally discriminates against voters who, like them, voted "no" on Amendment 1 and voted for governor, is obviously flawed; under that logic, the supermajority requirement at issue in Gordon also would have discriminated against an identifiable class—those favoring passage of the bond issuance.

(Docket No. 111 at 37). The Court disagrees.

Requiring more than a majority only empowers the minority because those favoring a proposal must marshal more votes to get something passed. This is not problematic where, as in Gordon, the value of votes both favoring and disfavoring passages have the same weight in either reaching or preventing the 60% threshold. Here, and has previously been explained, however, the votes on Amendment 1 were not all allotted equal relative weight during what Defendants describe as the ratification process –Plaintiffs' votes were afforded less weight than those cast by those in favor of Amendment 1 who did not vote for governor.

Moreover, the Supreme Court in Gordon distinguished the facts before it and cases like Gray v. Sanders, 372 U.S. 368 (1963) and Cipriano v. City of Houma, 395 U.S. 701(1969), where a "sector of the population may be said to be 'fenced out' from the franchise because of the way they will vote." Id. at 5. "The defect [the Supreme] Court found in those cases lay in the denial or dilution of voting power because of group characteristics 'geographic location and property ownership' that bore no valid relation to the interest of those groups in the subject matter of the election; moreover, the dilution or denial was imposed irrespective of how members of those groups actually voted." Id. at 4.

While Plaintiffs in this case were not "fenced off" from voting, their votes counted less. This Court agrees with Plaintiffs' position that "[t]his unequal ability for voters on only one side of an issue (here the voters who favored Amendment 1) to shift the threshold for ratification is an element unique to this case and one that differentiates this case from instances of simple strategic voting or a requirement over and beyond a simple majority." (Docket No. 116 at 39). Also unique to this case is that, for the first time since Article XI, Section 3 was enacted, there were more votes for a proposed constitutional amendment than there were for governor, suggesting the inference – if not leading to the conclusion – that the "double your vote" scheme worked. Proponents of Amendment 1 were certainly free to run that campaign, but opponents of that campaign were just as equally entitled to expect that their votes would be counted not only in accordance with the state constitution, but also in a way that would not violate their rights to due process and equal protection.[13]

## C. __Remedy__

As noted in this Court's findings, Plaintiffs' Amended Complaint sought (1) a declaration that their rights to due process and equal protection were violated by the manner in which the votes were tabulated on Amendment 1; (2) a declaration that the election results as certified are void; and (3) an injunction requiring Defendants to correlate the votes in the governor's race with those votes on Amendment 1. In the Pretrial Order and Plaintiffs' Proposed Findings and Conclusions, Plaintiffs both expand and contract those requests – they now seek to have the first paragraph of

---

[13] Defendants' counting method may be objectionable for another reason as well. In Plaintiffs' proposed findings, however, they state that "write-in [votes] were disregarded by Defendants[.]" (Docket No. 112 at 33). If true, this means that Defendants did not, in fact, compare the "yes' votes to the total of votes for Governor as they have claimed. The Court makes no findings or conclusions on this issue, however, because Plaintiffs' citation to the record does not support the assertion they make.

49

Article XI, Section 3 declared unconstitutional on its face, but forgo the request for a recount.

Plaintiffs' request that Article XI, Section 3 be declared unconstitutional on its face will be denied. Whereas an as-applied challenge "argues that a law is unconstitutional as enforced against the plaintiffs before the court," a "facial challenge to a law's constitutionality is an effort 'to invalidate the law in each of its applications, to take the law off the books completely.'" Speet v. Schuette, 726 F.3d 867, 872 (6th Cir. 2013) (citation omitted) . A "facial challenge . . . is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). It is incumbent upon the challenger to "shoulder the[] heavy burden to demonstrate that the [Amendment] is facially unconstitutional" in all of its applications, id., something Plaintiffs in this case do not attempt to show, or even argue in a compelling way. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 450 (2008) (citation omitted) (stating that "[f]acial challenges are disfavored for several reasons" and that "a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid'"); Speet, 726 F.3d 867, 872 (6th Cir. 2013) (citation omitted) (observing that "[s]ustaining a facial attack to the constitutionality of a state law . . is momentous and consequential").

As for equitable remedies, the Supreme Court has noted that "[i]n shaping equity decrees, the trial court is vested with broad discretionary power;" and, "in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." Lemon v. Kurtzman, 411 U.S. 192, 200 (1973). Having considered the record and the parties' arguments, the Court finds that what is necessary, fair, and workable is a recount of the 2014 Election as it relates to Amendment 1. Defendants cannot be heard to complain about having

to count the votes on Amendment 1 in accordance with the plain language of the Tennessee Constitution, and the citizens of this state, no less than Plaintiffs, are entitled to know whether its passage was "by a majority of all the citizens of the state voting for Governor."

The Court will defer ruling at this time on Plaintiffs' request that the election be voided or declared invalid because the recount may make this issue moot.

### III. <u>Conclusion</u>

For the foregoing reasons, the Court finds that the method used to tabulate the votes on proposed Amendment 1 in the 2014 Election was fundamentally unfair and violated Plaintiffs' due process rights because it was not done in accordance with the plain language of Article XI, Section 3 of the Tennessee Constitution, as well as their due process and equal protection rights under the Fourteenth Amendment because their votes were not accorded the same weight as those cast against proposed Amendment 1. The Court, however, will deny Plaintiffs' request that Article XI, Section 3 be declared unconstitutional on its face.

As a remedy, the Court will order a recount of the 2014 Election solely in relation to Amendment 1, but defer ruling on the question of whether the election on Amendment 1 should be voided.

Finally, as the prevailing party under Section 1983, Plaintiffs are also entitled to reasonable attorney's fees and costs in accordance with 42 U.S.C. § 1988. Given the likelihood of an appeal, however, the Court will defer awarding fees or costs until such time as any appeal has been completed, or the time for filing an appeal has run.

Case 3:14-cv-02182   Document 119   Filed 04/22/16   Page 50 of 51 PageID #: 3062

An appropriate Order will be entered.

_____

KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE