UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TRACEY E. GEORGE, ELLEN WRIGHT CLAYTON, DEBORAH WEBSTER-CLAIR, KENNETH T. WHALUM Jr., MERYL RICE, JAN LIFF, TERESA M. HALLORAN, and MARY HOWARD HAYES, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:14-2182 |
| WILLIAM EDWARD "BILL" HASLAM, as Governor the State of Tennessee, in his official capacity; et al. | ) ) ) ) ) | |
| Defendants. | ) | |

### DEFENDANTS' MOTION FOR STAY PENDING APPEAL

Defendants respectfully move this Court for a stay pending appeal of the portion of this Court's Order of April 22, 2016, enjoining Defendants "to conduct a recount of the votes to determine whether Amendment 1 passed by a majority of those who voted in the Governor's race" and the findings of fact and conclusions of law on which that injunction is based.

### INTRODUCTION AND BACKGROUND

Plaintiffs are registered voters in Tennessee who voted in the November 4, 2014, general election. On the ballot were, among other things, the gubernatorial election and four proposed amendments to the Tennessee Constitution. Plaintiffs all voted in the gubernatorial election and against approval and ratification of Amendment 1.

This lawsuit involved two primary issues: whether the Defendants' interpretation of article XI, section 3, of the Tennessee Constitution is correct, and if so, whether that interpretation as applied to the counting of votes on Amendment 1 violated Plaintiffs' rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution.

Plaintiffs argued that, properly interpreted, article XI, section 3, requires a voter to first vote for governor in order to vote on Amendment 1 and have his or her vote on the amendment counted. (D.E. 51 PageID #585). In other words, it was Plaintiffs' position that article XI, section 3, defines who is qualified to vote on a constitutional amendment. Defendants position is that article XI, section 3, requires a proposed amendment to first be approved by receiving more "yes" votes than "no" votes, and then be ratified by receiving "yes" votes constituting a majority of the total votes cast for governor, but does not make voting for governor a prerequisite for voting on an amendment. In other words, rather than defining who can vote, article XI, section 3, simply establishes the process by which votes must be counted. (D.E. 64 PageID # 787-806 at ¶¶ 5, 6, 7, 42, 43, 63, 64 and 65.)

Consistent with the State's long-standing interpretation of article XI, section 3, Defendants counted all the votes cast on the proposed amendments that appeared on the November 2014 ballot—including Amendment 1—regardless of whether the voter had voted in the gubernatorial election. Plaintiffs argued that this method of counting diluted their votes on Amendment 1 in violation of the Equal Protection Clause and resulted in an unfair election process in violation of the Due Process Clause.

After a bench trial on the papers, this Court entered Findings of Fact and Conclusions of Law in which this Court concluded that "Plaintiffs' reading [of article XI, section 3] is not only perfectly natural, but also correct" and that the language of article XI, section 3, "suggest[s] only

one interpretation – voters must vote for governor in addition to voting on a proposed amendment." (D.E. 119 PageID # 3040). Based on that interpretation, this Court also concluded that Defendants' application of article XI, section 3, in the election on Amendment 1 was in violation of the Due Process Clause because it was an "officially-sponsored election procedure" that did not follow the clear language of the Tennessee Constitution. (*Id.* at PageID # 3051). This Court further held that Defendants' application of article XI, section 3, in the election on Amendment 1 diluted Plaintiffs' votes in violation of the Equal Protection Clause. (*Id*. at PageID # 3053-54).

This Court granted Plaintiffs' request for "an injunction requiring Defendants to recount the vote on Amendment 1 to correlate the votes in the governor's race with votes on Amendment 1" and, as the appropriate remedy, enjoined Defendants "to conduct a recount of the votes to determine whether Amendment 1 passed by a majority of those who voted in the Governor's race." (D.E. 118 PageID #3011).

## STANDARD OF REVIEW

In determining whether a stay should be granted, this Court considers the same four factors that are traditionally considered in determining whether to issue a preliminary injunction. *Baker v. Adams County/Ohio Valley Sch. Bd.,* 310 F.3d 927, 928 (6th Cir. 2002) (per curiam). These factors are: "(1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; (2) the likelihood that the moving party will be irreparably harmed absent a stay; (3) the prospect that others will be harmed if the court grants the stay; and (4) the public interest in granting the stay." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir. 1991). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Id.*

# ARGUMENT

## I. DEFENDANTS ARE LIKELY TO SUCCEED ON THE MERITS.

The Sixth Circuit has recognized that, to justify the granting of a stay, a movant need not always establish a high probability of success on the merits. *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987). "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiffs will suffer absent the stay." *Id*. Thus, at a minimum, a movant is required to show "serious questions going to the merits." *In re Delorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

For the reasons explained below, Defendants are likely to succeed on the merits of their appeal. At a minimum, there are "serious questions" about the merits of this Court's interpretation of article XI, section 3, about its conclusions that Defendants' contrary interpretation, as applied in the election on Amendment 1, constituted a fundamentally unfair election system and impermissibly diluted Plaintiffs' votes, and about its decision to require Defendants to recount the votes on Amendment 1.

### A. This Court's Interpretation of Article XI, Section 3, Is Erroneous.

This Court interpreted the phrase, "that a majority of all the citizens of the state voting for Governor," to mean that "voting for governor is a precondition to having a vote on an amendment count." (D.E. 119 PageID # 3051). That interpretation is not only inconsistent with the plain language, legislative history, and longstanding interpretation of article XI, section 3, but it also conflicts with another provision of the Tennessee Constitution and violates the U.S. Constitution to boot.

This Court's interpretation conflicts with article IV, section 1, of the Tennessee Constitution because it imposes an additional qualification for voting in an election on a proposed

amendment. This Court reasoned that its reading of article XI, section 3, does not impose an additional requirement on a citizen's right to vote because "every eligible citizens has their right of suffrage preserved." (D.E. 119 PageID # 3042 (internal quotation marks omitted). But voters who choose *not* to vote for governor plainly *do not* have their right of suffrage preserved, because, under this Court's interpretation, they are not allowed to vote on a proposed constitutional amendment. Under this Court's reasoning, it would be permissible for the State to declare persons under the age of thirty-five ineligible to vote for governor as long as they were still eligible to vote for representatives. But the promise of article IV, section 1, is not so idle: that provision clearly requires that "[e]very person" that meets the enumerated qualifications "*shall be entitled* to vote in *all federal, state, and local elections* held in the county or district in which such person resides." Tenn. Const. art. IV, § 1 (emphasis added). An election on a proposed amendment is a state election, and this Court's interpretation precludes all persons who did not vote for governor from voting in that election. That interpretation therefore squarely conflicts with article IV, section 1.

This Court's interpretation also violates the Equal Protection Clause of the U.S. Constitution because it restricts the right to vote without sufficient justification. As Defendants explained in their trial brief, federal courts have repeatedly invalidated state laws imposing conditions precedent on voting because they impose a severe burden on voters' First and Fourteenth Amendment rights without furthering any compelling state interest. *See* [CITE to trial brief]. This Court dealt with that argument by suggesting that "having each voter's vote count equally on an issue" may be a "compelling interest" and asserting that the argument "applies to Defendants' tabulation procedure as well." (D.E. 119 PageID # 3042). Ironically, though, by declaring article XI, section 3, to mean that "voting for governor is a precondition to having a vote on an amendment count," this Court has adopted an interpretation that appears to impose an even

greater equal protection violation than the vote dilution alleged by Plaintiffs—that is, this Court's interpretation completely disenfranchises thousands of qualified voters, while Plaintiffs merely allege that Defendants' interpretation dilutes the votes of some voters.

This Court also erred by refusing to certify the issue of the proper interpretation of article XI, section 3, to the Tennessee Supreme Court or otherwise abstain from deciding that issue until it can be finally decided by the Tennessee courts in a declaratory judgment action that is already pending. This Court reasoned that neither certification nor abstention was necessary because a ruling by the Tennessee Supreme Court on the proper interpretation of article XI, section 3, would not allow this Court to avoid deciding Plaintiffs' federal constitutional claims. (D.E. 119 PageID # 3036). However, that reasoning ignores that this Court's conclusion that Defendants' interpretation of article XI, section 3, constituted a fundamentally unfair election system was premised entirely on its separate conclusion that Defendants' interpretation was inconsistent with the Tennessee Constitution.

> **B.  This Court's Conclusion That Defendants Violated the Due Process Clause Is Erroneous.**

This Court's conclusion that Defendants violated Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment followed directly from its conclusion that Defendants' interpretation of article XI, section 3, of the Tennessee Constitution was incorrect:

> If this Court is correct that "a majority of all the citizens of the state voting for Governor" means that voting for governor is a precondition to having a vote on an amendment count, then Defendants' decision to utilize their now-articulated two-step process was fundamentally unfair because it was "an officially-sponsored election procedure which, [in] its basic respects, was flawed[.] The process was flawed because it did not follow the language of the Tennessee Constitution.

(D.E. 119 PageID # 3051 (citations omitted)). However, as discussed in the previous section, Defendants have raised serious questions about merits of this Court's interpretation of article XI, section 3. If this Court's interpretation is incorrect or cannot stand because it also violates the Equal Protection Clause, then this Court's finding of a due process violation cannot stand either.

This Court's holding regarding the Due Process Clause was erroneous for an additional reason: not every election procedure that violates state law amounts to a fundamentally unfair election that violates the Due Process Clause. That is particularly true, where, as here, the election procedure that was followed was one that had long been followed and that voters had come to expect. This Court dismissed that argument by finding it not "inconceivable" that at least some voters would have interpreted the plain language of article XI, section 3, in the same manner as the Court. (D.E. 119 PageID # 3052.) Maybe so. But that does not change the fact that *most*, if not *nearly all*, voters would have gone to the polls in reliance on Defendants' announcement prior to the election that a voter was not required to vote for governor in order to vote on a proposed constitutional amendment.

### C. This Court's Conclusion That Defendants Violated the Equal Protection Clause Is Erroneous.

This Court's holding that Defendants' application of article XI, section 3, in the election on Amendment 1 violated the Equal Protection Clause by impermissibly diluting the votes of Plaintiffs is erroneous for three principal reasons. *First*, this Court wrongly declined to apply rational basis review, even though federal courts—including the U.S. Supreme Court—have long evaluated vote dilution claims in the referendum context under that deferential standard. Those precedents implicitly recognize that vote dilution that occurs in the referendum context, as opposed to in representative elections, does not constitute a burden on the fundamental right to vote that would trigger heightened scrutiny. Under the correct standard of review, Plaintiffs' vote dilution

claim fails because the requirement that a proposed amendment receive enough "yes" votes to constitute a majority of the total votes cast for governor is rationally related to preventing small interest groups from amending the Constitution.

*Second*, this Court erroneously found a violation of the Equal Protection Clause *without* finding discriminatory intent. Because the Equal Protection Clause has long been limited to instances of purposeful or invidious discrimination, a claim brought under that clause requires proof of discriminatory intent. *E.E.O.C. v. J.C. Penney Co.*, 632 F. Supp. 871, 872 (E.D. Mich. 1985), *aff'd,* 843 F.2d 249 (6th Cir. 1988) (citing *Washington v. Davis,* 426 U.S. 229 (1976)). When challenging a facially neutral classification, a plaintiff must prove both the discriminatory effect of and discriminatory purpose behind that classification. *See Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979); *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 264-68 (1977).

This Court's holding that Defendants' interpretation of article XI, section 3, violated Plaintiffs' equal protection rights was based only on the allegedly discriminatory effect of that interpretation. This Court did not find discriminatory intent or purpose. To the contrary, this Court expressly found that "there is no evidence that any of the Defendants participated in the campaigns or that any of them acted in anything less than good faith in conducting the election and tabulating the results." And Defendants interpreted and applied article XI, section 3, in the same manner in counting the votes on all four amendments on the November 2014 ballot, which further negates any claim that Defendants intended to discriminate against Plaintiffs (even assuming that persons voting for governor and against Amendment 1 constitute an "identifiable group" for equal protection purposes). Without proof of both a discriminatory effect *and* a discriminatory purpose, there can be no violation of the Equal Protection Clause.

*Third*, this Court summarily concluded that the State's method of determining whether Amendment 1 had passed burdened the right to vote because it permitted strategic voting. But there is simply no legal authority to support that conclusion—instead, all of the pertinent authority is to the contrary. *See Dudum v. City and County of San Francisco*, No. 10-00504, 2010 WL 3619709 (N.D. Cal. Sept. 9, 2010) (concluding that "[t]he fact that an election scheme *may* incentivize strategic voting surely does not operate as a severe burden on the franchise" (emphasis in original)), *aff'd by Dudum v. Arntz*, 640 F.3d 1098 (9th Cir. 2011). This Court's holding that an election procedure that allows voters to vote strategically violates the Equal Protection Clause breaks new legal ground and is unlikely to be upheld on appeal given its potentially sweeping potential implications for long-accepted practices such as bullet voting.

### D. This Court Ordered an Improper Remedy.

Finally, Defendants will be able to establish on appeal that the remedy ordered by this Court is improper. That remedy—a recount of the ballots cast on Amendment 1 in the November 2014 election that discards the votes of any voters who voted on Amendment 1 but did not also vote for governor—would disenfranchise thousands of Tennessee voters who went to the polls with the expectation that their votes on the proposed constitutional amendments would be counted regardless of whether they voted for governor. Indeed, it is the Court's remedy for Defendants' alleged constitutional violations that would result in a fundamentally unfair election system in violation of the Due Process Clause, not Defendants' method of determining whether Amendment 1 had passed in the first place. *See, e.g.*, *Roe v. Alabama*, 68 F.3d 404, 406-08 (11th Cir. 1995) and *Griffin v. Burns,* 570 F.2d 1065, 1077-79 (1st Cir.1978).

## II. THE BALANCE OF HARMS WEIGHS IN FAVOR OF A STAY.

Harm is irreparable if it cannot be fully compensated by money damages, or if the nature of the injury makes money damages difficult to calculate. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002); *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992). The balance of harms in this case significantly favors granting a stay of the injunction ordering a recount pending appeal.

### A. The State Will Be Irreparably Harmed If It Is Required to Conduct a Recount.

This Court has ordered Defendants to conduct a recount of all 1,430,117 ballots cast in the November 2014 election to determine "whether Amendment 1 passed by a majority of those who voted in the governor's race." Based on information provided by the 94 County Election Administrators, the State estimates that it will cost over approximately $ 1 million to conduct such a recount and will take approximately six to eight weeks. *See* Declaration of Mark Goins attached as Exhibit 1 and incorporated by this reference. This cost does not include the time that the employees of each county election commission will have to spend preparing for and supervising a recount—time that these employees would otherwise spend performing the regular election duties. Should the Defendants prevail after a full adjudication of the merits, it will be impossible to recoup any of these costs. Furthermore, if the State prevails on the proper interpretation of article XI, section 3, then the citizens of the State will be irreparably injured in their ability to amend their governing charter in a manner which is presumed constitutional. See *Ne. Ohio Coal. for Homeless & Serv. Employees Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1011 (6th Cir. 2006); *Hunter v. Hamilton County Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011).

### B. Plaintiffs Will Not Be Harmed by a Stay of the Recount, but Voters Whose Votes Would Be Discarded in the Recount Will Be Irreparably Harmed.

Plaintiffs will suffer no harm if a stay of the recount is granted, as the ballots cast in the November 2014 election (with the exception of Van Buren County, where a fire destroyed the ballots) have been fully preserved and will continue to be preserved until all appeals have been exhausted. Conversely, there are thousands of voters who will be irreparably harmed if the ordered recount is not stayed. Pursuant to this Court's order, Defendants are to conduct a recount of the votes cast in the November 2014 election—and with respect to Amendment 1 are to *only* count votes cast by voters who also voted in the governor's race. All other votes cast on Amendment 1 by otherwise qualified voters are not to be thrown out and discounted.

As the attached affidavits reflect, however, many of these voters were unaware that their vote on Amendment 1 would not be counted because they chose not to vote in the governor's race. *See* Affidavits of David Cassel, Mathilde Mellon, Aurora Wright, Miriam Thompson, Dr. Donald F. Thompson, Jennifer Hay, and Sarah Pope attached as Collective Exhibit 2 and incorporated by this reference. These individuals are all qualified voters who voted on Amendment 1 in the November 14 election, who deliberately chose not to vote in the governor's race for reasons other than trying to increase the likelihood that Amendment 1 would pass. The same voters all believed that their vote on Amendment 1 would count.

"The power to throw out a ballot . . . must be exercised very sparingly and with the idea in mind that . . . a group of voters are not to be disenfranchised except for compelling reasons." *Pierce v. Allegheny County Bd. of Elections*, 324 F.Supp.2d 684, 707 (W.D. Pa. 2003) (citing *Perles v. County Return Board*, 202 A.2d 538, 540 (Pa. 1964) (affirming the lower court's decision to count all of the absentee votes even though some but not all of the absentee votes might have been invalid)). Furthermore, the Sixth Circuit has recognized that "[m]embers of the public have

a 'strong interest in exercising the fundamental political right to vote.' That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful." *Hunter*, 635 F.3d at 244 (quoting *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006) (internal quotation marks omitted)).

Unless a stay is granted, thousands of voters will be irreparably harmed by having their votes on Amendment 1 declared invalid through no fault of their own. This substantial harm clearly weighs in favor of the granting of a stay pending appeal.

### C. Absent a Stay, the Public Interest Will Be Harmed.

Pursuant to Article I, section 4, clause 1 of the United States Constitution, states have the authority to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives[.]" Thus, the Supreme Court has long recognized that states have an interest in protecting the integrity, fairness, and efficiency of their election processes as means for electing public officials. *Bullock v. Carter*, 405 U.S. 134, 145 (1972). The Sixth Circuit has specifically recognized that there is a strong public interest against interfering with the electoral process immediately before an election. *Summit County Democratic Central & Executive Comm. v. Blackwell*, 388 F.3d at 551; *Cf., e.g., Purcell v. Gonzalez*, 127 S.Ct. 5, 7 (2006) ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, the risk will increase."); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("court can reasonably endeavor to avoid a disruption of the election process which might result from requiring precipitate changes"); *United States v. City of Philadelphia*, 2006 WL 3922115, at *2 (E.D. P. Nov. 7, 2006) ("Sensitivity to the highly time-sensitive nature of elections and the process leading up to them is appropriate and necessary to preserve comity between the states and the federal government.").

Unlike many other states, Tennessee does not provide for automatic recounts in elections. Instead, a recount may only be ordered within the context of an election contest and only under certain circumstances, such as a tie vote, a malfunction of a voting machine if the number of votes affected would be sufficient to change the result of the election, or an indication of fraud if the number of votes affected would be sufficient to change the results of the election. *See* Tenn. Code Ann. § 2-17-117. Because there is no provision for an automatic recount, state and county election officials have little experience, if any, with conducting a recount of ballots cast in a particular election. More importantly, state and county election officials have no experience with conducting a statewide manual recount of the magnitude ordered by this Court (over 1.4 million votes cast in the November 2014 general election).

The Declarations of election officials for Montgomery, Rutherford, Knox, Davidson and Shelby Counties all make clear that requiring a recount of the ballots cast in the November 2014 election before the August and November state and federal elections would significantly interfere with the electoral process and the election officials' ability to maintain the integrity of those elections. *See* Declaration of Vick Koelman attached as Exhibit 3 and incorporated by this reference; Declaration of Alan Farley attached as Exhibit 4 and incorporated by this reference; Declaration of Clifford Rogers attached as Exhibit 5 and incorporated by this reference; Declaration of Joan Nixon attached as Exhibit 6 and incorporated by this reference; and Declaration of Joe Young attached as Exhibit 7 and incorporated by this reference.

Given this lack of experience and familiarity with conducting recounts, as well as the numerous and significant duties specified in the attached Declarations that county election officials must perform in order to prepare for and conduct the August and November state and federal elections, an order mandating that the recount be conducted before those elections will inevitably
Case 3:14-cv-02182   Document 125   Filed 05/09/16   Page 13 of 16 PageID #: 3086

and irreparably result in "interference with orderly election administration" and threatens the fairness of the electoral process. *See Service Employees Intern. Union v. Husted*, 698 F.3d 341, 346 (6th Cir. 2012).

Finally, the ordered recount, which will require the disenfranchisement of thousands of voters, will result in irreparable harm to the State's interest in the integrity and fairness of its electoral process, as such disenfranchisement will undermine voters' confidence in the process and discourage participation in future elections. Moreover, because the Defendants counted the ballots on all four constitutional amendment on the November 2014 ballot in the same manner, the ordered recount will further undermine voters' confidence in the integrity of the election process and create uncertainty as to the validity of the other three amendments. Specifically, under the ordered recount, Defendants will only be counting votes cast on Amendment 1 by voters who also voted in the governor's race, but will be counting all votes cast on the other three amendments regardless of whether the voters voted in the governor's race.

Clearly, the balance of harm to the State, to the thousands of potentially disenfranchised voters and to the public interest weighs in favor of granting a stay of this Court's order to conduct a recount pending appeal.

## CONCLUSION

For these reasons, Defendants respectfully request that this Court grant their motion for a stay of this Court's order to conduct a recount of the votes cast on Amendment 1 in the November 2014 election pending appeal.

> Respectfully submitted,
>
> HERBERT H. SLATERY III
> Attorney General and Reporter

ANDRÉE S. BLUMSTEIN
Solicitor General

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER
Deputy Attorney General
Public Interest Division
Office of the Tennessee Attorney
General
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403
Janet.Kleinfelter@ag.tn.gov

/s/ Leslie Ann Bridges
LESLIE ANN BRIDGES
Senior Deputy of Public Protection Section
and Counsel to the Attorney General
P.O. Box 20207
Nashville, TN 37202
(615) 741-4710
Leslie.Bridges@ag.tn.gov

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of May, 2016, a copy of the foregoing Defendants' Motion has been served upon the following persons via the Electronic Case Filing (ECF) System:

William L. Harbison
C. Dewey Branstetter Jr.
Phillip F. Cramer
Hunter C. Branstetter
Sherrard & Roe, PLC
150 3rd Avenue South, Suite 1100
Nashville, Tennessee 37201
bharbison@sherrardroe.com
dbranstetter@sherrardroe.com
pcramer@sherrardroe.com
hbranstetter@sherrardroe.com

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER